RICHARD G. NOVAK (SBN 149303)
Richard G. Novak, A Professional Law Corp.
P.O. Box 5549
Berkeley, CA 94705
626-578-1175 (voice)
626-685-2562 (facsimile)
E-Mail: Richard@RGNLaw.com

SHAFFY MOEEL (SBN 238732)
Moeel Law Office
1611 Telegraph Avenue, Suite 806
Oakland, CA 94612-2147
415-735-5021 (voice)
415-967-3062 (facsimile)
E-Mail: Shaffy@MoeelLaw.com

Attorneys for Defendant
ROBERT ALVIN JUSTUS, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN CARRILLO (1) and<br><br>ROBERT ALVIN JUSTUS, JR. (2),<br><br>Defendants. | DEATH PENALTY CASE<br><br>Case No. 4:20-cr-00265-YGR<br><br>**DEFENDANT JUSTUS' NOTICE OF MOTION; MOTION TO COMPEL THE UNITED STATES ATTORNEY TO GIVE COUNSEL FOR THE DEFENDANT A REASONABLE OPPORTUNITY TO PRESENT INFORMATION WHICH MAY BEAR ON THE DECISION WHETHER TO SEEK THE DEATH PENALTY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL AND EXHIBITS THERETO**<br><br>BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, DISTRICT JUDGE<br><br>Hearing Date: October 28, 2020<br><br>Hearing Time: 2:00 P.M.<br><br>Location of Hearing: Courtroom 1 |

1

2      TO THIS HONORABLE COURT, PLAINTIFF, THE UNITED STATES OF

3  AMERICA, ALL DEFENDANTS, AND THEIR COUNSEL OF RECORD:

4  PLEASE TAKE NOTICE THAT at 2:00 p.m. on October 28, 2020, in the courtroom

5  of the Honorable Yvonne Gonzalez Rogers, District Judge, Defendant Robert Alvin

6  Justus, Jr., by and through his counsel of record, Richard G. Novak and Shaffy

7  Moeel, will and hereby does move this Court for an order compelling the United

8  States Attorney to provide counsel for Mr. Justus with a "reasonable opportunity to

9  present information which may bear on the decision whether to seek the death

10 penalty" as to Mr. Justus, as required by Justice Manual § 9-10.080, the due process

11 clause of the Fifth Amendment to the United States Constitution, the Sixth

12 Amendment to the United States Constitution and the Eighth Amendment to the

13 United States Constitution.

14      This motion is based upon this notice, the attached memorandum of points and

15 authorities, the attached declaration of counsel and exhibits thereto, the official

16 docket of the proceedings in this matter, the argument of counsel and all other

17 matters the Court may properly consider at the hearing on this motion.

18

19 Dated: September 28, 2020           Respectfully submitted,

20

21                                    RICHARD G. NOVAK
                                      SHAFFY MOEEL
22

23                                    /s/*Richard G. Novak*
                                      RICHARD G. NOVAK
24                                    Attorneys for Robert Alvin Justus, Jr.

25

26

27

28

                                      2

1

# TABLE OF CONTENTS

2

3

TABLE OF AUTHORITIES......................................................................................... ii

I.    INTRODUCTION ................................................................................1

II.   PROCEDURAL HISTORY ................................................................2

    Judicial Proceedings .............................................................................2

    The Government's Invocation of the Capital Case Protocol...............4

    The Status of Discovery ......................................................................5

    Mr. Justus' Detention Status ...............................................................6

III.  THE JUSTICE DEPARTMENT'S CAPITAL CASE PROTOCOL
     REQUIRES THE UNITED STATES ATTORNEY TO PROVIDE
     COUNSEL FOR MR. JUSTUS WITH A "REASONABLE
     OPPORTUNITY" TO PRESENT INFORMATION WHICH MAY
     BEAR ON THE DECISION WHETHER TO SEEK THE DEATH
     PENALTY..............................................................................................6

IV.   THIS COURT HAS THE AUTHORITY TO COMPEL THE UNITED
     STATES ATTORNEY TO COMPLY WITH THE "REASONABLE
     OPPORTUNITY" PROVISION OF THE CAPITAL CASE
     PROTOCOL..........................................................................................9

V.    COUNSELS' CONSTITUTIONAL AND ETHICAL OBLIGATIONS
     TO INVESTIGATE AND DEVELOP MITIGATION EVIDENCE
     CANNOT BE FULFILLED IN THE TIME FRAME ENVISIONED
     BY THE UNITED STATES ATTORNEY .......................................12

VI.   CONCLUSION ..................................................................................19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

3 <u>Cases</u>

4 *United States v. Benavides and Weber*, Case No. 06-cr-62 (D. Mt.) .................2, 13

5 *United States v. Chavez*, Case No. 5:15-cr-00285-LHK, (N.D. Ca.) .................1, 12

6 *United States v. Grace*, 526 F.3d 499, 508 (9th Cir. 2008)................................2, 10

7 *United States v. McGill*, Case No. 09-cr-2856-IEG, 2010 U.S. Dist.
8     LEXIS 37839 (S.D. Ca.) ...........................................................................1, 12

9 *United States v. Pedersen and Grigsby*, Case No. 3:12-cr-00431-HA (D.
    Or.) ................................................................................................................2, 13

10 *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991
11     (1976) ...............................................................................................................14

11

12 <u>Statutes</u>

13 18 U.S.C. § 2 ..........................................................................................................1, 2, 5

14 18 U.S.C. § 1111(b)...........................................................................................................1

15 18 U.S.C. § 1114(1) ......................................................................................1, 2, 3, 5

16 18 U.S.C. § 1114(3) ........................................................................................................5

17 18 U.S.C. § 3592(a) ...................................................................................................9, 10

18 28 U.S.C. § 1651 ............................................................................................................10

19 Federal Death Penalty Act of 1994.................................................................................9

20 <u>Other Authorities</u>

21 Justice Manual Title 9-10.080 .............................................................................8, 12

22 Criminal Justice Act (CJA) Guideline.....................................................................11

23 *Guide to Judiciary Policy*, Vol. 7, Defender Services, Chapter 6, § 670:
    Scheduling of Federal Death Penalty Case Authorization to
24     Control Costs (February 6, 2019 rev.).......................................................1, 12

25 Justice Manual Title 9-10.010 ....................................................................................7

26 Justice Manual Title 9-10.070 ....................................................................................8

27 Justice Manual Title 9-10.080A.(4)............................................................................9

28

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The potential capital prosecution of Mr. Justus arises from the alleged shooting by co-defendant Steven Carrillo of two persons employed to protect the United States Courthouse in Oakland, California on May 29, 2020.  Mr. Justus is charged with murder in violation of 18 U.S.C. § 1114(1), §2(a).  The charged offense is punishable by death.  18 U.S.C. §1111(b).

The United States Attorney in this district has an obligation to provide Mr. Justus' counsel with a "reasonable opportunity to present information which may bear on the decision whether to seek the death penalty."  Justice Manual, Title 9-10.080.  This Court has the authority to set a schedule for Mr. Justus' counsel to make that presentation.  *Guide to Judiciary Policy*, Vol. 7, Defender Services, Chapter 6, § 670: Scheduling of Federal Death Penalty Case Authorization to Control Costs (February 6, 2019 rev.); *United States v. Chavez*, Case No. 5:15-cr-00285-LHK, (N.D. Ca.), Doc. No. 736, *Case Management Order* (entered June 15, 2019); *United States v. McGill*, Case No. 09-cr-2856-IEG, 2010 U.S. Dist. LEXIS 37839 (S.D. Ca.) Apr. 16, 2010); *United States v. Pedersen and Grigsby*, Case No. 3:12-cr-00431-HA (D. Or.), Doc. No. 140, *Order* (entered July 2, 2013); *United States v. Benavides and Weber*, Case No. 06-cr-62 (D. Mt.), Doc. No. 123 at 7, *Order Granting Motion To Amend Scheduling Order* (entered Oct. 21, 2008); *see, generally United States v. Grace*, 526 F.3d 499, 508 (9th Cir. 2008).

The deadlines proposed by the United States Attorney for Mr. Justus' counsel to make that presentation (the first approximately 70 days after the appointment of counsel and the second approximately 115 days after the appointment of counsel) do not provide counsel with a "reasonable opportunity" both because of the complexity of this matter and because of the significant impairments in the defense function that have accompanied the COVID-19 pandemic.

1    Mr. Justus moves this Court to compel the United States Attorney to provide

2  his counsel with that reasonable opportunity, as more fully explained below.

3                                          **II.**

4                            **PROCEDURAL HISTORY**

5        **Judicial Proceedings**

6        On June 15, 2020, the United States filed against Mr. Justus a *Criminal*

7  *Complaint* alleging that he *aided and abetted* the murder (count one) and the

8  attempted murder (count two) of "a person assisting an officer or employee of the

9  United States Government in the performance of official duties," in violation of 18

10 U.S.C. §§ 1114(1), 1114(3) and 18 U.S.C. § 2.  (Doc. No. 1 in Case No. 4:20-mj-

11 70771-MAG)  The affidavit of FBI Special Agent Brett Woolard ("SA Woolard")

12 was filed in support of the *Criminal Complaint* against Mr. Justus (hereinafter

13 "Woolard Affidavit I").

14       On June 16, 2020, the United States filed against Mr. Carrillo a separate

15 *Criminal Complaint* alleging murder (count one) and attempted murder (count two)

16 of "a person assisting an officer or employee of the United States Government in the

17 performance of official duties, in violation of 18 U.S.C. §§ 1114(1), 1114(3).  (Doc.

18 No. 1 in Case No. 4:20-mj-70785-MAG).  A second affidavit of SA Woolard was

19 filed in support of the *Criminal Complaint* against Mr. Carrillo (hereinafter Woolard

20 Affidavit II).

21       According to SA Woolard, on May 29, 2020:

22              Carrillo opened fire on two guards with an assault rifle

23              from inside a van.  One guard died from his wounds.

24              The other guard was seriously wounded.  Eight days

25              later, on June 6, 2020, Carrillo murdered a Santa Cruz

26              County Sheriff's Deputy during an encounter in Ben

27              Lomond, California.  Following a confrontation with law

28              enforcement officers and a subsequent carjacking,

                                           2

1    Carrillo was arrested in possession of the assault rifle that
2    he had used to murder the courthouse guard."

3  (Woolard Affidavit II at ¶7)

4    SA Woolard reports, in the affidavit in support of the *Criminal*
5  *Complaint* against Mr. Justus, as follows:

6    On the morning of June 11, 2020, [] Justus and his
7    parents drove to the Federal Building [] in San Francisco.
8    Justus and his parents [] informed courthouse security
9    officers that they wanted to visit the FBI.  At 11:00 a.m.,
10   Justus began a consensual interview with FBI Agents.

11  (Woolard Affidavit I at ¶40)

12   Justus stated that he met Carrillo on Facebook and the
13   two arranged to meet on May 29 for Carrillo to give
14   Justus a ride to protests that were taking place in
15   Oakland.  Justus and Carrillo met at the San Leandro
16   BART station, where Carrillo arrived in white van.

17  (Woolard Affidavit I at ¶41)

18   According to Justus, when Justus originally got in the
19   van, Carrillo offered him body armor and a firearm, but
20   Justus declined to use them.  Justus stated that he briefly
21   handled the firearm but then dropped it on the seat.
22   Justus stated that, at that point, Carrillo instructed Justus
23   to drive the van…

24  (Woolard Affidavit I at ¶ 42)[1]

25

26

27

28

---

[1] SA Woolard did not include in his affidavit that Mr. Justus informed him that when Mr. Carrillo instructed Mr. Justus to drive the van, that Mr. Carrillo was pointing an AR-15 rifle at him and accused him of being "a cop or a rat."  (Novak Decl.  ¶3)

he

> Justus said he did not want to participate in the murder,
> but that he felt that he had to participate because he was
> trapped in the van with Carrillo… Justus responded that
> he stayed with Carrillo because Justus was trying to think
> of ways to talk Carrillo out of his plan.  Justus said
> Carrillo expressed an interest multiple times in shooting a
> helicopter, police officers, and civilians, but that Justus
> talked him out of it.  They eventually parked near the
> Guard Post.  As Justus drove the white van away from
> the Guard Post, Carrillo opened the passenger-side
> sliding door and began shooting.

(Woolard Affidavit I at ¶43)

On June 25, 2020, a grand jury in this district returned a two-count indictment against both Mr. Carrillo and Mr. Justus.  Count one charges both Mr. Carrillo and Mr. Justus with premeditated murder in violation of 18 U.S.C. §§ 1114(1), 2(a).  Count two charges both Mr. Carrillo and Mr. Justus with attempted murder violation of 18 U.S.C. §§ 1114(3), ), 2(a) (Doc. No.12)  Count one is punishable by death.  18 U.S.C. § 1111(b).

On July 6, 2020, this Court appointed undersigned counsel Ms. Moeel as "Lead Counsel" and undersigned counsel Mr. Novak as "Learned Counsel."  (Doc. No. 20)  On August 19, 2020, this Court conducted a status conference.  On August 27, 2020, pursuant to the stipulation of the parties, this Court declared this case "complex due to the nature of the prosecution and the presence of two defendants, and the COVID-19 pandemic has created many challenges in many aspects of the judicial process…"  (Doc. No. 30 at 1, ll. 25-26)

**The Government's Invocation of the Capital Case Protocol**

On July 30, 2020, counsel for the United States requested that counsel for Mr. Justus provide "your views on the United States' death-penalty position" no later

4

1    than September 15, 2020, "so that I may provide my recommendations no later than

2    September 28, 2020."  On July 31, 2020, counsel for Mr. Justus informed counsel

3    for the United States that the 45-day time frame proposed in their letter of July 30

4    "will preclude us from undertaking the type of investigation that is truly necessary

5    before we can competently communicate to the government the mitigating factors

6    that we believe the government should consider, as set forth in the capital case

7    protocol at Title 9-10.080."

8         On August 17, 2020, counsel for the United States offered to postpone his

9    self-imposed September 28, 2020 deadline to November 12, 2020.  On September 2,

10   2020, counsel for Mr. Justus informed counsel for the United States that the modest

11   extension of time he proposed "does not make a material difference in our ability to

12   prepare for such a presentation under the circumstances of this case at this time."

13   Thereafter, the parties met and conferred concerning the scheduling of the briefing

14   of this motion and the responsive pleadings that will follow.[2]

15        **The Status of Discovery**

16        The government has provided Mr. Justus with a significant amount of

17   discovery over the past 90 days.  Redacted versions of seven discovery cover letters,

18   each containing a rough index of discovery are attached hereto.  The seventh

19   production wave has not yet been received.  (Declaration of Richard G. Novak

20   ("Novak Decl.") Ex A.)

21        The discovery can generally be broken down into the following component

22   parts:  FBI Reports, ATF Reports, Santa Cruz Reports, Oakland Police Department

23   Reports, "Other" Reports, Photographs, Social Media materials in native file

24   _____

25   [2] Quotations from the parties' written communications are provided only for the
     purpose of setting forth the chronology that leads to the filing of this motion, and to
26   demonstrate that the parties did meet and confer on the disputed issue prior to
     undertaking litigation.  The letters also include information implicated by Federal
27   Rule of Criminal Procedure 11(c)(1) and, therefore, are not attached here or lodged
     for under seal filing.

28

formats, audio/video material including law enforcement body camera footage, search warrant materials and "miscellaneous" materials.  The "miscellaneous" materials include native files for numerous digital devices, including but not limited to cellular telephones and tablets.  The Court has issued a protective order with respect to the handling of discovery.  (Doc. No. 23)

**Mr. Justus' Detention Status**

Mr. Justus was arrested by law enforcement on June 11, 2020 and ordered detained on June 19, 2020.  (Doc. No. 7)  Mr. Justus is detained at the Santa Rita Jail.  Well before his detention and continuing to today, the Alameda County Sheriff has suspended all visiting at the Santa Rita Jail, because of the COVID-19 epidemic, with the exception of attorneys who may have "Non-Contact visits [] in attorney/client designated, glass-partitioned booths."[3]  There is not presently any information as to when the Alameda County Sheriff will modify its operations so as to permit Mr. Justus to have face to face contact visits with his counsel and other members of his defense team.

**III.**

**THE JUSTICE DEPARTMENT'S CAPITAL CASE PROTOCOL REQUIRES THE UNITED STATES ATTORNEY TO PROVIDE COUNSEL FOR MR. JUSTUS WITH A "REASONABLE OPPORTUNITY" TO PRESENT INFORMATION WHICH MAY BEAR ON THE DECISION WHETHER TO SEEK THE DEATH PENALTY**

The Attorney General's capital case review process is set forth at Title 9-10.000 of the Department of Justice's "Justice Manual", which is available at https://www.justice.gov/jm/jm-9-10000-capital-crimes.  (Novak Decl. Ex. B.)  The capital case review process controls all potential and active prosecutions in which a

---

[3] https://www.alamedacountysheriff.org/dc_srj_visiting.php.

