RICHARD G. NOVAK (SBN 149303)
Richard G. Novak, APLC
P.O. Box 5549
Berkeley, CA 94705
626-578-1175
Richard@RGNLaw.com

SHAFFY MOEEL (SBN 238732)
Moeel Lah Fakhoury LLP
1300 Clay St Ste 600
Oakland, CA 94612-1427
510-500-9994
Shaffy@mlf-llp.com

Attorneys for Defendant
ROBERT ALVIN JUSTUS, JR.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 4:20-cr-00265-YGR-2 |
| **Plaintiff,** | **NOTICE OF MOTION; MOTION OF DEFENDANT ROBERT ALVIN JUSTUS, JR. TO EXCLUDE PROFFERED EXPERT TESTIMONY OF ARIE PERLIGER AND FOR EVIDENTIARY HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL AND EXHIBITS THERETO** |
| **vs.** | |
| **ROBERT ALVIN JUSTUS, JR.,** | |
| **Defendant.** | BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, DISTRICT JUDGE |
| | Hearing Dates Set by Court: |
| | May 12, 2023 at 9:00 a.m. |
| | June 23, 2023 at 9:00 a.m. |

## NOTICE OF MOTION; MOTION

To this Honorable Court, the United States of America and its counsel of record: Please take notice that on May 12, 2023 at 9:00 a.m. and on June 23, 2023 at 9:00 a.m., defendant Robert Alvin Justus, Jr., by and through his counsel of record, Shaffy Moeel and Richard G. Novak, will and hereby does move this Court for an order excluding from the trial of this matter the proffered testimony of "extremist ideology/Boogaloo expert" Arie Perliger, and for an evidentiary hearing to resolve all disputed issues of fact concerning the admissibility of the proffered testimony under Federal Rule of Criminal Procedure 16, Federal Rules of Evidence 702, 703, and 704, and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

This motion is based upon the attached memorandum of points and authorities, the declaration of counsel and exhibits thereto, and any other matters the Court may consider at the hearings on this motion.

Dated:      March 27, 2023             Respectfully submitted,

                                       RICHARD G. NOVAK
                                       SHAFFY MOEEL


                                       /s/*Richard G. Novak*
                                       RICHARD G. NOVAK
                                       Attorneys for Robert Alvin Justus, Jr.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.    Introduction ........................................................................................... 1

II.   The Elements of the Charged Offenses ................................................ 2

      Count One ........................................................................................ 2

      Count Two ........................................................................................ 3

      The Elements of the Charged Offenses ........................................... 3

III.  The Law Controlling the Admissibility of Expert Testimony .......... 6

      Rule 702 ........................................................................................... 6

      Rule 704(b) ...................................................................................... 9

      Confrontation Clause Issues Implicated by Expert Testimony ....... 10

IV.   Professor Perliger's Proffered Opinions Are Not Admissible .......... 13

      Opinions Concerning "The Boogaloo" ........................................... 14

      Opinions Concerning Mr. Justus's State of Mind and Intentions .... 15

V.    If There Is Any Doubt that the Proffered Expert Testimony Is Not
      Inadmissible, an Evidentiary Hearing Is Necessary to Resolve Disputed
      Issues of Fact ................................................................................... 17

VI.   Conclusion .......................................................................................... 19

TABLE OF AUTHORITIES

**<u>Cases</u>**

*Braxton v. United States*, 500 U.S. 344 (1991) .......................................................... 5

*Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998)......................................... 7

*Claar v. Burlington N.R.R. Co.*, 29 F.3d 499 (9th Cir. 1994).................................... 7

*Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d
      177 (2004) ................................................................................ 10, 12, 16, 18

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)................................... 6, 7

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......................................................... 7

*Jetcraft Corp. v. Flight Safety Int'l,* 16 F.3d 362 (10th Cir.1993)............................ 7

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)................................................ 6

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843 (9th Cir.
      2014)................................................................................................................. 8

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) .......................................... 6, 18

*United States v. Barnard*, 490 F.2d 907 (9th Cir. 1973) ........................................ 10

*United States v. Benson*, 941 F.2d 598 (7th Cir. 1991) ........................................... 11

*United States v. Campos*, 217 F.3d 707 (9th Cir. 2000)......................................... 10

*United States v. Cerna*, 2010 U.S. Dist. LEXIS 62907, 2010 WL
      2347406 (N.D. Cal. June 8, 2010)................................................................. 11

*United States v. Cervantes*, No. CR 12-792 YGR, 2016 U.S. Dist.
      LEXIS 15837 (N.D. Cal. Feb. 9, 2016)............................................... 10, 11, 12

*United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002)......................................... 9, 16

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) ........................................ 8

*United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015)........................................ 11

*United States v. Gomez*, 725 F.3d 1121 (9th Cir. 2013)..................................... 13, 18

*United States v. Hermanek,* 289 F.3d 1076 (9th Cir. 2002) ...................................... 8

*United States v. Holguin*, 2022 WL 7284304 (9th Cir. Oct. 13, 2022) ................... 7

*United States v. Kwong*, 14 F.3d 189 (2d Cir. 1994)................................................. 5

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .......................................... 8, 12

ii

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) ....................................9, 19

*United States v. Rodriguez,* 125 F. Supp. 3d 1216 (D.N.M. 2015) .........................8

*United States v. Valencia-Lopez,* 971 F.3d 891 (9th Cir. 2020) ...........................8

*United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014) ...............................11, 13, 18

**Statutes**

18 U.S.C. § 2(a) .........................................................................................2, 3

18 U.S.C. § 1111 ...........................................................................................2

18 U.S.C. § 1113 ........................................................................................3, 5

18 U.S.C. § 1114(a) ...................................................................................2, 3

**Other Authorities**

29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268 (2d ed.)...............................................................................7

Ninth Circuit Manual of Model Criminal Jury Instructions 4.1(Dec. 2022)..................................................................................................4, 5

Ninth Circuit Manual of Model Criminal Jury Instructions 16.1 (Dec. 2022)..................................................................................................4, 5

Ninth Circuit Manual of Model Criminal Jury Instructions 16.5 (Dec. 2022).......................................................................................................6

**Rules**

Fed. R. Crim. P. 16 .......................................................................................2

Fed. R. Evid. 702 ...........................................1, 6, 7, 9, 12, 13, 15, 17, 18

Fed. R. Evid. 702(b).......................................................................................7

Fed. R. Evid. 703 ............................................................................1, 12, 16

Fed. R. Evid. 704 ...........................................................................................1

Fed. R. Evid. 704(b).........................................................3, 9, 13, 17, 18

Fed. R. Evid. 801(d)(2)(A) .......................................................................16

**Constitutional Provisions**

U.S. Const. amend. VI.........................................................1, 10, 12, 13, 15

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### <u>Introduction</u>

The trial of this matter is set to commence on September 18, 2023.  Mr. Justus is charged in count one of the indictment with aiding and abetting Steven Carrillo's premeditated murder on May 29, 2020 of David Patrick Underwood, who was working as a contract security officer on the grounds of the Ronald V. Dellums Federal Building and United States Courthouse in Oakland, California.  Mr. Justus is also charged with aiding and abetting Mr. Carrillo's attempted premeditated murder of an individual identified in the indictment as "S.M.", who was working in that same capacity at that same location on that same date.

The government timely disclosed the identity, qualifications, and the opinions of five expert witnesses it intends to present at trial.  (Declaration of Richard G. Novak ("Novak Decl.") Ex. A)  Within the context of Federal Rules 702, 703, 704 and the Confrontation Clause of the Sixth Amendment, Mr. Justus does not object to the proffered testimony of four of the five witnesses.[1]

Mr. Justus does, however, have serious concerns about the admissibility under Rules 702, 703, and 704 and the Confrontation Clause of the proffered testimony of the government's "extremist ideology/Boogaloo expert", Professor Arie Perliger, as well as the sufficiency of the disclosures of the bases for his opinions.  Professor Perliger's CV is attached to Novak Decl. as Exhibit B.  The "Expert Witness Report" of Professor Perliger is attached to Novak Decl. as Exhibit C.

As set forth in detail below, Mr. Justus moves this Court to exclude the proffered expert testimony because it is inadmissible under the Federal Rules of Evidence and the Sixth Amendment.  If the Court has any doubt that it is *not*

---

[1] The areas of expert testimony as to which Mr. Justus does not object are: 1) DNA evidence, 2) firearms/ballistics evidence, 3) cellular ("CAST") analysis, and 4) medical evidence related to cause of death and injuries suffered by the victims named above.

*inadmissible*, Mr. Justus moves this Court to convene an evidentiary hearing at which Dr. Perliger can be examined about his opinions, the bases for them, and the methodology, if any, he employed to reach the opinions he expresses in his report.

The next section of this memorandum sets forth the elements of the charged offenses based upon the Ninth Circuit's Model Criminal Jury Instructions and its comments thereto.  The third section of this memorandum addresses the statutory and case law that guides the resolution of the disputes here.  The fourth section identifies the specific opinions of Professor Perliger which are not, in Mr. Justus' view, admissible as expert testimony and/or which Mr. Justus submits cannot be deemed admissible without an evidentiary hearing at which Professor Perliger can be examined by counsel for Mr. Justus, as well as by the Court if it chooses to do so.[2]

## II.

## **The Elements of the Charged Offenses**

### Count One

Count one charges Mr. Justus with violation of 18 U.S.C. §§ 1111, 1114(a) and 2(a).  As there is no dispute that Mr. Underwood was personally killed by Steven Carrillo, the government's theory of liability as to Mr. Justus is that he aided and abetted Mr. Carrillo's premeditated murder of Mr. Underwood.

Section 1111 prohibits murder within the special maritime and territorial jurisdiction of the United States and prohibits both "murder in the first degree" and "murder in the second degree".  "Murder" is defined there as "the unlawful killing of a human being with malice aforethought."  In pertinent part, it provides that "[e]very murder perpetrated by any other kind of willful, deliberate, malicious and

---

[2] As noted by Mr. Justus in his recent Status Report (Doc. No. 186), it appears that Professor Perliger has not previously testified in any *judicial* proceeding concerning his opinions or the bases for his opinions on any matter.  The government has confirmed this as far as the temporal requirements of Rule 16 are concerned and did not supplement its disclosures in this regard at the hearing in this matter on March 23, 2023, at which Mr. Justus' counsel reiterated that the impression left by Dr. Perliger's CV and report is that he has not ever done so.  Nor does a Lexis search reveal any references to Dr. Perliger testifying in any judicial matter.

1   premeditated killing" is murder in the first degree.  The indictment alleges a

2   "premeditated" killing.

3          Section 1114(a) prohibits the killing of a person engaged in the performance

4   of official duties on behalf of the United States or an agency of the United States,

5   creating another basis for jurisdiction, but it does not otherwise modify the elements

6   at issue here.  Section 2(a) provides that one who "aids, abets, counsels, commands,

7   induces or procures" the commission of an offense is punishable as a principal.

8          Count Two

9          Count Two charges Mr. Justus with aiding and abetting the *attempted*

10  premeditated murder by Mr. Carrillo of S.M.  Section 1113 controls the punishment

11  that may be imposed upon a conviction for attempted murder, but it does not

12  establish additional or different elements for the offense.

13         Importantly, however, the Ninth Circuit's Manual of Model Criminal Jury

14  Instructions do clarify the important differences between what the government must

15  prove beyond a reasonable doubt in order to obtain a murder conviction and what it

16  must prove in order to obtain a conviction for attempted murder.

17         Since Federal Rule of Evidence 704(b) prohibits an expert from stating an

18  opinion or inference as to whether a defendant did or did not have the mental state or

19  condition constituting an element of the charged crime, careful consideration of the

20  elements of the charged offenses is important to a doctrinally correct resolution of

21  the issues raised in this motion.

22         The Elements of the Charged Offenses

23         The Ninth Circuit's criminal jury instructions for premeditated murder, for

24  attempted premeditated murder, and for aiding and abetting liability are attached to

25  Novak Decl. as Exhibits D, E, and F, respectively.

26         In order to obtain a conviction of Mr. Justus on count one, which alleges that

27  he aided and abetted the premeditated murder committed by Mr. Carrillo, the

28  government must prove each of the following elements beyond a reasonable doubt:

3

1) That someone else, here Mr. Carrillo, committed the premediated murder of Mr. Underwood, which requires proof at trial of the following elements:

   a. First, that Mr. Carrillo unlawfully killed Mr. Underwood;

   b. Second, that Mr. Carrillo did so with malice aforethought;

   c. Third, that Mr. Carrillo did so with premeditation; and

   d. Fourth, that the killing occurred within federal jurisdiction and/or that Mr. Underwood was a federal officer or employee and was engaged in official duties at the time of the killing, or that he was killed on account of the performance of his duties;

2) That Mr. Justus aided, counseled, commanded, induced, or procured Mr. Carrillo with respect to at least one element of the premeditated murder of Mr. Underwood;

3) That Mr. Justus acted with the intent to facilitate Mr. Carrillo's premeditated murder of Mr. Underwood, and

4) That Mr. Justus acted before the crime committed by Mr. Carrillo was completed.

Ninth Circuit Manual of Model Criminal Jury Instructions 4.1, 16.1 (Dec. 2022).

The aiding and abetting instruction also includes the following language:

> It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit [specify crime charged].
>  A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime [and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime].

Ninth Circuit Manual of Model Criminal Jury Instructions 16.1 (Dec. 2022).

4

In order to obtain a conviction on count two, which alleges that Mr. Justus aided and abetted Mr. Carrillo's attempted premeditated murder of S.M., the government must prove each of the following elements beyond a reasonable doubt:

1) That someone else, here Mr. Carrillo, did something which was a substantial step toward killing S.M. and that strongly corroborated his intent to commit that crime;

2)  That when Mr. Carrillo took that substantial step, he intended to kill S.M.;

3) That the killing occurred within federal jurisdiction or that S.M. was a federal officer or employee and was engaged in official duties at the time of the attempted killing, or that there was an attempt to kill him on account of the performance of his duties;

4) That Mr. Justus aided, counseled, commanded, induced, or procured Mr. Carrillo with respect to at least one element of the attempted premeditated murder of Mr. Underwood;

5) That Mr. Justus acted with the intent to facilitate Mr. Carrillo's attempted premeditated murder of Mr. Underwood; and

6) That Mr. Justus acted before the crime committed by Mr. Carrillo was completed.

Ninth Circuit Manual of Model Criminal Jury Instructions 4.1, 16.5 (Dec. 2022).

The comments to the Ninth Circuit's attempted murder instructions also include the following guidance concerning specific intent.

> See *Braxton v. United States*, 500 U.S. 344, 351 (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." (citations omitted)).  Although one acting "recklessly with extreme disregard for human life" can be convicted of murder if a killing results (see Instruction 16.1 (Murder—First Degree) and 16.2 (Murder—Second Degree)), that same recklessness cannot support a conviction of attempted murder if, fortuitously, no one is killed.  See *United States v. Kwong*, 14 F.3d 189, 194-95 (2d Cir. 1994) (holding that under 18 U.S.C. § 1113, attempted murder conviction requires proof of specific intent to kill; recklessness and wanton conduct, grossly

1            deviating from a reasonable standard of care such that
          defendant was aware of the serious risk of death, would
2            not suffice as proof of an intent to kill).

3  Ninth Circuit Manual of Model Criminal Jury Instructions 16.5 comment (Dec.

4  2022).

5  ### III.

6  ### The Law Controlling the Admissibility of Expert Testimony

7  <u>Rule 702</u>

8      The district court has a "special obligation" to serve as a gatekeeper for expert

9  testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Testimony is

10  properly characterized as "expert" if it concerns matters that the average juror is not

11  capable of understanding on his or her own. *See United States v. Amuso*, 21 F.3d

12  1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting

13  expert testimony where the evidence impermissibly mirrors the testimony offered by

14  fact witnesses, or the subject matter of the expert's testimony is not beyond the ken

15  of the average juror."). When faced with a proffer of expert testimony, the court

16  must determine whether:

17      (a) scientific, technical, or other specialized knowledge will assist the

18      trier of fact to understand the evidence or to determine a fact in issue;

19      (b) the testimony is based on sufficient facts or data;

20      (c) the testimony is the product of reliable principles and methods; and

21      (d) the witness has applied the principles and methods reliably to the

22      facts of the case. Fed. R. Evid. 702(a)–(d).

