ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JONATHAN U. LEE (CABN 148792)
JOHN C. BOSTIC (CABN 264367)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-6748
    Email:  jonathan.lee@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 20-CR-265 YGR |
| Plaintiff, | UNITED STATES' OPPOSITION TO MOTION TO EXCLUDE PROFFERED EXPERT TESTIMONY OF ARIE PERLIGER AND FOR EVIDENTIARY HEARING |
| v. | |
| ROBERT ALVIN JUSTUS, JR., | |
| Defendant. | |

## **TABLE OF CONTENTS**

I.      Introduction ...........................................................................................1

II.     Dr. Perliger's Expertise and Anticipated Testimony................................1

        A.      Dr. Perliger's Anticipated Testimony ...........................................1

        B.      Dr. Perliger's Expertise .................................................................2

        C.      Boogaloo ideological movement ...................................................6

                1.      Southern Poverty Law Center ...........................................6

                2.      Anti-Defamation League ...................................................7

                3.      Center for Strategic & International Studies ......................7

        D.      Defendant's Boogaloo Activity .....................................................7

III.    Legal Standard.......................................................................................11

I V .   Argument ...............................................................................................13

        A.      Dr. Perliger Has Specialized Knowledge About the Boogaloo Movement ...13

        B.      Dr. Perliger's Proposed Testimony Will Be Helpful to the Trier of Fact in this Case. ............................................................................14

        C.      Defendant's other motion arguments fail. ....................................20

                1.      Dr. Perliger's Proposed Testimony Is Not a "Hub of the Case" But Instead Is Based on His Expertise Which Is Grounded In His Experience And Research ................................................20

                2.      Dr. Perliger's Proposed Testimony Does Not Include An Opinion That Defendant Had the Requisite *Mens Rea* to Commit Murder or Attempted Murder, Nor Does His Testimony Impermissibly Compel the Jury To So Conclude ..........................................22

                3.      Dr. Perliger's Proposed Testimony Is Based on Defendant's Statements, Which Are Admissible When Offered Against Him, So There is No *Crawford* Or Confrontation Issue..................................23

                4.      Dr. Perliger's Reliability Is Demonstrated By His Work..................24

        D.      A *Daubert* Hearing Is Not Warranted to Establish the Admissibility of Dr. Perliger's Testimony ...........................................................24

V.      CONCLUSION .......................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ................................................................................................ 12

*Cooper v. Brown*,
   510 F.3d 870 (9th Cir. 2007) .................................................................................................. 11

*Crawford v. Washington*,
   541 U.S. 36 (2004) ................................................................................................................. 23

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .......................................................................................................... 11, 25

*Elosu v. Middlefork Ranch Inc.*,
   26 F.4th 1017 (9th Cir. 2022) ............................................................................................ 12, 13

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022) ................................... 13

*Kumho Tire Co.v. Carmichael*,
   526 U.S. 141 (1999) ................................................................................................................. 8

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) .................................................................................................. 20

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .................................................................................................. 11

*United States v. Aiyaswamy*,
   2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) ........................................................................ 25

*United States v. Al Farekh*,
   810 F. App'x 21 (2d Cir. 2020) .............................................................................................. 18

*United States v. Alatorre*,
   222 F.3d 1098 (9th Cir. 2000) ................................................................................................ 24

*United States v. Cerna*,
   2010 WL 2347406 (N.D. Cal. June 8, 2010) .......................................................................... 19

*United States v. Cervantes*,
   2016 WL 491599 (N.D. Cal. Feb. 9, 2016) ........................................................................ 19, 20

*United States v. Cutler*,
   806 F.2d 933 (9th Cir. 1986) .................................................................................................. 16

*United States v. Flores*,
   2014 WL 12686740 (N.D. Cal. June 16, 2014) ................................................................ 19

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ........................................................................................ 20

*United States v. Garcia*,
   793 F.3d 1194 (10th Cir. 2015) ........................................................................................ 12

*United States v. Gil*,
   58 F.3d 1414 (9th Cir. 1995) ........................................................................................... 12

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ............................................................................... 12, 13, 18

*United States v. Hassan*,
   742 F.3d 104 (4th Cir. 2014) ................................................................................. 17, 18, 25

*United States v. Hayat*,
   710 F.3d 875 (9th Cir. 2013) ........................................................................... 16, 17, 23, 25

*United States v. Hermanek*,
   289 F.3d 1076 (9th Cir. 2002) ......................................................................................... 20

*United States v. Holguin*,
   51 F.4th 841, 851 (9th Cir. 2022) .....................................................................................25

*United States v. Hunt*,
   573 F. Supp. 3d 779 (E.D.N.Y. 2021) ............................................................................. 18

*United States v. Jayyousi*,
   657 F.3d 1085 (11th Cir. 2011) .................................................................................. 17, 25

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008) ...................................................................................... 11, 21

*United States v. Morales*,
   108 F.3d 1031 (9th Cir. 1997) .................................................................................... 22, 23

*United States v. Nelson*,
   2021 WL 75757 (N.D. Cal. Jan. 8, 2021) .................................................................. 12, 19

*United States v. Rodriguez*,
   125 F. Supp. 3d 1216 (D.N.M. 2015) .............................................................................. 21

*United States v. Sandoval-Mendoza*,
   472 F.3d 645 (9th Cir. 2006) ........................................................................................... 11

*United States v. Santiago*,
   46 F.3d 885 (9th Cir. 1995) ............................................................................................. 16

*United States v. Shafi*,
  2018 WL 3159769 (N.D. Cal. June 28, 2018) ........................................................ 18, 25

*United States v. Skillman*,
  922 F.2d 1370 (9th Cir. 1990) ............................................................................... 16

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) ................................................................................. 21

*United States v. Vera*,
  770 F.3d 1232 (9th Cir. 2014) ............................................................................... 23, 24

*United States v. Williams*,
  2016 WL 899145 (N.D. Cal. Mar. 9, 2016) .......................................................... 19

*United States v. Winslow*,
  962 F.2d 845 (9th Cir. 1992) ................................................................................. 16

*United States v. Young*,
  916 F.3d 368 (4th Cir. 2019) ................................................................................. 17, 18

*United States v. Younger*,
  398 F.3d 1179 (9th Cir. 2005) ............................................................................... 23

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ............................................................................... 12, 13, 24

## STATUTES

18 U.S.C. § 1114 ....................................................................................................... 1, 14

## RULES

Federal Rule of Criminal Procedure 16 ……………………………………………………1, 2

Federal Rule of Evidence 403 ……. …………………………………………………… 16, 18

Federal Rule of Evidence 702 ……. ……………………………………………………passim

Federal Rule of Evidence 704 ……..…………………………………………………18, 22

Federal Rule of Evidence 801 ……...………………………………………………………23

## I.    Introduction

The defendant has moved this Court to exclude the testimony of the government's extremism expert, Dr. Arie Perliger.  Dr. Perliger's expertise includes researching far-right antigovernment violent groups, including the Boogaloo ideological movement.  This case arises from a planned, coordinated attack by two Boogaloo adherents on the Oakland federal courthouse which killed one security officer and wounded another.  The defendant is charged with violations of 18 U.S.C. § 1114, with the Indictment alleging that the victims were targeted while assisting federal officers "and on account of that assistance."  *See* ECF No. 12.  The evidence at trial—including Dr. Perliger's testimony—will prove that allegation partly by showing that the defendant was motivated by his adoption of the antigovernment ideology of the Boogaloo movement.  Contrary to the defendant's arguments in the motion, Dr. Perliger's testimony is both reliable and helpful to the jury, and clearly admissible.  Dr. Perliger will apply his expertise to the facts of this case to reach his opinions about Boogaloo and this defendant's involvement in Boogaloo.  In particular, Dr. Perliger will assist the jury in understanding relevant statements made by defendant, all of which are admissible when offered by the government. From this testimony, as well as other evidence, the jury may conclude that the defendant intentionally aided and abetted his co-defendant in carrying out the attack.  But the jury is not compelled to reach that conclusion simply because of Dr. Perliger's testimony.  Nor is a *Daubert* hearing necessary to determine the reliability of Dr. Perliger's testimony.  The motion should be denied.