6

1   defendant may be or has been charged with a federal offense punishable by death.

2   (Justice Manual Title 9-10.010) ("This Chapter sets forth the policies and procedures

3   for all Federal cases in which a defendant is charged, or could be charged, with an

4   offense subject to the death penalty. The provisions in this Chapter apply regardless

5   of whether the United States Attorney or Assistant Attorney General intends to

6   charge the offense subject to the death penalty or to request authorization to seek the

7   death penalty for such an offense.")

8          From the perspective of defense counsel in a federal death penalty matter, the

9   capital case review process can be viewed as a two-step process.  The first step

10  relates to the decision-making process of the United States Attorney's Office in

11  which the prosecution is pending or may be filed.  Under the capital case review

12  process, the United States Attorney submits to the Assistant Attorney General for the

13  Criminal Division a confidential recommendation as to whether to seek the death

14  penalty.  (Justice Manual Title 9-10.080)

15         In many cases, that confidential recommendation must take into consideration

16  and communicate to the Assistant Attorney General information provided by a

17  defendant's attorney setting forth reasons why the government should *not* seek the

18  death penalty.  "In any case in which the United States Attorney [] *is contemplating*

19  requesting authorization to seek the death penalty or otherwise believes it would be

20  useful to the decision-making process to receive a submission from defense counsel,

21  the United States Attorney [] *shall give counsel for the defendant a reasonable*

22  *opportunity* to present information for the consideration of the United States

23  Attorney [] which may bear on the decision whether to see the death penalty."

24  (Justice Manual Title 9-10.080 (emphases added))

25         There are cases, of course, where the United States Attorney determines at an

26  early stage of an investigation or prosecution that it will *not* request authorization to

27  seek the death penalty.  The capital case review process refers to such a situation as

28  an "Expedited Decision Submission."  (Justice Manual Title 9-10.070)  Generally

7

speaking, where the United States Attorney concludes that a case qualifies for expedited decision, the United States Attorney need not give counsel for the defendant an opportunity to present information for their consideration.

Where the United States Attorney "is contemplating" seeking the death penalty and does *not* seek an expedited decision, the United States Attorney submits to the Assistant Attorney General for the Criminal Division a "prosecution memorandum" which must include, *inter alia*, "applicable mitigation factors under 18 U.S.C. § 3592(a)" as well as the United States Attorney's "conclusion on whether all the aggravating factor(s) found to exist sufficiently outweigh all the mitigation factor(s) found to exist to justify a sentence of death." Justice Manual Title 9-10.080A(4).The United States Attorney must also provide "any documents or materials provided by defense counsel to the United States Attorney…" (Justice Manual Title 9-10.080(F)

A non-exclusive list of the "applicable mitigation factors" referred to in the Justice Manual are set forth in the Federal Death Penalty Act of 1994. It provides, in part:

(a) Mitigating factors. In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1) Impaired capacity. The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.
(2) Duress. The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

8

(3) Minor participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) Equally culpable defendants. Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(5) No prior criminal record. The defendant did not have a significant prior history of other criminal conduct.

(6) Disturbance. The defendant committed the offense under severe mental or emotional disturbance.

(7) Victim's consent. The victim consented to the criminal conduct that resulted in the victim's death.

(8) Other factors. *Other factors* in the defendant's background, record, or character or *any other circumstance of the offense* that mitigate against imposition of the death sentence.

18 U.S.C. § 3592(a) (emphases added).

## IV.

**THIS COURT HAS THE AUTHORITY TO COMPEL THE UNITED STATES ATTORNEY TO COMPLY WITH THE "REASONABLE OPPORTUNITY" PROVISION OF THE CAPITAL CASE PROTOCOL**

"The district court is charged with effectuating the speedy and orderly administration of justice." *United States v. Grace*, 526 F.3d 499, 508 (9th Cir. 2008). There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management orders designed to ensure that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly. *Id.*; *see also* 28 U.S.C. § 1651 (this court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.")

1    A district court's authority to establish a schedule of dates for resolution of

2  whether the government will seek the death penalty was well-established even before

3  the Ninth Circuit decision in *Grace*, which was issued on May 15, 2008.  In 2007,

4  the Judicial Conference of the United States approved a Criminal Justice Act (CJA)

5  Guideline which provided that:

6              the court should establish a schedule for resolution of

7              whether the Government will seek the death penalty.

8              The schedule should include dates for: (1) the submission

9              by the defendant to the United States Attorney of any

10             reasons why the Government should not seek the Death

11             penalty.

12 (*Memorandum* from Honorable John Gleeson, Chair, Judicial Conference of the

13 United States, Committee on Defender Services, March 25, 2008, Novak Decl.

14 Ex. C.)

15    Guidance from the Judicial Conference further provided that "[t]he schedule

16 should be flexible and subject to extension for good cause at the request of either

17 party (which may, as appropriate, be in an ex parte application of proceeding).  It

18 should allow for reasonable time for counsel for the parties to discharge their

19 respective duties with respect to the question of whether the death penalty should be

20 sought, taking into account such factors as the factual complexity of the case,

21 continuing investigations, the potential for successful plea negotiations *and any other*

22 *relevant factors*."  *Id*. (emphasis added).

23    The current *Guide to Judiciary Policy* adds "the anticipated or actual progress

24 of discovery" to the non-exclusive list of factors which may have bearing on the

25 court's timing decisions.  *Guide to Judiciary Policy*, Vol. 7, Defender Services,

26 Chapter 6, § 670: Scheduling of Federal Death Penalty Case Authorization to Control

27 Costs (February 6, 2019 rev.).

28

10

1    While the government may argue that this Court has no role to play in

2  scheduling the defense presentation required by Justice Manual Title 9-10.080, the

3  Judicial Conference of the United States has concluded otherwise for over a decade

4  and district courts within and outside the Ninth Circuit have exercised that inherent

5  authority in numerous potential capital cases since then.

6    Most recently in this district, Judge Koh granted, over the government's

7  objection, a defendant's motion to compel the United States Attorney to provide the

8  defendant's counsel with additional time to make its local presentation. *United States*

9  *v. Chavez*, Case No. 5:15-cr-00285-LHK, (N.D.Ca.), Doc. No. 736, *Case*

10  *Management Order* (entered June 15, 2019).

11    The Southern District of California has also found that it possessed, and

12  chose to exercise, the discretion to order DOJ to delay the local presentation to

13  allow sufficient time for the defendant to present mitigating evidence. *United States*

14  *v. McGill*, Case No. 09-cr-2856-IEG, 2010 U.S. Dist. LEXIS 37839 (S.D. Ca., Apr.

15  16, 2010).  Judge Irma E. Gonzalez wrote:

16    The question here, then, is whether this Court can issue a

17    scheduling order which effectively requires the

18    Department of Justice to delay its consideration of

19    whether to seek the death penalty. Such an order can only

20    be justified as an exercise of the Court's inherent

21    authority if it furthers the goal of 'speedy and orderly

22    administration of justice,' or is 'designed to ensure that

23    the relevant issues to be tried are identified, that the

24    parties have an opportunity to engage in appropriate

25    discovery and that the parties are adequately and timely

26    prepared so that the trial can proceed efficiently and

27    intelligibly' . . . . The Court believes a scheduling order as

28    requested by defendant, allowing additional time for

11

1    presentation of mitigation evidence to the U.S. Attorney,

2    furthers each of these goals." *Id*. at *8-9.

3    (*See*, *also*, *United States v. Pedersen and Grigsby*, Case No. 3:12-cr-00431-HA

4    (D. Or.), Doc No. 140, *Order* (entered July 2, 2013) (granting motion to extend

5    time for local presentation); *United States v. Benavides and Weber*, Case No.

6    06-cr-62 (D. Mt.), Doc. No. 123 at 7, *Order Granting Motion To Amend Scheduling*

7    *Order* (entered Oct. 21, 2008) (holding that "Court has the authority to set a date for

8    each stage of the mitigation presentation").

9    **V.**

10    **COUNSELS' CONSTITUTIONAL AND ETHICAL OBLIGATIONS**

11    **TO INVESTIGATE AND DEVELOP MITIGATION EVIDENCE**

12    **CANNOT BE FULFILLED IN THE TIME FRAME**

13    **ENVISIONED BY THE UNITED STATES ATTORNEY**

14    Effective representation of individuals who *may* face the federal death penalty

15    requires that counsel initiate a comprehensive mitigation investigation at the earliest

16    possible time, because the recommendation of the United States Attorney as to

17    whether or not the government should seek the death penalty is typically given great

18    deference.  The "reasonable opportunity to present information" gives counsel a

19    limited and unpredictable period of time to assemble a defense team that includes a

20    skilled mitigation specialist and other professionals, to identify and develop all

21    potential mitigation information, and to assemble and present that information in a

22    form which may be persuasive to the United States Attorney.  The time frame

23    envisioned by the United States Attorney in this case deprives Mr. Justus of that

24    reasonable opportunity, presents counsel with a Hobson's choice, and violates Mr.

25    Justus' right to capital decisions of heightened reliability.

26    As the Supreme Court stated decades ago,

27    [t]he penalty of death is qualitatively different from a

28    sentence of imprisonment, however long. Death, in its

12

1
2
3
4
5
6
7
8
9

finality, differs more from life imprisonment than a 100-
year prison term differs from one of only a year or two.
Because of that qualitative difference, there is a
corresponding difference in the need for reliability in the
determination that death is the appropriate punishment in
a specific case. *Woodson v. North Carolina*, 428 U.S.
280, 305, 96 S. Ct. 2978, 2991 (1976) (holding that a
state death penalty statute violated the Eighth and
Fourteenth Amendment).

10   "All capital cases require exceptional time and efforts simply due to the nature

11 of the proceedings."  (Decl. of Emily Olson-Gault, Director and Chief Counsel of

12 the American Bar Association Death Penalty Representation Project ("Olson-Gault

13 Decl.") ¶11, Novak Decl. Ex. D)  "Capital defense counsel and their team must

14 conduct thorough, independent investigations related to both the guilt and penalty

15 phases of the trial."  Olson-Gault Decl. ¶ 17. As part of the requisite investigation,

16 capital cases also require comprehensive, multigenerational psychosocial history

17 construction based on "exhaustive investigation."  Olson-Gault Decl. ¶ 18.

18
19
20
21
22
23
24
25
26
27
28

The areas for investigation include: (1) medical history,
including "hospitalizations, mental and physical illness or
injury, alcohol and drug use, pre-natal and birth trauma,
malnutrition, developmental delays, and neurological
damage;" (2) family and social history; (3) educational
history; (4) military service; (5) employment and training
history; and (6) prior juvenile and adult correctional
experience" as well as "multi-generational family history,
genetic disorders and vulnerabilities, as well as multi-
generational patterns of behavior; . . . religious, gender,
sexual orientation, ethnic, racial, cultural and community

13

1          influences; socio-economic, historical, and political

2          factors.

3    Olson-Gault Decl. ¶19 (internal citations omitted).

4          It is necessary to locate and interview the client's family

5          members (who may suffer from some of the same impairments

6          as the client), and virtually everyone else who knew the client

7          and his family, including neighbors, teachers, clergy, case

8          workers, doctors, correctional, probation, or parole officers and

9          others and records—from courts, government agencies, the

10         military, employers, etc. . . . should be requested concerning not

11         only the client, but also his parents, grandparents, siblings,

12         cousins, and children.

13   Olson-Gault Decl. ¶21 (internal quotations omitted).

14         Team members must conduct in-person, face-to-face, one-on-

15         one interviews with the client, the client's family, and other

16         witnesses who are familiar with the client's life, history, or

17         family history or who would support a sentence less than death.

18         Multiple interviews will be necessary to establish trust, elicit

19         sensitive information and conduct a thorough and reliable life-

20         history investigation.

21   Olson-Gault Decl. ¶23.

22         "This time-intensive, in-person contact is essential for establishing a

23   relationship of trust with the client, client's family, and other witnesses, which is

24   indispensable to effective representation."  Olson-Gault Decl. ¶24

25         In-person visits with the client and client's family are also a

26         crucial tool in dictating the defense team's choices regarding

27         necessary mental health screening and experts, which are

28         especially important given the near-ubiquity of mental health

                                    14

1                 issues in capital cases. Defense counsel's observations of the

2                 client's mental state are a necessary piece of the puzzle, as are

3                 the observations of a member of the defense team specifically

4                 trained to screen for disorders and recommend follow-up

5                 investigation and appropriate experts. In many cases, the results

6                 of such observation render a psychologist or other mental health

7                 expert [] a needed member of the defense team.

8  Olson-Gault Decl. ¶25 (internal quotations and citations omitted).

9                 Additionally, expert evaluations of the client are time-

10               consuming, particularly for issues related to intellectual

11               disability and mental illness or competency. Creating a

12               competent and reliable mental health evaluation consistent with

13               prevailing standards of practice is a time-consuming and

14               expensive process. In order to ensure the heightened reliability

15               of such evaluations, a thorough investigation must first be

16               conducted. Counsel must compile extensive historical data, as

17               well as obtain a thorough physical and neurological

18               examination. Diagnostic studies, neuropsychological testing,

19               appropriate brain scans, blood tests or genetic studies, and

20               consultation with additional mental health specialists may also

21               be necessary. [T]he mitigation specialist provides social history

22               information to experts to enable them to conduct competent and

23               reliable evaluations. Judgment calls regarding which expert

24               evaluations are recommended are necessarily the product of in-

25               person visits between the client and the defense team and are

26               informed by a comprehensive and thorough investigation.

27  Olson-Gault Decl. ¶27 (internal quotations and citations omitted).

28

1    Under "normal" conditions, the scheduling suggested by the United States

2    Attorney in this case is clearly not adequate to permit counsel to competently

3    identify, investigate, develop and present information which may bear on the

4    decision whether to seek the death penalty.  During the present pandemic, the

5    scheduling is, to be frank, irrational.  "The radical restrictions of court access and

6    inability to conduct field investigation or visit with clients is necessarily disruptive

7    to the core functions of defense teams."  (Declaration of Cassandra Stubbs, Director

8    of the Capital Punishment Project of the American Civil Liberties Union ("Stubbs

9    Decl.") ¶ 9, Novak Decl. Ex. E.)

10           Much of this detailed and time-intensive investigative and

11           presentation defense work cannot be done remotely and cannot

12           be achieved during time of social distancing. Witness

13           interviewing and preparation, record collection, and evidentiary

14           presentations, including defense team presentations to trial

15           prosecutors deciding whether to seek death are three illustrative

16           examples of the kinds of core defense team work that are

17           directly impacted by the pandemic's disruption.

18    Stubbs Decl. ¶12.

19           Witness interviewing and preparation will be necessarily

20           paused during the time of social distancing orders while in-

21           person interviewing is suspended. Phone calls or video calls are

22           an insufficient substitute. They do not guarantee privacy or

23           safety to the witness, they lack the necessary trust for such a

24           call, and they deprive the interviewer of important nonverbal

25           cues and evidence.

26    Stubbs Decl. ¶13.

27           Record collection is also likely to be significantly slowed and in

28           some instances paused, during the time of court closures and

16

social distancing. Mitigation specialists can, and should, search
on-line court records and databases for available information
during this shut down period. Many relevant records, however,
are not electronically available. Court records may require
travel to courthouses or public record requests of other court
clerks. In those cases, when travel is not possible, and when
court staff are not processing non-emergency requests, these
record-collection functions inevitably will be delayed. A wide
range of other categories of records are likely to be delayed by
staffing shortages with the requesting agencies, including, for
example, the client's medical records, employment records,
school records and military records.

Stubbs Decl. ¶19.

These significant delays in investigation and preparation have a
cascading impact on the defense team's ability to prepare
witnesses and their cases. For example, when a team's access to
court records and medical records is delayed, their ability to
provide an accurate and complete medical history for any
mental health experts will be delayed. This in turn means that
the hiring of mental health experts, and in some cases, the
evaluation of clients by already retained mental health experts,
must be delayed not just until when the prisons permit
evaluations again, but until the teams have compiled the
necessary precursor records.

Stubbs Decl. ¶20 (internal quotations and citations omitted).

Presentations to committees charged with the decision of
whether to recommend authorization of the death penalty in
individual cases are another category of defense team work that

17

1           will be impacted by the social distancing orders.  It is

2           imperative that defense teams have an adequate opportunity to

3           develop and present mitigating evidence at these presentations.

4           The mitigation investigation is crucial to persuading the

5           prosecution not to seek death at formal authorization meetings.

6 Stubbs Decl. ¶23 (internal quotations and citations omitted).

7      As the *Guide to Judiciary Policy* counsels, the "reasonable opportunity" under

8 the *Justice Manual* must, from the Court's perspective, take into consideration the

9 factual complexity of the case, continuing investigations, the potential for successful

10 plea negotiations, the status of discovery and "any other relevant factors."