23      The proponent of expert testimony bears the burden of proving the

24  foundational requirements of Rule 702 by a preponderance of the evidence. *See*

25  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n. 10 (1993).

26      While evidentiary hearings on expert testimony are not required, in a recent

27  case reviewing the admission of expert testimony concerning a criminal organization,

28  the Ninth Circuit explained that without "some proceeding, focused on the reliability

6

of expert testimony, such as a *Daubert* hearing . . . it may be difficult in many cases for the district court to clearly discern an expert's methodology and to evaluate how that methodology connects to the expert's opinions." *United States v. Holguin*, 2022 WL 7284304, at *4 (9th Cir. Oct. 13, 2022).

Under Rule 702(b), expert testimony must be "based upon sufficient facts or data." "The question is whether the expert considered enough information to make the proffered opinion reliable." 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268 (2d ed.). To determine the reliability of proffered expert testimony, the district court must "analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). An expert's opinions are not reliable when the expert bases their conclusions on "mere subjective beliefs or unsupported speculation." *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."); *Jetcraft Corp. v. Flight Safety Int'l,* 16 F.3d 362, 366 (10th Cir. 1993) (excluding expert testimony as "professional speculation").

A witness "relying solely or primarily on experience" must therefore explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 Amendment). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note (2000

Amendment).

The Government must carry its burden by explaining "how [its proposed expert's] experience led to the conclusion[s] he reached, why that experience was a sufficient basis for the opinion[s], and just how that experience was reliably applied to the facts of the case." *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004).  Indeed, "[i]t is well settled that bare qualifications alone cannot establish the admissibility of . . . expert testimony."  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (citing *United States v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir. 2002)); *see also United States v. Valencia-Lopez,* 971 F.3d 891, 900 (9th Cir. 2020) ("In assessing reliability, the court must not only consider a law enforcement officer's qualifications and experience, but also ensure the officer's general expertise is linked to his proffered opinion").

As an expert's purported expertise narrows from general details about an organization to the specific facts of a case, his "testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them," transforming the expert "into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *United States v. Mejia*, 545 F.3d 179, 190–191 (2d Cir. 2008). "In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict . . . ." *Id.* at 191; *see also United States v. Rodriguez,* 125 F. Supp. 3d 1216, 1248–49 (D.N.M. 2015) ("[A]s the officer's expertise narrows in scope from broad generalities about certain criminal practices—which are fixed in a meaning that transcends the case at hand, and about which the expert knew before his involvement in the case being tried—to practices of which the expert has learned only through his or her investigation of the instant case, there is the danger that the expert is cloaking percipient testimony in the garb of expert opinion")

Rule 704(b)

"Federal Rule of Evidence 704(b) precludes an expert, testifying as to the mental state or condition of a defendant, from stating 'an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto'." *United States v. Morales*, 108 F.3d 1031, 1033 (9th Cir. 1997).  In *Morales,* the Ninth Circuit explains that this limitation is not only applied to mental health experts but applies to all expert witnesses.  The Court explains, "the 'mental state or condition' refers to that 'of a defendant in a criminal case.' If that mental state or condition is an element of the crime charged or a defense thereto, 'no expert witness' may testify to it, regardless of whether the witness testifying is a psychiatrist or other mental health expert." *United States v. Morales*, 108 F.3d at 1036.

"A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea*." *United States v. Morales*, 108 F.3d at 1037. "We have adopted an interpretation of Rule 704(b) that allows testimony supporting an inference or conclusion that the defendant did or did not have the requisite *mens rea*, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Morales*, 108 F.3d at 1038.

> Expert testimony that compels the jury to conclude that the defendant did or did not possess the requisite *mens rea* does not "assist the trier of fact" under Rule 702 because such testimony encroaches on the jury's vital and exclusive function to make credibility determinations. Specifically, Rule 704(b) 'limits the expert's testimony by prohibiting him from testifying as to whether the defendant had the mental state or condition that constitutes an element of the crime charged." *Morales*, 108 F.3d at 1035.

*United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002).

The broad scope of Rule 704(b) is further explained by the Ninth Circuit in

9

1    *U.S. v. Campos*.  "[T]he rationale for precluding ultimate opinion testimony applies

2    to [] any ultimate mental state of the defendant that is relevant to the legal

3    conclusion sought to be proven such as premeditation in a homicide case or lack of

4    predisposition in an entrapment case. *United States v. Campos*, 217 F.3d 707, 711

5    (9th Cir. 2000) (internal quotations omitted).

> Congress added this provision out of a desire to 'eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact.' S. Rep. No. 98-225 at 230-31 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3412-13 ("S. Rep. 98-225"). Thus, with respect to a criminal defendant's mental state, Congress confirmed that 'the *jury* is the lie detector.' *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) (emphasis added).

12    *United States v. Campos*, 217 F.3d at 711.

13    <u>Confrontation Clause Issues Implicated by Expert Testimony</u>

14    Whenever a proffered expert witness may testify about the origins, principles,

15    and activities of a group that has a publicly documented history, there is a significant

16    risk of violating the defendant's Sixth Amendment rights under *Crawford v.*

17    *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

18    This Court's memorandum opinion in *United States v. Cervantes*, No. CR 12-

19    792 YGR, 2016 U.S. Dist. LEXIS 15837 (N.D. Cal. Feb. 9, 2016) explains how

20    expert opinions in this area run a serious risk of violating a defendant's

21    Confrontation Clause rights "when he is used as little more than a conduit or

22    transmitter for testimonial hearsay, rather than as a true expert whose considered

23    opinion sheds light on some specialized factual situation." *United States v.*

24    *Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *24-25.

25    In that opinion, this Court explained that "the key question for determining

26    whether an expert has complied with *Crawford* is the same as for evaluating expert

27    opinion generally: whether the expert has developed his opinion by applying his

28

1 extensive experience and a reliable methodology." *United States v. Cervantes*, 2016

2 U.S. Dist. LEXIS 15837, at *25.

> The truth-finding function of a trial is not at risk "if '[t]he jury [is] every bit as qualified to analyze' a piece of mundane evidence as the purported expert," and in that circumstance, "the expert provides no added value on which to be cross-examined." *[United States v.] Garcia*, 793 F.3d [1194] at 1212 [(10th Cir. 2015)] (quoting *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991)). *Cf. [United States v.] Cerna*, 2010 U.S. Dist. LEXIS 62907, 2010 WL 2347406, at *5 [(N.D. Cal. June 8, 2010)]("Juries are good at sorting out the facts, deciding, for example, what, if any structure resides within a particular gang. Juries would ordinarily rely on fact witnesses, such as cooperating witnesses and undercover officers, to supply the facts. They do not need police opinions to do this.").

*United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *25-26.

Applying these principles to the government's proffered expert on the structure, beliefs and practices of the Nuestra Familia, this Court explained:

> [T]he government's disclosures for this category appear to be solely repeating written or spoken hearsay, or testimonial hearsay. The Court finds that the experts are not providing their own considered opinions in a way that would assist the factfinder because each officer seeks to opine about specific Nuestra Familia duties, expectations, discipline, retaliation, and the like without distinguishing among his sources or explaining his reasoning with sufficient specificity." *Cf. Vera*, 770 F.3d at [1237-39 ]; *Garcia*, 793 F.3d at 1212-13. For instance, the proffered opinions about Nuestra Familia rules would introduce the fact that such rules exist and how they operate without sufficiently explaining whether the officers undertook their own independent analyses of the Nuestra Familia "Constitution" and other rules, how they applied their experience to reach their conclusions, or how such opinions would assist the factfinder. (Compare Docket No. 894 at No. 27 ("One of the primary duties of a member is to 'put in work' on behalf of the gang, which means he must generate money, normally through criminal activity.") with 8/17/15 Disclosure at 3 ("Bylaws regarding the goals, purposes, disciplinary procedures, and mechanics of operation are spelled out.").)

> …

1
2
3
4
5
6
7
8

> In addition, Garrow refers generally to his "experience" and "interviews with members of Nuestra Familia, gang drop outs, and informants, as well as specific events he has seen unfold." (8/17/15 Disclosure at 4.) Livingston also refers to prior investigations, "debriefings," interviews with gang members and government personnel, intercepted communications, and "evidence obtained from the execution of search warrants, such as money order receipts." (See id. at 5-6.) The specificity with which each expert seeks to opine combined with the failure to explain his reasoning or analysis, or to distinguish among the sources on which he relied lead the Court to find that the opinions as set out in this category are not admissible expert opinions that would assist the factfinder in compliance with Rules 702, 703, and *Crawford*.

9 *United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *26-28.  This Court

10 was similarly concerned about the admissibility of proffered expert opinions

11 concerning the connections between specific individuals and the organization at

12 issue.

13
14
15
16
17
18
19
20
21
22
23
24
25

> Further, as disclosed by the government, the proffered opinions identifying specific individuals holding positions in Nuestra Familia (Docket No. 894, Numbers 21 and 22) or the fact of occurrences tied to Nuestra Familia (id., Numbers 63, 65-77, 79-81) do not fit into a category of cognizable expertise, do not sufficiently identify reliable bases by which they were reached, and lack indication as to how admitting them would help the factfinder understand the evidence in this case. There is a meaningful distinction between a "sociologist describing the inner workings of a closed community" and "a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *See Mejia*, 545 F.3d at 190. Here, Garrow makes a general reference to "historical, structural and regulatory background" for opinions about the identities of certain leaders. (See 8/17/15 Disclosure at 3.) And similarly, Livingston refers generally to his investigation of Nuestra Familia, interviews, "debriefings," evidence seized, and the Nuestra Familia "Constitution" and rules. (See id. at 5-7.) But neither provides the Court sufficient basis from which to conclude that he applied his knowledge to reach an opinion about matters as specific as identities of Nuestra Familia leaders or the fact of occurrences tied to Nuestra Familia.

26 *United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *28-30.

27      The Ninth Circuit has explained that "an expert exceeds the bounds of

28 permissible expert testimony and violates a defendant's Confrontation Clause rights

1    when he is used as little more than a conduit or transmitter for testimonial hearsay,

2    rather than as a true expert whose considered opinion sheds light on some specialized

3    factual situation." *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014)

4    (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)).

5         As explained below, all of Professor Perliger's proffered opinions, to the

6    extent they can be discerned with specificity at this stage, fail one or more of these

7    tests for admissibility.[3]  The proffered opinions are set forth below, as are Mr. Justus'

8    arguments as to why they are not admissible.

9                                    **IV.**

10         **Professor Perliger's Proffered Opinions Are Not Admissible**

11         While Professor Perliger's Report (Ex. C), is of modest length, Mr. Justus

12    highlights the specific opinions the government has proffered, to the extent they can

13    be precisely discerned from the narrative, in the context of the requirements under

14    Rule 702, the limitations found in 704(b), and the Confrontation Clause concerns

15    addressed above.

16         Professor Perliger's proffered opinions can fairly be divided into two

17    analytical categories.  First, he expresses opinions about an "anti-government

18    movement" he refers to as "The Boogaloo".  (Ex. C at 2-7) Second, he summarizes

19    statements previously made by Mr. Justus on social media about this "movement",

---

[3] This Court has directed Mr. Justus not to address in his *Daubert* motion the *relevance* of Professor Perliger's proffered expert testimony.  Therefore, Mr. Justus will, if necessary, address that Rule 402 issue, as well as Rule 403 concerns, in a motion *in limine* in the manner and at the time established by the Court's briefing schedule.  Nonetheless, it is, in Mr. Justus' view, material to the Court's determination as to whether or not the proffered expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue" to note that the indictment does not allege that Mr. Justus was a member, adherent, or associate of "The Boogaloo" or any other "right-wing/extremist" movement or organization, it does not allege that he joined a conspiracy formed by members, adherents, or associates of "The Boogaloo" or any other "right-wing/extremist" movement or organization, and it does not allege that he acted to increase or maintain his status in such a movement or organization.  The disconnect between Professor Perliger's opinions and that which the government must prove at trial strongly suggests that his testimony will not assist the jury in determining a fact in issue, a prerequisite to admissibility under Rule 702.

1   speculates about Mr. Justus' subjective affinity for this "movement", and then

2   impermissibly states his opinions about Mr. Justus' state of mind with respect to

3   engaging in acts of violence.  (Ex C. at 7-11)

4          Opinions Concerning "The Boogaloo"

5          At the outset of his report, Professor Perliger describes in narrative form the

6   "origins" of what he calls "The Boogaloo".  One can only speculate that this

7   narrative is his own opinion, as it appears to be merely a recitation of literature, news

8   reports, and social media that he has read. He does not specifically identify his

9   sources, and he does not even attempt to identify any reliable principles or methods

10  he has applied to the information available to him.

11         He does not express any specific opinions that he claims are based on his own

12  independent research.  He uses phrases such as "*many see* the Boogaloo …"  and

13  "*most analysts attribute*" but he does not express any opinions that he holds nor does

14  he comment on the reliability of the opinions he purports to summarize.  He does cite

15  to a publication of the Southern Poverty Law Center but does not identify the

16  authors, and he vaguely refers to something known as the "UML dataset on far-right

17  violence".  (Ex C. at 3, nn.1, 2)

18         Professor Perliger then discusses "the emergence of the Boogaloo" (Ex. C. at

19  3-4), without referring to any research he has conducted, individuals he has

20  interviewed, or anything approaching a reliable methodology.  There are no citations

21  to materials he has reviewed.  Much of his narrative appears to focus on the role that

22  Facebook has played in facilitating communication among individuals he describes

23  as "former militia members and members of the more veteran extreme far-right

24  groups."  (Ex. C. at 3)

25         Professor Perliger then describes what he refers to as the "Ideology of the

26  Boogaloo" (Ex. C. at 5-6) Again, without any pretense of a methodology, reliance on

27  authoritative texts, or independent research, he expresses eight opinions concerning

28  what he refers to as "ideological narratives of the movement".  It is impossible to

14

1  discern the methodological bases for Professor Perliger's opinion these are "the

2  movement's" ideologies, if these actually are *his* opinions, as opposed to the

3  opinions of others that he has read or learned of anecdotally.

4      Finally, Professor Perliger describes what he refers to as "Boogaloo

5  engagement in illegal and violent activities."  (Ex. C. at 6-7) The same foundational

6  vacuum exists with respect to this narrative.  He passingly refers to specific incidents

7  in Texas, Minneapolis, South Carolina, Virginia, and Louisville, but it appears he is

8  simply summarizing publicly available information about the *arrests* of individuals

9  who he describes as "boogalooers" or "boogaloo enthusiasts".

10     This section of the report and, more importantly, the proffered expert

11  testimony of Professor Perliger utterly fails to comply with Rule 702.  Moreover,

12  expert testimony along the lines described in the report violate Mr. Justus' rights

13  under the Confrontation Clause as it is merely the recitation of hearsay statements

14  that Professor Perliger has read or has heard expressed by others.

15     Opinions Concerning Mr. Justus's State of Mind and Intentions

16     The second area of proffered opinions is generally referred to as "Robert

17  Justus Ideological and Operational Association with the Boogaloo". (Ex C. at 7-11)

18  Professor Perliger's preliminary statement is, "[b]ased on my review of Mr. Justus'

19  online activities, I conclude that there is an abundance of evidence linking him to the

20  ideological, operational, and organizational framework of the Boogaloo movement."

21  (Ex. C at 7).

22     While it is not clear from either the government's expert disclosure letter (Ex.

23  A) nor Professor Perliger's report (Ex. C), it appears that the only case-specific

24  sources of information that inform Professor Perliger's opinions in this area are his

25  review of Mr. Justus' social media posts and his review of Mr. Justus' recorded non-

26  custodial interview with law enforcement at the United States Courthouse in San

27  Francisco on June 11, 2020 (an interview which took place after Mr. Justus and his

28  parents drove to that location and told law enforcement that he wanted to provide

15

information about the shooting which took place on May 29, 2020).[4] (Complaint at 15, ¶40, Doc. No. 1) There is a vague reference in Professor Perliger's report to "interviews" in the plural, but he does not explain if there are reports of interviews with third persons he may have read, or if he his referring only to the recorded interview of Mr. Justus on June 11.