## II.    Dr. Perliger's Expertise and Anticipated Testimony

### A.    Dr. Perliger's Anticipated Testimony

Dr. Perliger possesses knowledge, experience, training, and education that will undoubtedly assist the jury in understanding the evidence in this case.  The government provided to the defendant on November 2, 2022, a summary of Dr. Perliger's expected testimony and a report signed by Dr. Perliger.[1]  These were attached to the defendant's motion to exclude as Def. Exhibits A-C so the

---

[1] Following service of the government's notice in November 2022, defense counsel requested confirmation of Dr. Perliger's prior testimony.  Rule 16 now requires disclosure of four years of testimony but is silent on whether a party must disclose the absence of testimony.  Moreover, at the time of the government's notice, Rule 16 did not require disclosure of prior testimony.  Nevertheless, on February 20, 2023, the undersigned AUSA emailed defense counsel a letter stating that Dr. Perliger has not testified as an expert at trial or deposition in the previous four years.

government does not reattach it here.  However, in summary, the government anticipates that Dr. Perliger's testimony will address the following areas:

- The origin and rise of the Boogaloo ideological movement within the last decade, and in particular its surge of activity during 2019-2021;

- The use of the internet and social media by Boogaloo adherents during this timeframe to connect with other adherents, discuss and coordinate activity in the physical world, particularly during the social unrest in May and June 2020;

- The paths of radicalization for such individuals seeking to join the Boogaloo movement during 2019-2020;

- Whether particular evidence that Dr. Perliger has reviewed in this case relating to the defendant is consistent with such paths of radicalization;

- The goals and ideologies behind the Boogaloo movement, and the use of violence by its adherents to achieve their objectives;

- Specific vocabulary (enumerated in more detail in the government's notice and in the government's 404(b) notice) that was used by the defendant in this case, and that is also used by individuals who adhere to the Boogaloo movement. *See generally*, Def. Mot. to Exclude Exhibit C at dkt. pp. 56-67.

This testimony falls squarely within the parameters of permissible expert testimony under Federal Rule of Evidence 702, as numerous courts have similarly found.  Accordingly, as discussed in further detail below, Dr. Perliger should be permitted to testify at trial.

### B.  Dr. Perliger's Expertise

Dr. Perliger is the Director of the Graduate Program in Security Studies, School of Criminology and Justice Studies, University of Massachusetts Lowell, and has been since 2017.  *See* dkt. no. 189 at Exh. B, dkt. pg. 40.[2]  The Program in Security Studies "looks to the future by focusing our research on

---

[2] After filing the motion to exclude defense counsel transmitted a letter requesting additional materials about Dr. Perliger's expertise and work.  The request went beyond Rule 16's disclosure requirements.  The government does not agree to provide materials beyond those required by the rule, and the materials are not in the government's possession in any case, but after the defense provides its expert disclosure, the undersigned AUSAs will consider the possibility of a reciprocal arrangement for extra disclosures of materials relating to the parties' respective experts.

emerging issues confronting the criminal justice system, including violence and victims, justice-involved mental health populations, police innovations, data-driven practice and national and international security."  https://www.uml.edu/fahss/criminal-justice/about.aspx (last accessed April 17, 2023).  Dr. Perliger, who also serves as a full tenured Professor, focuses his research on political violence and extremism, security policy and politics, far-right politics in the U.S. and other countries, political socialization, Middle Eastern politics, and research methodology.  Dr. Perliger's credentials include more than twenty years of extensive study and research of terrorism and political violence in the United States and abroad.  His research has appeared in at least nine books and monographs, numerous articles and book chapters, and has been cited in more than 2000 academic texts according to his Google Scholar profile.  https://scholar.google.com/citations?user=xBQYKHwAAAAJ&hl=en (last accessed April 17, 2023).

Dr. Perliger has presented research at the Annual Meeting of the American Political Science Association and the Annual Meeting of the International Studies Association.  He has received grant awards to conduct research for U.S. government agencies.  These grants include ongoing work in 2021-2023 for the National Institute of Justice in the amount of $998,599 for "Characterizing and Preventing Domestic Terrorism:  A Mixed-Methods Study of Five Far-Right Terrorist Groups."  He has advised the U.S. government policymakers to formulate possible responses to political unrest, including for example the U.S. Army's response to the Arab Spring.  He has served as an instructor at various training events for law enforcement agencies including the FBI and ICE among others, and he has briefed U.S. government officials including the Secretary of the Army, U.S. Army Chief of Staff and NORTHCOM, SOCOM, JSOC and AFRICOM commanders.

Dr. Perliger has published numerous peer-reviewed articles, and he serves as a peer reviewer for others' submissions.  His resume lists more than 50 peer reviewed articles or chapters since 2003.  In addition, Dr. Perliger serves as Editor-in-chief of Democracy and Security, and has since 2016.  Before that, he was co-editor of that publication from 2011-2015.  He is on the editorial board of Studies in Conflict and Terrorism, and has been since 2014.  He is a manuscript reviewer for Chicago University Press and Columbia University Press, among other publishers, and an article reviewer for

1  approximately 20 periodicals, including the American Political Science Review, Terrorism and

2  Political Violence, Critical Studies on Terrorism, and others.  In recent years, Dr. Perliger's

3  publications include American Zealots:  Inside Right Wing Domestic Terrorism (Columbia University

4  Press, 2020), and he has conducted extensive research.  His research projects include (1) examining

5  biological and psychological effects of extremist propaganda and counter-messaging strategies on

6  different personality types for the Department of Defense and (2) developing a comprehensive far-right

7  extremism database with more than 5,000 documented attacks by groups and individuals in the United

8  States.  https://www.uml.edu/fahss/criminal-justice/research/terrorism-security-transnational-

9  crime.aspx (last accessed April 17, 2023).

10      American Zealots, which is widely available both in public libraries and online outlets for book

11  sales such as Amazon.com, is an in-depth analysis of the history and contemporary trends of the violent

12  American far-right.  *See, e.g.*, American Zealots, pp. 21-24 ("Antigovernment") and 141-144 ("The

13  Anti-Government Stream").  In the book Dr. Perliger describes his research in which he built a dataset

14  of information on 5,697 incidents of violence in the United States between 1990-2017 that caused 823

15  fatalities and injured an additional 3,697 individuals.  *Id*., Appendix, pp. 163-166.  These incidents

16  include all violent attacks by groups or individuals affiliated with far-right associations and/or intended

17  to promote far-right ideologies.  *Id*.