11      The original September 15, 2020 deadline set by the Government in this

12 matter was a bit more than two months after this Court's July 6, 2020 order

13 appointing counsel.  Counsel diligently, if not aggressively, moved to establish the

14 core capital defense team required under the ABA Guidelines, and the Court's

15 funding order was issued on August 4, 2020.  The government has produced a vast

16 amount of discovery, as described above.

17      Beyond the complexity that characterizes every potential capital prosecution

18 and counsel's duty to investigate, develop and present the mitigating factors that

19 may counsel against seeking the death penalty, certain aspects of this matter make it

20 even more complex.  Especially complicating this matter is the government's

21 allegation that *Mr. Justus* premeditated the murder allegedly committed by *Mr.*

22 *Carrillo*.  While SA Woolard does not attribute to Mr. Justus any motive for

23 engaging in the charged conduct, he does state in the affidavit in support of the

24 complaint against Mr. Carrillo that Mr. Carrillo had links to what he calls "the

25 Boogaloo movement."  (Woolard Affidavit II at ¶¶ 35-37)  He describes "Boogaloo"

26 as "a term used by extremists to reference a violent uprising or impending civil war

27 in the United States."  He states that while "the Boogaloo movement is not a defined

28 group, and I believe that, in general, followers of the Boogaloo ideology may

18

1   identify as militia and share a narrative of inciting a violent uprising against
2   perceived government tyranny." (Woolard Affidavit II at ¶¶ 37)  Mr. Justus' counsel
3   and other members of his defense team are obliged to conduct an independent
4   investigation of the extent to which this alleged motive of Mr. Carrillo can be
5   imputed to Mr. Justus.

6        The COVID-19 pandemic has significantly interfered with the ability of Mr.
7   Justus' counsel and other members of his defense team to undertake the type of
8   mitigation investigation that is required by the Fifth, Sixth and Eighth Amendments
9   to the U.S. Constitution within the time frames proposed by the government in this
10  case.  No member of Mr. Justus' defense team has had a contact visit with him, and
11  Mr. Justus' ability to review discovery and documents collected by his team that are
12  directly relevant to mitigating factors counseling against a decision to seek death are
13  significantly impaired by the public health limitations on contact visits with him.
14  Interviews and record collection are significantly delayed, especially with respect to
15  records in the possession of third-party government agencies.  (Novak Decl.  ¶¶9-11)

16                                    **VI.**
17                              **CONCLUSION**

18        This Court has broad discretion to set the deadline at issue.  The government's
19  view of the time frame required for counsel to have a "reasonable opportunity to
20  present information which may bear on the decision whether to seek the death
21  penalty" fails to take into consideration the complexity of this case, the nature of the
22  discovery, and the barriers presented by the pandemic to an effective and
23  constitutionally adequate mitigation investigation.

24        Counsel respectfully suggest that the time frame that *would* provide a
25  "reasonable opportunity" cannot be even preliminarily set until there is a clear
26  indication that the well-established barriers to effective representation described
27  herein begin to disappear.  Counsel believe that once the Alameda County Sheriff
28  lifts the ban on contact visits between counsel and defendants *and* permits other

legal professionals such as mitigation specialists and forensic experts to have contact legal visits with defendants, Mr. Justus and the government should meet and confer in order to see if an agreement can be reached as to when the local presentation required under the capital case protocol will occur.

While Mr. Justus' entire defense team is working diligently on this matter, and some aspects of that work such as discovery review is not directly impacted by the pandemic, the defense team cannot be expected to make significant progress on, let alone complete, the record collection, independent investigation, mitigation interviews and evaluations that are substantially delayed and, in some instances, precluded, by the current public health crisis.

Mr. Justus respectfully requests that this Court compel the United States Attorney to provide his counsel with a reasonable opportunity to prepare for a mitigation presentation on his behalf, and that it set a further status conference in 90 days at which the Court and the parties can reassess the conditions which presently interfere with preparation for that presentation.

Dated: September 28, 2020                    Respectfully submitted,


                                             RICHARD G. NOVAK
                                             SHAFFY MOEL


                                             /s/*Richard G. Novak*
                                             RICHARD G. NOVAK
                                             Attorneys for Robert Alvin Justus, Jr.

# <u>DECLARATION OF RICHARD G. NOVAK</u>

I, RICHARD G. NOVAK, declare as follows:

1.     Along with Shaffy Moeel, I am counsel of record for defendant Robert Alvin Justus, Jr. (Mr. Justus) in this matter.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     This declaration is filed in support of Mr. Justus' *Motion to Compel the United States Attorney to Give Counsel for the Defendant  a Reasonable Opportunity to Present Information Which May Bear on the Decision Whether to Seek the Death Penalty*.

3.     During his recorded interview on June 20, 2020, Mr. Justus told SA Woolard that when he first got in Mr. Carrillo's van to go to the protest, Mr. Carrillo moved to the back of the van, pulled the curtain back, started pulling out guns, set one in his lap and began to fill magazines with ammunition.  According to the recording produced by the government, Mr. Justus told Mr. Carrillo, "I don't like this, I am not cool with this."  Mr. Justus explained to SA Woolard that Mr. Carrillo then casually pointed an AR-15 rifle at him with his finger on the trigger and asked Mr. Justus if he is "a cop or a rat."  SA Woolard then asked Mr. Carrillo, "When he is filling magazines, what are you thinking at that point."  Mr. Justus responded, "I am going to fucking die."  (Recorded FBI Interview of Robert Justus, June 20, 2020 at 4:23:44 p.m. to 4:24:49 p.m., Bates Numbers US 800104-US 800105, produced to Mr. Justus on or about July 2, 2020.)

4.     Attached to this declaration as Exhibit A are true and correct but redacted copies of seven discovery transmittal letters provided by the government to counsel for Mr. Justus.  The most recently discovery transmittal letter was received on September 25, 2020.

5.     Attached to this declaration as Exhibit B is a true and correct copy of Title 9-10.000 et seq. of the United States Department of Justice's Justice Manual.

6.     Attached to this declaration as Exhibit C is a true and correct copy of a March 25, 2008 memorandum from the Honorable John Gleeson, Chair, Judicial Conference of the United States, Committee on Defender Services, and the then newly adopted Section 6.04 of the Guidelines for the Administration of the Criminal Justice Act and Related Statutes, which constitutes Volume 7 of the Guide to Judiciary Policies and Procedures.

7.     Attached to this declaration as Exhibit D is the April 2, 2020 declaration of attorney Emily Olson-Gault, Director and Chief Counsel of the American Bar Association Death Penalty Representation Project.

8.     Attached to this declaration as Exhibit E is the April 1, 2020 declaration of attorney Cassandra Stubbs, Director of the Capital Punishment Project of the American Civil Liberties Union.

9.     Mr. Justus' defense team has regular VTC contacts with Mr. Justus, but no member of Mr. Justus' defense team has had a face to face contact visit with Mr. Justus since the outset of this case because the Alameda County Sheriff has suspended all visits with all detainees at the Santa Rita jail, and only attorneys may have non-contact visits through glass partitions.

10.     Mr. Justus' defense team has had preliminary contact with potential mitigation witnesses, but no member of Mr. Justus' defense team has conducted an in-person mitigation interview with any third party because of the social distancing protocols in place throughout California counties.

11.     While Mr. Justus' team has requested numerous records in the possession of third parties, the actual collection of records by Mr. Justus' defense team is significantly impaired by the limited availability of records custodians to search for, locate, reproduce and transmit records, especially those records in the possession of government agencies and school districts.

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3       Executed on this 28th day of September 2020.

4

5                               */s/ Richard G. Novak*
                                RICHARD G. NOVAK

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *1301 Clay Street, Suite 340S* | *(510) 637-3680* |
| *Oakland, California 94612* | *FAX (510) 637-3724* |

July 2, 2020

<u>**VIA USAFX**</u>
Richard Novak, Esq.
Law Offices of Richard G. Novak

███████████████

███████████

    Re: *United States v. Robert Alvin Justus, Jr.*
       20-CR-00265-YGR-2

Dear Counsel:

  Pursuant to your request for discovery, I am sharing with you electronically a link from USAfx that contains the below discovery. Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **6000000 Series – Social Media** |
| US-6000000 | US-6006564 | Facebook records related to Mr. Justus |
| US-6006565 | US-6008285 | Instagram records related to Mr. Justus |
| | | **800000 Series – Audio/Video** |
| US-800000 | US-800002 | Aerial surveillance footage (3 files produced in native format) |
| US-800003 | US-800004 | Body camera footage related to a prior arrest of Mr. Justus (2 files produced in native format) |
| US-800104 | US-800105 | FBI interview of Mr. Justus (2 files produced in native format) |

  The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief. Please contact me to arrange a mutually convenient time for your inspection of such items.

  The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion. By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations. We reject any suggestion that the criminal

local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Notice Re: FRE 404(b), 608, 609

The government also hereby gives notice that it may seek to introduce the other crimes, wrongs or acts committed by defendant which are referenced in the enclosed documents pursuant to Rules 404(b), 608 and/or 609 of the Federal Rules of Evidence.

Request for Reciprocal Discovery

With this letter the government requests all reciprocal discovery to which it is entitled under Federal Rules of Criminal Procedure 16(b) and (c) and 26.2, including, but not limited to, the following:

1.  Inspection and/or copies of all books, papers, documents, photographs, tangible objects, or portions thereof in the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in his case-in-chief at trial.

2.  Inspection and/or copies of the results of any reports of physical or mental examinations and of scientific tests or experiments made in connection with the above-entitled case within the possession or control of the defendant which the defendant intends to introduce as evidence in his case-in-chief at trial or which have been prepared by a witness whom the defendant intends to call at trial.

3.  Inspection and/or copies of all statements made by all witnesses whom the defendant intends to call at trial.

Request for Notice of Defenses

The government also requests notice of any intention of your client to rely on an entrapment defense or a defense involving mental condition or duress, and/or an alibi defense for the charged offenses.

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney


 /s/ Katherine Lloyd-Lovett
KATHERINE LLOYD-LOVETT
Assistant United States Attorney


Encl:   USAfx Folder entitled "USA v. Robert Justus"



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *1301 Clay Street, Suite 340S* | *(510) 637-3680* |
| *Oakland, California 94612* | *FAX (510) 637-3724* |

July 17, 2020

<u>**VIA FEDEX**</u>
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o



*Counsel for Justus*

Re:   *United States v. Robert Alvin Justus, Jr.*
        20-CR-00265-YGR-2

Dear Counsel:

Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ thumb drive which contains copies of the below discovery.  Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **0000001 Series – FBI Reports** |
| US-0000001 | US-0000017 | FBI 302s |
| | | **3000000 Series – OPD Reports** |
| US-3000000 | US-3000099 | Oakland Police Department Reports |
| | | **6000000 Series – Social Media** |
| US-6008286 | US-6014399 | Instagram records related to Mr. Carrillo |
| US-6014400 | US-6077323 | Facebook records related to Mr. Carrillo |
| | | **7000000 Series – Search Warrants** |
| US-7000000 | US-7000372 | Search warrants and associated documents |
| | | **9000000 Series – Miscellaneous** |
| US-9000000 | US-9000000 | 05-31-2020 FPS/FBI Press Release |
| US-9000001 | US-9000003 | 06-05-2020 FBI Press Release |

---

[1] Password will be sent separately by email.  Please return the thumb drive when you have downloaded the materials provided.

1

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief.  Please contact me to arrange a mutually convenient time for your inspection of such items.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.  We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

/s/ *Philip Kopczynski*

PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Thumb Drive (0000382)

2



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *1301 Clay Street, Suite 340S* | *(510) 637-3680* |
| *Oakland, California 94612* | *FAX (510) 637-3724* |

August 4, 2020

**VIA FEDEX**
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o 

*Counsel for Justus*

Re:     *United States v. Robert Alvin Justus, Jr.*
         20-CR-00265-YGR-2

Dear Counsel:

        Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ hard drive which contains copies of the below discovery.  Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **0000001 Series – FBI Reports** |
| US-0000018 | US-0000030 | Security Public Storage Unit paperwork Fairfield CA |
| US-0000031 | US-0000031 | FD-597 Security Public Storage ▮▮▮▮▮ |
| US-0000032 | US-0000036 | Photo log-cover Security Public Storage |
| US-0000037 | US-0000037 | Sign-in Log Security Public Storage |
| US-0000038 | US-0000038 | SW Execution Log Security Public Storage ▮▮▮▮ |
| | | **1000000 Series – ATF Reports** |
| US-1000000 | US-1000009 | Firearms Reports |
| | | **2000000 Series – SC Reports** |
| US-2000000 | US-2000039 | Santa Cruz Reports |
| | | **3000000 Series – OPD Reports** |
| US-3000100 | US-3000129 | Oakland Police Department Reports |

---

        [1] Password will be sent separately by email.  Please return the hard drive when you have downloaded the materials provided.

1

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **4000000 Series – Other Reports** |
| US-4000000 | US-4000003 | ACSO Incident/Criminal Report ███████ ██ CASE ██████ |
| US-4000004 | US-4000018 | ACSO Incident/Criminal Report ████████ ██ CASE ██ |
| US-4000019 | US-4000026 | ACSO Incident/Criminal Report █████████ ██ CASE ███████ |
| US-4000027 | US-4000032 | ACSO Incident/Criminal Report ██ ., Hayward CASE ██████ |
| US-4000033 | US-4000048 | JUSTUS, ROBERT CRIMINAL History/DMV Records |
| US-4000049 | US-4000052 | Alameda County Criminal Event Justus |
| US-4000053 | US-4000070 | San Leandro Case ██████ -Justus |
| US-4000071 | US-4000078 | ████████ Autopsy Report |
| US-4000079 | US-4000081 | SLPD Property Record re Justus Phone |
| | | **5000000 Series – Photographs** |
| US-5000000 | US-5000135 | Photos Search of ███████████ (Carrillo Unit Fairfield) |
| US-5000136 | US-5000351 | Photos of 1992 Van in Ravine |
| | | **7000000 Series – Search Warrants** |
| US-7000373 | US-7000409 | Search warrants and associated documents |
| | | **800000 Series – Audio/Video** |
| US-800106 | US-800106 | FPS Shooting Oak Fed Building Video (produced in native format) |
| US-800107 | US-800108 | ██████ 911 call (2 files produced in native format) |
| US-800109 | US-800110 | SCSO Body Cam re Arrest-Transport Carrillo (2 files produced in native format) |
| | | **9000000 Series – Miscellaneous** |
| US-9000004 | US-9000117 | FBI Compilation of Images of the White Van |

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief.  Please contact me to arrange a mutually convenient time for your inspection of such items.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.  We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney


 /s/ *Philip Kopczynski*
PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Hard Drive



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *11th Floor, Federal Building* | *(415) 436-7200* |
| *450 Golden Gate Ave., Box 36055* | |
| *San Francisco, CA 94102-3495* | *Fax (415) 436-7234* |

August 14, 2020

**VIA FEDEX**
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o



*Counsel for Justus*

Re:  *United States v. Robert Alvin Justus, Jr.*
     20-CR-00265-YGR-2

Dear Counsel:

Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ thumb drive which contains copies of the below discovery. Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **0000001 Series - FBI Reports** |
| US-0000039 | US-0000319 | Reports, Documents, and Photos re FBI ERT processing of Guard Post at 12th and Jefferson on 5.30.2020 |
| US-0000320 | US-0000369 | Reports, Documents, and Photos re FBI ERT processing of Oakland Federal Building Courthouse Entrance on 5.30.2020 |
| | | **1000000 Series - ATF Reports** |
| US-1000010 | US-1000034 | ATF Documentation re Pickup of Items Including ATF Inventory List, 25 ATF Guns XLSX, and 14 Photos |
| US-1000035 | US-1000059 | ATF Traces for Firearms Seized (17 Total) |
| | | **2000000 Series - SC Reports** |
| US-2000040 | US-2000071 | Santa Cruz Sheriff's Office Reports Part 1 |

---

[1] Password will be sent separately by email. Please return the thumb drive when you have downloaded the materials provided.