Professor Perliger's opinions about Mr. Justus' state of mind and intentions are merely based on his review of recorded statements made by Mr. Justus and his decisions about which portions of Mr. Justus' recorded statement he does and does not believe.[5] Of course, credibility determinations are not the dominion of an expert witness. It is the fact finder that makes those decisions. "[S]uch testimony encroaches on the jury's vital and exclusive function to make credibility determinations." *United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002).

There is nothing in the social media materials summarized by Professor Perliger that requires expert testimony. As he points out, our communities, social media, and even our political institutions have been inundated with information about what he refers to as anti-government extremism. None of this is beyond the knowledge base of jurors. Moreover, while Dr. Perliger purports to be able to explain Mr. Justus' linkages with the ideological, operational, and organizational framework of the Boogaloo movement, the government's disclosure letter and his report fail to explain what expertise he has with respect to the Boogaloo movement, what methodologies he utilized to reach his conclusion, and how that methodology is reliable. Professor Perliger merely highlights statements made by Mr. Justus that he

---

[4] While it was one interview that occurred on June 11, 2020, the video recording is preserved in two separate digital files because of the length of the recording.

[5] The entirety of Mr. Justus's non-custodial video and audio-recorded interview on June 11, 2020 is likely admissible at trial as a statement of a party under Rule 801(d)(2)(A). Additionally, the on-line communications between Mr. Carrillo and Mr. Justus are likely admissible under Rule 801(d)(2)(A). On the other hand, if Professor Perliger did review the contents of reports of interviews with third persons, those statements may not be admissible through an expert witness, pursuant to Rule 703 and *Crawford*.

1   concludes are consistent with the government's theory of this case.  He ignores

2   statements by Mr. Justus that are consistent with his innocence.

3        Many of Professor Perliger's opinions in this area also violate Rule 704(b).

4   For example, he concludes that "Mr. Justus … plans to engage in real world

5   boogaloo activities."  (Ex. C. at 9).  He also states that Mr. Justus and Mr. Carrillo's

6   online communications "led to real-world collaboration", and he refers to it as an

7   example of "collaboration … and actual real-world joint operations…"  (Ex. C. at

8   10).

9        Of course, Professor Perliger did not interview Mr. Justus about his state of

10  mind and intentions, and Professor Perliger's conclusions about Mr. Justus' state of

11  mind and intentions necessarily reject Mr. Justus' repeated statements to law

12  enforcement on June 11, 2022 that he did not intend to harm any person and did not

13  desire to assist Mr. Carrillo in his own clear efforts to do so.  This is squarely a

14  credibility determination within the province of the jury and Professor Perliger's

15  explicit and implicit rejection of Mr. Justus' statements to that effect is not proper

16  expert testimony under Rule 702 and 704(b).

17                              **V.**

18        **If There Is Any Doubt that the Proffered Expert Testimony**

19        **Is *Not* Inadmissible, an Evidentiary Hearing Is Necessary**

20                **to Resolve Disputed Issues of Fact**

21        Even when viewed in conjunction with each other, the government's expert

22  disclosure letter (Ex. A), Professor Perliger's CV (Ex. B), and his Report (Ex. C) fail

23  to establish the admissibility of his opinions under Rule 702 under almost every

24  prong.

25        It is clear that expert testimony in this area is not scientific, technical or

26  specialized.  If it were, Professor Perliger's report would explain something that is

27  "beyond the ken" of the average juror, and it does not.  "A district court may commit

28  manifest error by admitting expert testimony where the evidence impermissibly

                              17

mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). There is no showing that his familiarity with "The Boogaloo" is based upon his own independent research or fact-gathering activities. If he has done more than review the academic and popular culture-oriented writing of others, he does not say so, and if he has not, there is no showing that those writings are reliable or that opinions he embraces are methodologically sound.

Rule 702 requires that the government establish that Professor Perliger's proffered testimony is the product of "*reliable principles and methods",* and that he has "*applied the principles and methods reliably"* to the facts of the case. Fed. R. Evid. 702 (emphasis added). Neither the government's disclosure letter (Ex. A) nor his report (Ex. C) do so.

Additionally, Professor Perliger's mere regurgitation of the writings or presentations of others violates *Crawford,* as the Ninth Circuit has explained in subsequent decisions. "[A]n expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)).

Finally, certain portions of his Report clearly violate Rule 704(b) by expressing inferences and opinions about Mr. Justus' state of mind with respect to the charged conduct. While Professor Perliger may reject Mr. Justus' explanations to law enforcement on June 11, 2020 as to his state of mind and intentions, and reach his own conclusion, he may not invade the province of the jury by expressing that opinion or inferences that he has that opinion. Those inferences and opinions clearly violate Rule 704(b). "A prohibited 'opinion or inference' under Rule 704(b) is

18

1  testimony from which it necessarily follows, if the testimony is credited, that the

2  defendant did or did not possess the requisite *mens rea*." *United States v. Morales*,

3  108 F.3d at 1037.

4        The government's failure to make a showing that the proffered expert

5  testimony is admissible requires that this Court exclude it in its entirety. Nonetheless,

6  if the Court entertains any doubt about that, Mr. Justus requests that the Court

7  convene on June 23, 2023 the evidentiary hearing it has tentatively scheduled, so that

8  Professor Perliger can be examined about these important issues.

9  **VI.**

10  **<u>Conclusion</u>**

11        The proffered expert testimony of Professor Perliger should be excluded from

12  the trial of this matter.

13

14  Dated:    March 27, 2023        Respectfully submitted,

15

16                                    RICHARD G. NOVAK

17                                    SHAFFY MOEEL
                                  /s/*Richard G. Novak*

18                                    RICHARD G. NOVAK

19                                    Attorneys for Robert Alvin Justus, Jr

20

21

22

23

24

25

26

27

28

19

## DECLARATION OF RICHARD G. NOVAK

I, RICHARD G. NOVAK, declare as follows:

1.      Along with attorney Shaffy Moeel, I am counsel of record for defendant Robert Alvin Justus, Jr. (Mr. Justus) in this matter.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached to this declaration as Exhibit A is a true and correct copy of a letter received from counsel for the United States on November 1, 2022, setting forth the five expert witnesses it proposes to examine at the trial of this matter, including "Extremist Ideology/Boogaloo expert" Arie Perliger, Ph.D. ("Professor Perliger").

3.      Attached to this declaration as Exhibit B is a true and correct copy of Professor Perliger's *Curriculum Vitae*, also provided by counsel for the United States on November 1, 2022.

4.      Attached to this declaration as Exhibit C is a true and correct copy of Professor Perliger's "Expert Witness Report", also provided by counsel for the United States on November 1, 2022.

5.      Attached to this declaration as Exhibits D, E, and F, respectively, are Ninth Circuit Manual of Model Criminal Jury Instructions for: 1) murder in the first degree (Inst. No. 16.1); 2) attempted murder (Inst. No. 16.5), and 3) aiding and abetting liability (Inst. No. 4.1).


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of March 2023.

*/s/ Richard G. Novak*

RICHARD G. NOVAK

# EXHIBIT A



*United States Attorney*
*Northern District of California*

*11ᵗʰ Floor, Federal Building*                          *(415)436-7200*
*450 Golden Gate Ave., Box 36055*                *FAX: (415) 436-7234*
*San Francisco, CA 94102-3495*

November 1, 2022

**<u>VIA EMAIL</u>**

Shaffy Moeel                                    Richard G. Novak
Moeel Lah Fakhoury LLP                P.O. Box 5549
1300 Clay St., Suite 600                 Berkeley, CA  94705
Oakland, CA 94612

      Re: *United States v. Robert Alvin Justus, Jr.*, 20-CR-265 YGR

Dear Counsel:

      Please be advised of the following disclosures pursuant to Fed. R. Crim. P. 16(a)(1)(G).

On behalf of the government, we continue to demand production of any reciprocal discovery

pursuant to Fed. R. Crim. P. 16(b).

<u>NOTICE REGARDING EXPERT WITNESSES</u>

      The United States hereby provides notice pursuant to Fed. R. Crim. P. 16(a)(1)(G) that it

intends to call the following witnesses in its case-in-chief.

    1.  Firearms/Ballistics expert

        a.  Jennifer J. Owens, Chief, Identification Section, Bureau of Alcohol, Tobacco,

           Firearms & Explosives Forensic Science Laboratory - Washington

    2.  DNA expert

        a.  Gregory A. Peiffer, Ph.D, Forensic Biologist, Bureau of Alcohol, Tobacco,

           Firearms & Explosives Forensic Science Laboratory – Washington

1

3. CAST expert

    a. Special Agent Alexandra Bryant, Federal Bureau of Investigation, San Francisco, California

4. Medical Examiner expert

    a. Thomas Wayne Rogers, M.D., Forensic Pathologist, California

5. Extremist Ideology/Boogaloo expert

    a. Arie Perliger, Ph.D., University of Massachusetts Lowell, Lowell, Massachusetts

The testimony of each witness is outlined below:

1. <u>Firearms/Ballistics Expert – Jennifer J. Owens, Firearms and Toolmark Examiner, Bureau of Alcohol, Tobacco, Firearms & Explosives Forensic Science Laboratory – Washington</u>

The government currently intends to call firearms and toolmark examiner Jennifer Owens to testify based upon her knowledge, training, and experience, and based upon her examination of shell casings and bullet and bullet fragments, recovered from the crime scene on May 29-30, 2020. Criminalist Owens is expected to testify regarding her analysis consistent with the report of her examination of the cartridge cases, bullet and bullet fragments recovered at the crime scene, and firearms recovered from defendant Carrillo's possession. In summary, it is expected that Criminalist Owens will testify as to her identification of the cartridge cases, bullets and bullet fragments, and to her opinion that the firearm recovered from Carrillo's possession was used in the commission of the shooting of the two federal protective services officers on May 29, 2020. Criminalist Owens is also expected to testify as to the significance of each finding, consistent with her report. This witness's report and resume are attached as Attachment A.

2. <u>DNA Expert - Gregory A. Peiffer, PhD, Forensic Biologist, Bureau of Alcohol, Tobacco, Firearms & Explosives Forensic Science Laboratory – Washington</u>

USAExpert-0002

The government currently intends to call forensic biologist Dr. Gregory Peiffer to testify regarding the DNA testing conducted on swabs identified as Exhibit Numbers 23 (including but not limited to 21.3, 23.5, 23.6, 23.9, and 23.12), 27 (including 27.1, 27.3, 27.4, 27.5, 27.6, 27.7, 27.8, 27.9, 27.10, and 27.12), 33 (including 33.1, 33.2, 33.3, 33.4, 33.5, and 33.6), and 39 (including 39.1, 39.2, 39.4, 39.10, and 39.11) (report attached and incorporated by reference). Dr. Peiffer will explain, based on his training, knowledge, and experience, the DNA findings described in the attached report, including that:

(1) the statistical analysis calculation regarding Exhibits 23.3, 27.5, 27.6, 27.9, 27.10, and 33.1, resulted in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(2) the statistical analysis calculation regarding Exhibits 23.5, 27.12, and 39.10, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(3) the statistical analysis calculation regarding Exhibits 23.6 and 39.1, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(4) the statistical analysis calculation regarding Exhibit 23.9, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 851;

(5) the statistical analysis calculation regarding Exhibits 23.12, 27.3, 27.4, and 33.4, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo),

USAExpert-0003

who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(6) the statistical analysis calculation regarding Exhibits 27.1 and 39.4, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 64.3 billion;

(7) the statistical analysis calculation regarding Exhibit 27.7, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 30;

(8) the statistical analysis calculation regarding Exhibit 27.8, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 98.1 billion;

(9) the statistical analysis calculation regarding Exhibit 33.2, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(10) the statistical analysis calculation regarding Exhibit 33.3, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 765 thousand;

(11) the statistical analysis calculation regarding Exhibit 33.6, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(12) the statistical analysis calculation regarding Exhibit 39.2, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in 114 billion;

USAExpert-0004

(13) the statistical analysis calculation regarding Exhibits 33.5 and 39.11, resulting in a probability of an unrelated individual in the population (other than Steven Carrillo), who has not contributed DNA to these samples, with this level of support, is less than 1 in one trillion;

(14) the statistical analysis calculation regarding Exhibit 1.1.1.1, resulting in a probability that the DNA is at least 16 times more likely to have originated from two unrelated, unknown individuals than if it originated from Robert Justus and an unrelated, unknown individual;

(15) the statistical analysis calculation regarding Exhibit 1.1.1.1, resulting in a probability probability that the DNA is at least 6 times more likely to have originated from two unrelated, unknown individuals than if it originated from Steven Carrillo and an unrelated, unknown individual.

He will also explain the different factors that can contribute to insufficient DNA being obtained from firearms or ammunition casings.  The witness's report and resume are attached as Attachment B.

3.  <u>CAST expert – FBI Special Agent Alexandra Bryant</u>

The government currently intends to call FBI Cellular Analysis Survey Team (CAST) Special Agent ("SA") Bryant.  SA Bryant will provide expert testimony as to cellular telephone analysis.  Her CV, which contains her qualifications, and a summary of her experience and methodology are attached to this notice and incorporated herein by reference.  Specifically, SA Bryant will explain (1) how cellular telephones and cellular telephone networks operate; (2) the information contained in cellular telephone records, also known as call detail records; and (3) that it is possible to provide the general geographic location of a cellular telephone based on information contained in call detail records, based on the cell site location accessed for a particular call, along with any attendant cell sector information.

5

SA Bryant will testify about the methods of cellular telephone communications and how those communications are made possible by sending signals to a cell site tower in the general area.  SA Bryant will explain that cellular telephone networks provide service to their customers through antennas deployed across the provider's coverage area.  When the user places an outbound call, the handset transmits that communication to a cell site tower antenna in the general area, which relays the call to a local switch for routing.  Conversely, whenever another party places a call to a user's cellular telephone, the network "pages" that phone to alert the owner to the incoming call; if the owner answers, the call is put through and (as before) carried by a tower in the general area of the phone.  As a result, the system's awareness of a wireless phone's general whereabouts is essential to providing cellular service.  Spacing between antenna towers varies depending on a number of factors, especially terrain and population density.  A typical tower will have three separate antenna faces (also called sectors), with each face serving a 120-degree portion of the roughly circular coverage area extending out from the antenna mast.  Whenever a cellular phone user initiates or receives a communication—such as a voice call—the carrier routinely creates a record, including the date and exact time, of the tower and sector handling the communication at the start and end of the communication.  From the data collected by service providers, it is possible to determine the general geographic location area of a cell phone at a specific time.

SA Bryant will testify that she conducted cell site location analysis for the following two cellular phone numbers:

1.  831-325-4959 (T-Mobile) – Steven Carrillo

2.  510-962-0805 (T-Mobile) – Robert Justus

6

SA Bryant plotted the cell towers to which the phone numbers above connected and used a mapping program to determine the approximate physical location of each phone during certain time periods relevant to the investigation.

According to her analysis, a device using Phone Number 1 traveled southbound on I-80 from Solano County into Contra Costa County then going past Oakland at approximately 6:29 p.m. on May 29, 2020. During this same timeframe, a device using Phone Number 2 was in San Leandro and was in the vicinity of the BART station starting at approximately 6:15 p.m. Between 6:30 p.m. and 7:00 p.m., the same device using Phone Number 1 traveled south and east on I-580 towards San Leandro.  The two devices, one using Phone Number 1 and the other using Phone Number 2, remained in the area of the San Leandro BART station between 6:30 p.m. and 7:00 p.m. on May 29, 2020.

Between 7:00 p.m. and 7:30 p.m. on May 29, 2020, the two devices, one using Phone Number 1 and the other using Phone Number 2, stayed in the area of the San Leandro BART for the whole time period.  Between 7:00 p.m. and 7:30 p.m. on May 29, 2020, the two devices, one using Phone Number 1 and the other using Phone Number 2, stayed in the area of the San Leandro BART for the whole time period.

On May 29, 2020, between 8:00 p.m. and 8:10 p.m., the two devices, one using Phone Number 1 and the other using Phone Number 2, moved to different parts of San Leandro.  The device using Phone Number 1 did not register further cell site tower activity after 8:09 p.m. on that date.