18      Dr. Perliger's publications also include two recent articles discussing far-right and

19  antigovernment extremism in the United States, including the Boogaloo movement.  In "Deciphering

20  the Second Wave of the American Militia Movement," published in January 2021 by the Carr Centre

21  for Analysis of the Radical Right, Dr. Perliger wrote this about the Boogaloo movement.

22  https://www.radicalrightanalysis.com/2021/01/07/carr-policy-insight-series-deciphering-the-second-

23  wave-of-the-american-militia-movement/ (last accessed April 17, 2023).  Dr. Perliger describes the

24  Boogaloo movement and its relatively loosely organized formation in the online space before

25  manifesting in actions located in the physical world:

26          Alongside the more formal and hierarchical militia groups, the second
        wave of the movement also includes more loose associations that

27          originated in online communities before transitioning into real-world
        activities. Probably the most known such network is the Boogaloo

28          movement. After coalescing in 2019 mainly in online forums, the recent

wave of public unrest, which began with the demonstrations against police brutality following the May 2020 killing of George Floyd, led its members to participate in counter-protests and anti-lockdown rallies. Comprised of many former militia members and members of the more veteran extreme far-right groups, the "Boogaloo boys" promote various antigovernment ideas, including support for violent resistance against attempts by the government to undermine civil liberties and constitutional freedoms. It seems that at least some groups of Boogaloo also aim to exploit the social unrest in order to expedite national struggle, a kind of second civil war. *Id.* at 7.

Dr. Perliger then went on to discuss the specific shooting incidents giving rise to this prosecution.

On June 6, 2020, Air Force Sergeant Steven Carrillo—who was a member of the "Phoenix Ravens," an elite unit designated to secure military personnel in foreign countries—was detained after allegedly firing at police officers who arrived at his residence in Santa Cruz, California, to investigate his connection to a May 29 shooting in Oakland that killed a Federal Protective Service officer. During the shootout, a deputy sheriff was killed, and a sheriff sergeant was injured. Carrillo himself was injured and tried to run away on foot before hijacking a car, which he abandoned minutes later. He eventually was detained while trying to steal another car from a nearby home. He is currently awaiting trial after he was charged with 19 felonies, including murder and attempted murder. According to the FBI, Carrillo was associated with the Boogaloo movement, and investigators found a ballistic vest with a Boogaloo patch in his vehicle. Moreover, Carrillo wrote the word "boog" in blood on the hood of the vehicle he had hijacked. *Id.* at 8.

In a more recent article for the International Centre for Counter-Terrorism, "Contextualising the Jan 6th Report:  Contemporary Trends in the Far-Right Violence in the U.S.," Dr. Perliger discussed the link between far-right extremism and mass protests:

From a scholarly and policy perspective, several aspects of the [January 6] report should be especially notable for their reflection on important processes within the violent American far-right. The first is the increasing role of mass protest events in the facilitation of far-right violence. In some respects, the storming of the Capitol building on 6 January 2021 was unique in terms of its symbolism and the direct threat it posed to elected officials. In other respects, it demonstrated similar qualities to an increasing number of mass protest events that resulted in and facilitated severe acts of political violence. Such events can provide a strategic opportunity for far-right extremist groups to collaborate with like-minded organisations, enhance their organisational capabilities and profile, and empower their members to take violent action.

1   https://www.icct.nl/publication/contextualising-jan-6th-report-contemporary-trends-far-right-violence-

2   us (last accessed April 17, 2023).

3          Finally, Dr. Perliger has teaching experience on political violence, terrorism, and political

4   conflicts/civil war at multiple institutions, including the University of Massachusetts Lowell, the U.S.

5   Military Academy at West Point, and the University of Haifa.

6          In sum, Dr. Perliger has a wealth of relevant experience as a researcher who has studied and

7   published works about far-right, antigovernment extremism in the United States.  His work has focused

8   on specific groups, including the Boogaloo movement.  He has quantitative research serves as the

9   foundation of his work, and he advises government decisionmakers using his expertise.

10         **C.     Boogaloo ideological movement**

11         The Boogaloo ideology, which is at the center of this case, is a documented and studied, albeit

12   recently emerging, social phenomenon and movement.  The government alleges that both the co-

13   defendant (who has admitted his conduct, pled guilty, and received a 41-year sentence) and this

14   defendant adhered to this ideology.  Experts who monitor and study political extremism have

15   documented the provenance and recent growth of the Boogaloo ideological movement in the United

16   States.  This is scholarship that draws on multiple disciplines, including most prominently political

17   science, but also history and sociology.

18                **1.     Southern Poverty Law Center**

19         In summary, the Southern Poverty Law Center has described the Boogaloo as traceable to a

20   racist meme that emerged in "antigovernment and white power online spaces in the early 2010s."

21   https://www.splcenter.org/hatewatch/2020/06/05/boogaloo-started-racist-meme (published June 5,

22   2020; last viewed April 17, 2023).  The SPL noted the prevalence of Boogaloo activity in online

23   communities, with "well over 100 boogaloo Facebook groups, most replete with memes fantasizing

24   about or encouraging violence against police."  *Id*.  Some Boogaloo adherents, according to the SPL,

25   moved from online spaces to the physical world to carry out violence against law enforcement intended

26   to trigger an impending civil war.  https://apnews.com/article/virus-outbreak-american-protests-

27

28

terrorism-us-news-las-vegas-6223153093f08fa910c4ab445771b773 (last viewed April 17, 2023) (describing planned attack in Las Vegas).

### 2. Anti-Defamation League

In brief, the Anti-Defamation League has called the Boogaloo movement as a "developing anti-government extremist movement that arose in 2019 and features a loose anti-government and anti-police ideology." https://www.adl.org/resources/backgrounder/boogaloo-movement (last viewed April 17, 2023). The ADL catalogued a number of violent incidents in 2020-2021, including the conduct at issue in this trial, as well the Santa Cruz murder a few days later. *Id.*

### 3. Center for Strategic & International Studies

In summary, the Center for Strategic & International Studies has described the Boogaloo movement as a "decentralized ideological network that believes in a coming second U.S. civil war—referred to as the 'boogaloo'—and espouses anti-government and anti-law enforcement rhetoric." https://www.csis.org/blogs/examining-extremism/examining-extremism-boogaloo-movement (published June 30, 2021; last viewed April 17, 2023). The CSIS also noted that "[d]uring 2020, Boogaloo adherents increasingly attended protests and riots, and they often sought to capitalize on high tensions to incite violence and chaos." *Id.*

### D. Defendant's Boogaloo Activity

The evidence at trial will include, and Dr. Perliger has reviewed and bases his opinions upon, the following statements by the defendant regarding the Boogaloo movement. There are hundreds of statements by the defendant that are potentially relevant to the charges to be tried. The following are a sampling of the defendant's statements in two general categories. In the first category, the defendant's statements use boogaloo terminology and references that Dr. Perliger will need to help the jury understand.