1

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| US-2000072 | US-2000106 | Santa Cruz Sheriff's Office Reports Part 2 |
| US-2000107 | US-2000139 | Santa Cruz Sheriff's Office Reports Part 3 |
| US-2000140 | US-2000144 | Sumter PD (SC) Report of ███████████████ |
| | | **4000000 Series - Other Reports** |
| US-4000082 | US-4000158 | Carrillo Air Force Personnel Records |
| | | **3000000 Series - OPD Reports** |
| US-3000100 | US-3000129 | Oakland Police Department Reports |
| | | **5000000 Series - Photographs** |
| US-5000352 | US-5004084 | Sketch and Photos of ███████████ |
| US-5004085 | US-5004248 | Photos Cal DOJ White Camry (Carjacked Vehicle) |
| US-5004249 | US-5004314 | Photos of Guns from ATF |
| US-5004315 | US-5004558 | Photos Search of ████████████████ (Justus Apt Millbrae) |
| | | **7000000 Series - Search Warrants** |
| US-7000410 | US-7000419 | Equifax Response (Carrillo) and Declaration |
| US-7000420 | US-7000615 | Justus T-Mobile Account SW Results File Name: ████████████████ CDRT.xlsx |
| US-7000616 | US-7000628 | TransUnion Response (Carrillo) |
| US-7000629 | US-7000671 | 2020.06.18 Carrillo_SW Return_FB IG ███████████ |
| US-7000672 | US-7000709 | 2020.07.02 Carrillo T-Mobile Search Warrant FILED ██████████ |
| US-7000710 | US-7001147 | Carrillo T-Mobile Account SW Results |
| | | **800000 Series - Audio/Video** |
| US-800111 | US-800111 | AMR Interview File Name: 110214_003 Interview of ██████████ .MP3 |
| US-800112 | US-800112 | AMR Interview File Name: 110214_004 Interview of ██████████ .MP3 |
| US-800113 | US-800113 | AMR Interview File Name: 110214_005 Interview of ██████████ .MP3 |
| US-800114 | US-800114 | Ben Lomand Fire Camp Video 6-1-2020 File Name: 0 - 2020-06-01 00-00-01-592.mov |
| US-800115 | US-800115 | CHP Responding Dashcam ██████████ File Name: DvdManagerRecoveryReport_2020-06-09 15.24.39.html |
| US-800116 | US-800125 | CHP Responding Dashcam (10 Native Files) |
| US-800126 | US-800128 | Interview of ██████████ Audio (3 Native Files) |
| US-800129 | US-800129 | ██████ Body Cam File Name: ██████_2020-06-06_15-42-36.AVI |
| US-800130 | US-800130 | ██████ Body Cam File Name: ██████_2020-06-06_15-57-04.AVI |
| | | **9000000 Series - Miscellaneous** |
| US-9000118 | US-9000167 | LPR Hits for White Vans Assoc w Steven Carrillo from 4-19-20 to 6-6-20 |
| US-9000168 | US-9000168 | Placeholder for Justus Phone Galaxy S8 File Name: Justus Phone 2 Report.zip |

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief.  Please contact me to arrange a mutually convenient time for your inspection of such items.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.  We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

/s/ *Philip Kopczynski*

PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Thumb Drive



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *11th Floor, Federal Building* | *(415) 436-7200* |
| *450 Golden Gate Ave., Box 36055* | |
| *San Francisco, CA 94102-3495* | *Fax  (415) 436-7234* |

August 19, 2020

**VIA FEDEX**
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o



*Counsel for Justus*

Re:     *United States v. Robert Alvin Justus, Jr.*
        20-CR-00265-YGR-2

Dear Counsel:

Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ hard drive which contains copies of the below discovery.  Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **0000001 Series - FBI Reports** |
| US-0000370 | US-0000968 | Reports, Documents, and Photos re ERT Paperwork Santa Cruz |
| US-0000969 | US-0000970 | FD-302 Report re Interview of ▮▮▮▮ on 8-6-2020 |
| | | **4000000 Series - Other Reports** |
| US-4000159 | US-4000728 | Carrillo Air Force Medical Records |
| US-4000729 | US-4000730 | RCFL Report of Examination re Samsung Galaxy S9 & T-Mobile SIM Card |
| US-4000731 | US-4000733 | RCFL Report of Examination re Addonics HD, Seagate 3TB Sata HD and Addonics AES-256 key |
| US-4000734 | US-4000759 | USAF OSI interviews reports (13 Total) |
| | | **7000000 Series - Search Warrants** |
| US-7001148 | US-7001607 | Pay Pal Records (Carrillo-Justus) |

---

[1] Password will be sent separately by email.  Please return the thumb drive when you have downloaded the materials provided.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **800000 Series - Audio/Video** |
| US-800005 | US-800005 | SLPD Body Cam Video (1 Native File) |
| US-800005 | US-800074 | OPD Body Cam Video (69 Native Files) |
| US-800075 | US-800075 | Intentionally Left Blank |
| US-800076 | US-800103 | OPD Body Cam Video (28 Native Files) |
| US-800131 | US-800132 | ▮▮▮▮▮▮ Body Cam (2 Native Files) |
| US-800133 | US-800136 | ▮▮▮▮▮ Interview (4 Native Files) |
| US-800137 | US-800137 | ▮▮▮▮▮ interview (1 Native File) |
| | | **9000000 Series – Miscellaneous** |
| US-9000169 | US-9000169 | Placeholder for Carrillo ATT phone File Name: Carrillo ATT phone.zip (Native File Produced) |

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief. Please contact me to arrange a mutually convenient time for your inspection of such items.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion. By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations. We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

 /s/ *Philip Kopczynski*
PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Hard Drive

2



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

| | |
|---|---|
| *11th Floor, Federal Building* | *(415) 436-7200* |
| *450 Golden Gate Ave., Box 36055* | |
| *San Francisco, CA 94102-3495* | *Fax (415) 436-7234* |

August 26, 2020

**VIA FEDEX**
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o



*Counsel for Justus*

Re:  *United States v. Robert Alvin Justus, Jr.*
20-CR-00265-YGR-2

Dear Counsel:

Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ hard drive which contains copies of the below discovery. Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **9000000 Series – Miscellaneous** |
| US-9000170 | US-9000170 | Placeholder for Carrillo Samsung S9 File Name: Carrillo Samsung S9.zip (Native Produced) |
| US-9000171 | US-9000171 | Placeholder for Justus Samsung S9 Plus File Name: Justus Samsung S9 Plus.zip (Native Produced) |
| US-9000172 | US-9000172 | Placeholder for Justus SV-20-0069-3_iPad_Report File Name: SV-20-0069-3_iPad_Report.zip (Native Produced) |
| US-9000173 | US-9000173 | Placeholder for Justus SV-20-0069-3_ZTE_Tablet_Report File Name: SV-20-0069-3_ZTE_Tablet_Report.zip (Native Produced) |
| US-9000174 | US-9000174 | Placeholder for Justus Tablets File Name: Justus Tablets.zip (Containing 7 folders, see placeholder) (Native Produced) |

---

[1] Password will be sent separately by email. Please return the hard drive when you have downloaded the materials provided.

1

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| US-9000175 | US-9000175 | Placeholder for Justus Samsung Galaxy S9 Plus Report and SIM File Name: Justus Samsung Galaxy S9 Plus Report and SIM.zip (Native Produced) |

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief.  Please contact me to arrange a mutually convenient time for your inspection of such items.

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.  We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

 /s/ *Philip Kopczynski*
PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Hard Drive

2



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *11th Floor, Federal Building* | *(415) 436-7200* |
| *450 Golden Gate Ave., Box 36055* | |
| *San Francisco, CA 94102-3495* | *Fax: (415) 436-7234* |

September 25, 2020

**VIA FEDEX**
Richard Novak, Esq.
Shaffy Moeel, Esq.
c/o



*Counsel for Justus*

Re:     *United States v. Robert Alvin Justus, Jr.*
        20-CR-00265-YGR-2

Dear Counsel:

Pursuant to your request for discovery, enclosed is an encrypted[1] DOJ hard drive which contains copies of the below discovery. Please maintain this discovery pursuant to the terms of the parties' agreed-upon Stipulated Protective Order, as we have previously discussed.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **0000001 Series - FBI Reports** |
| US-0000971 | US-0000987 | FD-302 Report re Collection of Surveillance Video |
| US-0000988 | US-0000990 | FD-302 Report re Interview of ███████████ |
| US-0000991 | US-0000991 | FD-302 Report re Interview of ██████ ████ |
| US-0000992 | US-0000992 | FD-302 Report re Interview with ███████████ |
| US-0000993 | US-0000993 | FD-302 Report re Interview with ████████████ and ████ ███████████ |
| US-0000994 | US-0000994 | FD-302 Report re Interview with ████████ and ████████ |
| | | **1000000 Series - ATF Reports** |
| US-1000060 | US-1000086 | ATF Trace Reports for Guns Seized at ████ ██████ (18 total) |

---

[1] Password will be sent separately by email. Please return the hard drive when you have downloaded the materials provided.

| Beg. Bates | End Bates | General Description of Contents |
|---|---|---|
| | | **2000000 Series - SC Reports** |
| US-2000145 | US-2000174 | Carrillo Santa Cruz PD Report pages 1-30 |
| US-2000175 | US-2000206 | Carrillo Santa Cruz PD Report pages 31-62 |
| | | **4000000 Series - Other Reports** |
| US-4000760 | US-4000767 | SVRCFL Report re Surveillance Video 153919 |
| US-4000768 | US-4000769 | Justus SLPD phone-RCFL receipt 162348 |
| US-4000770 | US-4000771 | Return to Agency Evidence Receipt 152652 |
| | | **6000000 Series - Social Media** |
| US-6077324 | US-6077324 | Placeholder for Justus Facebook Records reproduced in Native Format File Name: 540837276584600.zip |
| US-6077325 | US-6077325 | Placeholder for Justus Instagram Records reproduced in Native Format File Name: 562331041010147.zip |
| US-6077326 | US-6077326 | Placeholder for Carrillo Instagram Records reproduced in Native Format File Name: 618518248750000.zip |
| US-6077327 | US-6077327 | Placeholder for Carrillo Facebook Records reproduced in Native Format File Name: 644986212765610.zip |
| | | **7000000 Series - Search Warrants** |
| US-7001608 | US-7001608 | Placeholder for Justus Gmail Account (1) File Name: Robert Justus Gmail 1 Account.zip (Native Format) |
| US-7001610 | US-7002039 | Selected documents from Justus Google SW results for 2019–2020 |
| US-7002040 | US-7002073 | Letter from Gmail re Gmail Accounts |
| | | **800000 Series - Audio/Video** |
| US-800138 | US-800138 | OPD Body Cam File Name: ▉▉▉▉ _2020-05-30_03-12-34.AVI (Native) |
| US-800139 | US-800141 | Video from ▉▉▉▉ ▉ (3 Native Videos) |
| US-800142 | US-800145 | Video from ▉▉▉▉ k (4 Native Videos) |
| | | **9000000 Series - Miscellaneous** |
| US-9000176 | US-9000177 | Email re EDD Request |

As noted above, we are reproducing certain Facebook and Instagram records in an alternative format. This is in response to a request by co-defendant Steven Carrillo.

The government will make available for your inspection any item of evidence referred to in the enclosed reports and documents, as well as any other evidence seized from your client and/or which the government intends to offer in its case-in-chief. Please contact me to arrange a mutually convenient time for your inspection of such items.

//

//

//

//

2

The enclosed materials and any future discovery provided to you which may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.  We reject any suggestion that the criminal local rules, including Criminal Local Rule 16-1(c), serve as valid authority for any substantive discovery obligations beyond that required under the applicable federal statutes and rules (e.g., Rule 16 and Jencks).

Please contact me if you have any questions concerning the foregoing.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

/s/ *Philip Kopczynski*
PHILIP KOPCZYNSKI
Assistant United States Attorney

Encl:   1 DOJ Hard Drive

EXHIBIT B

🇺🇸 An official website of the United States government  Here's how you know ✉

<table>
<tr><td>9-10.010</td><td>Federal Prosecutions in Which the Death Penalty May be Sought</td></tr>
<tr><td>9-10.020</td><td>Relevant Statutory Provisions</td></tr>
<tr><td>9-10.030</td><td>Purposes of the Capital Case Review Process</td></tr>
<tr><td>9-10.040</td><td>Consultation with the Capital Case Section</td></tr>
<tr><td>9-10.050</td><td>Confidentiality of Process</td></tr>
<tr><td>9-10.060</td><td>Mandatory Pre-indictment Review</td></tr>
<tr><td>9-10.070</td><td>Expedited Decision Submissions</td></tr>
<tr><td>9-10.080</td><td>Non-expedited Decision Submissions</td></tr>
<tr><td>9-10.090</td><td>Special Findings in Indictments</td></tr>
<tr><td>9-10.100</td><td>Consultation with the Family of the Victim</td></tr>
<tr><td>9-10.110</td><td>Substantial Federal Interest</td></tr>
<tr><td>9-10.120</td><td>Conditional Plea Agreements</td></tr>
<tr><td>9-10.130</td><td>Capital Review Committee</td></tr>
<tr><td>9-10.140</td><td>Standards for Determination</td></tr>
<tr><td>9-10.150</td><td>Post-Decision Actions</td></tr>
<tr><td>9-10.160</td><td>Withdrawal of the Notice of Intention to Seek the Death Penalty</td></tr>
<tr><td>9-10.170</td><td>Approval Required for Judicial Sentencing Determination</td></tr>
<tr><td>9-10.180</td><td>Reporting Requirements</td></tr>
<tr><td>9-10.190</td><td>Forms and Procedures</td></tr>
<tr><td>9-10.200</td><td>Exceptions for the Proper Administration of Justice</td></tr>
</table>

## 9-10.010 - FEDERAL PROSECUTIONS IN WHICH THE DEATH PENALTY MAY BE SOUGHT

This Chapter sets forth the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty. The provisions in this Chapter apply regardless of whether the United States Attorney or Assistant Attorney General intends to charge the offense subject to the death penalty or to request authorization to seek the death penalty for such an offense. The provisions in this Chapter are effective April 7, 2014, and they apply to any current or future investigations and indicted cases.

[updated April 2014]

## 9-10.020 - RELEVANT STATUTORY PROVISIONS

Federal death penalty procedure is based on the Federal Death Penalty Act of 1994, codified at 18 U.S.C. §§ 3591 to 3599.

The death penalty procedures introduced by the Anti-Drug Abuse Act of 1988, codified in Title 21, were repealed on March 6, 2006, when President Bush signed the USA PATRIOT Improvement and Reauthorization Act of 2005. A district indicting a Title 21 capital offense, *see* 21 U.S.C. § 848, that occurred before March 6, 2006, should consult with the Capital Case Section of the Criminal Division (hereinafter the "Capital Case Section") regarding indictment and procedure.

[updated April 2014]

## 9-10.030 - PURPOSES OF THE CAPITAL CASE REVIEW PROCESS

The review of cases under this Chapter culminates in a decision to seek, or not to seek, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. Arbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process. The overriding goal of the review process is to allow proper individualized consideration of the appropriate factors relevant to each case.

[updated June 2007]

## 9-10.040 - CONSULTATION WITH THE CAPITAL CASE SECTION

Prior to seeking an indictment for an offense potentially punishable by death, the United States Attorney or Assistant Attorney General shall consult with the Capital Case Section. This consultation will help streamline the process of preparing submissions made pursuant to this Chapter, ensure that charging documents are crafted in accordance with applicable legal and policy requirements, and help ensure that applicable deadlines are met. In the event the Attorney General determines the death penalty will be sought in a particular case, the Capital Case Section can provide valuable litigation advice and support, as well as trial assistance.

[updated April 2014]

## 9-10.050 - CONFIDENTIALITY OF PROCESS

Except as otherwise provided herein (*see* JM 9-10.160(B)), the Attorney General will make the final decision whether to seek the death penalty. The Attorney General will convey the final decision to the United States Attorney or Assistant Attorney General in a letter directing him or her to seek or not to seek the death penalty.

The decision-making process preliminary to the Attorney General's final decision is confidential. Information concerning the deliberative process may only be disclosed within the Department and its investigative agencies as necessary to assist the review and decisionmaking process. This confidentiality requirement does not extend to the fact that the case has been submitted for expedited decision pursuant to JM 9-10.070, the disclosure of scheduling matters or the level at which the decision is pending within the Department during the review process. The scope of confidentiality includes, but is not limited to: (1) the recommendations of the United States Attorney's Office or

Department component, the Attorney General's Review Committee on Capital Cases (hereinafter the "Capital Review Committee"), the Deputy Attorney General, the Capital Case Section, and any other individual or office involved in reviewing the case; (2) a request by a United States Attorney or Assistant Attorney General that the Attorney General authorize withdrawal of a previously filed notice of intent to seek the death penalty; (3) a request by a United States Attorney or Assistant Attorney General that the Attorney General authorize not seeking the death penalty pursuant to the terms of a proposed plea agreement; and (4) the views held by anyone at any level of review within the Department.

In no event may the information identified in this paragraph be disclosed outside the Department and its investigative agencies without prior approval of the Attorney General. The United States Attorneys and Assistant Attorneys General may exercise their discretion, however, to place additional limits on the scope of confidentiality in capital cases prosecuted by their offices.

[updated April 2014]

---

## 9-10.060 - MANDATORY PRE-INDICTMENT REVIEW

Absent extenuating circumstances, prior to seeking an indictment charging a capital-eligible offense, the United States Attorney or Assistant Attorney General shall submit the case for review pursuant to the provisions of this Chapter. Extenuating circumstances may include, for example, a need to present capital-eligible charges to comply with the Speedy Trial Act, to address public safety concerns, or a need to collect and/or analyze additional information necessary to determine whether to recommend seeking the death penalty.