On May 29, 2020, between 8:10 p.m. and 8:20 p.m., the device using Phone Number 2 moved north and west in the direction of Oakland, and the device was in the area of 5th Avenue and Embarcadero in Oakland from approximately 8:17 p.m. until 8:20 p.m.

USAExpert-0007

On May 29, 2020, between 8:20 p.m. and 8:27 p.m., the device using Phone Number 2 moved north and west in the direction of downtown Oakland.  On May 29, 2020, between 8:27 p.m. and 8:45 p.m., the device using Phone Number 2 remained in the area of Franklin Street and 17th Street from approximately 8:29 p.m. and 8:38 p.m. and then moved to the area of the Chevron gas station on 17th Street.

On May 29, 2020, between 8:45 p.m. and 8:58 p.m., the device using Phone Number 2 moved toward the area of 12th Street and I-980 and remained in that area from approximately 8:49 p.m. to 8:58 p.m.

On May 29, 2020, between 9:00 p.m. and 9:14 p.m., the device using Phone Number 2 was in the proximity of the Oakland federal courthouse building at approximately 9:02 p.m., and then the same device moves towards the area of 12th Street and Martin Luther King Way from approximately 9:05 p.m. to 9:14 p.m.

On May 29, 2020, between 9:14 p.m. and 9:28 p.m., the device using Phone Number 2 was in the proximity of the Oakland federal courthouse building.

On May 29, 2020, between 9:28 p.m. and 9:43 p.m., the device using Phone Number 2 remained in the proximity of the Oakland federal courthouse building.

On May 29, 2020, at approximately 9:44 p.m. when the shooting occurred, the device using Phone Number 2 was in the area of the Oakland federal courthouse building.

On May 29, 2020, between 9:45 p.m. and 10:00 p.m., the device using Phone Number 2 moved from the area of the Oakland federal courthouse building from approximately 9:45 p.m. until approximately 9:50 p.m. to approximately 9:51 p.m. when the same device moved along I-580 to the south and east of the Oakland federal courthouse building.

8

On May 29, 2020, between 10:15 p.m. and 10:30 p.m., the two devices, one using Phone Number 1 and the other using Phone Number 2, moved from I-580 in the Hayward area to I-880 southbound, moving in the direction of Fremont.

On May 29, 2020, between 10:30 p.m. and 11:00 p.m., the two devices, one using Phone Number 1 and the other using Phone Number 2, moved south along I-880 to Highway 237 westbound to Highway 101 northbound, reaching the area of Belmont by approximately 10:58 p.m.

On May 29, 2020, between 11:00 p.m. and 11:15 p.m., the two devices, one using Phone Number 1 and the other using Phone Number 2, moved northbound on Highway 101 to the area of Millbrae, California, with both devices reaching the area of Justus's residence by approximately 11:15 p.m.

From 11:30 p.m. on May 29, 2020 to 12:00 a.m. on May 30, 2020, the two devices, one using Phone Number 1 and the other using Phone Number 2, were located in the vicinity of Justus's residence in Millbrae.

The witness will also opine regarding the location of defendant Justus's device during May 30-June 11, 2020.

To form her opinions, SA Bryant relied on her knowledge, training and experience in the field. Furthermore, her analysis and opinions are based on data provided to the government by T-Mobile, including the location of all cell towers used by the provider and the underlying call detail records associated with the each of the cell phone numbers discussed above. The government has produced to the defendant call detail records from each relevant phone (US-7000710 – US-7001147 [Phone Number 1]; US-7000420 – US-7000615 [Phone Number 2], all

USAExpert-0009

of which are incorporated herein by reference.  The witness's report and resume are attached as Attachment C.

4.  <u>Medical Examiner - Thomas Wayne Rogers, M.D.</u>

The government currently intends to call Dr. Rogers to testify as an expert pathologist and forensic pathologist.  We expect that Dr. Rogers will testify to his autopsy of D.U. and that he will opine regarding the cause and manner of death and the specific injuries/observations contained in his report (US-4000772-795), which is incorporated herein by reference.  The bases for these opinions will be Dr. Roger's knowledge, training, experience, observations, medical procedures, and photographs taken during the autopsy.  Dr. Roger's qualifications are set forth in his CV, which is attached to this notice and incorporated herein by reference.  The observations and opinions expressed in his report include, but are not limited to, the following:

- The observation of 4 separate gunshot wounds (three entrance wounds and one exit wound) to the decedent;

- The presence of entrance wounds to the neck, torso, and right arm;

- The presence of an exit wound to the right arm;

- The presence of a probable grazing gunshot wound to the backside of the right shoulder;

- The recovery of bullets and/or bullet fragments from the torso and right arm;

- The path of each gunshot wound through the body, to include description of a series of entrance wounds on the neck, torso, and right arm, and an exit wound to the right arm, consistent with gunshots fired from in front of the decedent;

- The effects of each gunshot wound, to include perforating defects to the soft tissue of the neck, trachea, probably left subclavian artery and left subclavian vein, left humerus, left

10

pleural cavity and right pleural cavity, pericardial sac, heart, peritoneal cavity, liver, soft tissue right arm, and right fourth metacarpal;

- The likely time at which each wound would have been fatal and/or incapacitating;

- The presence of aspirated blood in the respiratory system, indicating that the decedent remained alive for some period after sustaining initial wounds; and

- The cause of death was "multiple gunshot wounds."

The witness's report, previously provided in discovery at US-4000772 – US-4000795, and resume are attached as Attachment D.

5. <u>Extremist Ideology/Boogaloo expert Arie Perliger, Ph.D.</u>

The government currently intends to call Dr. Arie Perliger, an expert in anti-government and other forms of extremism, including the Boogaloo ideological movement. The government anticipates that Dr. Perliger will describe the Boogaloo movement, including its origin, development, characteristics, and operations, and he will also describe defendant's ideological and operational association with the Boogaloo movement in the weeks leading up to the May 29, 2020 shooting and afterward. His resume and report are attached as Attachment E.

<u>Other Witnesses</u>

The government anticipates that it may call members of the Oakland Police Department's CSI team and other officers to testify regarding the collection of evidence from the scene. The government also anticipates calling, as percipient witnesses, the treating physicians of the one other victim of gunshot wounds that day.

The government may also call witnesses to testify regarding the downloading of cellphone materials using software such as Cellebrite. These witnesses will testify regarding the

USAExpert-0011

contents of the phones, as reflected in reports of those downloads. They will testify regarding the following topics as applicable:

a.      the process(es) used to extract data and information from cellular telephones, and particularly the phone(s) submitted for examination as relevant to this case;

b.      the presence of information indicating ownership or primary use of the device(s);

c.      how, where, and when data and information was stored on the device(s);

d.      the types of applications installed or located on the device(s), including discussion of how a given application operates, logs, or stores data and information, including IP log files and app installation dates; and

e.      the image and video operations of the cellular telephones, and the particular device(s) specifically, including how the device(s) create, store and send those files.

The government does not believe that these witnesses would be providing expert testimony but provides notice of this testimony in an abundance of caution. *See United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017); *United States v. McLeod*, 755 Fed. App'x 670, 673 (9th Cir. 2019).

The government reserves its right to supplement these disclosures before trial upon receipt of additional information or reports.  If you have any questions regarding anything disclosed by this letter, please do not hesitate to contact us.

Very truly yours,
STEPHANIE M. HINDS

United States Attorney


*/s/ Jonathan U. Lee*
JONATHAN U. LEE
Assistant United States Attorney

12

**EXHIBIT B**

Arie Perliger
*Professor of Security Studies • Director, Graduate Program in Security Studies*
*School of Criminology and Justice Studies • University of Massachusetts Lowell*
*113 Wilder Street, Lowell, MA 01854 • Office Phone: 978-934-4268 • arie_perliger@uml.edu, aperliger@gmail.com*

# *Arie Perliger – Curriculum Vitae*

## A.  EDUCATION, ACADEMIC POSITIONS AND INTERESTS

### *1.    EDUCATION*

- Golda Meir Post-Doctoral Fellowship, Department of Political Science, The Hebrew University of Jerusalem (2007-2008).
- Ph.D., Political Science, University of Haifa, 2007.
  Fields of Specialization: *Terrorism and Political Violence*
  *Security Policy and Politics*
- M.A., Political Science, University of Haifa, 2002 (*Magna Cum Laude)*.
- B.A., Political Science and Education, University of Haifa, 2000 (*Summa Cum Laude)*.

### *2.    ACADEMIC POSITIONS*

- Director, Graduate Program in Security Studies, School of Criminology and Justice Studies, University of Massachusetts Lowell, 2017-current.
- Professor, School of Criminology and Justice Studies, University of Massachusetts Lowell, 2016-current.
- Associate Professor, Department of Social Sciences, US Military Academy at West Point, 2013-2016.
- Director of Terrorism Studies, Combating Terrorism Center, US Military Academy at West Point, 2010-2016.
- Assistant Professor, Department of Social Sciences, US Military Academy at West Point, 2010-2013.
- Visiting Assistant Professor, Department of Political Sciencee and Department of History, Stony Brook University, 2008-2010.
- Instructor, Department of Political Science, University of Haifa, 2003-2007.

### *3.    RESEARCH AND TEACHING INTERESTS*

- Political Violence and Extremism
- Far-Right Extremism and Hate Crimes (Europe, US and Israel),
- Crime-Terrorism nexus
- Bio-criminology
- Social Network Analysis
- Security and counter-terrorism policies

USAExpert-0117

*Arie Perliger – Curriculum Vitae*

B.  RESEARCH

1.  PUBLICATIONS – BOOKS AND MONOGRAPHS (MONOGRAPHS ARE UNDERLINED)

- **Arie Perliger**. 2020. *America's Zealots: Inside Right-Wing Domestic Terrorism.* New York, NY: Columbia University Press.

- Darren Hudson, **Arie Perliger**, Riley Post and Zachary Hoffman. 2020. *The Irrational Terrorist and Other Persistent Terrorism Myths*. Boulder, CO: Lynne Rienner Publishers.

- <u>**Arie Perliger** and Daniel Milton**.** 2016. *From Cradle to Grave: The Lifecycle of Foreign Fighters in Iraq and Syria*. WEST POINT, NY: Combating Terrorism Center.</u>

- <u>**Arie Perliger.** 2015. *The Rationale of Political Assassinations*. WEST POINT, NY: Combating Terrorism Center.</u>

- <u>**Arie Perliger.** 2013. *Challengers from the Sidelines, Understanding America's Violent Far-Right*. WEST POINT, NY: Combating Terrorism Center **(cited/covered by - New York Times, Newsweek, Washington Post, Slate magazine, Mother Jones, The Atlantic, The New Yorker).**</u>

- Ami Pedahzur and **Arie Perliger**. 2009. *Jewish Terrorism in Israel*. New York: Columbia University Press (**Starred Review by *Publishers weekly,* Reviewed by Foreign Affairs, ranked by *Perspectives on Terrorism* as one of the 150 best books published in the field of Terrorism studies**).

- Leonard Weinberg, Ami Pedahzur and **Arie Perliger**. 2008. *Political Parties and Terrorist Groups*. London and New York: Routledge (second edition).

- **Arie Perliger**. 2005. *Middle Eastern Terrorism.* Philadelphia: Chelsea House Publications.

- Gadi Pahran, Ami Pedahzur and **Arie Perliger**. 2005. *Countering Terrorism in Jerusalem: 1967-2002*. Jerusalem: Jerusalem Institute (Hebrew).

2.  PUBLICATIONS – PEER REVIEWED ARTICLES AND CHAPTERS
(CHAPTERS ARE UNDERLINED; * DENOTE DOCTORAL STUDENT)

- Mengyan Liu* and Arie Perliger. (Accepted for Publication). "Exploring the Intersection of Environmental Events and Domestic Political Violence in the United States," *Terrorism and Political Violence.*

- Leonie Huddy, Oleg Smirnov, Karen Snider and **Arie Perliger**. (*May 17, 2021, Published Online)*. "Anger, Anxiety, and Selective Exposure to Terrorist Violence," *Journal of Conflict Resolution.*

2

*Arie Perliger – Curriculum Vitae*

- Josylyne Nkogo, Matthew Sweeney* and **Arie Perliger**. (*April 24, 2021, published online)*. "The Role of Demographic Diversification of the Police Force in Curbing Hate Crimes: Cross-Sectional and Longitudinal Analyses," *Police Practice and Research*.

- Natalie Anasatasio,* **Arie Perliger** and Neil Shortland. (*March, 24, 2021, Published Online)*. "How Emotioinal Traits and Practices Lead to Support in Acts of Political Violence," *Studies in Conflicts and Terrorism*.

- Matthew Sweeney*, **Arie Perliger** and Ami Pedhazur. 2021. "Reconstructing the Theater of Terror," *Small Wars & Insurgencies*, 32(3): 469-489.

- Jared Dmello*, **Arie Perliger** and Matthew Sweeney*. (*June, 9, 2020, Published Online*). "The Violence of Political Empowerment: Electoral Success and the Facilitation of Terrorism in the Republic of India," *Terrorism and Political Violence*.

- **Arie Perliger**. 2020. "Deradicalization of Foreign Fighters," In Stig Jarle Hansen and Stian Lid (Eds.) *The Routledge Handbook of De-Radicalization and Disengagment*, New York: Routledge.

- **Arie Perliger** and Matthew Sweeney*. 2020. "Terrorism: Domestic," *Encyclopedia of Security and Emergency Management*. Switzerland AG: Springer.

- Jared Dmello* and **Arie Perliger** and. 2020. "Terrorism: International," *Encyclopedia of Security and Emergency* Management. Switzerland AG: Springer.

- **Arie Perliger** and Michael Palmieri*. 2019. "Mapping Connections and Cooperation between Terrorist and Criminal Entities," *Studies in Conflict and Terrorism* (*11 November, 2019, Published Online*).

- **Arie Perliger**. 2019. "Terrorism and Religion: Palestine," *Oxford Research Encyclopedia of Politics*, New York: Routledge.

- **Arie Perliger** and Ami Pedahzur. 2018. "Deciphering the Settlements' Project," In Reuven Y. Hazan, Gideon Rahat and Menachem Hofnung (Eds.) *Oxford Handbook of Israeli Politics and Society*, Oxford: Oxford University Press.

- Matthew Sweeney* and **Arie Perliger**. 2018. "Explaining the Spontaneous Nature of Far-Right Violence in the United States," *Perspectives on Terrorism*, 12(6).

- **Arie Perliger** and Daniel Milton. 2018. "Fighting Together? – Understanding Bilateral Cooperation in The Realm of Counter-Terrorism," *Dynamics of Asymmetric Conflicts*, 11(3): 199-220.

- **Arie Perliger** and Matthew Sweeney*. 2018. "Re-thinking the Applicability of Deterrence in Counter-Terrorism: The American War on Terrorism," in Elli Lieberman (Ed.) *Deterring Terrorism*, New York: Routledge.

3

*Arie Perliger – Curriculum Vitae*

- Ami Pedahzur, Lusaura Gutierrez* and **Arie Perliger**. 2018. "Can Terrorism be Curbed? Lessons from Israel" in Andrew Silke (Ed.) *Routledge Handbook of Terrorism and Counterterrorism*, New York: Routledge.

- **Arie Perliger** and Ami Pedahzur. 2018. "The Radical Right in Israel" In Jens Rydgren (Ed.) *Oxford Handbook of The Radical Right*, Oxford: Oxford University Press.

- **Arie Perliger**. 2018. "9/11 Attacks" In Bruce A. Arrigo (Ed.) *The SAGE Encyclopedia of Surveillance, Security, and Privacy*, Thousand Oaks, CA: Sage Publications.

- **Arie Perliger.** 2017**.** "The Role of Civil Wars and Elections in Inducing Political Assassinations," *Studies in Conflict and Terrorism*, 40(8): 684-700.

- **Arie Perliger**. 2017. "Terrorism Networks," in Jennifer Victor, Mark Lubell and Alexander, H. Montgomery, (Eds.) *Oxford Handbook on Political Networks*, Oxford: Oxford University Press.

- Riley Post, Darren Hudson, Donna Mitchell, Patrick Bell, **Arie Perliger** and Ryan Williams. 2016. "Rethinking the Water-Food-Climate Nexus and Conflict: An Opportunity Cost Approach," *Applied Economic Perspective and Policy,* 38 (4): 563-577.