1. On July 27, 2019, at 22:59:43 UTC, defendant made this statement on Facebook: "BoogaLOOOOO." (Facebook ("FB") at 1896)

2. On August 9, 2019, at 14:43:52 UTC, defendant stated on Facebook: "We should go retake our courts #reformfamilycourts #boogaloo #doitforthekids." (FB 1825)

3.  On August 10, 2019, at 16:53:24 UTC, defendant commented: "Boogaloo & Hootenanny 2020." (FB 1802)

4.  On August 13, 2019, at 05:25:31 UTC, defendant stated on Facebook, "Time to boogaloo the courts." (FB 1759)

5.  On August 16, 2019, at 22:41:50 UTC, defendant replied to a comment, "thats where me and Isaiah are getting at. Its time to boogaloo for our future and rights." (FB 1700)

6.  On August 26, 2019, defendant interacted on Facebook with a meme depicting a cartoon character of a man wearing a red baseball hat and a pair of reflective mirror sunglasses. The meme said, "NOW THAT ALPHABET BOIS SUSPECT A BOOGALOO WE HIT THEM WITH THE BIGGEST HOOTENANNY THEY'VE EVER SEEN." (FB 1668)

7.  On August 27, 2019, at 14:50:00 UTC, defendant posted on Facebook, "Watching some fathers rights groups talking about boogaloo. Somethings gonna give soon." (FB 1661)

8.  On August 28, 2019, at 19:35:11 UTC, defendant posted on Facebook, "#boogaloo." (FB 1656)

9.  On August 28, 2019, at 21:57:49 UTC, defendant interacting with an image posted on Facebook referencing Boogaloo's definition, "Boogaloo term used to describe the upcoming libertarian revolution against the government. This term is used so mods on Instagram and other platforms don't catch on. 3% also use this phrase but it is mostly used on gun meme accounts on the gram." (FB 2889)

10. On September 18, 2019, at 23:33:44 UTC, defendant commented, "Cant we just skipp all that political jibberish and get to the end already. Feels like forever waitin for this hottenanny." (FB 1583)

11. On December 7, 2019, at 17:32:50 UTC, defendant commented, "Vote boogaloo & hootenanny 2020." (FB 1287)

12. On December 12, 2019, at 08:36:24 UTC, defendant stated, "Considering tryna kick off the boog." (FB 2518)

13. On December 12, 2019, at 09:18:40 UTC, defendant stated, "if enough buildings go up im

sure a few more boogys would come join the party." (FB 2530)

14. On December 12, 2019, at 15:52:46 UTC, defendant commented, "Time to boogey in the big igloo." (FB 1238)

15. On January 2, 2020, at 15:27:04 UTC, defendant commented, "Its time to start building a big igloo. Not for us, but for the children. For the judges, lawyers, and everyone else involved. Build a big igloo for them. #cometogether #boogaloo #builidanetwork." (FB 1191).

16. On January 2, 2020, at 15:28:14 UTC, defendant replied to a comment, "@[: Fred Clyde Burk] you mean hold these law makers and enforcers accountable for their actions? Time to build the big igllo and boogaloo." (FB 1192)

17. On January 8, 2020, at 06:53:01 UTC, defendant commented, "The time is coming. The judges will be judged. The lawyers will be prosecuted. The system is broken. We are the only hope. For the childrens sake, The broken must rise #buildyournetwork #standyourground #defendyourfamily #boogaloo." (FB 1146)

18. On April 22, 2020, at 02:30:16 UTC, defendant replied to a comment, "I wish I didnt want to move. I wish all of cali would boog and set things straight" (FB 760)

19. Within defendant's Facebook account is a meme depicting an individual in a helmet and a pair of goggles over a masked face wearing tactical gear. The meme said, "I WANT YOU TO JOIN THE UNITED STATES BOOJAHIDEEN."  On April 22, 2020, at 08:25:14 UTC, defendant liked this post.  (FB 751-752)

20. On May 28, 2020, at 14:20:28 UTC, Steve C Rillo posted on Facebook, "It's on our coast now, this needs to be nationwide.  It's a great opportunity to target the specialty soup bois. Keep that energy going."  (FB 876)  On May 28, 2020, at 14:37:25 UTC, defendant posted "Lets boogie." (FB 580)

In a second category of defendant's statements, the defendant made other statements consistent with the Boogaloo viewpoint and bearing directly on the May 2020 shooting.

1. On December 9, 2019, at 09:17:12 UTC, defendant posted on Facebook, "I really want to go

burn down some fed buildings." (FB 2530)

2. On December 12, 2019, at 08:37:53 UTC, defendant stated, "Wanna light up every damn federal office and child support/service building I can get to." (FB 2518)

3. On December 30, 2019, at 06:36:50 UTC, defendant commented, "The correct violence is necessary."  (FB 2548)

4. Visible within defendant's Facebook account is a meme depicting eight tiles with pictured backgrounds and captions to read, "I JUST CAN'T WAIT FOR THE FALL OF THE STATE." On the eighth tile the words "OF THE STATE" are embedded on a picture of a burning building. (FB 115)

5. On January 18, 2020, at 15:23:59 UTC, defendant commented, "Im down to take Monday off and build some gallows in front of cityhall or something" (Facebook return 1111)

6. On February 11, 2020, at 03:26:55 UTC, defendant wrote on Facebook, "You guys ask why we have a bloodlust for police…" (FB 190)

7. On February 22, 2020, at 04:19:55 UTC, defendant posted: "and this is why I think we should burn down the govt." (FB 1007)

8. On May 27, 2020, defendant interacted with a meme on Facebook depicting a police officer being shot in the face.  The meme said, "Speak to Cops in a Language They Understand." (FB 599)

9. On May 28, 2020, defendant commented "Maybe its time we burn the cities to the ground." (FB 573)

10. On May 29, 2020, at 02:02:15 UTC, defendant commented, "Start chucking molotovs." (FB 567)

11. Within defendant's Facebook account is an image of a conversation posted on Thursday, May 28, 2020, "Heads up, riots apparently planned in Oakland tomorrow (emoji)" at 2:06 PM.  A comment to that posting, "Maybe its time we burn the cities to the ground." (FB 527)

12. On May 30, 2020, at 01:35:48 UTC, defendant wrote, "Yea. Im watching. Waiting for a

1         buddy to pick me up and out to oak we go." (FB 2617)

2 **III.  Legal Standard**

3         Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or

4 otherwise" where:

5         (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

6         understand the evidence or to determine a fact in issue;

7         (b) the testimony is based on sufficient facts or data;

8         (c) the testimony is the product of reliable principles and methods; and

9         (d) the expert has reliably applied the principles and methods to the facts of the case.

10 Fed. R. Evid. 702.

11         Rule 702 imposes a "gatekeeping role" on the trial judge to ensure that an expert's testimony

12 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

13 *Pharm., Inc.*, 509 U.S. 579, 597 (1993).   The district court's role is to act as "a gatekeeper, not a fact

14 finder." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  Expert testimony is

15 admissible under Rule 702 if it is both relevant and reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509

16 U.S. 579, 589 (1993).

17         "[R]elevance means that the evidence will assist the trier of fact to understand or determine a

18 fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598

19 F.3d 558, 564 (9th Cir. 2010).  With respect to when expert testimony will assist the trier of fact, the

20 advisory committee notes for Rule 702 "refer to the traditional common law rule that expert testimony

21 is called for when the 'untrained layman' would be unable intelligently to determine 'the particular

22 issue' in the absence of guidance from an expert." *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir.

23 2008); *see also* Fed. R. Evid. 702 advisory committee notes ("There is no more certain test for

24 determining when experts may be used than the common sense inquiry whether the untrained layman

25 would be qualified to determine intelligently and to the best possible degree the particular issue without

26 enlightenment from those having a specialized understanding of the subject involved in the dispute.")