In the event that a United States Attorney or Assistant Attorney General determines that extenuating circumstances exist such that mandatory pre-indictment review is not feasible, or in the event that extenuating circumstances require the return of an indictment in a case in which a United States Attorney or Assistant Attorney General submitted the case for preindictment review but the review has not been completed, the United States Attorney or Assistant Attorney General shall submit, prior to seeking the indictment, a notice to the Capital Case Section describing the extenuating circumstances that necessitate the return of the indictment before the pre-indictment review process can be initiated or completed. In addition, in cases in which the United States Attorney or Assistant Attorney General has not submitted the case for pre-indictment review, the notice described in the preceding sentence must provide an estimated date by which the case will be submitted for capital review. The form for this notice is available to Department attorneys on the Capital Case Section site on DOJNet. Every 45 days after an initial notice is submitted pursuant to this paragraph, the United States Attorney or Assistant Attorney General shall submit to the Capital Case Section an updated notice setting forth (1) the extenuating circumstances that continue to justify not submitting the case for review, (2) the progress made toward a submission, and (3) the estimated date by which the case will be submitted for capital review.

In all events, the United States Attorney or Assistant Attorney General must submit a capital-eligible case for review no fewer than 90 days before the Government is required, by an order of the court, to file a notice that it intends to seek the death penalty. In the absence of a court-established deadline for the Attorney General's death penalty decision, the United States Attorney or Assistant Attorney General must make the submission sufficiently in advance of trial to allow for both the 90-day time period typically needed for the nonexpedited decision process plus any additional time necessary to ensure that a notice of intent to seek the death penalty is timely filed under 18 U.S.C. § 3593(a). If a case is not submitted 90 days in advance of a deadline for the Attorney General's decision or 150 days in advance of a scheduled trial date, the prosecution memorandum shall include an explanation of why the submission is untimely.

[updated January 2020] [cited in JM 9-10.180]

## 9-10.070 - EXPEDITED DECISION SUBMISSIONS

A. Many cases will qualify for expedited decision as to whether to seek the death penalty, and can often be decided pre- indictment. Whether submitted pre-indictment, or post-indictment on account of extenuating circumstances, cases qualifying for expedited decision include:

(1) cases in which, but for the use of proffer protected evidence, the government's evidence is insufficient to charge the defendant with a capital-eligible offense;

(2) cases in which the defendant is ineligible for the death penalty because the evidence is clearly insufficient to establish the requisite intent under 18 U.S.C. § 3591 or an applicable statutory aggravating factor under 18 U.S.C. § 3592(b)-(d);

(3) cases that involve the extradition of a defendant or crucial witness from a country that, as a pre-condition to extradition, requires assurances that the death penalty will not be sought for the defendant or the evidence obtained from the witness will not be used to seek the death penalty;

(4) cases that involve a potential cooperator whose testimony is necessary to prosecute remaining offenders; and

(5) any other case where the United States Attorney or Assistant Attorney General is able to recommend the death penalty not be sought without first receiving input from defense counsel.

A copy of the summary form to be used for submission of expedited decision cases is available to Department attorneys at the Capital Case Section site on DOJNet.

B. The submission for expedited decision cases in categories A(1) through (3) should provide a description of the relevant facts of the case, the defendant's criminal history, the federal interest in prosecuting the case, the rationale for why the death penalty should not be sought, and any applicable deadline for decision. The submission also should describe the basis upon which the case qualifies for expedited decision. For cases in categories A(1) and (2), the submission should include a discussion regarding whether expedited decision is appropriate in light of any potentially admissible evidence that might be marshaled to establish guilt and/or the existence of a threshold intent or statutory aggravating factor. All submissions for expedited decision cases in categories A(1) through (3) should also include the sealed non-decisional information form described in JM 9-10.080(C). Submissions in these categories will be referred to the Chief of the Capital Case Section for assessment of whether the case meets the requirements for expedited decision. If the Chief of the Capital Case Section determines that the case meets those requirements, the case will be transmitted expeditiously to the Attorney General, through the Deputy Attorney General, for final decision, without review by the Capital Review Committee. If the Chief of the Capital Case Section determines that the case does not meet the requirements for expedited decision, then the Chief of the Capital Case Section will notify the prosecuting United States Attorney's Office or component.

C. Submissions for expedited decision cases in categories A(4) and A(5) should be in the form of the prosecution memorandum described in JM 9-10.080(A), and also should include the sealed non-decisional information form described in JM 9-10.080(C). Submissions in categories A(4) and A(5) should be marked as "Expedited Decision" cases and will be reviewed expeditiously by the Capital Review Committee, which shall make a recommendation whether to seek capital punishment to the Attorney General, through the Deputy Attorney General, as described in JM 9-10.130, or defer making a recommendation to allow development of additional evidence.

[updated January 2020] [cited in <u>JM 9-10.050</u>; <u>9-10.080</u>; <u>9-10.120</u>; <u>9-10.130</u>]

## 9-10.080 - NON-EXPEDITED DECISION SUBMISSIONS

In any case in which the United States Attorney or Assistant Attorney General is contemplating requesting authorization to seek the death penalty or otherwise believes it would be useful to the decision-making process to receive a submission from defense counsel, the United States Attorney or Assistant Attorney General shall give counsel for the defendant a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty.

After the conclusion of a reasonable period of time, the United States Attorney or Assistant Attorney General shall submit to the Assistant Attorney General for the Criminal Division through the Capital Case Section his or her recommendation whether to seek the death penalty, along with the materials described below. Once a submission has been received, the review process will proceed in accordance with <u>JM 9-10.130</u>. The contents of a non-expedited decision submission or an expedited decision submission under <u>JM 9-10.070(A)(4)</u> or (5) shall include the following:

    A. <u>Prosecution memorandum</u>. This should be sufficiently detailed to fully inform reviewers of the basis for the United States Attorney's or Assistant Attorney General's recommendation. The prosecution memorandum should include:
    (1) Deadlines. Any deadline established by the Court for the filing of a notice of intent to seek the death penalty, trial dates, or other time considerations that could affect the timing of the review process should be noted on the first page of the memorandum.

    (2) A narrative delineation of the facts and separate delineation of the supporting evidence. Where necessary for accuracy, a chart of the evidence by offense and offender should be appended.

    (3) Discussion of relevant prosecutorial considerations.

    (4) Death penalty analysis. The analysis must identity applicable threshold intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18 U.S.C. §§ 3592(b)-(d), and applicable mitigating factors under 18 U.S.C. § 3592(a). In addition, the United States Attorney or Assistant Attorney General should include his or her conclusion on whether all the aggravating factor(s) found to exist sufficiently outweigh all the mitigating factor(s) found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factor(s) alone are sufficient to justify a sentence of death. The analysis should also include a discussion of the standards for determination as set forth in <u>JM 9-10.140</u>.

    (5) Background and criminal record of the capital-eligible defendants.

    (6) Background and criminal record of the victim.

    (7) Victim impact. Views of the victim's family on seeking the death penalty and other victim impact evidence should be provided.

    (8) Discussion of the federal interest in prosecuting the case.

    (9) Foreign citizenship. The memorandum should include a discussion on whether the requirements of the Vienna Convention on Consular Relations have been satisfied (*see* <u>JM 9-2.173</u> and Fed. R. Crim. Pro. 5(d) (1)(F) regarding consular notification when foreign nationals are arrested).

(10) Recommendation of the United States Attorney or Assistant Attorney General on whether the death penalty should be sought.

B. <u>Death-penalty evaluation form</u>. The Department will specify a standardized death penalty evaluation form, which should be completed by the United States Attorney or Assistant Attorney General for each capital-eligible offense charged against each defendant.

C. <u>Non-decisional information form</u>. This form should be submitted in a sealed envelope clearly labeled as containing the non-decisional information.

D. <u>Indictment</u>. Copies of all existing and proposed indictments and superseding indictments should be attached. As described in <u>JM 9-10.090</u>, the indictments should include the special findings necessary for the death penalty to be authorized by statute.

E. <u>Draft notice of intention to seek the death penalty</u>. This document is to be included in the submission only if the United States Attorney or Assistant Attorney General recommends seeking the death penalty.

F. <u>Materials provided by defense counsel</u>. Any documents or materials provided by defense counsel to the United States Attorney or Assistant Attorney General in the course of the United States Attorney's Office's or Department component's death penalty review process should be provided. These materials should not be solicited or submitted in cases presented pursuant to <u>JM 9-10.070</u>.

G. <u>Point-of-contact</u>. The name of the assigned attorney in the United States Attorney's Office or Department component who is responsible for communicating with the Capital Case Section about the case should be provided.

H. <u>Relevant court decisions</u>. The first page of the memorandum should highlight court orders and deadlines. The point- of-contact in the United States Attorney's Office or Department component is under a continuing obligation to update the Capital Case Section about developments or changes in court scheduling or any other material aspect of the case.

The prosecution memoranda, death penalty evaluation forms, non-decisional information forms and any other internal memoranda informing the review process and the Attorney General's decision are not subject to discovery by the defendant or the defendant's attorney. *See* Fed. R. Crim. P. 16(a)(2).

[updated April 2018] [cited in <u>JM 9-10.070</u>]

---

### 9-10.090 - SPECIAL FINDINGS IN INDICTMENTS

In cases in which the Attorney General has directed the United States Attorney or Assistant Attorney General not to seek the death penalty before the return of an indictment charging capital-eligible offenses, the indictment need not contain allegations of special findings concerning relevant facts and factors specified in 18 U.S.C. §§ 3591(a)(2) and 3592(b), (c), or (d). For all other charged offenses subject to the provisions of this Chapter, regardless of whether the United States Attorney or Assistant Attorney General ultimately recommends that the Attorney General authorize seeking the death penalty for the charged offense, the indictment shall allege as special findings: (1) that the defendant is over the age of 18; (2) the existence of the threshold intent factors specified in 18 U.S.C. § 3591(a)(2); and (3) the existence of the statutory aggravating factors specified in, as relevant, 18 U.S.C. §§ 3592(b), (c), or (d).

The indictment shall allege threshold intent and statutory aggravating factors that meet the criteria for commencing prosecution as set forth in <u>JM 9-27.200</u> and <u>9-27.220</u>. Prosecuting Assistant United States Attorneys or Department trial attorneys are encouraged to consult with the Capital Case Section regarding the inclusion of special findings in the indictment.

[updated April 2014] [cited in <u>JM 9-10.080</u>]

## 9-10.100 - CONSULTATION WITH THE FAMILY OF THE VICTIM

Unless extenuating circumstances exist, the United States Attorney or Assistant Attorney General should consult with the family of the victim, if reasonably available, concerning the decision on whether to seek the death penalty. The United States Attorney or Assistant Attorney General should include the views of the victim's family concerning the death penalty in any submission made to the Department. The United States Attorney or Assistant Attorney General should notify the family of the victim of all final decisions regarding the death penalty. This consultation should occur in addition to notifying victims of their rights under 18 U.S.C. § 3771.

[updated April 2014]

## 9-10.110 - SUBSTANTIAL FEDERAL INTEREST

When concurrent jurisdiction exists with a State or local government, a Federal indictment for an offense subject to the death penalty generally should be obtained only when the Federal interest in the prosecution is more substantial than the interests of the State or local authorities. See Principles of Federal Prosecution, JM Chapter 9-27.000; see also Memorandum from the Attorney General dated August 12, 2013 ("Federal Prosecution Priorities").

[updated April 2014]

## 9-10.120 - CONDITIONAL PLEA AGREEMENTS

The death penalty may not be sought, and no attorney for the Government may threaten to seek it, solely for the purpose of obtaining a more desirable negotiating position. Absent the authorization of the Attorney General, the United States Attorney or Assistant Attorney General may not enter into a binding plea agreement that precludes the United States from seeking the death penalty with respect to any defendant falling within the scope of this Chapter.

The United States Attorney or Assistant Attorney General, however, may agree to submit for the Attorney General's review and possible approval, a plea agreement relating to a capital-eligible offense or conduct that could be charged as a capital-eligible offense. At all times, the United States Attorney or Assistant Attorney General must make clear to all parties that the conditional plea does not represent a binding agreement, but is conditioned on the authorization of the Attorney General. The United States Attorney or Assistant Attorney General should not inform the defendant, court, or public of whether he or she recommends authorization of the plea agreement.

For proposed plea agreements that precede a decision by the Attorney General to seek or not to seek the death penalty, the United States Attorney or Assistant Attorney General should send a request for approval to the Assistant Attorney General for the Criminal Division through the Capital Case Section as early as possible. Absent unavoidable circumstances, the United States Attorney or Assistant Attorney General must send the request no later than 90 days prior to the date on which the Government would be required, by an order of the court or by the requirements of 18 U.S.C. § 3593(a), to file a notice that it intends to seek the death penalty. (Proposed plea agreements that would require withdrawing a previously filed notice of intent to seek the death penalty should follow the procedures described in JM 9-10.160).

Unless a potential capital defendant's testimony is necessary to indict the remaining offenders or other circumstances warrant separate consideration (see JM 9-10.070), review of the case against a prospective cooperator should occur simultaneously with the review of the cases against the remaining offenders who would be indicted for the offenses at issue. In submissions in support of requests for approval of plea agreements under this

section, the prosecution memorandum must include an explanation of why the plea agreement is an appropriate disposition of the charges, a death penalty evaluation form for each capital-eligible offense that has been or could be charged against the prospective cooperator, and a non-decisional information form. The Capital Review Committee will review requests for authorization to enter into a plea agreement under this subsection and, if a submission from defense counsel is not included with the submission, may request such a submission and schedule the case for a Committee conference.

See JM Chapter 9-16.000 for more information on the topic of pleas and plea agreements.

[updated April 2014]

---

### 9-10.130 - CAPITAL REVIEW COMMITTEE

The Capital Review Committee is composed of attorneys from the Office of the Deputy Attorney General and the Office of the Assistant Attorney General for the Criminal Division (AAG CRM), and at-large prosecutors from the United States Attorneys' Offices and other Department components.  The AAG CRM may fill at-large Committee member positions with prosecutors who will serve for renewable, limited terms of two years.

In any case in which (1) the United States Attorney or Assistant Attorney General recommends that the Attorney General authorize seeking the death penalty, or (2) two or more members of the Capital Review Committee request a Committee conference after the Capital Review Committee has conferred in person or by teleconference, a Capital Case Section attorney will confer with representatives of the United States Attorney's Office or Department component to establish a date and time for the Capital Review Committee to meet with defense counsel and representatives of the United States Attorney's Office or Department component to consider the case.

A request by two or more Committee members for a conference removes a case from the "expedited decision" process (see JM 9-10.070), and the submitting office may seek an indictment before the review is completed. No final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation.

The Capital Review Committee shall review the materials submitted by the United States Attorney or Assistant Attorney General and any materials submitted by defense counsel. The Capital Review Committee will consider all information presented to it, including any allegation of individual or systemic racial bias in the Federal administration of the death penalty. After considering all information submitted to it, the Committee shall make a recommendation to the Attorney General through the Deputy Attorney General.

If the Committee's recommendation differs from that of the United States Attorney or Assistant Attorney General, the United States Attorney or Assistant Attorney General shall be provided with a copy of the Committee's recommendation memorandum when it is transmitted to the Deputy Attorney General. The United States Attorney or Assistant Attorney General may respond to the Committee's analysis in a memorandum directed to the Deputy Attorney General. The Deputy Attorney General will then make a recommendation to the Attorney General. The Attorney General will make the final decision whether the Government should file a notice of intent to seek the death penalty.

[updated May 2020] [cited in JM 9-10.070; 9-10.080]

---

### 9-10.140 - STANDARDS FOR DETERMINATION

The standards governing the determination to be reached in cases under this Chapter include fairness, national

consistency, adherence to statutory requirements, and law-enforcement objectives.

A. Fairness requires all reviewers to evaluate each case on its own merits and on its own terms. As with all other actions taken in the course of Federal prosecutions, bias for or against an individual based upon characteristics such as race or ethnic origin play no role in any recommendation or decision as to whether to seek the death penalty.

B. National consistency requires treating similar cases similarly, when the only material difference is the location of the crime. Reviewers in each district are understandably most familiar with local norms or practice in their district and State, but reviewers must also take care to contextualize a given case within national norms or practice. For this reason, the multi-tier process used to make determinations in this Chapter is carefully designed to provide reviewers with access to the national decision-making context, and thereby, to reduce disparities across districts.