- **Arie Perliger,** Gabriel Koehler-Derrick and Ami Pedahzur. 2016. "The Gap between Participation and Violence: Why We Need to Disaggregate Terrorist 'Profiles'," *International Studies Quarterly* 60(2): 220-229.

- **Arie Perliger** and Ami Pedahzur. 2016. "Counter Cultures, Group Dynamics and Religious Terrorism," *Political Studies*, 64(2): 297-314.

- Gallya Lahav and **Arie Perliger**. 2016. "Immigrant Integration, Political Radicalization and Terrorism in Europe: Some Preliminary Insights from the Early Millennium," in Gary Freeman and Nikola Mirilovic (Eds.) *Handbook on Migration and Social Policy*, New York: Edward Elgar Publishing, pp. 265-289.

- **Arie Perliger**. 2015. "Comparative Framework for Understanding Jewish and Christian Violent Fundamentalism," *Religions,* 6(3): 1033-1047.

- **Arie Perliger** and Eran Zaidise. 2015. "The Peculiar Victory of the National Camp in the 2013 Israeli Elections," *Israel Affairs*, 21(2): 195-208.

- **Arie Perliger**. 2014. "Terrorist Networks' Productivity and Durability: A Comparative Multi-Level Analysis," *Perspectives on Terrorism*, 8(4): 36-52.

- **Arie Perliger**. 2012. "How Democracies Respond to Terrorism: Regime Characteristics, Symbolic Power, and Counter-Terrorism," *Security Studies*, 21(3): 490-528.

- Susanne Martin and **Arie Perliger**. 2012. "Turning to and from Terror: Deciphering the Conditions Under Which Political Groups Choose Violent and Nonviolent Tactics," *Perspective on Terrorism*, 6(4-5): 21-45.

4

*Arie Perliger – Curriculum Vitae*

- **Arie Perliger**. 2011. "The Changing Nature of the Israeli Reserve Forces: Present Crises and Future Challenges," *Armed Forces and Society*, 37(2): 216-238.

- **Arie Perliger** and Ami Pedahzur. 2011. "Social Network Analysis in the Study of Terrorism and Political Violence," *PS: Political Science and Politics*, 44(1): 45-50.

- **Arie Perliger**. 2011. "Sicarii," in Jeffery I. Ross (Ed.) *Encyclopaedia of Religion and Violence*. Armonk NY and London, UK: M.E. Sharp, pp. 691-694.

- **Arie Perliger**. 2011. "Suicide Bombing," in Jeffery I. Ross (Ed.) *Encyclopaedia of Religion and Violence*. Armonk NY and London, UK: M.E. Sharp, 718-724.

- Ami Pedahzur and **Arie Perliger**. 2011. "The Fourth Wave: Comparison of Jewish and Other Manifestations of Religious Terrorism," in Jean Rosenfeld (Ed.) *Terrorism, Identity and Legitimacy: The Four Waves Theory and Political Violence*, New York: Routledge, 103-111.

- Ami Pedahzur and **Arie Perliger**. 2010. "The Consequences of Counterterrorist Policies in Israel," In Martha Crenshaw (Ed.) *The Consequences of Counterterrorism*. New York: Russell Sage Foundation, pp. 335-366.

- **Arie Perliger**, Badi Hasisi and Ami Pedahzur. 2009. "Policing Terrorism," *Criminal Justice and Behavior* 36 (12) 1279-1304.

- Ami Pedahzur, **Arie Perliger** and Eran Zaidise. 2009. "The Nature of Existential Threats to Democracies," In Oren Barak and Gabriel Shefer (Eds.) *Existential Threats and Civil-Security Relations*, Lanham, MD: Lexington Books, pp. 61-80.

- Gabriel Ben-Dor, Ami Pedazhur, Daphna Canetti, Eran Zaidise, **Arie Perliger**, and Shai Bermanis. 2008. "I versus We: Collective and Individual Factors of Reserve Service Motivation during War and Peace," *Armed Forces and Society*, 34(4): 565-592.

- **Arie Perliger.** 2008. "Democracy in an Ongoing Conflict: The Politics of Defence in Israel," In James Forest and Isaiah Wilson (Eds.) *Handbook of Defence Politics: International and Comparative Perspectives*. London: Routledge, 293-307.

- Ami Pedahzur and **Arie Perliger.** 2007. "Coping with Terrorism: Lessons Learned From the Israeli Intelligence Community," In James Forest (Ed.) *Countering Terrorism and Insurgency in the 21st Century*. Westport, CT: Praeger Publishers, 465-486.

- Ami Pedahzur and **Arie Perliger**. 2006. "The Changing Nature of Suicide Attacks - a Social Network Perspective," *Social Forces*, 84(4): 1983-2004.

- **Arie Perliger** and Ami Pedahzur. 2006. "Coping with Suicide Attacks: Lessons from Israel," *Public Money and Management*, 13(2): 281-287.

- Ami Pedahzur and **Arie Perliger**. 2006. "Introduction: Characteristics of Suicide Attacks," in

USAExpert-0121

*Arie Perliger – Curriculum Vitae*

Ami Pedahzur (Ed.) *Rout Causes of Suicide Terrorism*. New York: Routledge, 1-12.

- Ami Pedahzur, **Arie Perliger** and Alexander Bialsky. 2006. "Explaining Suicide Terrorism," In Christopher Ankersen (Ed.) *Understanding Global Terror*. Cambridge: Polity, 37-56.

- Ami Pedahzur and **Arie Perliger**. 2006. "The Making of a Suicide Bomber: A Comparative Perspective," In James Forest (Ed.) *The Making of a Terrorist*, Westport, CT: Prager Publishers, pp.151-164

- **Arie Perliger,** Daphna Canetti-Nisim and Ami Pedahzur. 2005. "Democratic Attitudes Among High-School Pupils: The Role Played by Perceptions of Class Climate," *School Effectiveness and School Improvement,* 17(1): 119-140.

- **Arie Perliger,** Ami Pedahzur and Yair Zalmanovitch. 2005. "The Defensive Dimension of the Battle against Terrorism - An Analysis of Management of Terror Incidents in Jerusalem," *Journal of Contingencies and Crisis Management*, 13(2): 79-91.

- Ami Pedahzur and **Arie Perliger**. 2004. "An Alternative Approach for Defining the Boundaries of 'Party Families': Examples from the Israeli Extreme Right-Wing Party Scene," *Australian Journal of Political Science*, 39(2): 285-305.

- Ami Pedahzur and **Arie Perliger**. 2004. "The Challenge of Extremist Parties to Democratic Regimes," *Democratic Culture*, 8: 73-108 (Hebrew).

- Ami Pedahzur and **Arie Perliger**. 2004. "The Structural Paradox of Civic Education in Israel". *Megamot*. 43(1): 64-83. (Hebrew).

- **Arie Perliger** and Leonard Weinberg. 2003. "Jewish Self-Defence and Terrorist Groups Prior to the Establishment of the State of Israel: Roots and Traditions," *Totalitarian Movements and Political Religions*, 4(3): 91-118.

- Ami Pedahzur and **Arie perliger**. 2003. "The Causes of Vigilant Political Violence: The Case of Jewish Settlers," *Civil Wars*, 6(3): 9-30 (also published as a chapter in Clive Jones (Ed.). 2005. *Between Terrorism and Civil Wars*, New York: Routledge).

- Ami Pedahzur, **Arie Perliger** and Leonard Weinberg. 2003. "Altruism and Fatalism: The Characteristic of Palestinian Suicide Terrorists," *Deviant Behavior,* 24 (4): 405-423. (also, published as a chapter in Jeffrey Victoroff (Ed.). 2009. *Psychology of Terrorism, Key Readings: Classic and Contemporary Insights*, New York: Psychology Press).

### 3.  PUBLICATIONS – PROFESSIONAL/MEDIA PUBLICATIONS AND BOOK REVIEWS

- **Arie Perliger**. 2021. "Anti-Asian violence spiked in the US during the pandemic, especially in blue-state cities" *The Conversation, Hueston Chronicle*, Feb. 17th, 2022.

6

*Arie Perliger – Curriculum Vitae*

- **Arie Perliger**. 2022. "Far-right extremism in the US: New tools, old challenges" *TRT World*, Jan. 18, 2022, see at - https://www.trtworld.com/opinion/far-right-extremism-in-the-us-new-tools-old-challenges-53773

- **Arie Perliger**. 2021. "Summarizing 20 Years of War on Terror? Simplistic, Unsubstantiated, and Hyped Analysis of a Threat," *3STREAMES*, Sep. 14, 2021. See at - https://medium.com/3streams/summarizing-20-years-of-war-on-terror-simplistic-unsubstantiated-and-hyped-analysis-of-a-threat-ef6c7fbf298c

- **Arie Perliger**. 2021. "Why did a military superpower fail in Afghanistan?" *The Conversation, Business Insider*, Aug. 18, 2021.

- **Arie Perliger**. 2021. "Police, soldiers bring lethal skill to militia campaigns against US government" *The Conversation, Business Insider*, Jan. 19, 2021.

- **Arie Perliger**. 2021. "Why Hate Crimes Proliferate in Progressive Blue States?," *3STREAMES*, Aug. 20, 2020, see, See at - https://medium.com/3streams/why-hate-crimes-proliferate-in-progressive-blue-state-72483b2d72a7

- **Arie Perliger**. 2020. "Trump's purge of defense agencies comes at a vulnerable time for US national security," *Salon, The Conversation,* Nov. 18th, 2020.

- **Arie Perliger**. 2020. "The 'Domestic Terrorist' Designation Won't Stop Extremism," *Defense One, The Conversation,* June 28th, 2020.

- **Arie Perliger**. 2019. "From Across the Globe to El Paso, Changes in the Language of the Far-Right Explain its Current Violence," *Salon, Irish Examiner, San Francisco Chronicle,* August 6th, 2019.

- **Arie Perliger.** 2017. Book Review: Mueller John and Stewart, Mark. *Chasing Ghosts: The Policing of Terrorism.* New York, NY: Oxford University Press. *Perspectives on Politics*, 15(4): 1206-1208.

- **Arie Perliger**. 2017. "Homegrown Terrorism and Why the Threat of Right-Wing Extremism is Rising in America," *Newsweek*, June 4th, 2017.

- **Arie Perliger**. 2015. "The Causes and Impact of Political Assassinations," *CTC SENTINEL,* 8(1): 11-14.

- **Arie Perliger**. 2015. "Terrorism is a Political Message with A Psychological Impact," *The New York Times*, December 4th, 2015 (as part of the *Room for Debate* section).

- **Arie Perliger**. 2015. "Israel's Response to the Crisis in Syria," *CTC SENTINEL,* 6(8): 9-11.

- **Arie Perliger**. 2012. "Identifying Three Trends in Far-Right Violence in the United States," *CTC SENTINEL,* 5(9): 5-7.

USAExpert-0123

*Arie Perliger – Curriculum Vitae*

- Nelly Lahoud, David Dimeo, Cindy Jebb, **Arie Perliger**, Ruth Beitler and John Ringquist. 2011. "The 'Arab Spring': Investing in Durable Peace," *White Paper for the US Army Leadership*.

- Leonard Weinberg and **Arie Perliger**. 2010. "How Terrorist Groups Ends," *CTC SENTINEL,* 3(2): 16-18.

- **Arie Perliger**. 2009. "Israel's War on Terrorism: Historical and Political Perspective," *Israel Studies: An Anthology.* Washington DC: Jewish Virtual Library (online publication, see at - http://www.jewishvirtuallibrary.org/israel-studies-an-anthology-israel-s-war-on-terrorism).

- **Arie Perliger**. 2006. Book Review: Pape, Robert. *Dying to Win: The Strategic Logic of Suicide Terrorism.* New York: Random House; Pedahzur Ami. *Suicide Terrorism*. Cambridge: Polity; Khosrokhavar, Farhad. *Suicide Bomber: Allah's New Martyrs*. London: Pluto Press; Gambeta, Diego. *Making Sense of Suicide Missions*. New York: Oxford University Press. *Democracy and Security*, 2: 229-305.

- **Arie Perliger.** 2003. Book Review: Peleg, Samuel. *Zealotry and Vengeance: The Quest of a Religious Identity Group.* Lanham, Maryland: Lexington Books. *Terrorism and Political violence*, 15(2): 156-158.

### 4. GRANTS, FELLOWSHIPS AND CONTRACTS

- **DHS grant**: *Insider threats in US law enforcement: Assessing the personal and environmental risk factors from white supremacist and far-right groups* (Role: Co-PI), Department of Homaland Secuirty, 2022-2023, **(230,000$)**

- **NIJ grant**: *Characterizing and Preventing Domestic Terrorism: A Mixed-Methods Study of Five Far-Right Terrorist Groups* (Role: PI), National Institute of Justice, 2021-2023, **($998,599)**

- **NIJ grant**: *Gun Wars and Community Terrorization: Investigating Longitudinal Gang Violence in New Jersey from a Networked Perspective* (Role: Co-PI)*, National Institute of Justice, 2021-2022, ($435,020)*

- **Private Sector Grant**: Climate Change Initiative – Evaluating the Effectiveness and impact of CC Educational Simulations (En-ROADS), 2021-2022 *(***Role: Co-PI***) ($431,088)*

- **DOD Minerva Grant**: *Biomarkers and Counter-Messages: Measuring Individual Differences in the Influence of Extremist Propaganda and Counter-Messages* (Role: Co-PI), Minerva Research Initiative, Office of Basic Research and Office of Policy at U.S. Department of Defense, 2017-2020 **($794,181)**.

- Contract with the Army's Combating Terrorism Center (**$40K**) for conducting research on Social Resiliency to Terrorism (2017).

- Consulting/Research Contract **($3,850)** for the National Consortium for the Study of Terrorism

8

USAExpert-0124

*Arie Perliger – Curriculum Vitae*

and Response to Terrorism (START) on Far-Right Terrorism (2016-2017).

- Grant from the Army's Combating Terrorism Center **($20K)** for conducting research on Western Foreign Fighters in Syria and Iraq (2015-2016).

- Grant from the Army's Combating Terrorism Center **($20K)** for conducting research on Political Assassinations (2014-2015).

- Grant from the Army's Combating Terrorism Center **($30K)** for conducting research on Far-Right Violence in the US (2010-12).

- Schusterman Fellowship (2008-2010).

- Golda Meir Post-Doctoral Fellowship (2007-2008).

- Research Fellow, National Security Study Center, University of Haifa (2002-2007).

## C.   PROFESSIONAL ACTIVITIES

### 1.   PAPERS PRESENTATIONS/ GUEST LECTURES / POLICY BRIEFINGS

- "Contemporary Violent American Far-Right," Presentation to Carnegie New Leaders Council, Jan 19, 2022 (virtual).

- "The Landscape of Misogynist Ideological Violence," *Eradicate Hate Global Summit*, October 18th, 2021, Pittsburgh, US.

- "Current Trends in Far-Right Violence in the US," *Eradicate Hate Global Summit*, October 18th, 2021, Pittsburgh, US.

- "Exploring the Facilitators, Structure, Operations and Discourse of Misogynist Violence," *International Studies Association Annual Meeting,* April 6-9, 2021, Virtual.

- Guest Lecture "Learning From the Past, Adapting to the Present: Fighting Far-Right Extremism and Violence in the US," Center on Terrorism Colloquium Series (Virtual), Feb. 5th, 2021.

- Guest Lecture on "Learning From the Past, Adapting to the Present: Fighting Far-Right Extremism and Violence in the US," Organized by the CVE group at Washington Institute for Near East Policy (Virtual) , Oct. 30, 2020.

- Guest Lecture on "American Zealots – Inside Right Wind Domestic terrorism," Organized by the Georgh Washington University Program on Extremism, Aug. 18, 2020.

USAExpert-0125

*Arie Perliger – Curriculum Vitae*

- Guest Lecture on "Domestic and International Cyber Threats" at the *Cyber Adversaries* Conference organized by the Massachusetts CyberCenter, Nichols College, Oct. 16, 2019.

- Center for Naval Analysis National Security Seminar Series, "Beyond Jihad: Countering Violent Extremism at Home and Abroad," Washington DC, Sep. 12, 2019.

- "Reconstructing the Theater of Terror," NATO Advanced Research Workshop (ARW), "The Post ISIS-era: Regional and Global Implications," Washington DC, Sep. 6-8, 2019.