27 (internal quotation marks omitted).

28

Testimony is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry" and "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted).  As a result, "Rule 702 should be applied with a liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citation omitted). Even if testimony is "shaky," it is "to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona,* 750 F.3d at 1044.  Therefore, the gatekeeping role involves "screen[ing] the jury from unreliable nonsense opinions, but not exclud[ing] opinions merely because they are impeachable." *Id*. (citation omitted).  "Simply put, '[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.'" *United States v. Nelson*, 2021 WL 75757, at *2 (N.D. Cal. Jan. 8, 2021) (citation omitted).

Courts have long recognized the relevance of expert testimony about organized criminal groups "because the average juror is often innocent of the ways of the criminal underworld." *United States v. Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015).  Accordingly, "government agents or similar persons may testify as to the general practice of criminals to establish the defendants' modus operandi.'" *United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995) (quotation omitted).   This testimony can "help[] the jury understand complex criminal activities, and alert[] it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *Id.; see also United States v. Hankey*, 203 F.3d 1160, 1164 (9th Cir. 2000) (upholding admission of the expert testimony of a 21-year law enforcement veteran on topics such as colors, signs, and activities based on "street intelligence").

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citations omitted).  To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id*.  These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case."

1    *Id.* (internal quotation marks and footnotes omitted).  As noted, courts recognize that "[t]he *Daubert*

2    factors . . . simply are not applicable" in cases where "reliability depends heavily on the knowledge and

3    experience of the expert, rather than the methodology or theory behind it."  *Hankey*, 203 F.3d at 1169

4    (officer with undercover experience provided opinions about gang membership and communications).

5    In sum, the test of reliability is flexible.  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir.

6    2021), *cert. denied*, 142 S. Ct. 2834 (2022), *citing Wendell*, 858 F.3d at 1232.

7    **I V.   Argument**

8         Despite Dr. Perliger's qualifications, the defendant moves to exclude his testimony in its

9    entirety.  For the reasons discussed below, each of the defendant's objections is without merit.

10        **A.      Dr. Perliger Has Specialized Knowledge About the Boogaloo Movement**

11        Contrary to the defense's contention, Dr. Perliger has a wealth of knowledge about extremism

12   and political violence in this country, as outlined elsewhere in this brief.  This specialized knowledge

13   extends to far right, anti-government extremism, which includes the Boogaloo movement, a group of

14   individuals carrying out violent attacks that Dr. Perliger has studied.  Dr. Perliger's research includes

15   the construction of a comprehensive database of thousands of violent attacks by far-right extremists in

16   the United States, including Boogaloo.  One factor to bear in mind as the Court considers the

17   defendant's objection is that the Boogaloo movement is a relatively new ideological movement, as the

18   Southern Poverty Law Center and others have documented.  Yet despite the Boogaloo movement's

19   relatively short history, Dr. Perliger has nevertheless been able to incorporate the group's existence and

20   significance into his work.

21        Moreover, Dr. Perliger's specialized knowledge will assist the trier of fact in its understanding

22   of the evidence in this case.  A typical juror may have some understanding of far-right extremism in

23   general, just as many jurors in trials concerning other organized violent groups may have had such

24   information.  In fact, a juror sitting in a murder trial involving another organized group with a longer

25   history, such as the Hells Angels, MS-13, or Nuestra Familia, may have read or heard about the group

26   through movies or books, such as No Angel, Operation Devil Horns, or Blood in the Fields, but courts

27   admit expert opinions about those groups at criminal jury trials, including opinions about the group's

28

1    history, symbols, and vocabulary, as well as how the gang operates or coordinates its actions.  This is

2    because the subject matter as it applies to the evidence is beyond the common experience of jurors.

3    This is even more so the case in this trial, involving as it does a recently emerging, less well-publicized,

4    but violent group.

5           The motion contends that no expert testimony would assist the trier of fact in understanding

6    either right-wing extremism or the defendant's statements about the Boogaloo movement.  There is no

7    basis offered for this argument; no case law; no discussion of the facts.  The government submits that a

8    recently emerging anti-government ideological movement that spread through online communications

9    to connect and coordinate actions in the physical world while using memes and colloquialisms is

10   beyond the ken of the typical juror.  For example, the term "boogaloo" itself is a reference to a movie

11   title from the 1980s.  As a further example, Boogaloo adherents used "igloo", "big igloo", and "big

12   luau" to communicate with each other about impending, anticipated political violence.  They also spoke

13   of committing acts of violence against federal employees as a necessary step in sparking civil unrest

14   that would galvanize their movement into action, sometimes referred to as a "hootenanny" or similar

15   terms.  The defendant used all of these terms, and more, as he communicated with his co-defendant,

16   and others, in the weeks leading up to the deadly attack on two federal officers at the Oakland

17   courthouse.

18         **B.    Dr. Perliger's Proposed Testimony Will Be Helpful to the Trier of Fact in this Case.**

19          The defendant is charged with first degree murder and attempted murder in violation of a statute

20   criminalizing the killing or attempted killing of "any person assisting [an officer or employee of the

21   United States] in the performance of [official] duties *or on account of that assistance*."  18 U.S.C.

22   § 1114 (emphasis added).  The Indictment in this case expressly alleges that the defendants carried out

23   the May 2020 attacks targeting individuals who were assisting federal officers and employees "*and* on

24   account of that assistance."  *See* ECF No. 12 (emphasis added).  The defendant's own statements,

25   which show adherence to Boogaloo antigovernment sentiments, are an important part of the trial

26   evidence that will prove he and his codefendant attacked the victims "on account of" the assistance they

27   were rendering to federal officers and employees.

28

What is disclosed in Dr. Perliger's report is his opinion that this defendant associated himself with the Boogaloo movement through his repeated statements over many weeks and months. This opinion, again, is based on the case materials developed in the investigation of the shooting. The defendant's statements demonstrate his involvement in Boogaloo and his planning and decision-making that led up to and continued during the shooting, as well as afterward. The defendant's own statements are at the center of the issues to be tried. Over the course of many months, the defendant expressed his alignment with the Boogaloo ideological movement. He visited and communicated with online groups known to be Boogaloo sites. He sent and received messages expressing a desire to commit acts of violence against the government. He used online communication to coordinate his activities on May 29, 2020, as he moved from from Millbrae to Oakland by way of San Leandro. After the shooting, he continued to express agreement with Boogaloo principles and he communicated with his co-defendant and other known Boogaloo adherents for several days.

It was not by accident that this defendant navigated to Boogaloo online, communicated with other like-minded individuals about his animus toward the federal government and solicited others to participate in actions in the physical world that culminated in the shooting. On the day in question, the evidence shows that this defendant made a series of decisions to plan his involvement in the shooting. Those decisions resulted in his actions, leading to the point where he was driving the van from which the deadly gunfire emanated. In the aftermath, this defendant continued to interact with others who adhere to the Boogaloo ideology. His conduct, in sum, is intertwined with his participation in, and adherence to, Boogaloo ideology. Without Dr. Perliger's testimony to provide essential context for those statements, the jury would be left to speculate about the significance of much of this critical evidence.