C. In determining whether it is appropriate to seek the death penalty, the United States Attorney or Assistant Attorney General, the Capital Review Committee, the Deputy Attorney General, and the Attorney General will determine whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death or, in the absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death. Reviewers are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant. The analysis employed in weighing the aggravating and mitigating factors should be qualitative, not quantitative: a sufficiently strong aggravating factor may outweigh several mitigating factors, and a sufficiently strong mitigating factor may outweigh several aggravating factors. Reviewers may accord weak aggravating or mitigating factors little or no weight. Finally, there must be substantial, admissible, and reliable evidence of the aggravating factors.

D. In deciding whether it is appropriate to seek the death penalty, the United States Attorney or Assistant Attorney General, the Capital Review Committee, the Deputy Attorney General, and the Attorney General may consider any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty. Those considerations may include, but are not limited to:

(1) The strength and nature of the evidence;

(2) The relative roles in the offense of defendants in jointly undertaken criminal activity;

(3) Whether the offense was intended to obstruct justice or was otherwise motivated by the victim's cooperation with law enforcement or the belief that the victim was cooperating with law enforcement;

(4) Whether the offense was committed to retaliate against a third-party for cooperating with law enforcement or against a third party believed to be cooperating with law enforcement;

(5) Whether the victim engaged in criminal activity that was a relevant circumstance of the offense;

(6) Whether a defendant engaged in criminal activity for which he had not been held accountable;

(7) Whether the defendant is already serving a substantial sentence such that an additional sentence of incarceration would have. little punitive impact;

(8) Whether the defendant has a history of infractions or offenses while incarcerated; and

(9) Whether the defendant has accepted responsibility for his conduct as demonstrated by his willingness to plead guilty and accept a life or near-life sentence without the possibility of release.

[updated April 2011] [cited in JM 9-10.080]

## 9-10.150 - POST-DECISION ACTIONS

In any case in which the Attorney General has directed the filing of a notice of intention to seek the death penalty, the United States Attorney or Assistant Attorney General shall not file or amend the notice until the Capital Case Section has approved the notice or the proposed amendment. The notice of intention to seek the death penalty shall be filed as soon as possible after transmission of the Attorney General's decision to seek the death penalty.

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the final decision. Expeditious communication is necessary so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required. In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

[updated April 2014]

## 9-10.160 - WITHDRAWAL OF THE NOTICE OF INTENTION TO SEEK THE DEATH PENALTY

A. Request by a United States Attorney or Assistant Attorney General

Once the Attorney General has directed a United States Attorney or Assistant Attorney General to seek the death penalty, the United States Attorney may not withdraw a notice of intention to seek the death penalty filed with the district court unless directed by the Attorney General.

If a United States Attorney or Assistant Attorney General wishes to withdraw the notice, the United States Attorney or Assistant Attorney General shall advise the Assistant Attorney General for the Criminal Division through the Capital Case Section of the reasons for that request. The United States Attorney or Assistant Attorney General should base the withdrawal request on material changes in the facts and circumstances of the case from those that existed at the time of the initial determination.

Upon receipt of such a request, the Capital Case Section will seek review of the request by the Capital Review Committee. To the extent possible, the Capital Review Committee should include the members who originally considered the case. Reviewers should evaluate the withdrawal request under the principles used to make an initial determination, and limit the evaluation to determining if the changed facts and circumstances, had they been known at the time of the initial determination, would have resulted in a decision not to seek the death penalty. For this reason, information or arguments that had been advanced initially are not normally appropriate bases for withdrawal requests. In all cases, however, reviewers should consider all necessary information to ensure every defendant is given the individualized consideration needed for full review and appropriate decision-making.

The Capital Review Committee will make a recommendation to the Attorney General through the Deputy Attorney General on whether the notice of intent to seek the death penalty should be withdrawn.

B. Request by a defendant

Any request by a defendant for withdrawal of a notice of intention to seek the death penalty should be

submitted in the first instance to the United States Attorney or Assistant Attorney General responsible for the prosecution. If the United States Attorney or Assistant Attorney General concurs in the request, then he or she should follow the procedures in Section A above. Otherwise, the United States Attorney or Assistant Attorney General should submit the defendant's request along with a brief memorandum outlining the reasons why the United States Attorney or Assistant Attorney General opposes the request to the Assistant Attorney General for the Criminal Division through the Capital Case Section. Absent extraordinary circumstances, the Department will not consider successive defense requests to withdraw the notice of intention to seek the death penalty.

Upon receipt of such a request, the Capital Case Section will seek review of the request by the Capital Review Committee. To the extent possible, the Capital Review Committee should include the members who originally considered the case. Reviewers should evaluate the withdrawal request under the principles used to make an initial determination, and limit the evaluation to determining if the changed facts and circumstances, had they been known at the time of the initial determination, would have resulted in a decision not to seek the death penalty. For this reason, information or arguments that had been advanced initially are not normally appropriate bases for withdrawal requests: In all cases, however, reviewers should consider all necessary information to ensure every defendant is given the individualized consideration needed for full review and appropriate decision-making.

If fewer than two members of the Capital Review Committee agree with the defendant's request to withdraw the notice of intention to seek the death penalty, the Assistant Attorney General for the Criminal Division will inform the United States Attorney or Assistant Attorney General that the request has been denied. If two or more members of the Capital Review Committee recommend withdrawing the notice of intention to seek the death penalty, then the Capital Review Committee will convey the matter, along with the Committee's analysis, to the Attorney General, through the Deputy Attorney General, for decision.

The Attorney General shall make the final decision on whether to direct the withdrawal of a notice of intention to seek the death penalty upon any request made or endorsed by the United States Attorney or Assistant Attorney General. Until such a decision is made, the United States Attorney or Assistant Attorney General should proceed with the case as initially directed by the Attorney General. The fact that a withdrawal request has been made is confidential and may not be disclosed to any party outside the Department of Justice and its investigative agencies.

[updated April 2018] [cited in JM 9-10.050; 9-10.120]

---

### 9-10.170 - APPROVAL REQUIRED FOR JUDICIAL SENTENCING DETERMINATION

In cases in which the Attorney General has authorized seeking the death penalty, the United States Attorney or Assistant Attorney General must obtain the approval of the Assistant Attorney General for the Criminal Division before agreeing to a request by the defendant pursuant to 18 U.S.C. § 3593(b)(3) for the sentence to be determined by the trial court rather than a jury. Any request pursuant to this provision shall be submitted to the Assistant Attorney General for the Criminal Division through the Capital Case Section.

[updated April 2014]

---

### 9-10.180 - REPORTING REQUIREMENTS

Each United States Attorney's Office or Department component must identify a point-of-contact who will be responsible for ensuring compliance with the following reporting requirements. The Capital Case Section must be

immediately notified when:

    A. A capital offense is charged or when an indictment is obtained pertaining to conduct that could be, but has not been, charged as a capital offense. The point-of-contact must immediately provide the Section with a copy of the indictment and case number. In the event the indictment is obtained prior to submitting the case for review pursuant to the provisions of this Chapter, the United States Attorney or Assistant Attorney General shall comply with the notification requirements of JM 9-10.060.

    B. A deadline for filing a notice of intent to seek the death penalty or a trial date is established or modified.

    C. There are any developments that could affect the ability to file a notice of intent to seek the death penalty sufficiently in advance of trial to allow the defense and prosecution to prepare for a capital punishment hearing.

    D. A verdict and sentence are reached in a case in which the Attorney General has directed seeking the death penalty.

The victim's family must be notified of all final decisions regarding the death penalty.

[updated April 2014]

---

### 9-10.190 - FORMS AND PROCEDURES

The Assistant Attorney General for the Criminal Division, the Deputy Attorney General, and the Attorney General may promulgate forms and procedures to implement the provisions of this Chapter. The United States Attorney or Assistant Attorney General should contact the Capital Case Section to discuss the applicable procedures and obtain the appropriate forms.

[updated April 2014]

---

### 9-10.200 - EXCEPTIONS FOR THE PROPER ADMINISTRATION OF JUSTICE

To ensure the proper administration of justice in an appropriate case, the Attorney General may authorize exceptions to the provisions of this Chapter.

[renumbered from 9-10.190 April 2014]

‹ 9-8.000 - Juveniles                  up                  9-11.000 - Grand Jury ›

EXHIBIT C

**Judicial Conference of the United States**
**Committee on Defender Services**
United States District Court
727 United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201-1818

**Chair**
John Gleeson

**Telephone:**
(718) 613-2450
**Fax:**
(718) 613-2456

**Members**
Samuel Alba
Carl J. Barbier
Sandra S. Beckwith
Mark W. Bennett
Robert C. Chambers
Stanley R. Chesler
Anne C. Conway
Claire V. Eagan
Barry T. Moskowitz
Michael J. Reagan
Ricardo M. Urbina
John A. Woodcock, Jr.

March 25, 2008

MEMORANDUM

To:        Judges, United States Courts of Appeals
           Judges, United States District Courts
           United States Magistrate Judges

From:      Honorable John Gleeson

RE:        NEW CRIMINAL JUSTICE ACT GUIDELINE REGARDING SCHEDULING OF FEDERAL
           DEATH PENALTY CASE AUTHORIZATION

        I write about a Criminal Justice Act (CJA) Guideline, approved at the Judicial
Conference's September 18, 2007 session, relating to the establishment of a schedule for
resolution of whether the Government will seek the death penalty in death-eligible cases.  The
text of the new guideline is attached.  It was developed jointly by Department of Justice (DOJ)
staff and defender services representatives, based upon discussions I had with senior members of
the DOJ's Criminal Division and members of the capital defense community, wherein each side
expressed a desire to streamline the declination process whenever possible.

        The new guideline states that, within a reasonable period of time after appointment of
counsel pursuant to 18 U.S.C. § 3005, and after consulting with counsel for the Government and
for the defendant, the court should establish a schedule for resolution of whether the Government
will seek the death penalty.  The schedule should include dates for:

        (1)     the submission by the defendant to the United States Attorney of any reasons why
                the Government should not seek the death penalty;

        (2)     the submission by the United States Attorney to the appropriate officials of the
                Department of Justice of a recommendation and any supporting documentation
                concerning whether the death penalty should be sought; and

New Criminal Justice Act Guideline Regarding                                    Page 2
Scheduling of Federal Death Penalty Case Authorization

> (3)     filing of a notice under 18 U.S.C. § 3593(a) that the Government will seek the
>          death penalty, or notification to the court and the defendant that it will not.

The schedule should be flexible and subject to extension for good cause at the request of either party (which may, as appropriate, be in an ex parte application or proceeding).  It should allow for reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought, taking into account such factors as the factual complexity of the case, continuing investigations, the potential for successful plea negotiations, and any other relevant factors.  Because the full development of facts related to guilt and aggravating and mitigating factors may continue even after the case is submitted to the Department of Justice for review, scheduling extensions may be necessary.

It is my belief, and that of my colleagues on the Defender Services Committee, that the utilization of this guideline can facilitate the authorization/declination process and significantly reduce costs in capital representations.  An earlier declination decision enhances the opportunity to realize cost savings.

I would also like to take this opportunity to remind the judges who appoint counsel in death-eligible cases of certain judicial obligations, incorporated in 18 U.S.C. § 3005.  "Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly *assign 2 such counsel*[.]  In assigning counsel under this section, *the court shall consider the recommendation of the Federal Public Defender organization*, or, if no such organization exists in the district, of the Administrative Office of the United States Courts."  18 U.S.C. § 3005 (emphasis added).  Federal defender organizations work closely with Federal Death Penalty Resource Counsel, who are expert capital defense attorneys, to identify qualified attorneys to provide representation in death-eligible cases.  On its face, the statutory consultation requirement applies to the appointment of both counsel.  Court consultation with the local federal defender organization helps facilitate the appointment of qualified counsel and ensure that the representation furnished is consistent with the best practices of the legal profession.

If you have any questions regarding these matters, please contact your circuit's member on the Defender Services Committee, the Office of Defender Services at the Administrative Office, or me.

Attachment

cc:     Circuit Executives
        Federal Public/Community Defenders
        District Court Executives
        Clerks, United States Court of Appeals
        Clerks, United States District Courts
        CJA Panel Attorney District Representatives

**NEW PARAGRAPH 6.04 OF THE GUIDELINES FOR THE ADMINISTRATION
OF THE CRIMINAL JUSTICE ACT AND RELATED STATUTES, VOLUME 7,
*GUIDE TO JUDICIARY POLICIES AND PROCEDURES*,
REGARDING SCHEDULING OF FEDERAL DEATH PENALTY CASE
AUTHORIZATION**

**CHAPTER VI.      REPRESENTATION IN FEDERAL DEATH PENALTY CASES
AND IN FEDERAL CAPITAL HABEAS PROCEEDINGS**

*      *      *

**6.04    Scheduling of Federal Death Penalty Case Authorization to Control Costs.** Within a reasonable period of time after appointment of counsel pursuant to 18 U.S.C. § 3005, and only after consultation with counsel for the Government and for the defendant (including, as appropriate, in an ex parte application or proceeding), the court should establish a schedule for resolution of whether the Government will seek the death penalty. This schedule should include dates for:

(1) the submission by the defendant to the United States Attorney of any reasons why the Government should not seek the death penalty;

(2) the submission by the United States Attorney to the appropriate officials of the Department of Justice of a recommendation and any supporting documentation concerning whether the death penalty should be sought; and

(3) filing of a notice under 18 U.S.C. § 3593(a) that the Government will seek the death penalty, or notification to the court and the defendant that it will not.

The schedule should be flexible and subject to extension for good cause at the request of either party (again, as appropriate, in an ex parte application or proceeding). It should allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought, with due regard to the factual complexity of the case, the status of any continuing investigation of the crimes and related criminal conduct, the anticipated or actual progress of discovery, the potential for successful plea negotiations, and any other relevant factors. It is also recognized that scheduling extensions may be necessary because the full development of facts related to guilt and aggravating and mitigating factors may continue even after the case is submitted to the Department of Justice for review.

EXHIBIT D

## DECLARATION OF EMILY OLSON-GAULT, ESQ.

1.     I, the undersigned declarant, Emily Olson-Gault, am over eighteen years of age and competent to testify to the statements contained in this Declaration. I am an attorney licensed to practice law in the State of New York and the U.S. Supreme Court. I am the Director and Chief Counsel of the American Bar Association Death Penalty Representation Project, which is based in Washington, D.C.

2.     The American Bar Association ("ABA") created the Death Penalty Representation Project (the "Project") in 1986 to address the lack of qualified counsel available to those facing a death sentence.

3.     The ABA and the Project do not take a position on the death penalty itself. The Project is committed to ensuring that basic constitutional protections have been provided to all individuals who are charged with a capital crime or sentenced to death. To this end, the Project promotes policies and procedures that will guarantee that all those facing execution are represented at every stage of the proceedings.

4.     The ABA has promulgated Guidelines that govern the appointment and performance of defense counsel in death penalty cases. The Project is sometimes asked to provide affidavits in death penalty cases about the ABA Guidelines and standards for representation, and it does so not to advantage a particular litigant but to ensure that basic constitutional protections and due process have been provided to all individuals facing a death sentence.

5.     The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines" or "Guidelines"), first adopted in 1989, were revised and updated in 2003 so that they would accurately reflect current death penalty law and practice. 31 HOFSTRA L. REV. 913 (2003), *available at* http://ambar.org/2003guidelines. The Death Penalty Representation Project led the effort to revise and update the Guidelines. The ABA House of Delegates approved the revised ABA Guidelines in February 2003.

6.     After the revision of the ABA Guidelines in 2003, the Project and other organizations developed the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (hereinafter "Supplementary Guidelines") to address the urgent need to help defense counsel understand how to supervise the development of mitigation evidence and direct a key member of the defense team, the mitigation specialist. The Supplementary Guidelines are a complementary extension of the ABA Guidelines. They serve to spell out important features of the existing standards of practice that enable mitigation specialists and defense attorneys to work together effectively to uncover and develop evidence that humanizes the client. *See* Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 679 (2008).

7.     The ABA Guidelines and Supplementary Guidelines have been cited favorably in nearly 400 state and federal capital appellate decisions, including the United States Supreme Court.

*See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ...'" (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam)); *Florida v. Nixon*, 543 U.S. 175, 191, 191 n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). *See also* ABA Death Penalty Representation Project, *List of Cases Citing the Guidelines* (Mar. 23, 2020), available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/allcites.pdf.

8.  The Guidelines have been adopted in substantive part or officially acknowledged as an accurate description of the standard of care for defense representation in death penalty cases by organizations such as the State Bar of Texas, the Department for Public Advocacy for the Commonwealth of Kentucky, the Idaho Public Defender Commission, the Georgia Public Defender Standards Council, and numerous others. The ABA Guidelines have also been adopted in substantive part by state legislative action or court rule in Louisiana, Nevada, and Arizona. *See* ABA Death Penalty Representation Project, *Implementation Fact Sheet* (Jul. 2018), available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/ImplementationFactSheetJul2018.pdf.