- "Mapping Connections and Cooperation Between Terrorist and Criminal Entities," UNODC event, *A Look into the Dark: Linkages Between Organized Crime and Terrorism*, Vienna, Austria, May 24, 2019.

- "Analyzing the Constructions that Facilitate Effectiveness of ISIS's Visual Propaganda" *International Studies Association Annual Meeting,* March 27-30, 2019, Toronto, Canada.

- "Analyzing the Visual Constructions that Facilitate the Effectiveness of ISIS's Visual Propaganda," *WZB conference on Religious Fundamentalism and Violence*, Berlin, Germany, June 29-30, 2018.

- "Violent Extremism in Comparative Perspective: Refocusing the Conversation," *Beyond Countering Violent Extremism:  Enduring Challenges, Emerging Policy Frontiers and New Lines of Inquiry*, Yale McMillan Center, Council on Security Studies, New Haven, CT, February 23, 2018.

- "Mapping Connections and Cooperation Between Terrorist and Criminal Entities," UNODC Conference, *Exploring and Countering Linkages Between Organized Crime and Terrorism*, Doha, Qatar, April 25-26, 20018.

- "The Violence of Political Empowerment: Electoral Success and the Facilitation of Political Violence" *International Studies Association Annual Meeting,* April 4-7, 2018, San Francisco, CA.

- "Explaining Spontaneous Terrorist Attacks in the Context of the American Far-Right" *International Studies Association Annual Meeting,* April 4-7, 2018, San Francisco, CA.

- "Rethinking Radicalism," *The Future of US Counterterrorism*, The Yale Special Operations and Interagency Academic Symposium, Jackson Institute for Global Affairs, Yale University, February 3, 2018.

- "The Power of Political Empowerment: Electoral Success and the Facilitation of Political Violence," *11th Annual International Conference of the Society for Terrorism Research,* New York, NY, August 14-16, 2017.

- "Misconceptions in the Profiling of Terrorists," Guest Lecture at Simon Fraser University's

10

*Arie Perliger – Curriculum Vitae*

School of Criminology, August 3, 2017, Simon Fraser University, Burnaby, BC, Canada.

- "The Territories in Israeli Politics" *33rd Annual Conference of the Association for Israel Studies,* June 12-14, 2017, Brandeis University, Waltham, MA.

- "Fighting Together? Understanding Bilateral/Multinational Cooperation in The Realm of Counterterrorism" *IEEE International Symposium on Technologies for Homeland Security,* April 25-26, 2017, Waltham, MA.

- "Fighting Together? Understanding Bilateral/Multinational Cooperation in The Realm of Counterterrorism" *Midwest Political Science Association Annual Meeting,* April 6-9, 2017, Chicago, IL.

- "The American Far-Right". Guest Lecture at Tufts University's Fletcher School of Law and Diplomacy, Tufts University, February 13, 2017.

- "American Violent Far-Right," New Jersey Office of Homeland Security Conference on Domestic Terrorism, May 6, 2016, New Brunswick, NJ.

- "Explaining the Life Cycle of Foreign Fighters," *International Studies Association Annual Meeting,* March 16-19, 2016, Atlanta, GA.

- "Defining Terrorism," (Discussant), *International Studies Association Annual Meeting,* March 16-19, 2016, Atlanta, GA.

- "Challengers from the Sidelines: Understanding America's Violent Far-Right," Guest Lecture at the School of Government and Public Policy, University of Arizona, February 17, 2016, Tucson, AZ.

- "Policing Extremism: Law Enforcement Tactics, Surveillance, and Military Interference in Detecting and Preventing Domestic Terrorism," *National Security and Armed Conflicts Annual Law Review Conference, University of Miami Law School, University of Miami*, November 20, 2015, Miami, FL.

- "Civil Wars, Elections, and Political Assassinations," *ISAC-ISSS Annual Conference*, October 8-10, 2015, Springfield, MA.

- "Security Threats and The Israeli Response," INSS *Conference on Israeli Decision-Making in Turbulent Times*, September 30, 2015, Institute for National Strategic Studies at National Defense University, Washington DC.

- "Hezbollah – Current Situation and Future Threats," briefing to the Command and General Staff College and Kansas City Joint Terrorism Task Force, June 9, 2015, Fort Leavenworth, KS.

- Briefing to MG Richard D. Clark and the 82nd Airborne Division Staff on Foreign Fighters in Iraq, August 1st, 2015, West Point, NY.

11

USAExpert-0127

*Arie Perliger – Curriculum Vitae*

- "Fighting Together? Understanding Bilateral/Multinational Cooperation in The Realm of Counterterrorism" *International Studies Association Annual Meeting,* February 18-21, 2015, New Orleans, USA.

- "What Makes a Terrorist? A New Approach to The Study of Terrorists' Profiles," *International Studies Association Annual Meeting,* February 18-21, 2015, New Orleans, USA.

- Briefing to GEN Joseph L. Votel, SOCOM Commander, on Foreign Fighters in Iraq, January 22 2015, West Point, NY.

- Briefing to National Counter-Terrorism Center (NCTC) leadership about ISIS's Western Foreign Fighters, 20 November 2014, West Point, NY.

- "Fighting Together? Understanding Bilateral/Multinational Cooperation in The Realm of Counterterrorism," *ISAC-ISSS Annual Meeting,* November 14-16, 2014, Austin, USA.

- "The Security Landscape and Iran/Hezbollah Terrorist Threat," Briefing to the Command and General Staff College and Kansas City Joint Terrorism Task Force, June 10, 2014, Fort Leavenworth, KS.

- Briefing to Leadership of NY office of the Secret Service on Political Assassinations, May 8, 2014, West Point, NY.

- Briefing to General Ray Odierno, Army Chief of Staff, on the durability and productivity of terrorist groups, March 5, 2013, West Point, NY.

- Guest Lecture at the University of Minnesota's Law School on the Democratic Dilemma in the Struggle against Terrorism, September 24, Minneapolis, MN.

- "Turning to and From Terror: Deciphering the Conditions under Which Political Groups Choose Violent and Nonviolent Tactics," *International Studies Association Annual Meeting,* April 1-4, 2012, San-Diego, USA.

- "What Makes a Terrorist? A New Approach to the Study of Terrorists' Profiles" *International Studies Association Annual Meeting,* April 1-4, 2012, San-Diego, USA.

- "Violence from the Sidelines: The American Violent Far-Right," *International Studies Association Annual Meeting,* April 1-4, 2012, San-Diego, USA.

- "Terrorist Networks' Productivity and Durability – A Comparative Multi-Level Analysis," *International Studies Association Annual Meeting,* March 16-19, 2011, Montreal, Canada.

- "Immigrant Integration and Terrorism in Liberal Democracies," *International Studies Association Annual Meeting,* New Orleans, LA, February 17-20, 2010.

- "Explaining Religious Terrorism," Guest Lecture at Williams College, April 26-27, 2009.

USAExpert-0128

*Arie Perliger – Curriculum Vitae*

- "Understanding Religious Terrorism," Stony Brook University, Department of Political Science, October 10th, 2008.

- "Countering Al-Qaeda," *Conference on the Current Terrorist Enemies of the United States: Prospects for a New U.S. Administration,* September 17-18, 2008 Austin, Texas.

- "Explaining the Dominancy of Offensive Approaches in Modern Counterterrorism," *The American Political Science Association Meeting*, August 29-31, 2008, Boston, MA.

- "Understanding Contemporary Islamic Terrorist Networks", *The American Political Science Association Meeting*, September 2007, Chicago, IL.

- "The Consequences of Counterterrorism Policies in Israel", *The American Political Science Association Meeting*, September 2006, Philadelphia, PA.

- "The Changing Nature of Suicide Attacks: A Social Network Perspective", *The American Political Science Association Meeting*, September 2005, Washington, DC.

- "The Culture of Death: Terrorist Organizations and Suicide Bombing", *World Conference on Democracy and Global Security*, June 2004, Istanbul, Turkey.

- "The Merit of Defensive Coping with Suicide Terrorism: Lessons Based on the Israeli Case Study", *The American Political Science Association Meeting*, September 2004, Chicago, IL.

- "The Profile of the Suicide Terrorist". *CSTPV 3rd Annual International Conference on Islamic Extremism and Terrorism*, June 15, 2002, St-Andrews, Scotland.

- "Becoming Democratic Citizens? The Effects of Civic Education on Political Attitudes among High School Students in Israel." *The Twenty Fifth Annual Scientific Meeting, International Society of Political Psychology*, July 2002, Berlin, Germany.

### 2.   PROFESSIONAL AWARDS

- Medal of Superior Civilian Service Award, Department of the Army, US Government (for excellence in teaching and training cadets), July 15, 2016.

- Certificate of Appreciation, Department of Joint Interagency and Multinational Operations, Command and General Staff College, July 2015.

- Certificate of Recognition of Five Years of Service in the Government of the United States, August 12, 2015.

### 3.   EDITORIAL AND REVIEW EXPERIENCE

- <u>Editor-in-Chief</u>: *Democracy and Security (2016-current)*.

13

*Arie Perliger – Curriculum Vitae*

- Co-Editor: *Democracy and Security (2011-2015).*

- Editorial Board: *Studies in Conflict and Terrorism (2014-current).*

- Book Manuscript Reviewer:
  *Chicago University Press*
  *Columbia University Press*
  *Routledge*
  *Polity Press*

- Article Reviewer*:*
  *American Political Science Review*
  *International Studies Quarterly*
  *Journal of Conflict Resolution*
  *British Journal of Sociology*
  *Journal of Quantitative Criminology*
  *Security Studies*
  *Journal of Peace Research*
  *British Journal of Political Science*
  *Quantitative Criminology*
  *Political Psychology*
  *Comparative Political Studies*
  *International Interactions*
  *Terrorism and Political Violence*
  *Perspectives on Terrorism*
  *Studies in Conflict and Terrorism*
  *Political Research Quarterly*
  *Armed forces and Society*
  *Foreign Policy Analysis*
  *Critical Studies on Terrorism*
  *State and Society*
  *Totalitarian Movements and Political Religions*

### 4.   POLICY EXPERIENCE

- Co-authored a white paper for the Army leadership, providing concrete recommendations on how the Army should respond to the Arab Spring.

- Instructor at various training events for law enforcement bodies such as FBI, JTTFs, and ICE.

- Briefings of senior officials of the U.S. government and military, including the **State Department's Ambassador for Strategic Communications, Secretary of the**

USAExpert-0130

*Arie Perliger – Curriculum Vitae*

**Army**, **Army Chief of Staff** and **NORTHCOM, SOCOM, JSOC** and **AFRICOM** commanders.

## D.  INSTRUCTIONAL RELATED ACTIVITIES

### 1.   TEACHING EXPERIENCE

UNIVERSITY OF MASSACHUSETTS LOWELL

- Theories of Political Violence – Doctoral Seminar
- Terrorism: International and Domestic
- Graduate Seminar in Terrorism Studies
- Graduate Research Seminar in Terrorism  – Doctoral Seminar
- Domestic Terrorism and Extremism
- Terrorism Networks
- Intelligence Analysis: Policy and Practice
- Research Internship
- Contemporary Security Studies
- Capstone Course in Terroris Studies


US MILITARY ACADEMY AT WEST POINT

- Politics and Governments of the Middle East
- Violent Conflicts in the Middle East
- Internal Conflicts and Civil Wars
- Terrorism and Counter Terrorism

STONY BROOK UNIVERSITY

- Politics and Religion in the Middle East
- Terrorism and Counter Terrorism
- Issues in Israeli Politics and History
- The Radical Right in Israel and Europe

THE UNIVERSITY OF HAIFA

- Terrorism and Counter Terrorism
- Research Methodology and Statistics
- Introduction to Comparative Politics
- Political Socialization
- Radical Right in Israel and Europe
- Introduction to the Israeli Political System
- Issues in Israeli Political System

15

*Arie Perliger – Curriculum Vitae*

**2.   ADVISING EXPERIENCE**

UNIVERSITY OF MASSACHUSETTS LOWELL

- Doctoral Advisor (Chair) – Mengyan Lui, Criminology and Justice Studies (Terrorism Track), Expected graduation, Summer 23.
- Doctoral Advisor (Chair) – Natalie Anastasio, Criminology and Justice Studies (Terrorism Track), Expected graduation, Summer 23.
- Doctoral Advisor (Chair) - Jared Dmello, Criminology and Justice Studies (Terrorism Track), Graduated Summer 19 (currently Assistant Professor at TAMIU).
- Doctoral Advisor (Chair) – Matthew Sweeney, Criminology and Justice Studies (Terrorism Track), Graduated Spring 20 (Currently Adjunct Professor at Merimack College).
- Member of Master Thesis Committee – Michael Furnari, Peace and Conflict Studies.
- Thesis Advisor (Honor thesis) - Sean Rogers, Criminology and Justice Studies.
- Thesis Advisor (Honor thesis) - Jennifer Kawaguchi, Criminology and Justice Studies.
- Thesis Advisor (Honor Thesis) – Natalie Anastasio, Criminology and Justice Studies.
- Thesis Advisor (Honor Thesis) – Joseph Basile, Criminology and Justice Studies.

US MILITARY ACADEMY AT WEST POINT

- Thesis Advisor (Honor thesis) – Cadets Carson Warnberg (International Relations), Peter Knoetgen (International Relations), Zachary Kennedy (International Relations), Robert Hall (Social Sciences).

16

USAExpert-0132

**EXHIBIT C**

Arie L. Perliger

*Professor of Security Studies • School of Criminology and Justice Studies*
*Director • Graduate Program in Security Studies*
*University of Massachusetts Lowell • 113 Wilder Street • Lowell, MA 01854*
*Office: 978-934-4268 • Mobile: 631-704-6075 • arie_perliger@uml.edu, aperliger@gmail.com*

## Expert Witness Report – Arie Perliger, Ph.D.

### 1.  Evidence of Expertise in the Area of Far-Right Extremism and Radicalization

I am a Full Professor and the director of the graduate program in security studies at the School of Criminology and Justice Studies, University of Massachusetts Lowell.

In the past 20 years, I was engaged in an extensive study of issues related to terrorism and political violence, security policy and politics and politics and extremism of the Far Right in Israel, Europe, and the U.S. My recent book, "American Zealots – Inside Right-Wing Domestic Terrorism," which was published by Columbia University Press, provides an in-depth analysis of the history and contemporary trends of the violent American far-right. The book received strong reviews and was endorsed by top scholars in the field of radicalization and extremism. Overall, my studies appeared in nine books and monographs and in numerous articles and book chapters and were cited in more than 2000 academic texts.

My strong status in my fields of expertise is also reflected in the high volume of grants I was awarded, requests I received to provide my contribution to high-quality edited books (most of my chapters were published in high-quality publishers such as Oxford University Press), and the frequent requests I receive to brief/guest lecture to academics, top policymakers, and practitioners. Specifically:

- I have presented my research at numerous professional conferences, including the *Annual Meeting of the American Political Science Association* and the *Annual Meeting of the International Studies Association.*
- I have been involved in various engagements related to policymaking. Thus, helping to bridge the gap between academia and policymakers/practitioners. For example, I was part of a group of scholars who wrote a white paper for the U.S. Army leadership, providing concrete recommendations on how the Army should respond to the Arab Spring.
- I have also served as an instructor at various training events for law enforcement agencies such as FBI, JTTFs, and ICE, and regularly briefed senior officials of the U.S. government and military, including the Secretary of the Army, U.S. Army Chief of Staff and NORTHCOM, SOCOM, JSOC, and AFRICOM commanders.
- I received multiple federal grants to study extremism and political violence, including close to a 1 million grant from the DOJ to study violent far-right groups in the U.S. and

USAExpert-0133

another close to a quarter million grant from DHS to study the penetration of the far-right to law enforcement agencies in the U.S.
- I was invited to provide briefings to the most prominent think tanks in the field of security studies, such as the George Washington Project on Extremisms, CAN, and the CVE group at the Washington Institute.
- I receive Frequent invitations to guest lecture in professional presentations for practitioners, policymakers, and academics.
- I receive a very high volume of requests to review relevant manuscripts in my field, and I am the Editor in Chief of the Journal *Democracy and Security* and on the editorial board of the journal *Studies in Conflict and Terrorism*).
- I receive a high volume of media requests. For example, following the events in Charlottesville in August 2017, I was asked and given interviews to the Washington Post, BBC News, L'express, and many others. Following the January 6 event in the Capitol, I gave more than two dozen interviews, including on C-SPAN, *The Atlantic,* and CNN.