Moreover, Dr. Perliger's opinion testimony is relevant to show that this defendant had the motive – a clear animus toward federal government employees and in particular federal law enforcement officers – to commit murder and attempted murder. Although the government is not required to prove motive as an element of the offense, evidence is admissible if it will help the jury understand how the defendant's affiliations and ideologies created motive. Indeed, the Ninth Circuit

"specifically has admitted evidence relating to gangs and other organizations when relevant to the issue of motive." *United States v. Santiago*, 46 F.3d 885, 889 (9th Cir. 1995) (collecting cases).[3]\

The Ninth Circuit affirmed the admission of testimony by an outside expert in a prosecution of a member of an extremist group. *United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) (in terrorism prosecution, district court admitted testimony of expert on extremist groups and expert in Islamic studies). In *Hayat*, the United States charged defendant with providing support to terrorists and making false statements, relating to the defendant's travel to Pakistan to attend a training camp followed by his return to the United States to await to await orders to carry out an attack. 710 U.S. at 880. Following his conviction after jury trial, defendant appealed asserting three principal arguments, including as relevant here his claim that the district court improperly admitted expert testimony offered by the government. *Id*. Specifically, the government offered an expert in Islamic studies who testified that a note found in defendant's wallet was an Islamic supplication. *Id*. at 884. The expert further testified that the supplication was not a peaceful message and the type of person carrying such a message was someone with a belief of being part of a "…'war for God against an enemy.'" *Id*. The Ninth Circuit analyzed Hayat's argument about the expert under plain error, because there was no objection to the expert at trial. *Id*. at 900.

In rejecting the defendant's argument, the Ninth Circuit concluded the expert was qualified to give the opinions about the supplication, noting that the expert had several advanced degrees in Islamic studies, was fluent in Arabic, had previous service as an imam, and previous experience interpreting supplications and Islamic texts. *Id*. at 900-901. Finding the expert used reliable methods, the Ninth Circuit discussed the expert's own extensive knowledge, his review of relevant source materials, and his reliance on the opinions of other academics and religious scholars. *Id*. at 901. Finally, the Ninth Circuit rejected the argument that the expert impermissibly provided the opinion that defendant had the requisite mental state to commit the charged offense. *Id*. The court discussed its precedents, including

---

[3] *See, e.g.*, *United States v. Winslow*, 962 F.2d 845, 850 (9th Cir. 1992) (admitting testimony on Aryan Nation as relevant to bombing of gay bar by group members); *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990) (admitting testimony, over Rule 403 objection, that defendant asked to attend a "skinhead" picnic as relevant on issue of racial animus in civil rights case); *United States v. Cutler*, 806 F.2d 933, 936 (9th Cir. 1986) (admitting evidence of affiliation with Aryan Nation to show defendant's motive to hire hit man to kill persons who might testify against the group).

1    inter alia *Morales* and *Younger*, discussed below, and reaffirmed that an expert may testify to a

2    predicate proposition, from which the jury may infer *mens rea*. *Id*. at 902 (the expert "…testified about

3    the kind of person who would carry a note such as the one found in Hayat's wallet, but he never

4    commented directly on Hayat's mental state.").

5        Other circuit courts have reached the same conclusion. *See, e.g., United States v. Jayyousi*, 657

6    F.3d 1085 (11th Cir. 2011).  In a prosecution for providing support to a terrorist group, the government

7    proffered the head of the International Center for Political Violence and Terrorism Research in Asia to

8    testify about the characteristics of cells of supporters "upon which the violent Islamist movement

9    relies." *Id*. at 1098-1099.  The proffered expert studied terrorism for 25 years, was a published author

10    and teacher in the field, and conducted research of radical Islamists that included interviews of

11    members of radical groups, communication with others in the field, and travel to locations where

12    radical Islamist violence occurred. *Id*.  The expert opined regarding the meaning of code words used in

13    intercepted communications. *Id*.  The Eleventh Circuit concluded the trial court properly admitted the

14    testimony, noting the expert used "specialized knowledge" about the violent groups, which "helped the

15    jury understand the unique use of certain words in the intercepted calls, and countered defendants'

16    claim that these words did not have violent connotations." *Id*. at 1107.

17        Similarly, the Fourth Circuit has endorsed the admission of expert witnesses in cases involving

18    terrorism. *United States v. Young*, 916 F.3d 368 (4th Cir. 2019) (affirming conviction of police officer

19    for attempting to provide support to ISIL); *see also United States v. Hassan*, 742 F.3d 104, 131 (4th

20    Cir. 2014) (affirming the admission of expert testimony on homegrown terrorism in a material support

21    case where the court had "previously approved of [the expert's] expertise in terrorism matters" and the

22    expert's methods had been subjected to peer review).  In *Young*, the government proffered an expert on

23    violent extremism claiming inspiration from Islam, including white supremacists and neo-Nazis, the

24    radicalization process for these groups and the Libyan Civil War. *Id*. at 379-380.  The court agreed

25    with the district court's finding that the government's expert was qualified. *Id*.  The district court based

26    its finding on the expert's background, extensive academic credentials, his work for the U.S.

27    government for training in the same subjects, and his prior work as an expert. *Id*.  The circuit court

28

emphasized that it is the quality of the expert's qualifications, not the previous testimony, that is the court's focus.  *Id*. at 380.  The court also noted that publication in a peer reviewed publication is not a mandatory prerequisite to qualifications as an expert.  *Id*.  The court also confirmed its agreement with the district court's finding that the expert's social sciences-based methodology was proper.  *Id*.  The expert explained that he conducted research using a comparative method, using primary sources to develop his conclusions which he then compared to secondary sources and "events on the ground."  *Id*.[4]

In this judicial district, Judge Orrick considered a challenge to the government's terrorism expert.  *United States v. Shafi*, 2018 WL 3159769, at *4 (N.D. Cal. June 28, 2018).  The defense argued that the witness' testimony was based on his own research and therefore could not be reliably applied to the defendant, as well as claims that the testimony was irrelevant and should be excluded under Rule 403 because of the risk of unfair prejudice.  Judge Orrick disagreed.  *Id*.  He found the government's expert's research was reliable and the expert was qualified.  *Id*.

> *Daubert's* general holding applies to scientific and non-technical specialized knowledge, but importantly "the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co.*, 526 U.S. at 141... where the proposed expert testimony "depends heavily on the knowledge and experience of the expert, rather than the methodology or the theory behind it," strictly applying *Daubert* is not applicable.  *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).  *Id*. at *4.

By contrast, applying Rule 704, Judge Orrick limited the defense's experts from testimony describing defendant's statements made to the expert about the defendant's motives and beliefs, because of concerns that the expert would serve as a "conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony," *id*. at *5, a risk the government believes the defense's anticipated expert disclosures pose.  (*See* Argument C.2, below.)