9.  The ABA Guidelines did not themselves create the national standard of care for capital representation; rather they simply codified long-standing norms of capital defense practice in the United States. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("the [ABA Guidelines] merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

10. The Guidelines are intended to provide guidance to judges and capital defense counsel regarding the skills and training death penalty counsel must possess when representing a person charged with a capital crime.

11. All capital cases require exceptional time and efforts simply due to the nature of the proceedings. *See* Guideline 1.1, Commentary at 923 ("'Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution.' . . . Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make 'extraordinary efforts on behalf of the accused'" (quoting, first, Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences*, 43 Buff L. Rev. 329, 357-58 (1995) and, second, ABA Standards for Criminal Justice: Defense Function, Standard 4-1.2(C), (3d ed. 1993)). The need for time and resources to prepare the defense is due in part to the tremendous amount of investigation that the capital team must complete to adequately represent a person facing a death sentence.

12. In my position as Director of the Project, I am in frequent contact with capital defenders and pro bono attorneys to discuss and assist with issues related to capital representation.

13. During the month of March 2020, I have spoken with capital defenders and pro bono attorneys all over the United States as they attempt to cope with the unprecedented situation

created by the COVID-19 global pandemic. My understanding from these conversations is that most capital defense teams are unable to conduct the large majority of the investigation and expert work required in capital representation (*see* ¶¶17-29, *infra*). This is due to restrictions set in place by state and local governments, as well as departments of corrections and institutional defender offices and law firms, out of a concern for public health and the welfare of employees. As a result, the time available to capital trial teams has been truncated significantly because of health concerns related to COVID-19.

14.    Time is a scarce resource in all capital representation. The Guidelines recognize that the period of time prior to a capital trial is one of the most critical for development of the case and legal strategy. Guideline 1.1 notes that effective advocacy in early stages of a capital case "enabl[es] counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable" and "[t]hus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible . . . ." Guideline 1.1, History of Guideline, at 920. *See also* Guideline 10.2, Commentary, at 994 ("early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity . . ."); Guideline 10.7, Commentary, at 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.").

15.    When the time to perform these essential functions is truncated, whether by operation of the legal system or by something wholly external like a natural disaster, counsel will not have adequate time to prepare their case and this, in turn, jeopardizes due process and fairness in capital cases. *See* ABA Guideline 6.1, Commentary, at 969 ("Regardless of the context, no system that involves burdening attorneys with more cases than they can reasonably handle can provide high quality legal representation. In the capital context, no such system is acceptable.").

16.    The Guidelines' description of the nature of investigation required in capital cases provides insight into the extraordinary need for time in all capital proceedings.

17.    Capital defense counsel and their team must conduct thorough, independent investigations related to both the guilt and penalty phases of the trial. See ABA Guideline 10.7(A). This requirement is ironclad; an admission of guilt by the client, the client's direction not to investigate, or any other extenuating circumstances do not change or lessen counsel's obligations in this area. *See* ABA Guideline 10.7(A)(1)-(2). ABA Guideline 10.10.1 recognizes that defense counsel must be afforded the time not only to investigate and obtain discovery, but also to shape the fruits of the investigation into a comprehensive strategy governing each facet of the trial and pre-trial proceedings. To avoid credibility-damaging inconsistencies between the guilt and penalty phases, "it is critical that, well before trial, counsel formulate an integrated defense theory." ABA Guideline 10.10.1, Commentary, at 1047.

18.     As part of the requisite investigation, capital cases also require comprehensive, multi-generational psychosocial history construction based on "exhaustive investigation." ABA Guideline 4.1, "Defense Team and Supporting Services," Commentary, at 959. These histories must extend back at least three generations in the defendant's family. *See also* Supplementary Guideline 10.11(E)(2)(a).

19.     The areas for investigation include: (1) medical history, including "hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage;" (2) family and social history; (3) educational history; (4) military service; (5) employment and training history; and (6) prior juvenile and adult correctional experience. Guideline 10.7, Commentary, at 1022-23. *See also* Supplementary Guideline 10.11(B) (listing the same areas enumerated by the ABA Guidelines and further adding "multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; . . . religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.")

20.     The areas for investigation listed in ABA Guideline 10.7 are not intended to be exhaustive, and the Guidelines explicitly contemplate additional investigation for other legal issues: "Additional investigation may be required to provide evidentiary support for other legal issues in the case . . . Whether within the criminal case or outside it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist." Guideline 10.7, Commentary, at 1027. *See also* Supplementary Guideline 10.11(B) ("The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death.").

21.     The ABA Guidelines outline a dual-track approach to conducting this investigation, requiring both witness interviews and records collection. *See* Guideline 10.7, Commentary, at 1024 ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers and others" and "[r]ecords—from courts, government agencies, the military, employers, etc. . . . should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.")

22.     Simply locating a single source for this information is often insufficient. The Guidelines recognize that "[t]he collection of corroborating information from multiple sources—*a time-consuming task*—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." ABA Guideline 10.7, Commentary, at 1025 (emphasis added).

23.     The Guidelines also make clear that in-person interviews with the client, witnesses, and family members are at the core of any adequate investigation: "Team members must

conduct *in-person, face-to-face, one-on-one interviews* with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation." Supplementary Guideline 10.11(C) (emphasis added). *See also* ABA Guideline 10.5, Commentary, at 1008 ("Even if counsel manages to ask the right questions, a client will not—with good reason—trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls."). Remote technology options such as video conferencing and phone calls do not provide an adequate alternative for capital defenders, mitigation specialists, experts, or investigators.

24.   This time-intensive, in-person contact is essential for establishing a relationship of trust with the client, client's family, and other witnesses, which is indispensable to effective representation. *See* Supplementary Guideline 10.11(C) ("Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding."); ABA Guideline 10.5 and Commentary, at 1008 ("Client contact must be ongoing, and *include sufficient time spent at the prison to develop a rapport between attorney and client*.") (emphasis added).

25.   In-person visits with the client and client's family are also a crucial tool in dictating the defense team's choices regarding necessary mental health screening and experts, which are especially important given the near-ubiquity of mental health issues in capital cases. Defense counsel's observations of the client's mental state are a necessary piece of the puzzle, as are the observations of a member of the defense team specifically trained to screen for disorders and recommend follow-up investigation and appropriate experts. *See* ABA Guideline 4.1, Commentary, at 956. In many cases, the results of such observation render a "psychologist or other mental health expert [] a needed member of the defense team." ABA Guideline 10.4, Commentary, at 1004.

26.   The mental health services provided as a result of observations and screenings are also oftentimes necessary to ensure that a client is "cognitively and emotionally competent to make sound decisions concerning his case." ABA Guideline 4.1, Commentary, at 959. Moving capital proceedings forward while in-person visits cannot take place prevents counsel from ensuring that the client is competent.

27.   Additionally, expert evaluations of the client are time-consuming, particularly for issues related to intellectual disability and mental illness or competency. *See* ABA Guideline 4.1, Commentary, at 956 ("Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process."). In order to ensure the heightened reliability of such evaluations, a thorough investigation must first be conducted. *Id.* ("Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary."); *see also*

ABA Guideline 4.1, Commentary, at 959 (the mitigation specialist "provides social history information to experts to enable them to conduct competent and reliable evaluations"). Judgment calls regarding which expert evaluations are recommended are necessarily the product of in-person visits between the client and the defense team and are informed by a comprehensive and thorough investigation. *See* ¶¶25-26, *supra*.

28.   The investigation is also a necessary precursor to making key strategic decisions and preparing pleadings. *See* ABA Guideline 10.7, Commentary, at 1021 ("Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.").

29.   Similarly, the investigation informs voir dire, which is necessarily time-intensive. The Guidelines make clear that counsel must "devote substantial time" to preparation for jury selection. ABA Guideline 10.10.2, Commentary, at 1051. Given the importance of "choosing a jury most favorable to the theories of mitigation that will be presented," *id*., appropriate voir dire preparation can only occur once the defense team has completed its rigorous investigative duties.

30.   The norms of practice reflected in the ABA Guidelines are not aspirational. *See* Guideline 1.1, Commentary, at 920. They represent the minimum requirements for adequate representation. If counsel lacks adequate time to prepare their case, or if defense counsel, mental health experts, investigators and mitigation specialists are unable to conduct in-person meetings and interviews to discharge the duties outlined in ¶¶17-29 above, fundamental fairness and accuracy are put at risk.

31.   As the Guidelines have recognized, the provision of effective representation at trial is essential to due process in capital cases. In mandating the provision of high quality legal representation at the trial level of a capital case, [the Guidelines] recognize[] the simple truth that any other course has weighty costs—to be paid in money and delay if cases are reversed at later stages or in injustice if they are not." ABA Guideline 1.1, Commentary, at 930.

32.   The ABA Guidelines are the most authoritative and up-to-date articulation of the investigative and other responsibilities of capital defense counsel. The American Bar Association believes that meeting these responsibilities is essential to ensuring justice in capital cases.

I hereby swear under penalty of perjury that the above and foregoing is a true and correct statement.

Dated this 2nd day of April, 2020.

Emily Olson-Gault

EXHIBIT E

**Impacts of the COVID-19 Pandemic for Capital Defense Teams**

**DECLARATION OF CASSANDRA STUBBS**

I, CASSANDRA STUBBS, declare as follows:

1.      I am the Director of the Capital Punishment Project of the American

Civil Liberties Union (ACLU), a litigation project of the national office of the ACLU

dedicated to capital defense.

2.      I submit this declaration to detail some of the profound impacts of the

COVID-19 global pandemic on trial, post-conviction, habeas, and clemency

investigation of capital cases and to describe why the global pandemic will require

in many cases the extension of case timelines and deadlines.

**Background and Qualifications**

3.      I am engaged full time in capital defense litigation. I have 14 years of

exclusive capital defense experience and 16 years of criminal defense experience. I

am barred in North Carolina, California, and New York and admitted in multiple

federal courts, including the United States Supreme Court. I have represented

capital clients in state courts in Alabama, Arkansas, California, Kansas, Louisiana,

New Mexico, North Carolina, Mississippi, South Carolina, and Tennessee. I have

acted as lead or second chair counsel in trial, direct appeal, state post-conviction,

and federal habeas proceedings.

4.      I regularly consult with capital trial teams across the country on a

wide range of issues. I have served as an instructor in capital defense at trainings

throughout the country. In the past year I have presented at: a national training for trial, post-conviction and habeas capital lawyers sponsored by the California Association of Criminal Justice Attorneys in San Diego in February, 2020; a state training for post-conviction attorneys held in North Carolina in January, 2020; a regional case training for southeast capital teams sponsored by the National Association of Criminal Defense Lawyers in November, 2019 in Tallahassee, Florida; the Santa Clara Death Penalty College, a national training for federal and state capital trial teams held in California in August, 2019; and the NAACP Legal Defense Fund's national training for federal and state capital trial lawyers in New York in July, 2019. This year, in conjunction with senior mitigation specialists, I launched the Scharlette Holdman Mitigation Mentoring Program to partner developing mitigation specialists with leaders in the field to provide intensive training and hands-on mitigation mentoring. I have presented frequently about the ABA Guidelines and obligations of capital defense teams to adequately investigate and prepare for capital cases.

## COVID-19 Large Scale Disruptions

5.     As of today, April 1, 2020, life, work, and travel in the United States have been dramatically disrupted by the COVID-19 global pandemic. The President of the United States, Donald Trump, declared a National Emergency on March 13, 2020, following the declaration of a public health emergency declared by the Secretary of Health and Human Services (HHS) on January 31, 2020. The United

States Supreme Court closed the court to the public indefinitely, postponed

scheduled oral arguments, and extended the deadline for petitions for certiorari by

sixty days. *See* 589 U.S. __  Misc. Order (March 19, 2020),

https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf; Supreme

Court, Press Release (March 16, 2020). State and federal courts have entered a wide

of range of orders closing public access to court houses, suspending or postponing all

criminal jury trials, and in many cases, tolling and postponing deadlines.[1] *See*

United State Courts, *Court Orders and Updates During COVID-19 Pandemic*

(March 31, 2020), https://www.uscourts.gov/about-federal-courts/court-website-

links/court-orders-and-updates-during-covid19-pandemic (linking to COVID-19

orders for the United States Supreme Court, all of the federal courts of appeal, and

---

[1]The tolling and extension orders range in duration and kind. For example, in the federal appellate courts, the Second Circuit Court of Appeals extended and tolled all deadlines by 21 days and the Ninth Circuit Court of Appeals indicated that it would "extend non-jurisdictional filing dates as needed." Order re COVID-19 Pandemic (2d Cir. March 15, 2020),  http://www.ca2.uscourts.gov/docs/Order%20-%20RAK%20Extending%20Filing%20Dates%20FINAL%2031620.pdf ; COVID-19 Notice (9th Cir. March 26, 2020), http://cdn.ca9.uscourts.gov/datastore/general/2020/03/16/COVID-19%20Notice.pdf. The Pennsylvania Supreme Court suspended all deadlines and time calculations through at least April 3, 2020 and the Louisiana Governor suspended all legal deadlines through at least April 13, 2020.  *See In re: General Statement Judicial Emergency, Judicial Administrative Docket* (Pa. March 18, 2020) (Entries 531 and 532)*,* http://www.pacourts.us/assets/files/page-1305/file-8634.pdf; Louisiana Executive Department, *Additional Measures for COVID-19, Public Health Emergency, Proclamation No. 30 JBE 2020*, (March 16, 2020),https://gov.louisiana.gov/assets/ExecutiveOrders/JBE-EO-30.pdf.   The Georgia Supreme Court suspended, tolled, and extended time from filing deadlines, time schedules or filing requirements, including time within which to file a writ of habeas corpus to April 13, 2020, unless otherwise extended.  *See* Order Declaring Statewide Judicial Emergency (Ga. March 14, 2020), https://www.gasupreme.us/wp-content/uploads/2020/03/CJ-Melton-amended-Statewide-Jud-Emergency-order.pdf

the federal district courts); Brennan Center for Justice, *Courts' Responses to the Covid-19 Crisis* (March 30, 2020),  https://www.brennancenter.org/our-work/research-reports/courts-responses-covid-19-crisis ("Many district court have closed their doors to the public, postponed jury trials and grand jury proceedings, and ordered that judges waive certain appearances if a defendant consents, or conduct them by phone where possible"); National Center for State Courts, *The Evolving Nature of 'Essential Services' and 'Urgent Matters'* (March 30, 2020), https://www.ncsc.org/Newsroom/Public-health-emergency/Stories/Essential-services.aspx ("By now most states and territories have ordered their courts to limit in-person proceedings…[]"). Most courts have limited criminal court access to emergency matters. *See, e.g.,* The Marshall Project, *Coronavirus Tracker: How Justice Systems Are Responding in Each State*, https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus (updated March 25, 2020) (describing 33 state courts systems and DC as suspending most in-person criminal proceedings and 13 state court systems as reducing in-person criminal proceedings).

6.      Several jurisdictions are under mandatory stay at home orders, and social distancing has been directed nationwide. These orders restrict people from non-essential contact. It is neither responsible from a public health standpoint nor socially tolerable for a defense investigator to meet in-person with witnesses at this time. In-person outreach by an investigator is likely to be met with fear and anxiety by the witness, with good reason. Any attempt to conduct such investigation could

easily backfire by resulting distrust and anger from the witness. Travel, whether local or distant, increases the risk of the spread of COVID-19 and is inconsistent with our nation's shared goal to reduce the disease and death toll.

7.      Many legal offices, including defender agencies and non-profits like my office at the ACLU, have ordered all staff to work from home and directed staff not to travel for non-emergency in-person meetings. *See, e.g.,* Office of the Federal Public Defender Eastern District of Arkansas homepage, are.fd.org ("Due to the Covid-19 pandemic . . . [o]ur physical offices are closed, but we continue to work remotely."); Debra Cassens Weiss, *More BigLaw firms close or require remote work because of coronavirus threa*t, ABA Journal, March 16, 2020, https://www.abajournal.com/news/article/more-biglaw-firms-close-or-require-remote-work-because-of-coronavirus-threat. Even law enforcement and prosecutor offices have shifted to reduced in-person work and increased remote work and shifted investigation priority areas to emergent matters. *See, e.g.,* C. Ryan Barber, *How the US Justice Department is Responding to Coronavirus Threat*, The Nat'l Law J., March 13, 2020, https://www.law.com/nationallawjournal/2020/03/13/how-the-us-justice-department-is-responding-to-coronavirus-threat/ (describing direction by the Deputy Attorney General that attorneys consider teleworking); Office of the Maine Attorney General Home Webpage, https://www.maine.gov/ag/ ("Notice: Due to the current state of emergency caused by the 2019 Novel Coronavirus (COVID-19), the Office of the Attorney General is operating with a reduced staff at our physical office locations."); Cincinnati Police Department, cincinnati-

oh.gov/police/covid-19-changes-to-department-operations/ ("Effective at 8:00 a.m.