## 2. **The Boogaloo Movement**

The boogaloo is an anti-government movement that was initially crystallized online in 2019. In 2020, boogalooers increasingly engaged in real-world activities as well as online activities, showing up at protests and rallies focusing on gun rights, pandemic restrictions (such as anti-lockdown protests), and police brutality.

### *2.1 Origins:*
Many see the Boogaloo as part of the militia/patriot movement which first emerged in the early to mid-1990s and was dominated in its early years by "New World Order" beliefs in which the U.S. government is seen as an entity that has been hijacked by foreign "forces" or agents that aim to promote the merging of the United States into the United Nations or another version of global government. Such conspiracy theories were melded into various nativist, anti-immigration, and anti-globalist ideas. Moreover, in the early 1990s, many militia leaders also embraced more blunt white supremacy and anti-Semitic views, which further connected the militia to other components of the American far-right. Some of the militias focused on military training, while others were more engaged in building a base of support via propaganda efforts. The late 1990s and early 2000s saw a quick decline in militia activities. Most analysts attribute these dynamics to the increasing scrutiny from law enforcement following the Oklahoma City bombing, the economic boom of the 1990s, the failure of conspiracy narratives that predicted the collapse of U.S. infrastructure resulting from the Y2K computer bug, and the overall shift in attention to the threat of Jihadi terrorism.

The election of the first African American President in 2008 led to a dramatic rise in the activities of groups on the far-right, including a spike in acts of violence and hate crimes. This dynamic did not exclude the militias. Hence, it is not surprising that two of the most known current militia

USAExpert-0134

groups, the Oath Keeper and Three Percenters, were formed circa 2008. By the summer of 2009, the Southern Poverty Law Center had also taken notice, publishing a report about the "second wave" of militias, reflecting that these two organizations were a part of a broader movement.[1] Indeed, between 2008-2017 militias' yearly number of attacks doubled on average in comparison to the period of 2001-2007.[2] While still retaining its affinity for conspiracy theories about various cabals of elites who are controlling the U.S. government, the second wave of militias shifted to focus on the need to counter what they perceived as ongoing attempts by the federal government to erode constitutional rights (such as limiting civil liberties, undermining the Second Amendment, enhancing surveillance capabilities and promoting restrictive policies related to land ownership and environmental regulations).

*2.2 The emergence of the Boogaloo*

SUMMARY: **Alongside the more formal and hierarchical militia groups, the second wave of the militia movement also includes more loose associations that originated in online communities before transitioning into real-world activities. Probably the most known such network is the Boogaloo movement. After coalescing in 2019 mainly in online forums, the 2020-21 wave of public unrest, which began with the demonstrations against police brutality following the May 2020 killing of George Floyd, led its members to participate in counter-protests and anti-lockdown rallies. Comprised of many former militia members and members of the more veteran extreme far-right groups, the "Boogaloo boys" promote various anti-government ideas, including support for violent resistance against (what they perceived) attempts by the government to undermine civil liberties and constitutional freedoms. It seems that at least some groups of Boogaloo also aim to exploit the social unrest in order to expedite a second civil or revolutionary war. They believe that such a war will allow them to restore what they believe is the appropriate and traditional American way of life, preserve and restore civil liberties, and dismantle many power hubs of the federal government.**

The boogaloo movement is an anti-government extremist movement that emerged in 2019 and has a loose anti-government and anti-police ideology. The participation of boogaloo supporters in the 2020 anti-lockdown protests and Black Lives Matter has brought much attention to the movement, as have the criminal and violent acts committed by some of its supporters.

The term "boogaloo" is a slang term used as an abbreviation for a future civil war that became popular in various far-right circles and online platforms in late 2018. Thus, it was not uncommon to find online posts urging people to be "ready for the boogaloo" or even "bring the boogaloo." By

---

[1] "The Second Wave: Return of the Militias," Southern Poverty Law Center, August 1, 2009.

[2] UML dataset on far-right violence.

USAExpert-0135

mid-2019, "boogaloo" had evolved into more than simply a slang term; an entire movement was coalescing around the concept.

Those who did participate in the movement began referring to themselves as "boogaloo bois/boys," "boogs," and "boojihadeen." They also produced tangible objects, such as recognizable symbols, flags, patches, apparel, and stickers, to manifest their commitment. Over the following year, Boogalooers steadily expanded, mostly thanks to online distribution. Before Facebook removed one boogaloo Facebook page, the Big Igloo Bois page, in June 2020, it had more than 32,000 "likes." Similarly, a boogaloo Facebook group called HonoLuau Sunrise, which was started on June 30, 2020, had more than 2,000 members by August 5th. In just a few weeks, CNN Bois, another boogaloo Facebook group started at the same time, attracted 9,400 members.

Several social media platforms were especially prominent as tools for the expansion and proliferation of boogaloo ideology. Gradually boogaloo transitioned from more niche social media platforms such as 4chan's /k/ to Instagram and Facebook. The latter is possibly the most substantial platform which facilitated the expansion of the boogaloo. In both public and private Facebook groups, boogalooers utilized memes and texts that called for revolution or civil war as well as violence against the government or law enforcement. Between 2019 to mid-2020, thousands of Facebook users were drawn to dozens of boogaloo pages and groups. Users had access to these platforms where they could connect with one another and disseminate extremist discourse. For instance, three boogalooers who were reportedly involved in a scheme to stir BLM demonstrators against police in Las Vegas were all associated with the same Nevada-based boogaloo Facebook page.

The public backlash resulting from the lack of action against the movement from social media firms seems to lead Facebook to ban the use of "boogaloo" and related terms in early May 2020 when paired with references to weapons or calls to action. A month later, on June 4, following the exposure of a plot of three boogalooers– Andrew Lynam, William Loomis and Stephen Parshall-- to cause destruction by using Molotov cocktails at a Black Lives Matter protest, Facebook reformulated its algorithm so it would no longer recommend boogaloo groups. On June 30, Facebook removed several hundred boogaloo accounts and groups from its platform and stated that boogaloo content would be banned from its platform.

As with many other groups which were banned from mainstream social media platforms, the boogaloo didn't disappear but transitioned to less restricted online spaces, such as MeWe, Discord, and GAB. Some, however, attempted to maintain active on Facebook while adopting new vocabulary and discourse in the hope of avoiding detection and banning. They are especially apt in utilizing memes for such purposes. Memes, the pictorial format adopted by denizens of the internet to promote in-jokes and group-specific humor, have been utilized to avoid detection since it can be divorced from any context for broader use. Frequently, meme discourse can shift between legitimate attempts to promote an ideology and baser attempts to simply subvert the accepted

USAExpert-0136

norms of politeness. This muddy distinction makes attempts at definitive statements on the actual "point" being made nebulous (which very well might be the point in itself). This further enhances the echo chamber for boogaloo members to operate within mainstream social media.

## 2.3 – Ideology of the Boogaloo

As mentioned earlier, the boogaloo is a contemporary manifestation of the anti-government/militant movement. This is reflected in the major ideological narratives of the movement:

a. A perception that the government is aggressive in its efforts to erode the 2nd amendment and thus, there is a need to engage in performative activities to deter the authorities (such as parading with guns and military equipment or storming public areas while exhibiting guns). The substantial focus on the need to protect and preserve the second amendment attracted to the movement guns enthusiastic and hobbyists.

b. Strong libertarian and anaraco-capitalists narratives (who seek the removal of the central government but emphasize private property and the free market) attracted to the movement many supporters of Jo Jorgenson (the 2020 Libertarian Party candidate for president).

c. Gradually the boogaloo also adopted many of the conspiracy theories and narratives of the traditional militias and the more current ones, such as the III percenters. Specifically, the perception that the government is controlled by cabals of elites interested in enhancing the power and intrusiveness of the federal government while eroding individual freedoms and local authorities. In two ways, however, the boogaloo is distinct from the other militia groups: 1. Boogalooers do not embrace, for the most part, the more conspiratorial ideas of New World Order and the belief that the government wants to merge the U.S. to some kind of global government; 2. They were also critical to the willingness of some militias to ignore "government oppression" as long as Trump was in power.

d. The boogaloo also embraces and promotes the narrative that just violent resistance can "cure" the nation and preserve individual freedoms. Some boogaloo tends to use a vocabulary of "civil war II," while others tend to reference a second revolutionary war. There are various views within the movement regarding the forms and targets of the violence (see next point); while some support the initiation of offensive operations to incite a second civil war, others mainly seem to see violent resistance as a counter-response to the brutal and violent actions of authorities, and mainly law enforcement and federal agencies.

e. The animosity towards the federal government and its proxies (i.e., police organizations) takes various forms within the movement. While some members extend this adversarial approach to local law enforcement, the majority agree that the focus should be on the "tyrannical federal government." Such hostility also led some Boogaloo to show up with military gear, weapons, tropical shirts, and other boogaloo symbols in BLM (Black Lives Matter) events as they exploited the opportunity to clash with law enforcement.

USAExpert-0137

f. Following up on the previous point, The Black Lives Movement's martyrs have been incorporated by some boogaloo into their own pantheon of victims of police brutality. One commonly circulated boogaloo meme, which has various forms, features the boogaloo "igloo" flag and lists numerous right-wing radicals killed by police with Black persons killed by police (including Vicki Weaver, Duncan Lemp, and Robert LaVoy Finicum with Oscar Grant, Breonna Taylor and Eric Garner). To conclude, boogaloo supporters are typically sympathetic to the specific cause of resisting police brutality while being less sympathetic or even hostile to other BLM objectives.

g. The overlap in membership between the boogaloo and other far-right groups, as well as the ideological proximity, led the movement to adopt many ideological themes which are prominent within the other streams of the American far-right. This is reflected in the following manner: (i) general hostility towards progressive/liberal/left-wing political figures and cultural symbols; (ii) anti-immigrant nativist and xenophobic sentiments; (iii) suspicion towards Jews and usage of antisemitic tropes, especially in the context of the influence of global corporate and financial entities on the government and in the erosion of civil liberties (such as the right for privacy). It is important to note in this context that there were many efforts by Boogaloo members to distance themselves and their ideology from white supremacy and to attack what they perceived as the media efforts to link them with the racist components of the far-right. To conclude, Boogaloo supporters frequently claim their movement is not racist in an effort to protect the movement's public image. However, there is clear evidence that it was "infiltrated" by nativist and xenophobic ideologies and that members of white supremacy groups are active within the movement.

h. A substantial amount of rhetoric in online boogaloo communities seems to focus on hatred towards pedophiles and the punishment they should suffer, as well as related conspiracy theories. This seems to be a result of the influence of other groups who promoted conspiracy theories connecting Democrats and pedophilic networks (i.e., Qanon and Chen forums).

### 2.3 –Boogaloo engagement in illegal and violent activities

In late 2019 and more profoundly in 2020, boogalooers began to organize several mass protest activities, including rallies and parades in which they engaged in performative manifestations of their 2nd amendment right (thus parading in full military gear and firearms in addition to their Hawaiian shirts). The intensification of public health restrictions following the spread of COVID-19, was effectively exploited by boogalooers to exemplify what they perceived as the tyrannical and intrusive nature of federal and state governments, hence they flooded the streets and, in some cases, capitol buildings, demonstrating against lockdown measures implemented by authorities. Some boogalooers justified such activities by the need to "protect" local businesses which disregard local regulations and reopened. This happened on May 4, 2020, in West Odessa, Texas, where seven protesters, including six armed ones, were detained during a standoff with police over the reopening of a local bar. Wyatt Winn, one of the detained demonstrators, liked a lot of

USAExpert-0138

boogaloo-related Facebook groups, and posed for pictures with armed men wearing Hawaiian shirts.

Lastly, as BLM protests began to intensify, especially in taking a stand against police organizations, some boogalooers joined these events, as they provided an opportunity to clash directly with the police. Like in other instances, in some cases, their BLM-related street activities escalated. One boogaloo enthusiast was accused of firing 13 bullets from an AK-47-style rifle into the Third Precinct of the Minneapolis Police Department on May 28, 2020 while people were still inside; he was apprehended for the crime in October 2020. During a demonstration on May 30 in Columbia, South Carolina, two boogaloo enthusiasts were detained. One individual was charged with inciting a riot and aggravated breach of peace after he allegedly threw a water bottle at police officers during a protest; a second person faced numerous charges after allegedly stealing a police jacket from a police vehicle.

As with many other movements on the far-right, also in the case of the boogaloo movement, some groups and individuals were engaged in actual operational efforts to promote their anti-government and anti-police ideology and ignite what they perceived as a necessary second civil war. In April 2021 in St. Cloud, Minnesota, The FBI arrested Michael Paul Dahlager, a self-proclaimed boogaloo boi, and charged him with illegal possession of a machine gun. A month earlier, in Raven, Virginia, Jaap Willem Lijbers, an undocumented Dutch citizen, was arrested on weapons and immigration charges when federal agents raided his home and recovered a RF-15 military-style rifle and five magazines. He was a member of the private Facebook group that included Steven Carrillo and was in contact with both Benjamin Ryan Teeter and Ivan Harrison Hunter. During his communications with other boogalooers, Lijbers reportedly encouraged others to commit acts of violence at political rallies and against law enforcement officers in a "pig roast." More recently, in February 2021 in Louisville, Kentucky, John Subleski was arrested after he shared multiple posts on social media that advocated for rioting and violence and then later fired his weapon at a motorist during a January 6, 2021, riot in Louisville. According to the indictment, Subleski was a leader of the United Pharaoh Guard, a boogaloo group based in Louisville.

### 3.  **Robert Justus Ideological and Operational Association with the Boogaloo**

Based on my review of Mr. Justus online activities, I conclude that there is an abundance of evidence linking him to the ideological, operational, and organizational frameworks of the Boogaloo movement.

### *3.1 – Online Activities*

As explained above, the boogaloo originated from online communities on social media, mainly Facebook. Thus, Mr. Justus online activities, especially on Facebook, provide an important source of evidence for his affiliation with the movement and his embracement of its ideological pillars.

USAExpert-0139

**Violent Resistance against Authorities and Delegitimization of Law Enforcement** –

Mr. Justus advocacy of anti-Government sentiments and violence is clearly in line with the Boogaloo vision of a second civil war. On February 22, he seems to call for the burning of the govt (pg. 1007). Such general calls for violence are highly common within the Boogaloo and reflect both substantial animosities towards law enforcement and also clear view that violence is legitimate.

The following examples further reflect the strong animosity towards law enforcement and the overall perception that they are representative/proxies of oppressive government -

- On February 22, he seems to claim that a substantial portion of police officers are domestic abusers.
- He shared a meme that focuses on the message that there are no good cops, and most are corrupt and engage in criminal activities (pg. 489).
- Another meme included language which asserted that law enforcements are proxy of tyrannical government and are killing citizens in cold blood (pg. 956).
- In a comment from Oct 2019, Mr. Justice seems to argue that violence against police officers is a solution for police killings of innocent people (pg. 1441).
- In a meme posted on his Facebook page, it seems Mr. Justice suggests rigging a house with explosives to harm searching operation by law enforcement (pg. 1511).

**Direct Political Violence** – In some of his online engagements, Mr. Justus also expresses some support/sympathy for violence again political leaders. This growing trend within the American far-right reflects the increasing personalization of the political discourse and the tendency to direct violence against political leaders. Specifically:

- He commented on April 10, 2020, that "we should have started hanging politicians long ago" (pg. 812).
- A meme found on Mr. Justus Facebook seems to directly endorse the killing of cops by showing a cop being shot in his face and including the text "Speak to Cops in the language they understand."
- A meme found on Mr. Justus Facebook seems to directly endorse the killing of cops by showing a person sitting in his car and shooting with the following text below "How to Inform an Officer to find cover elsewhere."
- Mr. Justus also had on his Facebook page "professional" materials which were supposed to provide practical guidelines for engaging in violence against authorities (pg. 1130).
- A meme found on Mr. Justus Facebook (pg. 775) seems to encourage the use of firearms by showing a person with a shark costume with the words "Boo-GA-LOO" and "DO DO…"

USAExpert-0140

**Linkage to the Boogaloo Ideological and Operational Sphere** - Mr. Justus seems to engage with multiple websites and platforms which are associated with the ideology of the Boogaloo/anti-government movement. Additionally, his online activities seem to address many of the social and political topics promoted by the boogaloo and the broader anti-government militia movement.