Other judges in this district have reached similar opinions, allowing law enforcement expert

---

[4] Other decisions confirm the use of expert witness testimony is standard in cases where defendants associated with extremist groups, although the opinions do not include a discussion of *Daubert* principles.  *See, e.g., United States v. Hunt*, 573 F. Supp. 3d 779, 787 (E.D.N.Y. 2021) (summarizing expert witness testimony on white supremacists and anti-Semitic propaganda from trial involving threats charges); *United States v. Al Farekh*, 810 F. App'x 21, 25 (2d Cir. 2020) (affirming under FRE 403 expert testimony on jihadists and the routes commonly used to travel to join al-Qaeda in the Middle East).

witnesses to testify to their opinions regarding violent groups' history, symbols, vocabulary, rules and mores, and activities. *See, e.g.*, *United States v. Nelson*, 2021 WL 75757, at *6–7 (N.D. Cal. Jan. 8, 2021) (law enforcement experts are reliable under Ninth Circuit precedent if opinion based on knowledge and experience and/or specialized training in criminal enterprises). Judge Chen's order in *Nelson* summarized several opinions in this district considering whether a law enforcement expert could rely on their investigative experience to "opine expansively" in support of RICO or VICAR charges against a criminal gang, such as MS-13. *Nelson* at *7-8; *see generally United States v. Williams*, 2016 WL 899145, at *5 (N.D. Cal. Mar. 9, 2016) (allowing expert testimony on a gang's "common slang," "gang territory," and "gang symbols," but excluding opinions related to "gang alliances and rivalries," "general characteristics of gangs, including common values and behaviors," and gangs' "use of rap music"); *United States v. Flores*, 2014 WL 12686740, at *1 (N.D. Cal. June 16, 2014) (admitting expert testimony on gang colors and symbols, tattoos and graffiti, and specific terminology but not testimony "that would more properly be elicited from percipient witnesses," such as the contention "that certain gangs operate in South San Francisco," "that they committed acts of violence to enhance the gang's standing," "that rival gangs fight and engage in retaliatory killings, and that they dislike 'snitches' "); *United States v. Cerna,* 2010 WL 2347406, at *2 (N.D. Cal. June 8, 2010) (analyzing whether 24 expert witnesses in a RICO/VICAR case against MS-13 members could "supply opinions in place of hard facts" to prove the government's case).

      In *United States v. Cervantes*, 2016 WL 491599 (N.D. Cal. Feb. 9, 2016), this Court considered categories of expert opinion evidence offered by officer-experts in a RICO prosecution of the Nuestra Familia. The Court largely permitted the proffered opinion evidence on gang colors, gang symbols, gang terminology, means of communication and interstate commerce in relation to gangs. *Id*. at *4-5. With respect to coded language in intercepted phone calls, the Court ordered the government to submit a supplemental disclosure identifying the proffered testimony as either expert or percipient. *Id*. at *6. The Court granted the motion to exclude the proffered testimony regarding the history of Nuestra Familia that dated to the 1960s. *Id*. at *7. Finally, the Court granted the motion to exclude the expert's opinions that specific individuals held positions in Nuestra Familia or that certain factual occurrences

1   were tied to Nuestra Familia because the testimony was based on the expert's investigation including

2   interviews, debriefings, seized evidence, the group's constitution and rules.  *Id*. at *8-9.

3       Although the cases cited from this district permitted the proffered law enforcement experts to

4   testify in a variety of subject matter areas, they restricted the scope of some of the opinions in some of

5   the areas based on concerns that are not present in this case because Dr. Perliger is an independent

6   academic, author, and researcher, not a law enforcement investigator providing expert opinions.

7       **C.    Defendant's other motion arguments fail.**

8           **1.    Dr. Perliger's Proposed Testimony Is Not a "Hub of the Case" But Instead
                Is Based on His Expertise Which Is Grounded In His Experience And**
9               **Research**

10      The motion argues Dr. Perliger's experience as an academic is insufficient by itself to qualify

11  him to provide expert opinion evidence and that the Court should exclude his testimony because the

12  government is asking the Court to accept the expert's word for his opinions.  First, this is an inaccurate

13  framing of Dr. Perliger's opinions.  Instead of *ipse dixit*, Dr. Perliger bases his opinions on his

14  knowledge of the Boogaloo movement, which in turn is based on research by him and others.  The

15  symbols, vocabulary, and purposes of this movement have been documented by Dr. Perliger and others.

16  These well-documented markers indicating the Boogaloo movement are found not only in recognized

17  scholarship but also in the defendant's own words, all of which are admissible when offered by the

18  United States.  Dr. Perliger's research includes construction of a comprehensive database of over 5,000

19  violent attacks in the United States by far-right extremists.

20      Second, none of the case authority cited in the motion supports the argument to exclude Dr.

21  Perliger, because the facts considered or issues resolved are very different than those in this case.  *See*

22  *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (finding district court did not abuse

23  discretion in concluding defense expert lacked sufficiently verifiable basis for opinion that recovery of

24  hair or seminal fluid "would be expected" in kidnapping prosecution); *Ollier v. Sweetwater Union High*

25  *Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (agreeing with district court's determination that

26  plaintiff's and defendant's experts on finances of high school softball programs and related issues did

27  not provide reliable opinion testimony); *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir.

28

Opp. to Mot. to Exclude                          20
20-CR-265 YGR

2002) (concluding that trial record did not support finding of reliability with respect to case agent's expert testimony in drug trafficking prosecution regarding code words and phrases for which he had no prior knowledge or experience); *United States v. Valencia-Lopez*, 971 F.3d 891, 901 (9th Cir. 2020) (finding a failure to establish the reliability of the case agent's expert opinion in a drug trafficking prosecution that a drug cartel would not use coerced couriers).  This case is not a kidnapping or drug trafficking prosecution, nor does it relate to funding of high school athletics.  The issue here is whether the jury should hear from a recognized expert in far-right antigovernment extremism when the admissible evidence in the case squarely addresses that subject, in the defendant's own words and actions, over the course of weeks and months leading up to a deadly attack on two federal security officers outside a federal courthouse.

In an analogous argument, the motion suggests that Dr. Perliger's testimony is merely a hub of the case for the government that is a "little too convenient."  This, too, is an argument that rests on an improper framing.  The two cases cited by the defense involve officer witnesses who are tendered as experts, and then drawing from their experience as officers, the witnesses offer the testimony to which the defense objects, both because it is convenient and beyond the scrutiny and testing of the defense. Neither case applies here.  *See United States v. Mejia*, 545 F.3d 179, 190-195 (2d Cir. 2008) (discussing government's use of own investigator to opine on existence and meaning of all facts needed to prove guilt); *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1250 (D.N.M. 2015) (discussing three limitations on officer-expert testimony: 1) testimony is proper only if needed for jurors to understand, 2) expert must point to foundation that exists outside facts of investigation, and 3) if dual witness, the district court should demarcate the officer's opinion testimony from percipient knowledge). Analytically, neither case applies to Dr. Perliger, who is not a case agent or law enforcement investigator but rather a researcher and academic whose work on far-right antigovernment extremism provides the foundation for his opinions.  Dr. Perliger's opinions are directly relevant and will assist the jury in understanding what the defendant did, when he did it, for how long he was involved, and his motivations for his actions.

### 2. Dr. Perliger's Proposed Testimony Does Not Include An Opinion That Defendant Had the Requisite *Mens Rea* to Commit Murder or Attempted Murder, Nor Does His Testimony Impermissibly Compel the Jury To So Conclude

The government agrees with the general proposition that no expert witness in the trial of this matter should be permitted to render an opinion on the ultimate question of the defendant's *mens rea*. That proposition should apply with equal force to the defendant's anticipated, but not yet disclosed, expert witness(es). Although defense expert(s) are not yet disclosed, in prior discussions on the topic, the government formed the impression that the defense plans to elicit expert testimony about their client's intentions in the incident.