Tuesday, March 24, 2020, a temporary suspension of in-person officer response will

be in effect" for various offenses, including assault, breaking and entering, property

damage, dog bites, and lost or stolen property).

8.     Prisons and jails are susceptible to widespread COVID-19 infections.[2]

Several state and federal correction facilities have suspending all in-person visits,

including legal visits.[3]  Without in-person client contact, defense teams lack critical

---

[2] *See* Danielle Ivory, '*We Are Not a Hospital': A Prison Braces for the Coronavirus,*
N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-
prisons-jails.html?searchResultPosition=1; Martin Kaste, *Prisons and Jails Worry
About Becoming Coronavirus 'Incubators'*, NPR (March 13, 2020),
https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-
coronavirusincubators; Keri Blakinger & Beth Schwarzapfel, *How Can Prisons
Contain Coronavirus When Purell is a Contraband*?, ABA Journal (March 13, 2020),
https://www.abajournal.com/news/article/when-purell-iscontraband-how-can-
prisons-contain-coronavirus; Jennifer Hansler & Kylie Atwood, *Pompeo Calls for
Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus
Outbreak*, CNN (Mar. 10, 2020), https://cnn.it/2W4OpV7; Kimberly Kindy et al.,
'*Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons
Face Coronavirus Threat*, Washington Post (Mar. 25, 2020),
https://www.washingtonpost.com/national/disaster-waitingto-happen-thousands-of-
inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-
b313-df458622c2cc_story.html.
[3] *See, e.g.,* Federal Bureau of Prisons,
https://www.bop.gov/resources/news/20200313_covid-19.jsp (suspending legal visits
for 30 days); United States Penitentiary Terra Haute,
https://www.bop.gov/locations/institutions/thp/ (suspending all visitation "until
further notice"); Alabama Department of Corrections,
https://www.bop.gov/locations/institutions/thp/ (updated March 13, 2020) ("General
legal visits conducted in-person by attorneys with inmates will be suspended for 30
days."); Arizona Department of Corrections,
https://corrections.az.gov/sites/default/files/notifications/new-actions-to-mitigate-
covid-19-risk.pdf (effective March 13, 2020 suspending all visitation for 30 days);
Arkansas Department of Corrections,
https://adc.arkansas.gov/images/uploads/COVID_News_Release_-
_Inmate_Visitation_Suspension_ADC-3-16-2020.pdf (effective March 16, 2020

information to understanding the client's current functioning and cannot explore sensitive topics with their clients, like trauma history, as described more fully below.

**COVID-19 Interference with Constitutionally Adequate Defense**

9.     The radical restrictions of court access and inability to conduct field investigation or visit with clients is necessarily disruptive to the core functions of defense teams. The Sixth Amendment imposes a constitutional obligation on capital counsel to conduct a thorough investigation of both guilt-innocence issues and potential penalty phase issues for trial. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000) (counsel ineffective for failing to investigate readily available evidence); *Wiggins v. Smith*, 539 U.S. 510, 535-38 (2003) (counsel ineffective for limiting the investigation to the presentence report and narrow set of records); *Rompilla v. Beard,* 545 U.S. 374, 390-92 (2005) (counsel ineffective for failing to: investigate client's prior conviction; follow up on "red flags" in school, medical and prison records that pointed to the need for further mental health testing, and investigate mitigation beyond the immediate family). Whether the defense team failed to meet these obligations, and whether such failures prejudiced the client are at the heart of

suspending all visitation for 21 days); Georgia Department of Correction http://www.dcor.state.ga.us/NewsRoom/PressReleases/georgia-department-corrections-suspends-visitation-statewide (effective March 13, 2020 suspending all visitation until April 10, 2020);  Louisiana Department of Correction, https://doc.louisiana.gov/wp-content/uploads/2020/03/3.13.20-Coronavirus-Inmate-Notification-of-Visiting.pdf (effective March 12, 2020 suspending indefinitely all visitation, to be revisited every 30 days).

many federal habeas and state post-conviction inquires. *Id.*; *Martinez v. Ryan*, 566 U.S. 1 (2012).

10.     The American Bar Association's professional guidelines describe the prevailing capital defense norms. American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Case*s, 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines"). The ABA Guidelines "stand as the single most authoritative summary of the prevailing professional norms in the realm of capital defense practice."  Russell Stetler and W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 Hofstra L. Rev. 635, 635 (2013).  These Guidelines "set forth a national standard of practice" (Guideline 1.1.A) and "extend to all stages of every case," including initial and ongoing investigation, pretrial proceedings, trial proceedings, postconviction review and clemency proceedings. 31 Hofstra at 919 (Guidelines 1.1A and 1.1.B). The most recent comprehensive ABA Guidelines were published in 2003, almost two decades ago. Under the guidelines, as well as basic rules of professional responsibility in every jurisdiction requiring zeal and competence, "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." 31 Hofstra at 1015 (Guideline 10.7 (A)).

11.     In 2008 the ABA published a supplement to the 2003 Guidelines, providing additional description of the existing standards for capital mitigation investigations. *See* American Bar Association*, Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev.

677 (2008). ABA Supplementary Guideline 10.11 addresses the "requisite mitigation functions of the defense team," which include conducting an "exhaustive and independent" biopsychosocial history of the client, 10.11(B); conducting multiple "in-person, face-to-face, one-on-one interviews" with biopsychosocial history witnesses or any witness "who would support a sentence less than death," 10.11(C); generating documentary evidence of the client's biopsychosocial history for counsel's use, 10.11(D); aiding counsel with the selection and preparation of testifying witnesses, lay and expert, 10.11(E); gathering documentary support for lay and expert witness testimony, including biopsychosocial history records, 10.11(F), and aiding counsel in gathering and preparing demonstrative evidence that "humanize the client or portray him positively," 10.11(G).

12.     Much of this detailed and time-intensive investigative and presentation defense work cannot be done remotely and cannot be achieved during time of social distancing. Witness interviewing and preparation, record collection, and evidentiary presentations, including defense team presentations to trial prosecutors deciding whether to seek death are three illustrative examples of the kinds of core defense team work that are directly impacted by the pandemic's disruption.

**Disruptions to Witness Interviewing and Witness Preparation**

13.     Witness interviewing and preparation will be necessarily paused during the time of social distancing orders while in-person interviewing is

suspended. Phone calls or video calls are an insufficient substitute. They do not guarantee privacy or safety to the witness, they lack the necessary trust for such a call, and they deprive the interviewer of important nonverbal cues and evidence.

14.     Long-prevailing professional norms, including those in the 2003 ABA Guidelines and 2008 ABA Mitigation Guidelines, have stressed the importance of sensitive social history interviewing to overcome barriers to disclosure such as "shame, denial and repression." ABA Guideline 10.7, Investigation, Commentary, 31 Hofstra L. Rev. at 1024; ABA Supplemental Guideline 10.11(C), The Defense Case: Requisite Mitigation Functions of the Defense Team, 36 Hofstra L. Rev. at 689. This kind of interviewing requires trust and must be conducted in-person.  The 2008 Supplemental Guidelines direct that such interviews must be in-person, face-to-face:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history or family history or who would support a sentence less than death.  Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

Supplemental Guideline 10.11.C, 36 Hofstra L. Rev. at 689. This directive is routinely instructed at national and state capital trainings and is reflected and explained in a number of publications about the standard of practice in capital cases.  *See, e.g.*, Sean O'Brien, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases: When Life Depends on It*, 36 Hofstra L. Rev. 693, 746 (2008) (describing the need for mitigation specialists to conduct in-person interviews because witnesses will not speak freely without that

10

privacy and assurance of trust and because of the ability to detect non-verbal cues through in-person interviews); Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 Hofstra L. Rev. 923, 939-40 (discussing the need for in-person face-to-face interviewing for documenting and understanding the client's trauma history).

15.    A wide range of investigators in criminal settings insist on the need for sensitive, rapport building interviews in comfortable and private settings. Vincent A. Sandoval and Susan H. Adams, *Subtle Skills for Building Rapport*, 70 FBI Law Enforcement Bulletin 1, 1-2 (Aug. 2001) ("The need for rapport applies to all interviews, but especially those involving a victim or a witness who has experience physical or psychological abuse."); Office of Justice Programs, U.S. Dept. of Justice, Child Forensic Interviewing: Best Practices (2015), available at: https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/248749.pdf (recommending interviewing in settings that are comfortable and private to build rapport); Kelly Browe Olsen, *Screening for Intimate Partner Violence in Mediation*, ABA Dispute Resolution Magazine, Fall 2013, at 27 ("A separate in-person interview helps build rapport and lead to a thorough understanding of the issues of a particular family.").

16.    As just one illustration of the inadequacy of phone interviewing, one of my clients was resentenced to life without parole in Alabama post-conviction proceedings in 2018 after our post-conviction investigation uncovered proof of his intellectual disability through in-person interviews. Our client had immigrated to the United States as a teenager and his trial defense team had sought to travel to

11

Vietnam to conduct an in-person investigation of his background. The trial counsel submitted declarations about the need to do in-person interviewing but the trial judge denied the defense motion and ordered telephone or video conferencing as an alternative.  The defense team prepared for trial relying only on telephone interviews for the witnesses in Vietnam.

17.    In post-conviction, the mitigation specialists on our defense team traveled to Vietnam and conducted several in-person interviews, including interviews of family members who had been previously interviewed by phone. They learned critical new evidence about our client's traumatic childhood, as well as evidence of brain injuries, hospitalizations, and evidence of his adaptive functioning deficits.  With the information from the in-person interviews we were able to show the need for psychological testing and to ultimately prove his intellectual disability.

18.    For capital teams facing upcoming post-conviction hearings and trials, the loss of in-person witness preparation time is another significant disruption that will require additional time. Much of the most persuasive and powerful evidence in death penalty litigation comes from witnesses who are able to come to the stand and share emotionally brutal experiences, like stories from family members about physical and sexual abuse suffered by the client. Preparing those witnesses to testify and share publicly such difficult personal family history is a time intensive and sensitive task that requires in-person preparation.  The same conditions of trust and privacy are critical for witness preparation.  During the pandemic, when families are quarantined and ordered in place, there are particular reasons to doubt

privacy. Many witnesses will lack access to internet and the technology necessary for video communication.

## Disruptions to Record Collection

19.    **Record collection** is also likely to be significantly slowed and in some instances paused, during the time of court closures and social distancing. Mitigation specialists can, and should, search on-line court records and databases for available information during this shut down period. Many relevant records, however, are not electronically available. Court records may require travel to courthouses or public record requests of other court clerks. In those cases, when travel is not possible, and when court staff are not processing non-emergency requests, these record-collection functions inevitably will be delayed. A wide range of other categories of records are likely to be delayed by staffing shortages with the requesting agencies, including, for example, the client's medical records, employment records, school records and military records. *See, e.g.*, Air Force Compliance Division, https://www.foia.af.mil/Resources/FOIA/ (March 29, 2020) ("All USAF Freedom of Information Act (FOIA) Offices will be minimally manned, or closed, due to Coronavirus (COVID-19). We anticipate delays in processing your FOIA request during this time."); Jacksonville, Florida Sheriff's Office Public Records Center, https://jacksonvilleso.mycusthelp.com/WEBAPP/_rs/(S(lkika1kymhnzx1kea2ngwjz0) )/supporthome.aspx ("In order to comply with the protocols to lessen any risks, the JSO Public Records Unit will be operating on minimum staff. Public records

requests may not be filled as quickly as usual."); Congressional Research Service, *Freedom Of Information Act (FOIA) Processing Changes Due to COVID-19: In Brief*, March 27, 2020, https://crsreports.congress.gov/product/pdf/R/R46292, CRS-4-CRS-7 (describing delays, changes, and hurdles in FOIA processing from the pandemic and remote work policies of federal agencies).

20.     These significant delays in investigation and preparation have a cascading impact on the defense team's ability to prepare witnesses and their cases. For example, when a team's access to court records and medical records is delayed, their ability to provide an accurate and complete medical history for any mental health experts will be delayed. ABA Guideline 4.1(B) and Commentary, 31 Hofstra L. Rev. at 956 (describing counsel's duty to create a "competent and reliable mental health evaluation" by compiling "extensive historical data"); Douglas S. Liebert and David V. Moster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 Am. J. Forensic Pysch. 43-64 (1994). This in turn means that the hiring of mental health experts, and in some cases, the evaluation of clients by already retained mental health experts, must be delayed not just until when the prisons permit evaluations again, but until the teams have compiled the necessary precursor records. *See id.*, O'Brien, 36 Hofstra L. Rev. at 726 ("Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.")

21.     Record collection is a critical and on-going part of any capital investigation that is directly tied to the other parts of case investigation. Mitigation

specialists and defense teams must process records for new information and leads

on areas of additional investigation, including new witnesses and issue areas. *See*

*generally*, Lee Norton*, Capital Cases: Mitigation, Investigations*, THE CHAMPION

45 (May 1992) ("The investigation is not complete until the information uncovered

becomes redundant and provides no new insight."). The inability to timely obtain

social history records will reverberate into delays in identifying new witnesses and

investigation areas as well.

22.     Funding issues that may arise will compound delays where timely

payments are disrupted. As one federal court has acknowledged, the "disruption to

Court operations caused by the Coronavirus Disease 2019 may cause a disruption to

timely payments and place a financial burden on [counsel], their staff and their

service providers." *In re: Court Operations Under the Exigent Circumstances*

*Created by the Outbreak of Coronavirus Disease* 2019: Interim CJA Orders, Case

No. 2:20mc (March 20, 2020 E.D. Va.).

https://www.nacdl.org/getattachment/08a98203-6049-4e90-94bb-

ac80499c5ebb/general-order-no-2020-05.pdf.


**Disruptions for Plea Presentations and Evidentiary Hearings**

23.     **Presentations to committees** charged with the decision of whether

to recommend authorization of the death penalty in individual cases are another

category of defense team work that will be impacted by the social distancing orders.

The federal government and some state jurisdictions invite capital teams to give an

in-person presentation before the prosecution will decide whether to authorize the death penalty. *See, e.g.*, U.S. Dep't. of Justice, United States Attorneys' Manual (DOJ Manual) § 9-10.080. For pre-trial cases this is a critical juncture to make the case for life.  *See generally,* 31 Hofstra L. Rev. at 1035-44 (ABA Guideline 10.9.1 and commentary).  It is imperative that defense teams have an adequate opportunity to develop and present mitigating evidence at these presentations.  *Id.* at 1041 (noting that "the mitigation investigation is crucial to persuading the prosecution not to seek death" at formal authorization meetings). For some teams, presentation of that information in-person may be a critical piece of the defense strategy and plan for persuasion. *See, e.g.,* Noam Ebner et al., *You've Got Agreement: Negoti@ting Via Email*, 31 Hamline J. Pub. L. & Pol. 427, 429, 436 (2010) (describing how during negotiations "communication media influence not only what information is shared and how that information is communicated, but also how information is received and interpreted" and noting that electronic negotiations risk diminished trust and cooperation so that digital "negotiators are contending on a much rougher playing field than face-to-face negotiators").  Requiring capital defense teams whose cases are being considered during the COVID-19 outbreak to give presentations remotely when in-person presentations are otherwise the norm introduces an element of arbitrariness to capital decision making.  *Cf.,* DOJ Manual 9-10.140.B ("National consistency requires treating similar cases similarly, when the only material difference is the location of the crime."); Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham

Urb. L. J. 347, 424 (1999) ("In the author's experience, virtually every case submitted for review was accompanied by an in-person presentation by defense counsel.").

24.    These examples are just a few illustrations of what are likely to be many concrete ways in which capital defense teams' work will be disrupted. Delayed investigation will impact most aspects of **capital trial preparation and post-conviction proceedings**, beyond just witness preparation and exhibit identification. For example, comprehensive investigation informs key decisions about trial strategy, which must be tailored and refined on an on-going basis. This includes a range of strategy decisions, like how to conduct voir dire in a manner "most favorable to the theories of mitigation that will be presented" to selection of the most powerful themes for the penalty phase presentation. ABA Guideline 10.10.2, Voir Dire and Jury Selection, 913 Hofstra at 1051; *see also*, ABA Guideline 10.7 and Commentary, 913 Hofstra at 1023 (mitigation investigation may impact investigation of first phase defenses, need for expert evaluations, motion practice and plea negotiations); ABA Guideline 10.11, The Defense Case Concerning Penalty, 913 Hofstra at 1059, 1061 ("During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial . . . construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present.")

17

## CONCLUSION

25.    The disruptions of COVID-19 are profound to all areas of American life today, and capital defense is no exception. Capital teams will require additional time after the relaxing of the COVID-19 restrictions in order to move forward with constitutionally sufficient representation.

I declare under penalty of perjury under the laws of the State of North Carolina that the foregoing is true and correct and was executed this 1st day of April 2020 in Durham, North Carolina.

/s Cassandra Stubbs

Cassandra Stubbs

18