Specifically -

- Evidence collected found that Mr. Justus liked or was connected to various anti-government militia movement organizations such as the "The Real Three Percenters" "The Real Indiana Three Percenters," and "The Real Three Percenters California."
- Mr. Justus also seems to engage in misogynist and Man Rights platforms, a growing trend among many individuals operating in the ideological sphere of the American far-right. Some of them are – "The Bitch if Fantabulous," Feminism is Evil," and "The California Fathers Rights Movement." In his specific case, his interest may be related to his divorce process and related financial difficulties (pg. 129). In at least several online posts, he also seems to endorse violence against family courts by posting that they are a joke and including a meme with a Molotov cocktail (pg. 1182). In other posts, he declares that it is time to "…make a big igloo and fix our family courts through via #boogaloo2020" and "watching some fathers' rights groups talking about boogaloo. Something gonna give soon" (pg. 1661).
- Mr. Justus seems to show interest in the case of Marvin Heemeyer, who became a kind of folk hero among members of anti-government groups. Mr. Heemeyer was a repair shop owner who demolished several buildings with a modified bulldozer in Granby, Colorado, on June 4, 2004, following a feud with town officials over fines for violating city health ordinances. Heemeyer had secretly modified a Komatsu D355A bulldozer by adding layers of steel and concrete intended to serve as armor. More importantly, he left behind texts and tapes which inspired various anti-federal and libertarian online communities, including Boogaloo.
- As explained above, Memes are one of the most common communications methods utilized by the Boogaloo; indeed, we can also see such extensive utilization of memes by Mr. Justus, mostly focusing on expressing mistrust and animosity against the law and the agencies which enforce it (see pp. 134, 179). He also actively requested boogaloo-related memes focusing on firearms, taxes, and family courts (see, for example, pg. 1189).
- As described above, the substantial focus on the need to protect and preserve the second amendment attracted to the boogaloo gun enthusiasts and hobbyists. Multiple documents from Mr. Justus Facebook page illustrate his interest in various forms of firearms upgrades/modification (pp.195, 197, 201, 205, 207, 209, 211, 213, 811) as well as emphsize his view that fire-arms are a fundamental component of the American way of life (pg. 796).
- Mr. Justus seems be interested in acquiring boogaloo clothing and memorabilia, which may indicate plans to engage in actual real world boogaloo activities (pg. 313). Indeed, in a

USAExpert-0141

Facebook post from Jan 18, 2022, he states "Im down to take off Monday and build Sorre gallows in from of cityhall or something" (pg. 1111).

- One of the memes found on Mr. Justus Facebook page (pg. 562) commemorates various incidents which became part of the ethos of the militia movement, such as Waco and Ruby Ridge, as well as victims of police brutality. It directly connects the anti-government ideology of the Militia movement to the current protest against police brutality. This is a common trend among boogaloo, as I discussed above. His attachment to the history of the Militia movement is also reflected in his "efforts" to "educate" others about these events (pg. 853) and calls to "abolish the federal government (pg. 1590).

- As I mentioned earlier, those who did participate in the movement began referring to themselves as "boogaloo bois/boys," "boogs," and "boojihadeen." The latter seems to appear in several memes on Mr. Justice's Facebook account.

## 3.2 – Interviews

The interviews reflect the engagements and interactions of Mr. Justus with other members of anti-government groups.

- The fact that these members were willing to share with Mr. Justus their future intentions to attack law enforcement (see the interview on June 10th, around min. 29-32) reflects that (at least in their eyes) he was not an anecdotal passerby in those online communities, but someone whom his committed enough to an anti-government ideology that they were willing to share with him such potentially incriminating information.

- Mr. Justus Indicated involvement in the California Kommando Facebook page – another indication of engagement with the online sphere of the anti-government movement.

- During the interview, Mr. Justus describes how the relationship that was formed between him and Mr. Carrillo in an online community eventually led to real-world collaboration. This is a vivid example of how boogaloo and anti-government online communities facilitate trust, collaboration, and, eventually actual real-world joint operations of their members.

- While Mr. Justus indicated in the interview that he was not supportive of the idea of the attack, the fact that he continued to "like" posts by Mr. Carrillo in the post-attack period is a reflection of some ongoing camaraderie and connection, which was not necessarily damaged because of the attack. In addition, my experience is that most people involved in extremist movements find it difficult to compartmentalize real-world actions and online rhetoric. For example, research I conducted and published in 2018 illustrates that a substantial portion of hate crimes are not planned in advance and are "spontaneous."

USAExpert-0142

**Summary**

Based on the evidence related to Mr. Justus's online activities, as well as his interviews, I conclude that Mr. Justus was active in the boogaloo/anti-government movement and embraced its ideological pillars. Including manifesting animosity, distrust, and hatred towards government institutions and proxies, especially law enforcement. Additionally, multiple times he engaged in rhetoric which is supportive of violent actions against and delegitimization of, political authorities and law enforcement agencies. Mr. Justus consistent engagement with multiple websites and platforms which are associated with the ideology of the Boogaloo/anti-government movement, as well as his active interactions with other members discussing many of the social and political topics promoted by the boogaloo and the broader anti-government militia movement, further reflect that he was part of a community and not a lone actor. Finally, his willingness to collaborate in real life with other members reflects that he was interested in identifying ways to transition from online to real-life ideological activism.

November 1, 2022                              Sincerely,

                                             s/*Arie Perliger*

                                             Arie Perliger, Ph.D.

USAExpert-0143

**EXHIBIT D**

**16.1 Murder—First Degree (18 U.S.C. § 1111)**

The defendant is charged in [Count _____ of] the indictment with murder in the first degree in violation of Section 1111 of Title 18 of the United States Code.  For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant unlawfully killed [*name of victim*];

Second, the defendant killed [*name of victim*] with malice aforethought;

Third, the killing was premeditated; and

Fourth, the killing occurred at [*specify place of federal jurisdiction*].

To kill with malice aforethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life.

Premeditation means with planning or deliberation.  The amount of time needed for premeditation of a killing depends on the person and the circumstances.  It must be long enough, after forming the intent to kill, for a killer to have been fully conscious of the intent and to have considered the killing.

**Comment**

The applicable statute, 18 U.S.C. § 1111, also contains a first-degree felony murder provision.  When felony murder is charged, the instruction relevant to premeditation should be appropriately modified.  For examples, see the Tenth Circuit's Criminal Pattern Jury Instructions 2.52.1 (2011 ed., updated Feb. 2018) and the Eleventh Circuit's Pattern Jury Instructions O45.2 (2019 ed.).

The elements for first degree murder are discussed in *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988) ("The essential elements of first-degree murder are: (1) the act . . . of killing a human being; (2) doing such act . . . with malice aforethought; and (3) doing such  act . . . with premeditation.").

As to the second element, in *United States v. Houser*, 130 F.3d 867, 872 (9th Cir. 1997), the Ninth Circuit approved the use of a jury instruction that defined malice aforethought as "either deliberately and intentionally or recklessly with extreme disregard for human life."

Killing with "extreme disregard" refers not only to acts endangering the public at large, but also to acts directed solely to the person killed.  *Houser*, 130 F.3d at 890.  In addition, the court should exercise caution regarding the "troublesome issue" of providing a permissive inference instruction on malice aforethought.  *Id*. at 869-71.

As to the fourth element, whether the crime alleged occurred at a particular location is a question of fact. *United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993). Whether the location is within the special maritime and territorial jurisdiction of the United States, or a federal prison is a question of law. *See United States v. Gipe*, 672 F.2d 777, 779 (9th Cir. 1982).

If there is evidence that the defendant acted in self-defense or with some other justification or excuse, *see* Instruction 5.10 (Self-Defense).

Voluntary and involuntary manslaughter are lesser included offenses of murder. *United States v. Arnt*, 474 F.3d 1159, 1163 (9th Cir. 2007). However, they are not lesser included offenses of felony murder. *United States v. Miguel*, 338 F.3d 995, 1004-06 (9th Cir. 2003).

The trial judge may be obligated to give an instruction on involuntary manslaughter in a murder case even when the defense does not offer the instruction. In *United States v. Anderson*, 201 F.3d 1145, 1150 (9th Cir. 2000), the Ninth Circuit held that it was plain error for the court not to instruct the jury on involuntary manslaughter, even though the defendant had not requested such an instruction, because there was evidence in the record to support the theory that the killing was accidental. A defendant is not automatically entitled to a voluntary manslaughter instruction. There must be some evidence that supports the proposition that the defendant was acting out of passion rather than malice, such as evidence of provocation. *United States v. Begay*, 673 F.3d 1038 (9th Cir. 2011) (en banc). The district court, which instructed the jury following Instruction 8.89 (2003) (now this instruction), properly instructed the jury on the correct definition of premeditation. *Id.* at 1043.

The trial judge is obligated to give an instruction on a lesser included offense in a murder case if the law and evidence satisfy a two-part test. *Arnt*, 474 F.3d at. The first step is a legal question: "Is the offense for which the instruction is sought a lesser-included offense of the charged offense?" *Id.* "The second step is a factual inquiry: Does the record contain evidence that would support conviction of the lesser offense?" *Id.*

*Revised June 2019*

# EXHIBIT E

## 16.5 Attempted Murder (18 U.S.C. § 1113)

The defendant is charged in [Count _____ of] the indictment with attempted murder in violation of Section 1113 of Title 18 of the United States Code.  For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant did something that was a substantial step toward killing [*name of intended victim*] and that strongly corroborated the defendant's intent to commit that crime;

Second, when the defendant took that substantial step, the defendant intended to kill [*name of intended victim*]; and

Third, the attempted killing occurred at [*specify place of federal jurisdiction*].

Mere preparation is not a substantial step toward committing the crime.  To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.

## Comment

"To constitute a substantial step, a defendant's actions must cross the line between preparation and attempt by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances."  *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007) (per curiam) (quoting *United States v. Nelson*, 66 F.3d 1036, 1042 (9th Cir. 1995)).

The "strongly corroborated" language in this instruction comes from *United States v. Snell*, 627 F.2d 186, 187 (9th Cir. 1980) (per curiam) ("A conviction for attempt requires proof of culpable intent and conduct constituting a substantial step toward commission of the crime that strongly corroborates that intent.") and *United States v. Darby*, 857 F.2d 623, 625 (9th Cir. 1988) (same).

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.  *United States v. Hofus*, 598 F.3d 1171, 1176 (9th Cir. 2010).

*See Braxton v. United States*, 500 U.S. 344, 351 (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." (citations omitted)).  Although one acting "recklessly with extreme disregard for human life" can be convicted of murder if a killing results (*see* Instruction 16.1 (Murder—First Degree) and 16.2 (Murder—Second Degree)), that same recklessness cannot support a conviction of attempted murder if, fortuitously, no one is killed.  *See United States v. Kwong*, 14 F.3d 189, 194-95 (2d Cir. 1994) (holding that under 18 U.S.C. § 1113, attempted murder conviction

requires proof of specific intent to kill; recklessness and wanton conduct, grossly deviating from a reasonable standard of care such that defendant was aware of the serious risk of death, would not suffice as proof of an intent to kill).

"[A] person may be convicted of an attempt to commit a crime even though that person may have actually completed the crime." *United States v. Rivera-Relle*, 333 F.3d 914, 921 (9th Cir. 2003).

*Revised June 2019*

EXHIBIT F

## 4.1 Aiding and Abetting (18 U.S.C. § 2(a))

A defendant may be found guilty of [*specify crime charged*], even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission.  To "aid and abet" means intentionally to help someone else commit a crime.  To prove a defendant guilty of [*specify crime charged*] by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed [*specify crime charged*];

Second, the defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of [*specify crime charged*];

Third, the defendant acted with the intent to facilitate [*specify crime charged*]; and

Fourth, the defendant acted before the crime was completed.

It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit [*specify crime charged*].

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime [and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime].

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

### Comment

Use this instruction with an instruction on the elements of the underlying substantive crime.

The Supreme Court has stated that the federal aiding and abetting statute has two primary components: "a person is liable under § 2 if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014).  The defendant's conduct need not facilitate each and every element of the crime; a defendant can be convicted as an aider and abettor even if the defendant's conduct "relates to only one (or some) of a crime's phases or elements." *Id*. at 1246-47.  The intent requirement is satisfied when a person actively participates in a criminal venture with advance knowledge of the circumstances constituting the elements of the charged offense. *Id*. at 1248–49; *see also United States v. Goldtooth*, 754 F.3d 763, 769 (9th Cir. 2014) (reversing defendants' convictions for aiding and abetting robbery on

Indian reservation because there was no evidence that defendants had foreknowledge that robbery was to occur).

In *Rosemond*, the defendant was charged with aiding and abetting the crime of using a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c).  The Supreme Court held that the government need not necessarily prove that the defendant took action with respect to any firearm, so long as the government proves that the defendant facilitated another element—drug trafficking.  *Rosemond*, 134 S. Ct. at 1247.  It was necessary, however, that the government prove that the defendant had advance knowledge of the firearm. *Id.* at 1249-50.  *See* Instruction 14.22 (Firearms—Using, Carrying, or Brandishing in Commission of Crime of Violence or Drug Trafficking Crime).

If, as in *Rosemond*, there is an issue as to when the defendant learned of a particular circumstance that constitutes an element of the crime, the judge should further instruct the jury that the defendant must have learned of the circumstance at a time when the defendant still had a realistic opportunity to withdraw from the crime.  *See Rosemond*, 134 S. Ct. at 1251-52 & n.10 (instruction telling jury to consider whether Rosemond "knew his cohort used a firearm" was erroneous because instruction "failed to convey that Rosemond had to have advance knowledge . . . that a confederate would be armed" such that "he c[ould] realistically walk away").

Aiding and abetting is not a separate and distinct offense from the underlying substantive crime but is a different theory of liability for the same offense.  *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005).  An aiding and abetting instruction is proper even when the indictment does not specifically charge that theory of liability because all indictments are read as implying that theory in each count.  *United States v. Vaandering*, 50 F.3d 696, 702 (9th Cir. 1995); *United States v. Armstrong*, 909 F.2d 1238, 1241-42 (9th Cir. 1990); *United States v. Jones*, 678 F.2d 102, 104 (9th Cir. 1982)*.  See also United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988); *United States v. Sayetsitty,* 107 F.3d 1405, 1412 (9th Cir. 1997).

A person may be convicted of aiding and abetting despite the prior acquittal of the principal.  *Standefer v. United States,* 447 U.S. 10, 20 (1980); *United States v. Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998).  Moreover, the principal need not be named or identified; it is necessary only that the offense was committed by somebody and that the defendant intentionally did an act to help in its commission.  *Mejia-Mesa*, 153 F.3d at 930 (citing *Feldstein v. United States,* 429 F.2d 1092, 1095 (9th Cir. 1970)).

The defendant's deliberate ignorance of the actions taken by another person who commits a crime is sufficient to satisfy the knowledge required for the offense of aiding and abetting that crime.  *United States v. Nosal*, 844 F.3d 1024, 1039-40 (9th Cir. 2016) (approving instruction that defendant acted "knowingly" if he "was aware of a high probability that [other employees] had gained unauthorized access to a computer . . . or misappropriated trade secrets . . . without authorization . . . and deliberately avoided learning the truth.").  For a definition of "deliberate ignorance," *see* Instruction 4.9 (Deliberate Ignorance).

No specific unanimity instruction on the issue of who acted as principal or aider and abettor is necessary, *id.*, nor does the jury need to reach unanimous agreement on the manner

(e.g., "procured," "aided," "abetted," "counseled," "induced," or "commanded") by which the defendant provided assistance. *United States v. Kim*, 196 F.3d 1079, 1083 (9th Cir. 1999).

The last paragraph of this instruction has been expressly approved in *Vaandering*, 50 F.3d at 702. It may be unnecessary to give the last paragraph if there is no dispute as to the identities of

the principal and the aider and abettor.

*Revised Sept. 2019*