In any event, the United States does not offer Dr. Perliger as an expert on the defendant's subjective intent at the time of the offense conduct. Dr. Perliger's report does not state, anywhere, that he holds an opinion about the defendant's subjective intent or state of mind at the moment the gunfire emanated from the white van the defendant drove across the intersection of Jefferson and 12th Streets in Oakland. The government submits that there is nothing in the expert report that could be construed to disclose such an opinion.

Dr. Perliger can provide expert testimony, applying his knowledge and expertise to the facts of the case, that confirms that this defendant was a longstanding adherent to the Boogaloo ideological movement. The defendant's statements over many weeks and months, all of which are admissible when offered by the government, confirm this opinion. Courts recognize that an expert witness may opine on such a predicate matter, from which the jury may but is not required to infer that the defendant held the requisite *mens rea*, without running afoul of Federal Rule of Evidence 704. *See United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997).

In *Morales*, the Ninth Circuit confirmed that its interpretation of Rule 704 "allows testimony supporting an inference or conclusion that the defendant did or did not have the requisite *mens rea,* so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony. *Id*. at 1038. The expert in question in *Morales* was an accountant proffered by the defense in a tax fraud prosecution who sought to opine that the defendant had a weak background in bookkeeping principles. *Id*. The Ninth Circuit

1  criticized the district court's exclusion of the opinion because the opinion did not compel a finding by

2  the jury that the defendant either had or did not have the requisite *mens rea*. *Id.* at 1037 ("Morales

3  hoped, of course, that the jury would infer from Crosby's testimony that her errors were due to ignorant

4  but innocent mistakes.  But such a conclusion was by no means compelled, even if the jury believed

5  that Morales had a weak grasp of bookkeeping principles.").  More recent cases adhere to the rule in

6  *Morales*.  *See*, *e.g.*, *United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) (in terrorism prosecution,

7  district court admitted testimony of expert on extremist groups and expert in Islamic studies); *United*

8  *States v. Younger,* 398 F.3d 1179, 1189-90 (9th Cir. 2005) (upholding admission of expert testimony

9  that the person (defendant) who possessed the cocaine did so with the intent to distribute, concluding

10  the jury could "still infer the defendant was atypical" and reject the opinion).

11       Likewise, here, Dr. Perliger's opinions do not compel the jury to find that defendant had the

12  intent to kill one officer and wound another.

13           **3.    Dr. Perliger's Proposed Testimony Is Based on Defendant's Statements,
              Which Are Admissible When Offered Against Him, So There is No**
14           ***Crawford* Or Confrontation Issue.**

15       The motion claims that Dr. Perliger's opinions are based on hearsay.  As an initial matter, "an

16  expert witness may offer opinions based on such inadmissible testimonial hearsay, as well as any other

17  form of inadmissible evidence, if 'experts in the particular field would reasonably rely on those kinds

18  of facts or data in forming an opinion on the subject.' *United States v. Vera*, 770 F.3d 1232, 1237 (9th

19  Cir. 2014) (quoting Fed. R. Evid. 703).  But in fact, Dr. Perliger reviewed case materials that largely if

20  not exclusively involve the defendant's statements.  Those statements are nonhearsay when offered by

21  the government under Federal Rule of Evidence 801(d)(2).  As nonhearsay, defendant's statements are

22  substantive evidence when offered by the government.  Dr. Perliger's work, therefore, does not

23  implicate *Crawford v. Washington*, 541 U.S. 36 (2004).

24       This outcome is consistent with defendant's case authority.  In *Vera*, 770 F.3d at 1239–40, the

25  court concluded that the officer-expert's testimony complied with *Crawford* because he "applied his

26  training and experience to the sources before him and reach[ed] an independent judgment."  The expert

27  in question testified both as a gang expert and a percipient witness describing his knowledge of the

28

investigation itself.  He testified that a particular location was in the gang's territory and the gang-maintained control and taxing authority over narcotics sales at that location.  He based the testimony on intercepted phone communications played for the jury.  The Ninth Circuit reasoned that the expert provided the information not "for its own sake" but to support the opinion that a defendant was a leader of the narcotics trade at the subject location.  *Id*. at 1239.  Furthermore, the "expert opinion therefore was not merely repackaged testimonial hearsay but was 'an original product' that could have been 'tested through cross-examination.'"  *Id*. (citations omitted).

### 4.  Dr. Perliger's Reliability Is Demonstrated By His Work

The motion seems to argue that Dr. Perliger's lack of prior expert testimony suggests his testimony should be excluded here.  It is true that Dr. Perliger has not provided expert testimony in a previous case.  If the drafters of the rules thought prior testimony was a requirement of admission for expert testimony, they would have included language describing it as such.  But neither the Federal Rules of Evidence nor the relevant case law requires prior testimony by a proffered expert.  Instead, these authorities focus the inquiry on whether the expert has knowledge, skill, training or experience that would, when applied to the facts in dispute, assist the trier of fact, not whether the individual is an expert *at being a witness*.  Presumably, the defense would attack a more experienced testifier as a "hired gun."  Moreover, the defense's position would effectively preclude any expert testimony about a recently developing phenomenon, such as the emergence of the Boogaloo ideological movement or any number of other nascent areas of technology, science, medicine, or the like, simply because no witness had yet testified as an expert in that particular subject matter.  This outcome would strip the Federal Rules of Evidence pertaining to experts of their role in the trial process, a role the Ninth Circuit has described as grounded in reasonable flexibility; indeed, a "liberal thrust favoring admission."  *Wendell*, 858 F.3d at 1232.

### D.  A *Daubert* Hearing Is Not Warranted to Establish the Admissibility of Dr. Perliger's Testimony

With respect to its gatekeeping role, this court is not required to conduct any hearing or make findings before trial.  *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000).  The court may make findings at trial, following voir dire of the expert either within or outside the presence of the jury.

*United States v. Aiyaswamy*, 2017 WL 1365228, at *1 (N.D. Cal. Apr. 14, 2017); *see United States v. Holguin*, 51 F.4th 841, 851 (9th Cir. 2022) (the district court should make reliability findings, but a pretrial hearing is not required).  Specific to the type of testimony at issue, courts have repeatedly approved the admission of expert testimony regarding extremist organizations and activities.  *See, e.g., United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013); *United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014); *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011); *United States v. Shafi*, 2018 WL 3159769, at *4 (N.D. Cal. June 28, 2018).  Nor is the trial court's role as gatekeeper intended to serve as a replacement for the adversary system.  As *Daubert* clarified, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. 596.  Thus, any challenge to Dr. Perliger's testimony is better suited to cross-examination at trial and closing argument.

## V.     CONCLUSION

Contrary to the defense's arguments, Dr. Perliger is highly qualified and will provide reliable testimony based on his knowledge and research that will assist the jury at trial.  In a case in which the government has charged the defendant with aiding and abetting the murder and attempted murder of two federal officers, Dr. Perliger's opinions will shed light on this defendant's statements and actions aligning himself with anti-government extremism.  The charge to be tried includes the allegation that this defendant targeted the two victims because they were assisting federal officers or on account of that assistance.  Therefore, the United States respectfully requests that the Court deny the motion.

DATED:  April 17, 2023                                     Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


/s/ *Jonathan U. Lee*
JONATHAN U. LEE
JOHN C. BOSTIC
Assistant United States Attorneys