RICHARD G. NOVAK (SBN 149303)
Richard G. Novak, APLC
P.O. Box 5549
Berkeley, CA 94705
626-578-1175
Richard@RGNLaw.com

SHAFFY MOEEL (SBN 238732)
Moeel Lah Fakhoury LLP
1300 Clay St Ste 600
Oakland, CA 94612-1427
510-500-9994
Shaffy@mlf-llp.com

Attorneys for Defendant
ROBERT ALVIN JUSTUS, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:20-cr-00265-YGR-2 |
| Plaintiff, | **DEFENDANT ROBERT ALVIN JUSTUS, JR.'S POST-HEARING BRIEF IN SUPPORT OF HIS MOTION TO EXCLUDE PROFFERED EXPERT TESTIMONY OF ARIE PERLIGER AND EXHIBITS THERETO** |
| vs. | |
| | |
| ROBERT ALVIN JUSTUS, JR., | BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, DISTRICT JUDGE |
| Defendant. | |

Defendant Robert Alvin Justus, Jr., by and through his counsel of record, Shaffy Moeel and Richard G. Novak, hereby files his post-hearing brief in support of his motion for an order excluding from the trial of this matter the proffered testimony of "extremist ideology/Boogaloo expert" Arie Perliger.

1 | Dated: July 8, 2023

Respectfully submitted,

RICHARD G. NOVAK
SHAFFY MOEL

/s/*Richard G. Novak*
RICHARD G. NOVAK
Attorneys for Robert Alvin Justus, Jr.

**DEFENDANT ROBERT ALVIN JUSTUS, JR.'S POST-HEARING BRIEF IN SUPPORT OF HIS MOTION TO EXCLUDE THE PROFFERED EXPERT TESTIMONY OF ARIE PERLIGER**

**I.**

**Introduction and Procedural History**

On March 27, 2023, Mr. Justus filed a motion to exclude the testimony of the government's proffered Boogaloo expert, Arie Perliger.  (Doc. No. 189) The government's opposition was filed on April 17, 2023. (Doc. No. 190) Mr. Justus' reply was filed on May 1, 2023.  (Doc. No. 192)

The Court heard argument on the motion on May 12, 2023. (Amended Minute Entry at Doc. No. 198; Tr. of hearing on 05/12/23 (hereinafter Tr. I), attached hereto as Exh. A) At the conclusion of that hearing, the Court set an evidentiary hearing, ordered the government to submit a new expert report setting forth Dr. Perliger's *specific* opinions, and ordered the government to provide to Mr. Justus the database of anti-government extremism events that the government represented at the hearing is the primary basis for his expertise and opinions about the Boogaloo movement and ideology.  (Tr. No. 1 at 8, 11-13) Dr. Perliger's "Supplemental Expert Witness Report" was filed by the government on June 16, 2023.  (Doc. No. 203) Dr. Perliger appeared before this Court to testify on June 26, 2023.  A transcript of that proceeding, referred to here as Tr. II, is attached hereto as Exh. B.

In light of the Court's admonitions that Dr. Perliger's initial expert report failed to adequately set forth his opinions with sufficient specificity, that his initial report failed to make clear the bases for them, and that his stated opinions touching on Mr. Justus' state of mind are inadmissible (Tr. II at 9-10), Mr. Justus focuses here on: 1) the "sources of expertise" Dr. Perliger attempts to establish in his Supplemental Expert Witness Report and through his testimony at the evidentiary hearing on June 26, 2023, and 2) the specific opinions set forth in Dr. Perliger's Supplemental Expert Witness Report that continue to violate Rule 704(b).

As set forth below, it is clear that Dr. Perliger's claimed expertise with respect to the "Boogaloo" fails to meet the foundational criteria required by Rule 702(b). "An opinion based on … unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). While Dr. Perliger has an admirable academic pedigree, "it is well settled that bare qualifications alone cannot establish the admissibility of … expert testimony." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (citing *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002).

Moreover, Dr. Perliger's Supplemental Expert Witness Report perpetuates his earlier improper and inadmissible opinions concerning Mr. Justus' state of mind. (*See, e.g.*, Supplemental Expert Opinion Report, Doc. No. 203-1 at 8 ("As I indicated in my main testimony, in my opinion, Mr. Justus's online communications are consistent with advocacy of, and support of, violence or actions against the main perceived adversaries of the boogaloo movement, i.e., federal authorities and law enforcement agencies."))

Thus, if the Court is to permit some testimony by Dr. Perliger, opinions that touch on Mr. Justus' state of mind must be excluded, as they are inadmissible under Rule 704(b). In light of the fact that it is Mr. Justus' mental state which is *the* disputed issue at trial, this Court's "special obligation" to serve as the gatekeeper for expert testimony requires heightened vigilance with respect to Dr. Perliger's proffered opinions that touch on that issue. Mr. Justus is not confident that the Court's admonition to Dr. Perliger and the government at the hearing on June 26, 2023 will be heeded at trial. An order clearly precluding opinions such as or similar to the one quoted above is necessary in order to ensure that the jury is not exposed to inadmissible expert opinion testimony.

//

//

## II.

**Dr. Perliger's Supplemental Expert Witness Report and His Testimony Reveal That His "Sources of Expertise" Fail the Test for Admissibility Under Rule 702**

At the hearing in this matter on May 12, 2023, the government went to great length to tether Dr. Perliger's expertise on matters related to the Boogaloo to his vast database documenting incidents of anti-government extremism.  (Tr. I at 8, 11-13) Dr. Perliger reiterates in his Supplemental Expert Opinion Report the claim that his database is the leading basis for his expertise.  At page 1 of that report, he attempts to describe the methods of research which make him "a subject matter expert in the area of far-right extremism and political violence, *including the Boogaloo movement*."  (Doc. No. 203-1 at 1, emphasis added) His first "method" is his "comprehensive data collection and compilation of relevant data sets."  (*Id.*)

Now that the Court has received into evidence the relevant portions of the database at issue (Def. Exhs. 5-27) and has heard Dr. Perliger's testimony about it, it is clear that the miniscule Boogaloo-related portions of that dataset are *not* a reliable basis upon which opinions can be based, even in part.  This is true with respect to both the quantity and quality of the data.

Dr. Perliger acknowledged during his sworn testimony that his database has only 21 entries that even touch upon the "Boogaloo".  (Def. Ex. 5, 7-27) He admitted that the data he provided to the government and that the government thereafter provided to Mr. Justus do not include sources for the information included in his database.  While he testified that a wide range of sources are relied upon, he does not know which sources are utilized for these specific data points, and that they may include media accounts.  (Tr. II at 27, 32-34)   Moreover Dr. Perliger has no idea who among his "team" entered the data at issue.  (Tr. II at 31; Def. Exhs. 6-27)

Dr. Perliger's Supplemental Expert Witness Report also asserts that his expertise is also based upon analysis of "primary sources" produced by individuals and groups engaged in extremist violence."  (Doc. No. 203-1 at 2) At the evidentiary

1    hearing, Dr. Perliger was asked if he could recount the names of any specific person

2    who he views as a prominent adherent to or advocate of the Boogaloo movement.

3    He could not.  (Tr. II at 67) Nor could he identify while under oath a single website

4    or Facebook account or other social media account he had studied.  (Tr. II at 66-67)

5         Dr. Perliger's Supplemental Expert Witness Report asserts that his expertise is

6    also based upon "experimental bio-criminology" which he describes as "lab

7    experiments that measure the behavioral and emotional impact of individuals'

8    exposure to extremist propaganda."  (Doc No. 203-1 at 2) Neither his supplemental

9    report nor his testimony connects this type of research with the Boogaloo movement.

10   While his report claims that this research is done under strict ethical standards, his

11   representation that "this research allows us to understand the biological and

12   emotional markers of radicalization" does not appear to be connected with any of his

13   opinions in this matter.  He knows nothing of Mr. Justus' biology, has been warned

14   to stay away from opinions about Mr. Justus' mental state, and is not held out as an

15   expert in behavioral neuroscience or any field close to it.

16        Dr. Perliger's Supplemental Expert Witness Report also claims that his

17   expertise is based upon opinion surveys which "identify general social trends related

18   to extremism and support for extremist groups and ideologies."  (Doc. No. 203-1 at

19   2) Neither his report nor his testimony ties this purported source of expertise to the

20   issues he opines upon here, and it would be difficult to see how opinion surveys

21   about the Boogaloo movement, if he had done any, would even be a basis for his

22   opinions.

23        Finally, and importantly, Dr. Perliger claims in his Supplemental Expert

24   Witness Report that his "professional engagements" are a source of expertise.  (Doc.

25   No. 203-1 at 2-3) He includes in the realm of "professional engagements" activities

26   such as "conferences, briefings, webinars, work meetings, etc."  (Doc. No. 203-1 at

27   2) However, when he testified before this Court, he acknowledged that he had not

28   conducted any briefings or webinars on the Boogaloo. (Tr. II at 14) He could not

identify the leading authorities on the Boogaloo movement in either the law enforcement or national security space.  (Tr. II at 66) He has never interviewed a former adherent to the movement.  (Tr. II at 65) Nor are any of his grants or grant reports related to the Boogaloo.  (Tr. II at 23-24) He could not recall what articles he has read nor when.  (Tr. II at 65)

It is beyond dispute that as of August 18, 2020, Dr. Perliger has not closely studied the Boogaloo movement.  Those are his own words.  (Def. Ex. 4) It is Mr. Justus' position that Dr. Perliger does not qualify *today* as an expert under Rule 702 with respect to the opinions he proffers about the Boogaloo movement.  His claim of expertise is based on methodologies that do not apply here (survey research and "experimental bio-physiology"), are not reliable (the database of 21 relevant entries of unknown origin) or fall under the prohibition of "simply taking an expert's word for it."  Fed. R. Evid. 702 advisory committee's note (2000 Amendment).

### III.

### Dr. Perliger's Opinion 5e Is an Example of An
### Inadmissible Opinion About Mr. Justus' Mental State

If the Court does permit Dr. Perliger to testify, the Court should prohibit any opinion which touches on Mr. Justus' state of mind.  The Court admonished the government about this at the hearing on May 12, 2023 and ordered the government to have Dr. Perliger prepare a new report which sets forth specific opinions which do not include opinions about Mr. Justus state of mind.  Dr. Perliger's lack of familiarity with what is and is not admissible expert opinion testimony, or the government's failed effort to help Dr. Perliger skate close to that line without going over it, requires additional vigilance by both Mr. Justus and the Court.

//

//

//

//

Opinion 5e in the Supplemental Expert Witness Report is a perfect example. There, Dr. Perliger states:

> As I also indicated in my main testimony [referring to his original report], in my opinion, Mr. Justus's online communications are consistent with advocacy of, and support of violence or actions against the main perceived adversaries of the boogaloo movement, i.e., federal authorities and law enforcement agencies.

(Doc. No. 203-1 at 8) Here, Dr. Perliger is essentially opining that *Mr. Justus* supports violence against federal law enforcement agents. This is an impermissible extension of that which is permitted under Rule 704(b), as explained by the Ninth Circuit in *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997), *United States v. Campos*, 217 F.3d 707 (9th Cir. 2000), and *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002). Moreover, because Dr. Perliger is expressing an opinion about Mr. Justus' state of mind based in part upon on-line comments made by Mr. Justus on May 28, 2020 ("Maybe it's time we burn the cities to the ground) and May 29, 2020 (Start chucking Molotov's"), his opinion that Mr. Justus supports violence is especially impinging upon the jury's provenance which, here, is to determine Mr. Justus' state of mind in that very narrow timeframe.

Finally, Dr. Perliger acknowledged in his testimony that he reviewed Mr. Justus' lengthy interview with the FBI in June 2020. Without directly saying so, Dr. Perliger has clearly rejected Mr. Justus' statements as a truthful expression of his state of mind just prior to and during the time he was with Mr. Carrillo. Mr. Justus told the FBI that he did not intend to assist Mr. Carrillo in acts of violence against any individuals, and that his primary intentions during his time with Mr. Carrillo were to stay alive and to prevent Mr. Carrillo from harming others.

While Dr. Perliger is certainly free to quietly accept or reject Mr. Justus' explanation, his expert opinion testimony cannot touch upon Mr. Justus' state of mind in that time period. "A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the

1  defendant did or did not possess the requisite *mens rea*." *United States v. Morales,*

2  108 F.3d at 1037.

3       The government's argument that the jury is free to reject Dr. Perliger's

4  opinion about Mr. Justus' mental state misses the point of the binding authority.  If

5  Dr. Perliger's opinion on Mr. Justus' state of mind in May 2020 *is credited* by the

6  jury, it necessarily follows that the jury will conclude that Mr. Justus did intend to

7  assist Mr. Carrillo in his premeditated murder and attempted murder of federal law

8  enforcement officers.  The possibility that the jury may not credit Dr. Perliger's

9  testimony and may instead conclude that Mr. Justus' state of mind was as he

10 explained it to the FBI in early June 2020 does not make the opinion admissible.

11 *His* proposed also expert testimony in this area reflects an impermissible credibility

12 determination, which is for the jury alone to make.  *United States v. Finley,* 301 F.3d

13 1000, 1014-15 (9th Cir. 2002).

14                                    **IV.**

15                              **Conclusion**

16       Dr. Perliger's proffered opinions, and especially any that touch upon Mr.

17 Justus' state of mind, are inadmissible for all of the reasons set forth above.

18 Dated: July 8, 2023                    Respectfully submitted,

19

20                                        RICHARD G. NOVAK
                                         SHAFFY MOEEL

21

22                                        /s/*Richard G. Novak*

23                                        RICHARD G. NOVAK
                                         Attorneys for Robert Alvin Justus, Jr.

24

25

26

27

28

EXHIBIT A

UNITED STATES DISTRICT COURT   *CERTIFIED COPY*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Motion to Exclude** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR CR20-00265 YGR |
| | ) | |
| Robert Alvin Justus, Jr., | ) | Pages 1 - 36 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 12, 2023 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

```
For Plaintiff:          Ismail J. Ramsey, Esq.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  JOHN C. BOSTIC,
                        JONATHAN U. LEE,
                        ASSISTANT UNITED STATES ATTORNEYS


For Defendant:          Richard G. Novak, APLC
                        P.O. Box 5549
                        Berkeley, California 94705
                   BY:  RICHARD G. NOVAK, ATTORNEY AT LAW


                        Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612
                   BY:  SHAFFY MOEEL, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258
```

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   Friday, May 12, 2023                              9:02 a.m.

 2                   P R O C E E D I N G S

 3                       --o0o--

 4        THE CLERK:  Calling the criminal matter of United

 5   States of America versus John Russell -- my apologies --

 6   United States of America versus Robert Alvin Justus,

 7   20-CR-00265-YGR-2.

 8      Parties, please state your appearances for the record.

 9        MR. LEE:  Good morning, Your Honor.  Jonathan Lee

10   appearing for the United States.

11        THE COURT:  Good morning.

12        MR. BOSTIC:  And John Bostic also for the United

13   States.  Good morning, Your Honor.

14        THE COURT:  Okay.  Good morning.

15        MR. NOVAK:  Good morning, Your Honor.  Richard Novak

16   and Shaffy Moeel for Mr. Justus, who is present in custody.

17        THE COURT:  Okay.  Good morning.

18        MS. MOEEL:  Good morning.

19        THE COURT:  All right.  There are a number of things

20   that we need to do this morning.  Let's just get the list,

21   shall we?

22      One is the motion to exclude, which is pending.  Next is

23   the request to push out the trial date.  Is there anything

24   else?

25        MR. NOVAK:  No.  We received the Court's sealed
```

1    order, which we will address with the Clerk's Office.  I don't

2    think there's anything to discuss other than just to note that

3    we received it in the mail.

4              **THE COURT:**  Okay.

5              **MR. LEE:**  Not from the government, Your Honor.

6              **THE COURT:**  Okay.

7        So let's go ahead and talk about the motion.

8        Mr. Novak, it's your motion.  Do you want to begin?

9              **MR. NOVAK:**  I will, Your Honor.  But I think -- I

10   think it's fully briefed.  I don't know that I need to make a

11   general statement about why we believe Professor Perliger --

12   Professor Perliger's proffered testimony is not admissible.  I

13   mean, we wrote an extensive motion with exhibits.  We filed a

14   reply with exhibits.  The government chose not to respond to

15   the reply.

16             **THE COURT:**  Well, I don't know that that's accurate,

17   right?  I thought --

18             **MR. NOVAK:**  In writing, is what I was going to say.

19             **THE COURT:**  Okay.

20             **MR. NOVAK:**  Okay.  Yes, I'm sure they have

21   something -- something to say about it.

22        I do want to point out that we've asked the government on

23   a couple occasions -- and this is all documented -- to give us

24   any written materials that are nonpublic.  And at least in a

25   footnote in its opposition, the government declined to do so.

```
1          So we're going to take the position that there is nothing

2     beyond what has been presented to the Court that would

3     establish that Dr. Perliger has done any research, that that

4     research has any methodology, that it's based on any data.

5          I mean I think it's really telling, just to contradict

6     myself that there's not much to say, that the only thing he's

7     written relies on some popular culture literature that he's

8     read.  I mean I like the *Atlantic* monthly, but I don't think

9     that makes me an expert on something that I've read.

10         And there's just no basis at this point for the Court to

11    evaluate the data that are the bases for his opinions, whether

12    there's any methodology.  And then the flip side of that is I

13    just don't see how his opinions are necessary for the jury to

14    understand this case.

15             **THE COURT:**  Well, that I disagree with vehemently.  I

16    think that there is not much known about this group to the

17    average person who's done zero reading.  And so I think that

18    there is absolutely a relevance and a need for this kind of

19    expert.

20         Now, whether or not he qualifies is a separate topic.

21             **MR. NOVAK:**  Agreed.

22             **THE COURT:**  The fact that he has never been admitted

23    before again is not -- is not insurmountable.  Everybody has a

24    first time.  And so that particular issue doesn't concern me.

25         There are a number of things that concern me, but
```

1    certainly the relevance issue does not concern me at all.

2          Mr. Lee.

3            **MR. LEE:**   Thank you, Your Honor.

4          I want to start by just setting a framework for how we're

5    looking at these issues to the extent that that assists the

6    Court with our later discussion of the defense arguments.  I

7    think it will.

8          This is not a -- this is not a typical case.  It may be

9    *sui generis* in this district.  It's not a long-term law

10   enforcement investigation of a group such as a prison gang,

11   for example.  It's an alleged organized attack on the

12   courthouse itself and the people that guard it by extremists

13   that give rise to the need for an extremist expert --

14   extremism expert.

15         Our witness, Dr. Perliger, is -- he's an academic scholar

16   which puts him independent of a law enforcement investigation.

17   He's researched and studied extremism for a decade or more.

18   Again that puts him independent of any law enforcement

19   investigation.  And he's applied his expertise to the case

20   materials that were provided to him.

21         Again, that's independent of the -- the case law, the bulk

22   of the case law that the defense has raised in opposition to

23   his -- to the use of Dr. Perliger.  He's not a technical

24   scientific expert.  There won't be lab results.  He didn't

25   claim to discover boogaloo.  He hasn't given a --

```
 1          THE COURT:  And --
 2          MR. LEE:  -- projection of what will happen in the
 3   future.
 4          THE COURT:  -- I'm just going to short-circuit this.
 5   I don't think that social scientists are the same as, you
 6   know, my patent experts who have Ph.D.'s on the architecture
 7   of semiconductor chips.  So there is a difference.
 8       What I hear you saying is that he is an expert on
 9   extremism.
10
11
12          MR. LEE:  That's right.
13          THE COURT:  But is he -- does he -- has he done in --
14   I mean he's got 20 years of -- of expertise, as I read the
15   papers, 20 years of expertise in studying extremist groups; is
16   that right?  Does everybody agree on that?
17          MR. LEE:  Yes, Your Honor.
18          MR. NOVAK:  Yes.
19          THE COURT:  Okay.
20       So the question then is -- or what I hear you saying is
21   he's an expert on extremism but boogaloo is new and so he's
22   just, what?  He's just what?
23          MR. LEE:  Yes, Your Honor.  That was the -- the first
24   argument in the reply was it's a false statement to say he's
25   an expert in boogaloo because of a transcript of a book talk
```

1    in August of 2020 where he said at that point in time "I

2    haven't studied boogaloo."

3        He's not being offered for his expertise in August of

4    2020.  It's significant because the landscape of extremism in

5    the country has been evolving, splintering.  New groups have

6    been merging.  And boogaloo is one of those phenomena.

7        It was a new phenomenon as of the spring of 2020, at least

8    in the visible world.  There were people online talking about

9    it in 2019.  But it was a new phenomenon.  And actually that

10   transcript shows that Dr. Perliger took great care to say that

11   "I haven't studied it," but then he offered an opinion of a

12   sort about how to classify it because he is an expert in

13   extremism and he had begun to gather information about

14   boogaloo at that time.

15       The way we think of this, Your Honor, is the genus is

16   extremism.  The species is boogaloo.  He's an expert in the

17   genus.  He can classify the species that fit within the genus.

18   Those species are constantly -- in this particular field,

19   those species are emerging over time.

20       In August of 2020, Dr. Perliger was not an expert on

21   January 6th attack on the capitol and the groups that carried

22   that out because it hadn't happened yet of course.  But he is

23   today.

24              **THE COURT:**  Has he testified in those trials?

25              **MR. LEE:**  No.  No, he hasn't testified in those

1    trials.  But he is -- he is an expert in extremism and could

2    be qualified to testify if he were called in those trials.

3         The -- the point is that boogaloo is new.  It was new in

4    2020.  And he has studied it and he does have an opinion about

5    it.

6              **THE COURT:**  Okay.

7              **MR. LEE:**  He's constructed a database, Your Honor, a

8    database of incidents dating back to 1990 in this country.

9    The database gives -- substantiates his general ability to

10   classify the species that fit into the genus.

11             **THE COURT:**  But he hasn't disclosed that.

12             **MR. LEE:**  Well, he has --

13             **THE COURT:**  Yes?  I'm correct?

14             **MR. LEE:**  Correct.  Yes.

15             **THE COURT:**  Keep going.  I just want to make sure I

16   understand the record.

17             **MR. LEE:**  Yes.  And I'll get to that point because I

18   think there's a significant -- we have a significant

19   difference of -- of that particular point with what the

20   defense has presented here.

21        He has not -- he has amassed a -- a great wealth of

22   knowledge about extremism in this country in the last

23   20 years.  And within that, he is someone who has amassed

24   information about boogaloo.

25        And that's what he does in political science, that is,

```
 1    it's political science, history, and perhaps some sociology

 2    mixed in.  Those are recognized fields of social science.  And

 3    the way to develop expertise in analyzing groups that might

 4    fit into a category of extremism is to gather information as

 5    things are happening, as events are occurring, and then

 6    attempt to classify who fits into what.

 7         Now, what's significant here, Your Honor, is that I did

 8    not read in any of the voluminous papers any argument by the

 9    defense that would dispute that boogaloo does exist, that it

10    does have ideology or ideological principles that can be

11    defined, that it uses vocabulary and symbols that can be

12    defined, and that Mr. Justus and Mr. Carrillo met in the -- in

13    the online world and then moved to the physical world.  That's

14    what put them in the white van together.

15         None of that has been disputed.  And so what we're talking

16    about is could an expert come in and help the jury to

17    understand what boogaloo is at that point in time, and what

18    the vocabulary and symbols of boogaloo are and what they mean.

19         And, Your Honor, just the evidence in this case, and this

20    is going to come from Mr. Justus's own words, two days before

21    the incident he's commenting on Facebook, "Now is a good time

22    for the bay to join in and storm police buildings."

23         That's May 27th.

24         May 28th, Mr. Carrillo says, "It's on our coast now.  This

25    needs to be nationwide.  It's a great opportunity to target
```

1   the specialty suit boys," a term of art in boogaloo, "keep

2   that energy going."

3        Mr. Justus responds, "Let's boogie."

4        Those are terms and terminology used by boogaloo.  And

5   Dr. Perliger has studied it and can identify it, can classify

6   it like an expert would put a species into a genus.

7        So we are -- I mean that -- that is the first argument,

8   that this book talks somehow and the index to the book

9   published in 2020 somehow make it a false statement to say

10  that Dr. Perliger is an expert.  That's a straw man argument

11  because he was not offered to this Court as an expert based on

12  his expertise in 2020.

13       A lot has changed since 2020, and he's continued to study

14  and develop information about boogaloo, and he's offered for

15  the state of his expertise in 2022 when he authored his

16  report.

17       The next argument in the reply was that the publications

18  that were cited in our brief were not peer-reviewed.  Well,

19  the expert witness in this case has many peer-reviewed

20  publications, and he's a reviewer of other persons' works in

21  his field.

22       There's been no rule cited that an expert must have a

23  peer-reviewed publication on a specific gang or extremism

24  group that's at issue in a trial.  And that would be

25  inconsistent with Ninth Circuit law such as the *Hankey* case

1    and even in this district the *Shafi* case that Judge Orrick

2    handled.

3        The next argument was that there's this database and the

4    defense has to know what's in the database in order to accept

5    the proposition that he's qualified as an expert.

6        Your Honor, that's putting too much on the database.  An

7    expert amasses a lot of information in the course of their

8    work as an expert, and not all of that information is relevant

9    to a decision of whether someone should be admitted as an

10   expert.  At most it's a cross-examination topic.

11       But what is clear is that Dr. Perliger has built this

12   database.  It has thousands of incidents of right wing

13   political violence in this country since 1990.  And he's used

14   his expertise to identify new groups and classify them as

15   events have unfolded.

16       It's our understanding that the database is kept current

17   with new incidents, and that helps inform his ability to

18   classify new species into the genus as contemporary trends

19   have unfolded and new groups have emerged.

20       There's no need for the defense to screen the thousands of

21   entries in a database in order to concede that this is a basis

22   for qualifications that makes him a reliable witness who can

23   be accepted as an expert.

24       At most --

25            THE COURT:  But can't they -- you yourself just

 1  admitted that it would be appropriate for cross-examination.

 2          **MR. LEE:**  It could be.  I said at most it could be,

 3  yes.

 4          **THE COURT:**  Well, it can't cross-examine if it's not

 5  disclosed.

 6          **MR. LEE:**  It can be disclosed pursuant to a trial

 7  subpoena when we get closer to trial.  Right now, Your Honor,

 8  we're not deciding all the matters of cross-examination.  I

 9  understood that we were deciding under *Daubert* whether there's

10  a sufficient basis to determine that he's reliable and

11  should --

12          **THE COURT:**  But you want me to take your word for it

13  that it exists and that it supports his expertise.

14          **MR. LEE:**  Well, there's -- no, it's not my word, Your

15  Honor.  There's no dispute.  I mean the defense attached the

16  portion of the -- of the book that describes the database

17  itself.  It's been offered by the defense as well, as one of

18  the exhibits.

19      There's no dispute that this database exists.  There's no

20  dispute as to what's in the database.  And there's no dispute

21  that he's used the database to build his expertise and

22  therefore give his opinions about right wing extremism in this

23  country.

24      The exhibit, just to point the Court to what I was

25  referring to, Mr. Novak's declaration, docket 192.

1           **MR. NOVAK:**  It's Exhibit B, Your Honor.

2           **MR. LEE:**  It's --

3           **MR. NOVAK:**  But there is a dispute.

4           **MR. LEE:**  -- docket page 18.

5       Excuse me, counsel.

6       Docket page 18 of that filing includes the appendix,

7   methodology and statistical results, Data Set Construction is

8   the title of the appendix.

9       And in a couple of pages, at that point in time which is

10  2020, the expert describes the database.  He says that there

11  are 5,697 violent attacks in the database that occurred

12  between 1990 and 2017.

13      That's on -- that's on docket page 19 of that filing.

14      There's a description there.  He says it's probably the

15  most comprehensive accumulations of data on far right violence

16  in the United States.  He talks about the regression models

17  that were used to interpret the data.  He talks about

18  demographic factors that were used.

19      There's no dispute that that's part of Dr. Perliger's --

20  excuse me -- work as an expert in extremism.  And again,

21  that's -- that's the genus.  And the species here is boogaloo.

22      Again, there's no dispute about that either.

23      What these arguments miss, the defense arguments, what

24  they miss is the simple idea that expertise grows and evolves

25  with newly observed conditions in this field.  Expertise

1    involves the incorporation and integration of new information

2    into existing frameworks.  Right wing violence -- right wing

3    extremism -- excuse me -- in this country is something that

4    has been evolving and developing.  There's been splintering of

5    groups, new groups, and that's what boogaloo represents.

6            THE COURT:  Mr. Lee, I don't know how he can testify

7    as to the state of boogaloo which exists after the event in

8    question.

9        Now, he could have developed an expertise afterwards, that

10   I grant you.  But the development of this particular group

11   after the event seems to be not particularly relevant to the

12   event because it -- its -- its development thereafter, how is

13   that at all relevant?

14           MR. LEE:  Your Honor, that -- I may have misspoken.

15   That's not my understanding of what this expert will say.

16   This expert will say --

17           THE COURT:  Okay.  It's just what you just said.

18           MR. LEE:  Then I definitely misspoke.  Because the --

19   Dr. Perliger's opinion will be boogaloo emerged in early

20   2020 -- late 2019, early 2020.  That's before the event in

21   question.  Here's what boogaloo means.  Here are the signs and

22   symbols that were used in the runup to late May of 2020.

23           THE COURT:  Okay.

24           MR. LEE:  That's it.

25           THE COURT:  Let me say a couple of things, and then

1    I'll hear back from you --

2             **MR. NOVAK:**  Thank you.

3             **THE COURT:**  -- Mr. Novak.

4    One is 85 percent of my calendar is civil, not criminal.

5    And I understand that in the criminal context, there are not

6    the same kinds of disclosures that I get in the civil context.

7    But that doesn't mean that more disclosure isn't appropriate.

8    It -- it shocks my law clerks that we don't have, you

9    know, a box full of disclosures in a motion to strike because

10   that's what we get routinely in a civil context.  I understand

11   it doesn't happen in the criminal context.

12   This particular expert, as I've indicated, assuming that

13   there is a basis for these opinions, many of these opinions I

14   think are both relevant and will be helpful to the jury.

15   That being said, he doesn't know how to write an expert

16   witness report.  And the government's explanation of what it

17   means or what he's going to opine treads the line

18   appropriately from an evidentiary point of view, and I'll give

19   you some examples, but this expert didn't do it.

20   That's what I would call a rookie mistake.  That can't --

21   but it can be fixed.  But it's -- it's just because he's never

22   done this before.

23   As a for instance, he cannot say, as he has in his report,

24   that certain things are -- that certain evidence is evidence

25   that he is a member of the boogaloo movement.

1    What he can say is that that same evidence is consistent

2    with whatever the -- whatever the kind of his view is of, as

3    you're saying, kind of what the genus is of an extremist group

4    or -- well, primarily that.

5    But it's the jury to -- it's for the jury to decide

6    ultimately whether or not, to the extent it's relevant,

7    whether or not that is in fact what the evidence shows.

8    The government indicated that in its memo.  The report did

9    not.  And so those kinds of things can be, I think, easily

10   fixed.

11   It does concern me -- and I think it would be appropriate

12   to get some more clarity as to whether he can -- he can make

13   the extension arguments that you want him to make.

14   I am not hearing an argument from the defense that he is

15   not an expert in extremism.  Maybe you -- am I wrong?

16   **MR. NOVAK:**  I don't think a court has ever said he

17   is.  But I think that his --

18   (Simultaneous colloquy.)

19   **MR. NOVAK:**  -- training and experience would

20   certainly allow for that general conclusion that he is an

21   expert in extremism -- I'm not going to use the genus species

22   analogy but generally speaking.

23   **THE COURT:**  Okay.

24   **MR. NOVAK:**  And then the question may be so what?

25   **THE COURT:**  Well, so what, then it goes to weight not

 1    admissibility.

 2              **MR. NOVAK:**  But --

 3              **THE COURT:**  Hold on.  Let me finish.

 4         So if there is no argument that he is an expert in

 5    extremism, then opinions with respect to extremism are

 6    admissible because I do think that there is enough evidence in

 7    the record that this is an extremist group and the jury will

 8    be aided with that kind of information.

 9         Now, the question is what is there that he can opine, if

10    anything, with respect to the extension?

11         Some of the things that he has in his report postdate the

12    event.  And that concerns me because at -- if what you're

13    saying is true, that this organization has morphed over time,

14    then it's morphed -- whatever it looks like after the event

15    isn't relevant to the event.

16         So I don't know what kind of distinctions he's making.

17    And he certainly doesn't need to explain to a jury that the

18    word boogaloo in a text or on a post means boogaloo.  They

19    don't need that.  That doesn't help anybody.

20         And I haven't seen in here -- I see you say that he wants

21    to talk about terminology in terms of vocabulary and

22    symbolism, but I don't see a list of what it is that he is

23    claiming that he has expertise in or how he got the expertise

24    to unscramble this vocabulary or symbolism.

25         Where's the disclosure on that?  What terms are we talking

1    about?  How is it that he knows?  I don't know.  I don't see

2    that in here.

3        I think everybody agrees he cannot -- he cannot testify as

4    to the *mens rea* of the defendant.  But, again, I think that's

5    in part because he doesn't know how to write a report.

6        So I think there has to be much more clarity.

7            **MR. LEE:**  Yes, Your Honor.

8            **THE COURT:**  And in terms of this database, I order

9    that he disclose it.  I'm not going to make them -- why would

10   I have them go through a subpoena of a third party?  It's

11   ordered by the end of the month.

12       If you need to have a protective order, I think a

13   protective order is entirely appropriate.  But they need to be

14   able to cross-examine, especially if that's the basis of all

15   of his expertise.  So you need to work with him.

16       Again, I think -- I think certainly, at a minimum,

17   opinions with respect to his expertise on extremism are

18   important.  The question is how far does that extend.

19       So I do think that it would be appropriate just to cut to

20   the chase on this, have an evidentiary hearing on June 23rd as

21   we originally had tentatively set.

22       One week in advance, by June 16th, I do want the

23   government to file a list of opinions, right?  And so that I

24   know what he purports to want to opine on, the defense knows

25   what he wants to opine on, and that way to the extent I need

1    to strike anything, I'll know what I'm striking.

2            **MR. LEE:**  Understood.

3            **THE COURT:**  And that includes terminology or

4    whatever, Mr. Lee.  But I want more specifics because this

5    is -- this is a new area and so we do have to be careful and

6    we do have to be precise.  And as the gatekeeper, I think that

7    is my job.

8       But I don't agree with the defense that -- that, you know,

9    these opinions are not relevant in general.  I think they

10   certainly are relevant.  And I do think that they're beyond

11   the scope of the average juror.  So I don't -- that argument

12   is not persuasive.

13      Okay.  June 23rd, we can start at 9:00 a.m.

14           **MR. NOVAK:**  May I just ask the Court one question?

15           **MR. LEE:**  I have a timing question when you're done.

16   Go ahead.

17           **MR. NOVAK:**  Yeah.  No, it's not a timing question.

18   It's a disclosure question.

19      I think if there's any more data that Dr. Perliger has

20   relied upon for the opinions which the government will

21   disclose one week in advance, it would be -- well, actually,

22   then the database which the Court ordered disclosed by the end

23   of this month, it will save the Court's time if we have a

24   disclosure of the bases -- of the specific bases for his

25   opinions as well.

1          So, for example, if there's literature that he's read, if

2    there are people he's interviewed, if there are trials he's

3    observed or transcripts summarized by his graduate students,

4    it would be my intention to ask him as to every single opinion

5    that the Court wants listed what the specific bases are.

6          And so if the Court thinks that that is something that

7    could be disclosed early and save some time, I think that that

8    would be an efficient way to proceed.

9          If the Court doesn't want to order Dr. Perliger, through

10   the government, to disclose the specific bases for each

11   opinion, then I'm going to ask him about each opinion.

12         Because all we're being told right now is there's a

13   database.  And I do want to say that in his report -- it

14   doesn't really matter whether I agree with the Court's

15   observations, but I do -- he doesn't say in his report, "Since

16   2017, I've added X entries to the database that are boogaloo."

17         Mr. Lee is saying, and the government says in its papers,

18   that his database includes it.

19             **THE COURT:**  I -- I understand.

20             **MR. NOVAK:**  So okay.

21             **THE COURT:**  I also understand that the rules here are

22   different than the rules in a -- in a civil proceeding.

23         I don't know at this point how this is going to get

24   refined or not refined.  I'm giving them basically a month to

25   get this together.  And to the extent that there's additional

1    information, I think it behooves the government to disclose it

2    in advance, but I'm not going to order it.

3            MR. NOVAK:  Understood.  I hope the Court will give

4    us leave to ask those questions if the government chooses not

5    to, and I hope it's not repetitive but we don't know how many

6    specific opinions there will be when we get here.

7            THE COURT:  Did you want to say something else?

8            MR. NOVAK:  No.  I had a number of comments on

9    Mr. Lee's presentation, but I think I should just save them

10   for June 23rd.  Because we're going to be here.  And then

11   we'll see what happens after June 23rd.

12           THE COURT:  Okay.

13           MR. NOVAK:  I suspect we'll ask the Court for a short

14   period for some post hearing briefing, and then we'll see

15   where we are.

16           THE COURT:  All right.  In terms of the trial date,

17   did you want to respond, Mr. Lee?

18           MR. LEE:  Your Honor, I'm going to let Mr. Bostic

19   address that.

20           MR. BOSTIC:  Thank you, Your Honor.

21       The defense filed its motion on Monday.  We were planning

22   on filing an opposition, but we're happy to discuss the issue

23   now if the Court prefers.

24           THE COURT:  Now's your opportunity.  And I can tell

25   you I'm inclined to grant the motion.

1          **MR. BOSTIC:**  The government opposes the motion for a

2     continuance for a few reasons.

3          First, there is chief in the government's mind an interest

4     obviously for the government, also the community, and the

5     victims in this case for the trial to proceed without --

6          **THE COURT:**  And the difference in one month is what?

7          **MR. BOSTIC:**  Well, it's -- it's a month on top of the

8     delay that has already occurred between the actual shooting

9     and the -- the currently scheduled trial date.

10         So that would cause us to -- to just urge the Court to

11    proceed carefully when considering any additional delay.  But

12    I'm sure the Court is well aware and -- and cares about those

13    interests as well.

14         For us it comes down to the fact that the defense just

15    hasn't shown the need for a continuance here.

16         **THE COURT:**  Well, I think the biggest issue -- and

17    we've talked about this before -- I don't remember if you were

18    in the courtroom when we talked about it -- is that I've

19    already told people that I am dark for a week, and that

20    concerns me in terms of when this case will go to the jury.

21         Because it is one thing to have them, you know,

22    deliberating for a significant period of time, and then if

23    they don't get, you know, if they don't get to it, then that's

24    fine.  It happened in my NF case where they, for whatever

25    reason, you know, they deliberated for two weeks, we thought

1    they would be done, and they weren't.  So we went dark for a

2    week, and then they came back and they finished up.

3        That's very different from finishing a trial and only have

4    a day or two to deliberate before going dark for a week.

5    That's my concern.  I expressed that concern myself before.

6    And now according to the defense, they believe this is going

7    to take longer to get done.  So we are much closer up to that

8    week that we know we have to be dark.

9            **MR. BOSTIC:**  So and I'm not sure, Your Honor, after

10   reading the defense's filing, what exactly they think has

11   changed that causes those concerns to be elevated.

12           **THE COURT:**  All right.  Mr. Novak?

13           **MR. NOVAK:**  Well, there are two specific things that

14   we mentioned and then there's one general thing.

15       The two specific things we mentioned are post the last

16   hearing disclosures by the government of two potential

17   witnesses.  We addressed that.  And I think that the one whose

18   identity is discussed specifically in the papers, unless the

19   government today is going to say no, we're not calling

20   Mr. Carrillo as a witness, I mean, Mr. Carrillo has no

21   Fifth Amendment issues at this point.  He's done.  He's made

22   public statements.  He's pled guilty in two courts.  He's

23   done.

24       So if the government wants to call Mr. Carrillo, they can

25   compel him.  I don't think as to the matters that are relevant

```
 1    in this case, he can invoke.

 2         Okay?

 3         So if the government --

 4              THE COURT:  Has anybody -- has --

 5              MR. NOVAK:  I'm sorry.

 6              THE COURT:  Let me ask on that.

 7         Well, what is -- as you sit here, what is the plan with

 8    Mr. Carrillo?  Are you calling him or not?

 9              MR. BOSTIC:  I think that remains to be seen, Your

10    Honor.  We saw the filing that everyone else saw from

11    Mr. Carrillo's attorney stating that he does not intend to

12    testify.  The government has not determined whether it will

13    try to call him and elicit testimony regardless.

14         If he is on the stand though, I -- I don't imagine that

15    his testimony would be lengthy.  I think that's what it comes

16    down to for purposes of the -- the continuance.

17              THE COURT:  But how could it not be lengthy?  How

18    could it not be lengthy?  He was there the entire time.  The

19    argument is that Mr. Justus aided and abetted.  It is -- it --

20    it could go on for days.

21              MR. BOSTIC:  Well, I -- that's not how the government

22    sees it, Your Honor.  I think the key events here took place

23    over the space of a few hours.

24              THE COURT:  Your examination might be short.  But the

25    defense's will not.  And even I can see that.
```

```
1          Now, if what I have is something from his attorney that

2     says he will refuse to testify, and I don't know -- I don't

3     know that Jim Thompson said that.

4              MR. NOVAK:  What he said is he won't cooperate.

5              THE COURT:  Okay.

6              MR. BOSTIC:  He also said that he will not testify.

7              THE COURT:  Well, then maybe I need to hear from Jim

8     Thompson.

9              MR. NOVAK:  But that's not the only reason why we

10    brought the scheduling issue to the Court's attention.

11             THE COURT:  But let me just say right up front, while

12    he doesn't have a Fifth Amendment right, the only option I

13    have when a witness refuses to testify is to incarcerate them

14    pending the trial.

15             MR. NOVAK:  I understand.

16             THE COURT:  Well, guess what?  He's incarcerated so

17    there's nothing I can really do to him to change -- other than

18    incarcerate him.

19             MR. NOVAK:  I understand.  We're not -- we're not

20    calling him --

21             THE COURT:  You may understand but some Ninth Circuit

22    clerk may not understand if they're reading this transcript.

23             MR. NOVAK:  Okay.  No, I appreciate that.  And I've

24    heard a witness in a -- in a case where the court said I'm

25    going to compel you to testify and the witness said, Your
```

1    Honor, I'm doing a life sentence, I'll get to it.

2              THE COURT:  Yeah.

3              MR. NOVAK:  You know, I understand.

4        We're not calling him as a witness.  But until that plays

5    out, and I don't think that that can play out six months

6    before trial.  I think that a -- that the Court has to at

7    least plan for that contingency.

8        And I think it's interesting that when we asked the

9    government if they could tell us whether or not he's going to

10   testify, the government's position was we don't know, we'll

11   let you in mid-June when we have to disclose our witness list.

12       So, yeah, maybe Mr. Carrillo, through his counsel, says

13   he's going to refuse.  But is that -- does the Court want to

14   bank on that today?

15             THE COURT:  Well, I could --

16             MR. NOVAK:  The other thing --

17             THE COURT:  I could wait till mid-June.  We could

18   stay on track and I could -- I could wait.

19             MR. NOVAK:  Okay.

20       The other thing that I think is important -- and I don't

21   think that the jailhouse informant is something that should --

22   that a trial scheduling should rise or fall on, but I think

23   that, you know, after the last hearing, Ms. Moeel and I began

24   to sketch out, as we said in our pleading, what the defense

25   case may look like.

1    I sort of felt -- and this may, I don't know, show some

2    weakness on my part -- but I sort of felt like what the

3    government was saying is we can get this done and we'll give

4    the defense a couple days.

5        And that is not going to work in this case, especially in

6    light of the role that Mr. Carrillo played in this offense,

7    the order that the Court has made concerning disclosure, and

8    the defense that we're going to have to put on.

9        And we will, in good faith, disclose a witness list in

10   mid-June or -- I think it's June 12th or whatever the date is,

11   and if the Court wants to take it up on June 23rd, we can, but

12   it's going to be a fulsome defense case-in-chief.

13           **THE COURT:**  Okay.  And could you tell me, to the

14   extent you know at this point, what is the defense?

15           **MR. NOVAK:**  No, I'm not going to say that in open

16   court.

17           **THE COURT:**  Okay.

18           **MR. NOVAK:**  If the Court is inviting an in camera

19   pleading, we're happy to do that.  But I'm not going to say in

20   open court what the defense is, either in terms of which

21   elements are most at issue or what the theories of the defense

22   are.  And I hope that the Court doesn't conclude I'm being

23   disrespectful, but we --

24           **THE COURT:**  No, I -- look, sometimes defense lawyers

25   are willing to say because to them it's obvious, and sometimes

1    not.  Ask the question, I won't get an answer unless I ask

2    so --

3              **MR. NOVAK:**  I respect that.

4        It will not be an alibi.  I'm not trying to be cute, but I

5    think, you know, there's certain facts beyond dispute and then

6    there are many facts that are in dispute.

7              **MR. BOSTIC:**  So, Your Honor, if I could respond to

8    one point.  Just beyond what we've talked about, about the

9    length of the respective parties' cases, and I still haven't

10   heard an estimate from the defense about how long they think

11   their case will be.  Based on them saying that they think

12   their case may be more than a couple days --

13             **THE COURT:**  What is your estimate currently?

14             **MR. BOSTIC:**  May I have one moment to confer, Your

15   Honor?

16             **THE COURT:**  You may.

17                  (Pause in the proceedings.)

18             **MR. BOSTIC:**  So, Your Honor, I think a conservative

19   estimate would be that the government could complete its case

20   in 10 to 11 days.  It may be less than that.  Of course part

21   of that we don't control because it depends on the length of

22   the cross-examination.

23       But I think the parties also diverge on -- on how

24   concerned they are or how much of a problem they think a

25   one-week break would be in the middle of this trial.  And of

1    course it's the Court's opinion that matters ultimately on

2    that.

3        But having the jury go dark for a week during

4    deliberations is not unheard of.  I've been unable to find any

5    case law that says that that is some kind of error.  I don't

6    think the defense has been able to cite any either.

7        And the -- the final point I want to make on that is that

8    continuing this start date into October might just trade one

9    scheduling inconvenience for another in the form of the

10   Thanksgiving holiday.

11       Right now we have a trial that will clearly be done before

12   people start needing to worry about the Thanksgiving travel.

13   If we start in mid-October, we may start losing jurors to

14   Thanksgiving towards the ends of the trial or -- or towards

15   the -- or in their deliberations, if their deliberations are

16   still going at that point.

17       So one more reason to -- to keep the trial date where it

18   is, from our perspective.

19           **THE COURT:**  We could start a week earlier.  My

20   schedule freed up.

21           **MR. NOVAK:**  A week earlier meaning October 16th or

22   meaning September?

23           **THE COURT:**  September.

24           **MR. NOVAK:**  Oh, I see.

25           **MR. BOSTIC:**  That's fine for the government, Your

1    Honor.

2           **MR. NOVAK:**  September 11th, is that what the Court is

3    saying?

4           **THE COURT:**  We were supposed to start I thought

5    September 15th.  I'm suggesting the --

6           **MR. BOSTIC:**  The 8th.

7           **THE COURT:**  -- the 8th.

8           **MR. BOSTIC:**  And so jury selection would begin on

9    that day, Your Honor?

10                    (Pause in the proceedings.)

11          **MR. NOVAK:**  That's fine, Your Honor.  Our -- our

12   primary concern, as we said, is continuity.

13          **THE COURT:**  Right.

14          **MR. NOVAK:**  Not we need more time to prepare.

15      I do want to observe, though, that if -- well, we're going

16   to have an evidentiary hearing on June 23rd.  At that point in

17   time, the witness lists will be -- will have been exchanged,

18   the exhibit lists will have been exchanged.

19                    (Off-the-record discussion.)

20          **MR. NOVAK:**  Ms. Moel suggests to me that the Court

21   might want to move all of the disclosures up as well and the

22   deadlines so that we have the same amount of time in terms of

23   preparation before trial.

24          **THE COURT:**  Any objection?

25          **MR. BOSTIC:**  Your Honor, we'd suggest that that start

1   with the dates after the June dates.  Part of the government

2   team is going to be traveling internationally during that

3   time.  And we would like that -- that time up to June 12th to

4   get that work done.

5            MR. NOVAK:  That -- that's fair.  I think that we

6   probably need until June 12th, especially since Ms. Moeel is

7   deep in trial prep in another matter --

8            THE COURT:  As I understand it --

9            MR. NOVAK:  -- that was supposed to start 15 minutes

10  ago.

11           THE COURT:  As I understand it, we are going to

12  trial, right?

13           MS. MOEEL:  Yes, Your Honor.

14           MR. NOVAK:  So that's fine.  The June dates which are

15  reciprocal exchanges of witnesses and exhibit lists --

16           THE COURT:  Right.  We have that on June 12th.  Well,

17  June 12th is for the -- I'm not going to repeat it.  There's a

18  lot of information.  So the June 12th disclosures remain.  The

19  June 20th disclosures remain.  And then the next set of dates

20  is the exchange of motions July.

21       So is -- is that what we're going to start moving up to --

22  that would be June 26.  Or do you want to -- what do you want

23  to do?

24                  (Off-the-record discussion.)

25           MR. NOVAK:  We can live with moving it up a week

32

1    early.

2         **THE COURT:**   All right.   So then what I'll -- I will

3    do is issue an order moving those dates up.

4              (Off-the-record discussion.)

5         **MR. NOVAK:**   Oh, because you're going to be out of the

6    country.

7         **THE COURT:**   Hold on.

8    In terms of the pretrial conference.

9         **MR. NOVAK:**   Your Honor, Ms. Moeel is actually going

10   on the outside of the country until just before that date.

11        **THE COURT:**   So are you withdrawing your request that

12   things get moved up?

13        **MS. MOEEL:**   No, Your Honor.   But if we could -- if

14   it's possible to keep the pretrial conference on the 4th of

15   August?

16        **THE COURT:**   Yes, I can do that.

17        **MR. NOVAK:**   Thank you.

18        **MR. BOSTIC:**   Your Honor, as to the pretrial motion

19   filing deadline, we're going to be in court on the 23rd.   And

20   I -- I believe the Court was considering the 26th for that

21   filing deadline.   I wonder if we might split the difference

22   and aim for the 30th just to give a little more breathing room

23   after the hearing on the 23rd, subject to what the defense

24   thinks.

25        **THE COURT:**   Well, splitting the difference, wouldn't

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    that be the 28th?

2              **MR. BOSTIC:**  That's fine too, Your Honor.

3              **THE COURT:**  Does that work?

4              **MR. NOVAK:**  That's fine.

5              **THE COURT:**  Okay.  So the July 3rd becomes June 28th.

6    And that's -- there's no filing.  That's an exchange date.

7              **MR. BOSTIC:**  Understood.  Thank you.

8              **THE COURT:**  Okay.

9         One other question since we're shifting things.  We had

10   planned on -- on a Friday for jury selection with evidence to

11   begin on the 18th.

12        Under this current view, evidence -- well, and I would say

13   opening statements and evidence would start on September 11th.

14        Do you want to have -- is one day going to be sufficient

15   to pick the jury on September 8th?  Or do you want to -- the

16   other alternative because I can -- that I can offer to you is

17   we could try to pick the jury on September 6th, and if we

18   don't finish, we could finish up on the 8th.  We still

19   wouldn't start evidence or openings until the 11th, but that

20   gives us two days.

21             **MR. NOVAK:**  I think that that's better if the Court

22   can accommodate it.

23             **MR. BOSTIC:**  Agreed.  If it's possible to reserve two

24   days for jury selection, that seems prudent.

25             **THE COURT:**  And we'll talk about it at the pretrial

1    conference, but are the parties going to be interested in

2    trying to excuse jurors in advance based upon the

3    questionnaires?  Or are you going to want me to call everybody

4    in?

5            MR. NOVAK:  Do you mean just based on --

6            THE COURT:  Responses to questionnaires.

7            MR. NOVAK:  Oh, the substantive responses to

8    questionnaires.  Yeah, I think that it would be -- is the

9    Court talking about hardship or bias or both?

10           THE COURT:  Both.

11           MR. NOVAK:  The answer is yes.  I think that it's

12   better for the Court's time and to respect the jurors' time if

13   we can stipulate to excusing jurors based on a questionnaire

14   for hardship or bias or both.

15           MR. BOSTIC:  The government has the same position,

16   Your Honor.

17           THE COURT:  Okay.  The reason that I -- and I want

18   you -- I'm going to hold you to that.  Because I have tried

19   other cases, criminal context, and everybody wanted to see

20   everything in advance, and then they refused to stipulate

21   because they wanted everybody to come in so that they could be

22   questioned.  So....

23           MR. NOVAK:  I think -- I think we talked about this

24   briefly at the last hearing, and I shared my experience with

25   Judge Chen in what I'll call the first Hell's Angels trial

1    since the second one is going on right now.

2        The parties didn't agree on every juror who one side

3    thought should be excused for hardship or bias, but we did

4    eliminate many -- many potential jurors.

5            **THE COURT:**  Okay.

6            **MR. NOVAK:**  And then the court -- sometimes the court

7    made its own decision overnight and told the jury commissioner

8    who to bring in and not bring in, and sometimes we discussed

9    it on the record.

10           **THE COURT:**  Okay.  All right.  So we'll set jury

11   selection --

12                   (Simultaneous colloquy.)

13           **THE COURT:**  -- then for September 6 and 8th, with

14   openings and evidence to begin on September 11th.  And that

15   should satisfy everyone's concerns.

16           **MR. NOVAK:**  Does the July 31st date for proposed jury

17   questions to be included in the, quote, SurveyMonkey, close

18   quote, need to change in terms of the Court's --

19           **THE COURT:**  I don't think so.  If it does, I'll let

20   you all know.

21           **MR. NOVAK:**  Okay.

22           **THE COURT:**  Well, actually I was going to -- I was

23   going to advance all of this one week, so I'll advance that as

24   well.

25           **MR. NOVAK:**  Okay.

```
 1              THE COURT:  Okay.  All right.  Anything else we
 2    should do today?
 3              MR. BOSTIC:  Nothing from the government, Your Honor.
 4              MR. NOVAK:  I think that's all.
 5              THE COURT:  Okay.  And everybody remembers then that
 6    we're trying this case in San Francisco?
 7              MR. NOVAK:  (Nods head.)
 8              MR. BOSTIC:  Yes, Your Honor.
 9              THE COURT:  Okay.
10              MR. BOSTIC:  Your Honor, has a courtroom been
11    identified in the San Francisco courthouse?
12              THE COURT:  Judge Martínez-Olguín has agreed to let
13    me use her courthouse -- her courtroom.
14              MR. BOSTIC:  Thank you, Your Honor.
15              MR. LEE:  Thank you.
16              THE COURT:  Okay.  Anything else?
17              MR. NOVAK:  Thank you very much for your time.  I
18    know the Court's got a busy morning.  We'll see you on
19    June 23rd.
20              THE COURT:  All right.  We'll see you on June 23rd.
21    Thank you.
22              MR. BOSTIC:  Thank you, Your Honor.
23                 (Proceedings were concluded at 9:53 A.M.)
24
25
```

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Monday, June 19, 2023

EXHIBIT B

                                          **Pages 1 - 105**

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )        **NO. CR 20-00265-YGR**
                                 )
ROBERT ALVIN JUSTUS,             )
                                 )
            Defendant.           )
_____  )


                          Oakland, California
                          Monday, June 26, 2023

                    <u>**EVIDENTIARY HEARING**</u>


<u>**APPEARANCES:**</u>

For Plaintiff:
                        ISMAIL J. RAMSEY
                        United States Attorney
                        1301 Clay Street
                        Oakland, CA  94612
                   BY:  **JONATHAN LEE**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        ISMAIL J. RAMSEY
                        United States Attorney
                        150 Almaden Boulevard
                        San Jose, CA 95113
                   BY:  **JOHN BOSTIC**

For Defendant:
                        RICHARD G. NOVAK, APLC
                        P.O. Box 5549
                        Berkeley, CA 94705
                   BY:  **RICHARD G. NOVAK, ESQUIRE**


Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

```
APPEARANCES CONTINUED:

For Defendant:
                        MOEL LAH FAKHOURY LLP
                        1300 Clay Street, Suite 600
                        Oakland, CA 94612
                BY:  SHAFFY MOEL, ESQUIRE
```

## I N D E X

Monday, June 26, 2023 - Volume 1

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **PERLIGER, ARIE** | | |
| (SWORN) | 4 | 1 |
| Direct Examination by Mr. Lee | 5 | 1 |
| Cross-Examination by Mr. Novak | 9 | 1 |
| Voir Dire Examination by Mr. Lee | 10 | 1 |
| Cross-Examination resumed by Mr. Novak | 11 | 1 |
| Redirect Examination by Mr. Lee | 51 | 1 |
| Recross-Examination by Mr. Novak | 64 | 1 |
| Further Redirect Examination by Mr. Lee | 70 | 1 |
| Examination by The Court | 71 | 1 |
| Further Recross-Examination by Mr. Novak | 79 | 1 |

## E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4 through 29 | | 50 | 1 |

<u>**Monday - June 26, 2023**</u>                                    **8:56 a.m.**

## P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling the matter of CR 20-00265-YGR, United States vs. Robert Alvin Justus.

Parties, please state your -- please come forward and state your appearance for the record.

**MR. LEE:**  Good morning, Your Honor.  Jonathan Lee and John Bostic for the United States, and Dr. Arie Perliger is here in the gallery.

**THE COURT:**  Okay.  Good morning.

**MR. NOVAK:**  Good morning, Your Honor.  Richard Novak and Shaffy Moel for Mr. Justus, who is also present.

**THE COURT:**  Good morning.

All right.  Let's get started.  Take the witness stand, please.

<u>**ARIE PERLIGER**</u>, called as a witness for the Government, having been duly sworn, testified as follows:

**THE CLERK:**  Please -- thank you.  In the microphone, please state your full name and spell out your last name.

**THE WITNESS:**  Arie Perliger, P-E-R-L-I-G-E-R.

**THE COURT:**  Okay, sir.  Good morning.  You may be seated.

You may proceed.

1          **MR. LEE:**  Thank you, Your Honor.

2                    **<u>DIRECT EXAMINATION</u>**

3     **BY MR. LEE:**

4     **Q.**   Dr. Perliger, can you explain to us your current

5     occupation.

6     **A.**   I'm a professor at the School of Criminology and Criminal

7     Justice at the University of Massachusetts Lowell.

8     **Q.**   Have you been asked by the United States in this case to

9     examine the materials and see if you can render an expert

10    opinion?

11    **A.**   Yes.  That is correct.

12         **MR. LEE:**  Your Honor, with the Court's permission, I'm

13    going to approach the witness with three exhibits, Government

14    hearing exhibits.

15         **THE COURT:**  You've shown them to counsel?

16         **MR. LEE:**  Yes, Your Honor.  Actually, I have a spare

17    copy for the Defense.

18         **THE COURT:**  You may proceed.

19         **MR. LEE:**  Your Honor, a copy for the Court.

20         **THE COURT:**  Thank you.

21    **BY MR. LEE:**

22    **Q.**   Is it appropriate to address you as Dr. Perliger?

23    **A.**   Yes.  Perfectly fine, thank you.

24    **Q.**   You have a Ph.D.?

25    **A.**   I do.

1  **Q.**   You obtained that from the University of Haifa?

2  **A.**   Yes.

3  **Q.**   You also obtained a master's degree from that university?

4  **A.**   That is correct.

5  **Q.**   You did your undergraduate work there as well?

6  **A.**   Yes.

7  **Q.**   Dr. Perliger, let me refer you to what is before you and

8  has been marked as Government's Exhibit 1, hearing Exhibit 1.

9     Do you recognize that document as a copy of your expert

10  report that you signed?

11  **A.**   Yes.

12  **Q.**   You signed that on or about November the 1st, 2022?

13  **A.**   Yes.

14  **Q.**   Let me direct you to Exhibit No. 2.  Do you recognize that

15  as a copy of your curriculum vitae?

16  **A.**   That is correct.

17  **Q.**   And this is the -- the updated version from 2023.

18     Counsel, that was provided by email in March or April.  I

19  can't remember at this point.

20     **THE COURT:**  I can't hear you, Mr. Lee.

21     **MR. LEE:**  This is an updated CV after the initial

22  disclosure was provided to the Defense in March of this year,

23  Your Honor.

24     **THE COURT:**  So the update is from March or the update

25  is an update from a March disclosure?

1          **MR. LEE:**  Apologies, Your Honor.  No.  It's -- the

2     update -- the original disclosure was --

3          **THE COURT:**  What is the date of this?

4          **MR. LEE:**  This is March 2023 curriculum vitae.

5          **THE COURT:**  Okay.

6     **BY MR. LEE:**

7     **Q.**   This was not available in this exact form on the day of

8     your signing your November 22, 2022 report; correct?

9     **A.**   Correct.

10    **Q.**   And the difference between the CV at that time and this CV

11    is it was just updated for publications and other work that you

12    had done in late 2022 and early 2023?

13    **A.**   That is correct.

14    **Q.**   Let me direct your attention to was been marked as

15    Exhibit No. 3 before you.  I will ask you to turn to the fourth

16    page of the exhibit.

17         Do you recognize what begins on that page under your name,

18    Arie L. Perliger, and an address as your supplement to your

19    expert witness report?

20    **A.**   Yes.

21    **Q.**   That continues on to the last page of the exhibit, which

22    has a number 8 at the bottom; correct?

23    **A.**   That's correct.

24    **Q.**   This document is something that you prepared to supplement

25    your expert report; correct?

**A.**    Correct.

          **MR. LEE:**   Your Honor, I would be prepared to have an
examination that covered the witness' credentials and
qualifications, but tendering this CV may be more efficient.
It's whatever the Court would prefer at this point.

          **THE COURT:**   Counsel?

          **MR. NOVAK:**   We are prepared to cross-examine.

          **THE COURT:**   The Court will accept it, these three
exhibits -- 1, 2 and 3 -- not for their truth but as -- given
it's an evidentiary hearing in front of the Court, I will take
them as a quasi-direct, how about?

          **MR. LEE:**   Thank you, Your Honor.

          **MR. NOVAK:**   Your Honor, if I could pass up to the
Court Mr. Justus' exhibit binders.  There is one for the Court
and one for the clerk.  There is an exhibit list inside each,
and I also have an exhibit list for the court reporter.

          **THE COURT:**   Thank you.

     And, Mr. Novak, do you have one for the --

          **MR. NOVAK:**   Of course.  And if I may approach the
witness?

          **THE COURT:**   You may.

          **MR. NOVAK:**   Thank you.

          **THE COURT:**   The examination is from that microphone.

          **MR. NOVAK:**   I'll just use that as my warehouse.

1          **CROSS-EXAMINATION**

2     **BY MR. NOVAK:**

3     **Q.**   Dr. Perliger, I'm going to hand you a black binder, and

4     then I also have this folder which is basically the exact same

5     thing, so depending upon which is easier for you to use --

6     okay.   There is exhibits.   It's exactly the same, one of each.

7     Okay?

8     **A.**   Okay.   Thank you.

9     **Q.**   Hopefully we can use the binder because it's more

10    efficient.

11         **THE COURT:**   You may proceed.

12         **MR. NOVAK:**   Thank you, Your Honor.

13    **Q.**   Okay.   So, Dr. Perliger, I want to clarify one thing that

14    Mr. Lee asked you about.   You've written two reports in this

15    matter; correct?

16    **A.**   Correct.

17    **Q.**   And do you intend your supplemental report to replace your

18    first report, or are the opinions in that report in addition to

19    the opinions in your first report?

20    **A.**   In addition.

21    **Q.**   All right.

22         **THE COURT:**   I'd like to get some clarity on this,

23    though.

24         Mr. Lee, if you will come to the other mic.

25         I already explained to you -- I don't want to waste time.

1    I already explained to you that it was entirely inappropriate

2    for this witness to express opinions with respect to the notion

3    that -- of the actual mental state of someone.  He can express

4    opinions, as he does in his supplemental report, that indicate

5    that there are certain things that would be consistent with,

6    but if he's now testifying that he's standing by what he claims

7    in his first report, those things are not appropriate, and I've

8    already indicated that.

9        So can I get some clarity from you?

10           **MR. LEE:**  Your Honor, I -- I believe the witness is

11   well aware of the Court's direction, that as an expert witness,

12   you cannot opine on the ultimate question of whether Mr. Justus

13   had intent at the moment of the shooting to -- that was

14   premeditated, etc., etc.

15       I don't believe the witness' answer just now contravenes

16   that.  I think this witness will abide by the Court's ruling at

17   trial, and I could elicit that testimony from him.

18           **THE COURT:**  Go ahead.  From there is fine.

19           **MR. LEE:**  Sure.

20                        <u>**VOIR DIRE EXAMINATION**</u>

21   **BY MR. LEE:**

22   **Q.**   Dr. Perliger, are you aware as you sit here today that one

23   of the guidelines and rules for this trial will be that you

24   cannot offer an opinion about what Mr. Justus' intent was in

25   the shooting incident?

**A.**   I do.

**Q.**   Do you intend to abide by the Court's rulings with respect to that limitation?

**A.**   Definitely.

**Q.**   Okay.  So when you mentioned a moment ago that your supplemental report is in addition to your first report, did you mean to contravene that understanding of how you would need to follow the Court's directives and orders?

**A.**   No, I did not.  My first report included also discussion about my areas of expertise, a discussion about the Boogaloo movement.  So there is definitely some sections where I provided addition in the second report regardless of the topic you just discussed.

**Q.**   So is it your understanding that to the extent that the supplemental report supplements your first report, then the material that it supplements is still something that you would intend to provide, except for anything that the Court has explained would be an ultimate opinion about the defendant's intent?

**A.**   That is correct.

          **THE COURT:**  Thank you.

     Mr. Novak.

          **MR. NOVAK:**  Thank you, Your Honor.

               <u>**CROSS-EXAMINATION**</u>   **(resumed)**

**BY MR. NOVAK:**

**Q.**   Dr. Perliger, have you ever professionally testified under oath in any court proceeding?

**A.**   No.

**Q.**   Have you ever testified under oath professionally -- so I'm not talking about personal family matters -- in a deposition?

**A.**   No.

**Q.**   Have you ever testified under oath in any government proceeding?

**A.**   I believe I did, yes.

**Q.**   And where was that?

**A.**   While I was a faculty at West Point, I published a report, scientific report focusing on far-right extremism in the U.S., and as far as I remember, someone submitted a complaint to the Inspector General about the fact that I think federal employees are not allowed to collect data about political organizations or something similar along that line, so the Inspector General conducted an investigation.  I gave testimony about how I did my research, and then I never heard from them again.

**Q.**   What year was that, approximately?

**A.**   Probably 2013, 2014, something around that time, probably. While I was still faculty at West Point.

**Q.**   So you gave under-oath testimony to an Inspector General of the Department of Defense?

**A.**   Yes.  I think it was representatives of West Point, I think.  I didn't -- I think that none of us put a lot of -- none of us thought it's anything serious because if that is something that we're not allowed to do as faculty, as scientists working for the government, then basically we need to shut down the entire military academies.  So we thought that is not something we should worry about.

**Q.**   This was before 2015, is your best recollection?

**A.**   As far as I remember, yes.

**Q.**   So would it be fair to assume that the research that somebody was expressing concerns about did not touch on Boogaloo?

**A.**   No.  No.

**Q.**   And just as like an agreement, if I may, about terminology, when we talk about the Boogaloo today, just for purposes of today's hearing, do you refer to it as an organization, as a movement?  Like, what's the -- I understand that "boogaloo" can be a verb and "boogaloo" can be a noun, but, you know, I just don't want to have that slow down our conversation.

So what is it?  Is it an ideology to you?  Is it a movement?  Is it a group?  What is it?

**A.**   I would define it as a decentralized movement.

**Q.**   Okay.  A decentralized movement.  Okay.  That's fine.

So moving beyond the questions of prior testimony, have

1  you made any presentations or delivered any lectures related to

2  Boogaloo?

3  **A.**   No, not specifically to the Boogaloo.

4  **Q.**   Okay.  In the classes that you teach at Lowell, at UMass

5  Lowell, have you developed a syllabus which includes some

6  section on Boogaloo?

7  **A.**   I have sections about antigovernment organizations which

8  discuss many different antigovernment extremist organizations,

9  and in this section, I also discuss the Boogaloo.

10 **Q.**   And have you taught that section of the course material in

11 recent semesters or quarters or whatever you're dealing with?

12 **A.**   Yeah.  Last semester.

13 **Q.**   So last semester.  So that would have been the spring of

14 2023?

15 **A.**   That is correct.

16 **Q.**   So there's a syllabus for the spring of 2023.  Does the

17 syllabus actually mention Boogaloo?

18 **A.**   I don't think so.

19 **Q.**   You state in your CV that you consult with, what I will

20 call, the national security community and the law enforcement

21 community; is that correct?

22 **A.**   That is correct.

23 **Q.**   Okay.  Have you consulted on Boogaloo?  Other than the

24 conversations --

25          **THE COURT:**  I didn't hear an answer.

1          **MR. NOVAK:**  I'm sorry?

2          **THE COURT:**  I did not hear an answer.

3          **MR. NOVAK:**  Okay.

4          **THE WITNESS:**  I engage in many different conversations

5     with law enforcement, with other research institutions, with

6     different stakeholders, and so on, and we talk about far-right

7     extremism.  We talk about different manifestations of far-right

8     extremism.

9          To tell you that I talked with anyone specifically about

10    the Boogaloo, I don't remember if I did.  I probably did,

11    especially during 2020, 2021 when it was a very hot topic.  I

12    probably discussed with many of them about the Boogaloo.

13         Yes.  So that's my answer.

14    **BY MR. NOVAK:**

15    **Q.**  Okay.  So I'm going to try to drill down on that a little

16    bit.

17         Are we talking about informal communications with law

18    enforcement and national security people, or are we talking

19    about you do a PowerPoint presentation and you show up at

20    Quantico and deliver a talk -- when you say many, many

21    conversations, we need to know a little bit more specifically

22    what you mean.

23    **A.**  Yes.  So I conduct webinars, and, you know, especially

24    after I published my book, there was a lot of interest and many

25    people invited me to conduct webinars.  Some of them were

1    fairly early so at that time Boogaloo was not as prominent but,

2    you know, later on.  So this is usually how I do that.  I do

3    webinars in different setting, in different context and so on.

4        I also, of course -- talks in different conferences and

5    meetings.  I meet with both other academics who conduct

6    research about similar issues, of course, and I meet there also

7    with different practitioners who also are interested the

8    situations, and this is where we discuss -- this is where we

9    share our findings, this is where basically we -- we, you know,

10   discuss all those professional issues.

11   **Q.**   I understand.

12       Do you have any writings of your own, whether it's a

13   webinar that you've saved, a PowerPoint you've shared, an

14   abstract, a poster board for a seminar, a full speech that

15   addresses your views on Boogaloo?

16   **A.**   Yes.  So I -- I was asked by the Centre for the Study of

17   Radicalisation of the -- of the Radicalisation of the Far

18   Right.  I think that's the name.  It's ICSR.  That's the

19   acronym.  At that time it was ICSR.

20       They asked me to write a piece, basically a report about

21   the current wave of anti-governmental organizations or the

22   militia movement, and in that section, I also -- in that

23   basically research paper, I also have a section focusing on the

24   Boogaloo movement, which at that time was a fairly new

25   phenomenon, but, nonetheless, I think I included several

1  paragraphs about the Boogaloo and how it's different than the

2  more traditional militias that we are familiar with in the '90s

3  and early 2000.

4  **Q.**   Okay.  Could you open up that binder and look at

5  Exhibit 28, please.

6  **A.**   Yes.

7  **Q.**   Is that the report that you're referring to?

8  **A.**   That is correct.

9  **Q.**   Are there any others other than this one?  I don't mean in

10  the binder.  I mean have you written any other documents -- and

11  I'm using that term very broadly -- that address Boogaloo?

12  **A.**   I don't think so.  Nothing that comes to mind right now.

13  **Q.**   All right.

14      Now, you referred a moment ago to the book that you wrote

15  that led to a lot of requests for presentations and

16  consultations.  Is that this book, *American Zealots*?

17  **A.**   Yes, sir.

18  **Q.**   Would you agree with me that *American Zealots* doesn't talk

19  about Boogaloo?

20  **A.**   It doesn't talk about the specific group.

21  **Q.**   Okay.  So the term doesn't come up in the book; correct?

22  **A.**   Correct.

23  **Q.**   Okay.

24      What I would now ask you to do is to look at Exhibit 4 in

25  that binder.  And is the first page -- does it say, "A book

1   talk with Arie Perliger"?

2   **A.**   Uh-huh.

3   **Q.**   "GW program on extremism"?

4   **A.**   Yes.

5   **Q.**   So there is nothing wrong with this, but you did some work

6   to publicize or market the publication of this book; correct?

7   **A.**   Correct.

8   **Q.**   Would you agree with me that one of the things that you

9   did was that you had a web-based book talk in August of 2020?

10  You were interviewed by somebody also associated with --

11  **A.**   That's --

12  **Q.**   -- the institution?

13  **A.**   -- the program on extremism.  That's a research center in

14  Washington, D.C.  They wanted me to give a webinar on that.

15  **Q.**   Okay.  And so you did a webinar on your book; correct?

16  **A.**   Correct.

17  **Q.**   Okay.  And then I'm not asking you to read the exhibit,

18  but if necessary, it might refresh your recollection.

19      Do you recall being asked during the question-and-answer

20  period a question by a colleague of yours named

21  Professor Hoffman about your assessment of the Boogaloo

22  movement?  So, actually, Dr. Perliger --

23  **A.**   Yes.

24  **Q.**   -- rather than just reading the exhibit, I need you to --

25  we are going to practice, okay, for the jury.  I need you to

```
1    look at me and listen to the question and not read the book.

2         Okay.  So do you recall the question-and-answer period?

3    A.   I don't recall.  I'm sure it's here.  I don't -- my

4    memory --

5    Q.   Okay.  Do you know Bruce Hoffman?

6    A.   I do very well, yes.

7    Q.   He's a colleague of yours?

8    A.   He's a colleague.

9    Q.   Do you remember who was the -- the host or the interviewer

10   of this webinar?

11   A.   Yes.  I think it's Alex Hitchens I think.

12   Q.   Meleagrou-Hitchens?

13   A.   Yes.

14   Q.   So do you recall at all Professor Hoffman asking the

15   question, "What is your assessment of the Boogaloo movement?"

16   Do you remember that?

17   A.   I do not remember.  Again, I did many of those webinars.

18   Q.   So would it refresh your recollection to look at what I

19   will represent is a transcript of that portion of the

20   question-and-answer?

21        Actually, Your Honor, if I may --

22        When I ask you if it would refresh your recollection, I

23   need a yes or a no.

24   A.   Yes.

25   Q.   So why don't you take a moment to just read your answer in
```

1    that transcript.  Do you see where it says "AP"?

2    A.   Uh-huh.

3    Q.   Okay.  I'm going to represent to you that that's a

4    transcript of what you said.  Does that refresh your

5    recollection about this conversation?

6    A.   Yes.

7    Q.   Okay.  So isn't it true that one of the things that you

8    said is -- in response to the question from Professor Hoffman

9    was, "I haven't studied closely the Boogaloo movement."

10   A.   Yes.

11   Q.   Okay.  And when was this interview?

12   A.   I don't remember.  Shortly after I published the book.

13   Q.   Well, it was August 18th of 2020; right?

14   A.   Yes.  Yes.

15   Q.   All right.

16        Now, one of the sources of data for your research and your

17   writings is this database.  Or you called it a dataset.

18   A.   Yes.

19   Q.   Okay.  And the dataset -- I don't know if you know this or

20   not, but the dataset is something that the Court ordered the

21   Government to ask you to provide, and you provided that to

22   Mr. Bostic and Mr. Lee; correct?

23   A.   Yes.

24   Q.   And just so you know, they provided it to us.  Okay?

25        So how many entries, roughly, are in that dataset?

1    **A.**    Roughly a bit more than 9,000 entries.

2    **Q.**    Okay.  And before you came here today, did you look at

3    that dataset to see how many of the data entries relate to

4    Boogaloo?

5    **A.**    I think I looked at that -- not before I came here today.

6    I looked at it in the past.

7    **Q.**    Okay.  So would you agree with me that there are about 21

8    entries in that 9,000-piece dataset that relate to the

9    Boogaloo?

10   **A.**    Sounds right.

11   **Q.**    Okay.  So why don't you look at Exhibit 5.

12        And for the Court's benefit, we are going to be dealing

13   with Exhibits 5 and 6 and then 7 through 27.

14        So, Dr. Perliger, what I will represent to you Exhibit 5

15   is, is a compilation of those 21 entries in your dataset that

16   use the term "Boogaloo."

17   **A.**    Okay.

18   **Q.**    Okay?

19        Why don't you just take a moment to look at that.  Does

20   this strike you as excerpts from your dataset?

21   **A.**    Yes.

22   **Q.**    Now, let's just look at Item 6 -- Exhibit 6 for a moment.

23             **THE COURT:**  I don't know which one Item 6 is.

24             **MR. NOVAK:**  Exhibit 6.  I'm sorry, Your Honor.  I did

25   say Item 6.  What I mean is Exhibit 6.

1  **Q.**   Dr. Perliger, Exhibit 6 is what you call the "code book";
2  right?
3  **A.**   Correct.
4  **Q.**   And is it correct that the code book is basically your
5  data entry guide, your data entry system so that when data is
6  put into your dataset, there is some standardization and
7  uniformity?
8  **A.**   Yes.
9  **Q.**   How many people, other than yourself, actually build this
10 dataset?
11 **A.**   Oh, that's quite a lot.  It's a dataset that was built for
12 the last ten years or so.
13 **Q.**   Okay.
14 **A.**   At that time, you know, the way it works, usually I have a
15 team of other researchers as well as graduate students, usually
16 doctoral students who also help in the coding process and
17 quality control and verification and cross-checking and so on,
18 so we are talking about a group of researchers working together
19 to improve, as much as possible, the database.
20 **Q.**   So let's talk about in the last three to four years.
21 **A.**   Yes.
22 **Q.**   Because we're just talking about the Boogaloo entries;
23 right?
24 **A.**   Yes.
25 **Q.**   Wouldn't it be fair to say that there would not have been

1 any Boogaloo entries before --

2 **A.** Yep.

3 **Q.** What year?

4 **A.** Probably 2020, 2019.

5 **Q.** Okay.  So how many different individuals have contributed

6 to the dataset in the last three to four years?

7 **A.** Something between probably four, five.

8 **Q.** Okay.  And are those all people under your supervision at

9 the university?

10 **A.** Most of them.  I work with some partners in -- in a

11 research team tag in D.C. which are also part of this project

12 so they also have two, three people who also worked on it, so I

13 actually will correct myself.  So with their group, it's

14 probably closer to six, seven people.

15 **Q.** Okay.  And is that research project specific to the

16 Boogaloo or is it more generally about anti-government

17 extremism?

18 **A.** It's far-right extremism in the U.S.

19 **Q.** I'm sorry.  Far-right extremism in the U.S.

20  Is that funded by one of your grants?

21 **A.** It was funded since 2020.  Before that between 2012, 2011,

22 and 2020 it was not funded.  Through a federal grant since

23 2020, the Department of Justice, through NIJ, help us to

24 further expand and improve the database.

25 **Q.** I'm walking away from the code book for a second because I

1  want to ask you about the grant funding.

2       Have you written any grant proposals that specifically

3  discuss your views or information about Boogaloo?

4  **A.**   Not specifically the Boogaloo, no.

5  **Q.**   Okay.  And when you received these grants, I assume that

6  sometimes you need to write interim reports to show that you're

7  progressing on your research?

8  **A.**   Correct.

9  **Q.**   And do any of those interim reports that you've written

10  for any of your grant funding address your views or information

11  about Boogaloo?

12  **A.**   No.

13  **Q.**   All right.  So the code book -- I'm going to go back to

14  Exhibit 6 -- guides the data entry -- and I understand you're

15  talking about graduate students and other professionals, but it

16  guides them in how to categorize the materials that they're

17  collecting; right?

18  **A.**   Correct.

19  **Q.**   Okay.  Does the code book, and therefore the dataset, have

20  an entry for who entered the data?

21  **A.**   No.

22  **Q.**   Okay.  Does the code book or the dataset show the source

23  of the data?

24  **A.**   Not consistently, no.

25  **Q.**   Okay.  Which column or, I should say, which variable

1  would, even if it's inconsistently, tell a reader what the

2  source of the data is?

3  **A.**   So I think in some -- in some parts of the dataset, I

4  think some of the coders included some sources that they used.

5  **Q.**   So in the narrative?

6  **A.**   It's -- it's another column, I think, as far as I

7  remember -- another column in the dataset where they include

8  also whether it's the URL, whether it's a specific source,

9  specific document that they use.

10      It's not included in the code book.  It's not something

11  that we, you know -- it's something that we suggested them to

12  do that, but it's not included in the code book itself which is

13  focusing on how you translate the actual information about the

14  incident.

15  **Q.**   Okay.  So let's go back to Exhibit 5, please.

16      What I'm representing to you is that we've captured the 21

17  entries that refer to Boogaloo.  And if you later decide there

18  were 22 or 23 or we missed a couple, I'm sure -- I'm sure

19  the -- you can let the Government know that.  Okay?  But I'm

20  just telling you we found 21.

21      So do you agree with me that on the first page of

22  Exhibit 5, there's this left column that has the word "ID" at

23  the very beginning?

24  **A.**   Yes.

25  **Q.**   Okay.  So that column on the left is a descriptor for

1   what's in the box to the right?

2   **A.**   Yes.

3   **Q.**   Okay.  And those columns on the left -- ID, FIP year,

4   state/county year -- those follow your coding -- your code

5   book, right, which is Exhibit 6?

6   **A.**   Yes.

7   **Q.**   Okay.  So where in the -- in the columns or the categories

8   of information does it show the source of the information?  You

9   said that there's another column which is not in the code book.

10  **A.**   Yeah.  It's not included here, yes.

11  **Q.**   Was it in your Excel spreadsheet that you gave the

12  Government?

13  **A.**   I don't -- I don't -- I don't remember if it was on that.

14  I say -- I said there's some students, some coders, some worker

15  who worked on it, they put them the right side, in the last

16  column, probably, URLs or sources so they can know to go back

17  to it or other people that want to verify can go back to it.

18      I don't think it was something that we consistently

19  included.  We trust our coders, and usually they know how to

20  find those cases.  Yeah.

21  **Q.**   Okay.  So my question was, was it included in the Excel

22  spreadsheet that you sent the Government that has the roughly

23  9,000 entries --

24  **A.**   I don't think so, as far as I remember.

25  **Q.**   Okay.  So we don't have available to us whatever data you

1    have on the sources that contributed to the information in the

2    database?

3    **A.**    Correct.

4    **Q.**    All right.

5         You say in your supplemental report that your dataset

6    sources range from law enforcement reports, court records, all

7    the way to media accounts; correct?

8    **A.**    Correct.

9    **Q.**    Okay.

10        So I'm not going to go through all 21 of them because I

11   don't know that we need to, but what I want to do is just start

12   to go through some of them, and we'll see how far we get.

13   Okay?

14        So for your benefit, for the Court's benefit, for

15   Government counsel's benefit, Exhibits 7 through 27 are each of

16   the 21 columns summarized in Exhibit 5.  Does that make sense

17   to you, Dr. Perliger?

18   **A.**    Yep.

19   **Q.**    Right.  So we're going to, just so the record is clear --

20   the first column of data, the first dataset on page 1, you have

21   this unique identifier of 7050; right?

22   **A.**    Yes.

23   **Q.**    And then if you look at Exhibit 7, that's 7050; right?

24   **A.**    Yes.

25   **Q.**    Let's talk about Exhibit 7 for a second.

1      Do you know who entered this data into your dataset?

2  **A.**   No.

3  **Q.**   Do you know what the source of information was?

4  **A.**   No.

5  **Q.**   All right.

6      Now, I think many of us -- I don't want to speak for

7  anybody in particular, but we are familiar with the prosecution

8  of the Wolverine Watch members for the conspiracy to kidnap

9  Governor Whitmer.

10      You're familiar with that incident; right?

11  **A.**   Yeah.

12  **Q.**   Okay.  Did you personally interview anybody who had any

13  knowledge about that crime?

14  **A.**   No.

15  **Q.**   Okay.  So I'm just going to be a little more specific.

16      Did you ever interview any law enforcement officers who

17  investigated?

18  **A.**   I don't believe so.

19  **Q.**   Did you ever interview anybody who was acting as a

20  confidential informant?

21  **A.**   No.

22  **Q.**   Do you know what I mean by that term?

23  **A.**   Yes.

24  **Q.**   Okay.  Did you ever interview any of the defendants?

25  **A.**   No.

1    **Q.**   Did you ever interview any witnesses?

2    **A.**   No.

3    **Q.**   Did you read any transcripts from the prosecution of that

4    case?

5    **A.**   Me personally?  No.

6    **Q.**   All right.

7         Let's go to Exhibit 8.  Exhibit 8 refers to an incident in

8    May of 2020 in Las Vegas; correct?

9    **A.**   Yes.

10   **Q.**   Three men with ties to the anti-government Boogaloo

11   movement were arrested for a conspiracy to throw Molotov

12   cocktails against police at a protest over the killing of

13   George Floyd.  That's what that says; right?

14   **A.**   Yes.

15   **Q.**   Do you know who entered this data?

16   **A.**   No.

17   **Q.**   Do you know what the source is?

18   **A.**   No.

19   **Q.**   Do you know -- I'm sorry.  So the same questions that I

20   asked you before about did you interview anybody --

21   **A.**   Similars answers.

22   **Q.**   You haven't interviewed any of these people?

23   **A.**   Correct.

24   **Q.**   Did anybody working with you sit through any court

25   proceedings?

1  **A.**   That's a possibility, yes.

2  **Q.**   Okay.  So I need more than a possibility.

3  **A.**   Okay.  So when someone code this data, they look at

4  multiple reports, whether these are media reports or press

5  releases of law enforcement or any kind of source that they can

6  find about that specific incident.

7       In some cases, they'll decide that because they need more

8  fidelity, they need more nuance, they'll go and they try to see

9  if they can get access to judicial proceedings or court records

10  and so on and so forth.  So basically it depends on the

11  specific researchers that works on the case to go as far as he

12  needs to in expanding the number of resources until he feel

13  confident that the data is accurate.

14  **Q.**   Okay.  So let's look at the data.

15       One piece of data is that three men with ties to the

16  Boogaloo movement were arrested --

17  **A.**   Yes.

18  **Q.**   -- right?

19  **A.**   Yes.

20  **Q.**   The second piece of data is that they had discussed fire

21  bombing a power station; right?

22  **A.**   Yes.  Yes.

23  **Q.**   As you sit here today, do you know what -- do you know

24  that somebody actually did anything to verify this information?

25  I mean, this looks like something that doesn't really need

1   verification.  There was an arrest.  That's sort of a fact

2   beyond dispute; right?

3            **THE COURT:**  So one question at a time.  You've got

4   about 15 in there.

5            **MR. NOVAK:**  I'm sorry.  Let's just back up.

6            **THE COURT:**  Back it up.  Go ahead.

7   **BY MR. NOVAK:**

8   **Q.**   You already said you don't know who wrote this

9   description; right?

10  **A.**   I know that is my research team who wrote this.

11  **Q.**   But you don't specifically?

12  **A.**   I don't know who is the specific person.  When you have

13  9,000 incidents and there is sometimes some years you have

14  hundreds of incidents and I work with a small team of people --

15  yes.  I don't have the capacity to basically verify the work of

16  each doctoral student or each researcher.

17  **Q.**   I understand.

18       Do you specifically know what Stephen Parshall's ties to

19  the Boogaloo were?

20  **A.**   Not me personally.

21  **Q.**   How about Mr. Lynam -- Lynam?

22  **A.**   None of them.  I didn't review personally the case.

23  **Q.**   Understood.

24       If I go back to Exhibit 7 about the Wolverine Watch, do

25  you have personal knowledge about the way in which the members

1  of the Wolverine Watch were, quote, affiliated with Boogaloo?

2  **A.**   No.   I don't have that specific information.

3  **Q.**   Let's go to Exhibit 9, sir.   This is an entry for an

4  incident in September of 2020 in Hennepin, Minnesota; right?

5  **A.**   Yes.

6  **Q.**   Same questions, did you personally interview anybody or

7  observe any court proceedings or read any court documents

8  related to the charges against Mr. Teeter and Mr. Solomon?

9  **A.**   No.

10  **Q.**   Do you have any personal knowledge as to how it is that

11  somebody says that they are adherents to the Boogaloo movement?

12  **A.**   No.

13  **Q.**   So to short circuit this, if I may -- and if that's

14  premature, then you'll tell us -- in any of these 21 cases,

15  have you personally interviewed anybody affiliated with the

16  incident?

17  **A.**   No, because that's not part of our procedure.   Again, when

18  you have hundred of cases, we don't have the capacity and I

19  don't think anyone in our community of researchers expect us to

20  interview each person that was involved in those cases,

21  especially when you build such a database.

22       I would also add that as far as I know, none other similar

23  databases, including those that are funded by the Government,

24  are using this process of interviewing a case-by-case basis

25  when you build a quantitative database.

1  **Q.**   Okay.  And so for what it's worth, I'm not criticizing the

2  research.  I'm trying to understand whether your opinions are

3  admissible under the Federal Rules of Evidence.  Those are two

4  very different things.  Do you understand?

5  **A.**   Yes.

6  **Q.**   Okay.

7         **MR. LEE:**  Your Honor, objection to that.  That's not a

8  question.  It's a speech.

9         **THE COURT:**  Sustained.

10 **BY MR. NOVAK:**

11 **Q.**   Okay.  So I think the answer to the relevant question was

12 whether you've interviewed anybody connected with these 21

13 incidents, and you said no, and you explained why.

14        My next question is by looking at column -- table --

15 Exhibit 5 or even these individual exhibits, as you sit here

16 today, do you know who entered that data?

17 **A.**   I know that it's someone from my group of researchers.

18 **Q.**   But I mean a specific person?

19 **A.**   No.

20 **Q.**   Okay.  And as you sit here today, you also don't know what

21 their source was; right?

22 **A.**   No.

23        **THE COURT:**  And by that, just so that you know, I

24 understand that he doesn't understand the specific source other

25 than the sources he's generically testified to.  That's what

1  I'm understanding.

2         **MR. NOVAK:**  Right.

3  **Q.**  So, Dr. Perliger, your report says that your sources for

4  the dataset range from official government reports to court

5  records to media accounts.

6  **A.**  That is correct.

7  **Q.**  Okay.

8       Is that what the Court was referring to, because I don't

9  want to skip over something that the Court --

10        **THE COURT:**  And he testified to some other things that

11  I've taken notes on.

12        **MR. NOVAK:**  All right.

13        **THE COURT:**  So whatever is in the record, I just want

14  to make sure that you understand that -- what my understanding

15  is of his testimony.

16        **MR. NOVAK:**  Okay.

17  **Q.**  So, Dr. Perliger, what I would like to do is go back, if

18  we can, to Exhibit 3 in this binder, which is what you referred

19  to as your supplement, your supplemental report.  Okay?

20  **A.**  Yes.

21  **Q.**  All right.  And I want you to look down at the footnote on

22  page 3 of your report.  It's Footnote 2.

23  **A.**  Yes.

24  **Q.**  Do you see of that?

25  **A.**  Yes.

1   **Q.**   Okay.  And what you cite there are two articles published

2   in what I would refer to as, you know, academic publications.

3   Is that fair?  Research publications?

4   **A.**   So one source is a report that was released by the SPLC,

5   the Southern Poverty Law Center, and the second source is our

6   database.

7   **Q.**   The second source is a database?

8   **A.**   It's real.  UML, dataset, and far-right balance.

9   **Q.**   We must be on the wrong -- I'm looking at your

10  supplemental report.  Are you in Exhibit 3 of the binder?

11  **A.**   Sorry.  I was at 2.

12  **Q.**   My mistake for not directing you to the binder I gave you.

13  **A.**   Okay.  Yes.  I can see it now.

14  **Q.**   Exhibit 3, page 3, Footnote 2?

15  **A.**   Yes.

16  **Q.**   You cite two articles.

17  **A.**   Correct.

18  **Q.**   And those articles were written in 2021 --

19  **A.**   Yes.

20  **Q.**   -- right?

21  **A.**   Yes.

22  **Q.**   Okay.  Now, have you read those articles?

23  **A.**   Yes.

24  **Q.**   Okay.  Did you read those articles before you wrote your

25  first expert report for this case?

**A.**   I read hundreds of articles throughout the years.   To tell
you if I read that specific one before, probably, yes, because
I'm reading the *Sentinel* pretty frequently, the *CTC Sentinel*.
I actually wrote many papers to that specific organization as
well so I'm familiar.

I usually try to review all the publication in my area of
expertise, but to tell you if I specifically read that,
probably yes.   I cannot tell you a specific date or day.
It's -- that's what we do as part of our job, reading articles
that are published by our colleagues.

**Q.**   I respect that.   I understand.

What I want to point out, though, and see if you agree
with this, is that you cite it as a source for your information
in your supplemental report, but you don't cite it as a source
in your first report.   Do you agree with that?

**A.**   Yes.

**Q.**   All right.

Is there anything in those two articles about Boogaloo,
their history, the way they organize, the terminology they use,
which you don't agree with?

**A.**   I don't remember every word in those articles, but I think
I agree with most of their conclusions.

**Q.**   Okay.

Now, on pages -- we're going to stick with the same
exhibit, which is your supplement report.   On pages 5 through

1    6, you identify certain terminology or what you refer to as the

2    Boogaloo's language.

3    **A.**    Yes.

4    **Q.**    Okay.  And then some of those you note those terms, those

5    phrases, were used by Mr. Justus in the social media materials

6    that you reviewed; right?

7    **A.**    Correct.

8    **Q.**    All right.  And so -- actually now I'm going to digress

9    for one second.

10        You were provided with a large set of what I'll just refer

11   to as social media materials; correct?

12   **A.**    Correct.

13   **Q.**    That were somehow obtained from Mr. Justus' social media

14   accounts; right?

15   **A.**    Yes.

16   **Q.**    Facebook and other materials?

17   **A.**    Correct.

18   **Q.**    In addition to those, what I'll refer to as social media

19   materials from Mr. Justus, what other case-related materials

20   did the Government provide you with?

21   **A.**    I was provided with his recorded interviews.  I think it

22   was roughly five hours of --

23   **Q.**    You're talking about his interview with the FBI when he --

24   **A.**    I think so, yes.  With two agents, if I remember.

25   **Q.**    When he came to the courthouse?

1    **A.**   Yes.

2    **Q.**   What else?

3    **A.**   So that was provided to me.

4    I received, I think it was -- I also received many

5    different extractions from his different social media posts,

6    whether it's posts that he posted or posts that he liked or,

7    you know, engaged with.  Yes.

8    **Q.**   Okay.  Anything else?

9    So his social media posts and the context and then his FBI

10   recorded interview?

11   **A.**   Yes.  Yes.

12   **Q.**   Okay.  When you say you have the FBI recorded interview,

13   did you watch the video or did you --

14   **A.**   I watched the video.

15   **Q.**   You watched the video?

16   **A.**   Yes.

17   **Q.**   What about Mr. Carrillo.  Were you given any materials

18   related to Mr. Carrillo?

19   **A.**   No, except for cases where it was in the context of

20   Mr. Justus liked that or respond to that or -- so in the same

21   materials that I just mentioned.

22   **Q.**   Okay.

23   And did you watch the video of the interview of Mr. Justus

24   by the FBI before you wrote your first report or after you

25   wrote your first report but before you -- before today?

**A.**    It was during or before I wrote my first report.

**Q.**    Okay.

So I'm going to go back now to the pages 5 and 6 of your report which talk about certain terminology.

What is your source of information, for example, for what "Big Igloo" means?  How do you know what it means?

**A.**    I know what it means because I read materials about the movement.  One of the things that I do quite a lot, substantial portion of my research is focusing on linguistic analysis and sentiment analysis so these are the kind of research that I also read, articles about the movement, people that are publishing about the movement, as well as things that I myself and my team reviewed throughout, you know -- throughout the years.

So these are the sources that -- that usually we use and we're getting familiar with those movement, the same way that I'm familiar with the terminology of the Three Percenters or the Oath Keepers or many other groups that I study.

**Q.**    And with respect to each of the different terms that you list and then describe on pages 5 and 6, is your answer the same, like that's your source of information?

**A.**    Yes.

**Q.**    Okay.

Have you personally ever interviewed somebody who says, "I view myself as a member of the Boogaloo movement"?

1    **A.**    No.

2    **Q.**    Have you ever interviewed anybody who has -- in law

3    enforcement who has substantially investigated and studied the

4    Boogaloo movement?  When I use the term "law enforcement," I

5    mean the national security community and the law enforcement

6    community.

7    **A.**    Maybe.  I don't remember specific.  I have a lot of

8    discussions with law enforcement because we work with them very

9    closely, so I don't remember.  Probably but, again...

10   **Q.**    Okay.  I want to actually go back to your -- your comment

11   about linguistic analysis because you say in your report that

12   you spend a lot of time looking in -- I mean, it's not just the

13   internet but sort of out there in the world, the real world,

14   terminology used by people who are part of different --

15   **A.**    Extremist groups.

16   **Q.**    -- extremist movements or extremes; right?

17   **A.**    Yes.

18   **Q.**    And you refer to what I'm going to call sort of a deep

19   dive that you did with respect to an area of extremism -- I'm

20   not sure that's the right term -- which you refer to as

21   misogyny?

22   **A.**    Yes.

23   **Q.**    You actually wrote a paper about that data research;

24   right?

25   **A.**    That is correct.

**Q.**   Why don't we look at Exhibit 29.  Do you see that?

**A.**   Yeah.

**Q.**   It's a paper you wrote with a couple colleagues.  It was published in January of this year; correct?

**A.**   Correct.

**Q.**   And so what -- what was the point of this research?  I don't mean what is the point because I think it has great social value, but I mean is what was -- what was the goal of the research and the publication of the paper?

**A.**   The goal was -- there were several goals.  First of all, we thought that it's important to identify trends in what we define as an ideological valid misogyny, various groups that promote misogynist narrative, and some of them also encourage violent practices to promote their misogynist ideas and misogynist ideologies.  That was one.

   The second one was to show that this is not a uniform landscape, that there is many different misogynist extremist groups and each one has its own language, its own rhetoric, and its own practices, and when we are trying to deal with this growing concern, societal threats, we need to acknowledge that those different groups demands also different type of responses.

**Q.**   And so the -- tell the Court just a little bit about the data collection process that led to the results that you published.

**A.**   So we identify online platforms which can be website or message boards, sometimes social media accounts that are being utilized by those different groups.  In the study, we actually provide very specific inclusion criteria, that means criteria that explain why we decided to include those platforms and not, for example, others.

And then after we selected those platforms, we utilized advanced software that allow us to basically collect all the communications on those dataset.  We're talking about thousands of communication, hundreds of thousands of texts, of course.

And then we used special linguistic software that allows us to analyze and identify different psychological sentiments, different linguistic trends and to show that indeed the language of those different groups is distinct with the way they describe their adversaries, the way they -- the level of violence that they legitimize, if they legitimize violence at all, and so on and so forth.

**Q.**   Have you done that type of statistical, methodological, linguistical analysis with respect to the different strands of the Boogaloo movement?

**A.**   Not specifically the Boogaloo, no.

**Q.**   Okay.  And so right now the dataset that you have is these -- what I'm representing to you are 21 entries; fair? That touch on Boogaloo.

**A.**   So I just want to clarify because you mentioned 21 or 22

1    multiple times.  So in some cases, we don't know.  Sometimes

2    people perpetrate an attack, and they may be Boogaloo, but

3    nobody will identify them -- them as that.  They may -- you

4    have to acknowledge the limitations of data collection, right,

5    so some of them will describe themself as general

6    anti-government groups.

7         Also I think it's important to acknowledge that people are

8    sometimes not exclusively members of one group, right?  So if

9    someone identified as Oath Keeper but is also a -- a -- engaged

10   in activities also in Boogaloo website, sometimes we won't

11   catch both.  Sometimes we'll catch just one, especially some of

12   the groups are very prevalent and very visible such as the Oath

13   Keepers, for example.  So I'm saying that's what we identify in

14   the limitations of this kind of data collection procedures,

15   yes.

16   **Q.**   Okay.  Understood.

17        Let's talk about some chronological issues for a moment,

18   and then, Your Honor, I think I'm pretty close to being done.

19        Do you -- as you sit here today, do you remember the month

20   and the year when Mr. Underwood was shot and killed outside of

21   this building?

22   **A.**   It was May 2020.

23   **Q.**   Okay.  That's correct.

24        So my question for you is are you in a position to testify

25   about which terminology Boogaloo movement adherents or true

1    believers were using in May of 2020 and what their ideologies

2    were and what their methodologies were as opposed to today

3    looking back on what you might just think of as like a status

4    quo?   In other words, can you differentiate who they were in

5    May 2020 versus who they are in June of 2023?

6    **A.**   Yes.  I think so.  I think a lot of our work is historical

7    work.  I have significant portion of my book that are -- are

8    basically focusing on the history of far-right extremism in the

9    U.S.  So part of our work is not just focusing on the here and

10   now but also looking at historical trends.

11       I think you cannot understand the societal processes

12   without looking at historical trends, and sometimes I'll be the

13   first one to acknowledge you don't identify the importance of a

14   phenomenon when it just appears because there's hundreds of

15   far-right groups and associations and cells and so on, and

16   sometimes -- and they merge and they split and they, you

17   know -- and sometimes it takes, even for us people who are

18   studying those issues for a long time -- it takes us time to

19   acknowledge that sometimes it's something that is worth our

20   attention, right?  But once it's got our attention, it's not

21   like we started studying from the point we -- we start to look

22   back as well and try to identify its origin.  So my short

23   answer is yes.

24   **Q.**   Okay.  I understand what you're saying.  My family is from

25   Southern Illinois, a Jewish family from Southern Illinois.  I

1   don't think in the '30s and the '40s we understood what the

2   Klan was doing in Southern Illinois, but now we understand what

3   they were doing, right, even back then.  So I understand what

4   you're saying.

5       But my question is can you testify as to which of the

6   various things, in your opinion, describe the Boogaloo as of

7   May 2020 as opposed to as of, for example, when your colleagues

8   wrote the report in February of 2021 or after January 6th or

9   today?  Do you understand my question?

10   **A.**   Yes.  I -- I think so.  I think so.

11         **MR. LEE:**  Objection.

12         **THE COURT:**  Overruled.

13         **THE WITNESS:**  I think so, yes.

14   **BY MR. NOVAK:**

15   **Q.**   So if we take your supplemental report -- and you're

16   welcome to look at it -- which portions of it, in your opinion,

17   accurately represent a description, a set of terminology, as to

18   the Boogaloo in May of 2020, and which ones are really only

19   based on, you know, now it's 2023 and we're doing a

20   retrospective.

21         **MR. LEE:**  Objection.  Foundation.

22         **THE COURT:**  Well, it's compound, but why don't you try

23   to answer it.

24         **THE WITNESS:**  So I just want to say that as social

25   scientists, those issues are complex and they're very volatile.

1   There is not -- there's not -- it's not -- it's not physics,

2   it's not biology, it's not like we are looking at a sample and

3   it's a static sample.  These things are very volatile; they

4   change.  Especially movements like the Boogaloo, which was very

5   decentralized.  For a long time it existed merely online and --

6   before it started to materialize on the ground.

7        So what I'm trying to say is it's very nice to try to put

8   those kind of time markers, but the reality is it's much more

9   complex, the way we study terrorist organizations.  I can tell

10  you that, yes, Hezbollah, for example, was some specific thing

11  in 2020 and today it's a bit different.  To tell you what

12  specific month or specific day this -- of course we cannot do

13  that.  We try to provide, I think, a knowledgeable

14  approximation based on me studying these kind of groups and

15  these kind of phenomenon for more than 20 years now.

16  BY MR. NOVAK:

17  Q.   All right.  Let me try a different question.

18       You've never interviewed Mr. Carrillo; correct?

19  A.   That is correct.

20  Q.   And you haven't read any statements that he's made to

21  anybody other than his social media interactions --

22  A.   That is correct.

23  Q.   -- including those with Mr. Justus; right?

24  A.   Correct.

25  Q.   And in your database -- and I assume that you're familiar

1   with some individuals who were associated with the California

2   Grizzlies, the commandos?  Do you know what I'm talking about?

3   **A.**   Yes.

4   **Q.**   Mr. Rush and Mr. Ybarra?

5   **A.**   Yes.

6   **Q.**   Have you ever interviewed any of them?

7   **A.**   No.

8   **Q.**   Have you ever interviewed anybody who says, "I was

9   involved in the Boogaloo in May of 2020 or before"?

10  **A.**   No.

11  **Q.**   All right.

12       What is your understanding of the relationship between the

13  Boogaloo movement and the Black Lives Matter movement in May of

14  2020?

15  **A.**   So since the Boogaloo movement, like many other, similar

16  anti-government groups have -- have significant animosity and

17  suspicious towards federal authorities, law enforcement.  For

18  many of them, the BLM movement direct challenge -- challenging

19  of law enforcement, of authorities, of law enforcement

20  policies, of the criminal justice system was something that was

21  easy for them to identify with, to -- to recognize it's

22  something which is very similar to their perceptions and to

23  their own animosity and suspicions towards what they perceive

24  as the intrusive, aggressive nature of the criminal justice

25  system and law enforcement.

1      And as a result of that, many of them felt that there is

2  some kind of, you know, ideological overlap or some kind of

3  camaraderie as both of them basically see law enforcement as --

4  as an off-style element, as something which is engaging in

5  violation of constitutional rights and civil -- civil liberties

6  and so on and so forth.

7      So that's -- that's how you can understand this kind of

8  temporary overlap, if you'd like to say.

9  **Q.**   Okay.  So is it fair to say that it's your opinion that in

10  May of 2020, people who identified as supporting the Boogaloo

11  movement were supportive of the Black Lives Matter movement?

12      **MR. LEE:**  Objection.  It's mischaracterizing the

13  testimony.

14      **MR. NOVAK:**  It's just a question.

15      **THE COURT:**  I'd like to understand.

16  Go ahead.  Overruled.

17      **THE WITNESS:**  Yes.  I think that some individuals who

18  were engaged with the Boogaloo discourse and ideology felt

19  probably some kind of support for the BLM movement, especially

20  the direct challenge that it represented to law enforcement,

21  especially extreme -- especially the demonstration, the willing

22  to challenge directly law enforcement.

23      If you remember the first, you know, few months after

24  the -- the murder of George Floyd, the demonstrations was very

25  active and directly challenged law enforcement, and I think

1   that for many Boogaloo members, that's something that they felt

2   very comfortable with, that they felt that, yes, that's -- you

3   know, it's connected or linked to their own animosity and their

4   own suspicions and their own resentments toward law enforcement

5   and federal authorities more generally.

6   **BY MR. NOVAK:**

7   **Q.**   Okay.  So if we assume that Mr. Carrillo identifies

8   himself as a member of the Boogaloo movement or did at that

9   time, do you have any personal knowledge about whether his

10   decision to go to the Black Lives Matter protest in May of 2020

11   was to be supportive as opposed to -- to exploit it for his own

12   separate agenda?  I'm not asking you to speculate.  I really

13   want to know if you have any information about what

14   Mr. Carrillo's agenda was that night.

15   **A.**   My understanding was that I'm not supposed to engage in

16   identifying the mindset of those individuals, as I was

17   directed --

18   **Q.**   I am asking you about Mr. Carrillo.  I'm not asking you

19   about Mr. Justus.

20   **A.**   Yeah.  But I don't see that there is any qualitative

21   fundamental difference.  I don't know what was his mindset.  I

22   can assume, I can guess, if you'd like, a calculated guess

23   based on my understanding of the dynamics within the movement

24   at that time, that he felt that that provided him a channel, an

25   opportunity to directly engage and challenge law enforcement,

1    maybe even in a -- you know, violent activism, maybe.  I don't

2    know exactly what he did in specific that demonstration.  I'm

3    just saying that that was some kind of an outlet.  Again, this

4    is a calculated guess.  I don't know what was his mindset at

5    that time.

6    **Q.**   Understood.  Understood.

7         May I just have one movement?

8              **THE COURT:**  You may.

9              **MR. NOVAK:**  Thank you, Your Honor.  We have no further

10   questions.

11             **THE COURT:**  Redirect?

12             **MR. NOVAK:**  Do you want me to do the -- address which

13   exhibits are received into evidence while the witness is on the

14   witness stand or after?

15             **THE COURT:**  Which are you offering?

16             **MR. NOVAK:**  4 through 29 -- well, I mean, 1, 2 and 3

17   are cumulative of the Government's exhibits.  They are

18   Dr. Perliger's CV and the two reports, so I don't think that's

19   necessary.  But I think that we've gone through --

20             **THE COURT:**  Any objection?

21        **MR. NOVAK:**  4 through 29.

22             **THE COURT:**  Any objection?

23        **MR. LEE:**  No objection.

24             **THE COURT:**  4 through 29 are admitted.

25         (Defense Exhibits 4 through 29 received in evidence)

1        **THE COURT:**  So I am going to need you to -- because we

2   don't have an electronic version of these --

3        **MR. NOVAK:**  I do.  I do have an electronic version.

4        **THE COURT:**  Okay.  But I don't.

5        **MR. NOVAK:**  I'm sorry.

6        **THE COURT:**  So the courtroom deputy needs a copy.  I

7   wrote on -- I think you gave us two, and I -- so we need a

8   clean copy.

9        **MR. NOVAK:**  Paper or electronic?

10        **THE COURT:**  Paper.

11        **MR. NOVAK:**  I'll do it from the folders.

12        **THE COURT:**  That's fine.  Great.  Thank you.

13        **MR. NOVAK:**  Thank you.  And I'll do that at the

14   conclusion of the hearing, if that's okay.

15        **THE COURT:**  That's fine.

16      The one thing I would like the electronic on, Mr. Novak,

17   is 29 because I can't see these footnotes.  The copy version of

18   the footnotes is so light that it's not legible.

19        **MR. NOVAK:**  Yes.  I can blame Office Depot, but I will

20   just get the Court an electronic version.

21        **THE COURT:**  That will be better.  Thank you.

22      Redirect?

23        **MR. LEE:**  Yes, Your Honor.

24                          **REDIRECT EXAMINATION**

25

1  BY MR. LEE:

2  Q.   I'm just going to start with one cleanup area.

3       Going back to the testimony you were giving when Mr. Novak

4  was asking you about your discussion under oath with the OIG

5  and you were at West Point, I think there was an unintended

6  double negative there, so let me ask you, would it be fair to

7  say that your testimony in that respect did not address

8  Boogaloo in any way?

9  A.   No.  The movement didn't exist then, so, yeah.

10 Q.   So, yes, it didn't address it?

11 A.   It didn't address, yes.

12 Q.   Thank you.

13      You were asked questions about your book, *American*

14 *Zealots*, and one question was asking you to confirm that it

15 doesn't discuss the Boogaloo movement specifically in the book;

16 correct?

17 A.   Correct.

18 Q.   And by that did you mean that the word "Boogaloo" does not

19 appear in the book?

20 A.   Probably not.

21 Q.   At the time that you wrote the book, was there a reason

22 why you didn't include any discussion of Boogaloo?

23 A.   Yes.  So probably the final manuscript was completed

24 something around late 2018, early 2019.  The way academic books

25 works, you need to submit your final manuscript to external

1    reviewers who review the book, provide their comments, and then

2    you do revisions, so it's a very lengthy, long movement.

3         The bottom line is when I was writing the book, the

4    Boogaloo movement was not on anyone's radar at that time.

5    **Q.**   You also described elsewhere in your testimony that there

6    have been dynamics within far right and anti-government

7    extremist groups in the United States.  You mentioned merging,

8    splintering?

9    **A.**   That is correct.

10   **Q.**   Can you elaborate on that recent history for the Court,

11   please.

12   **A.**   Yes.  So the first emergence of a substantial

13   anti-government extremist movement was basically from the early

14   to the mid '90s.  I think it's -- we're all familiar with

15   McVeigh, the Oklahoma City bombing.  That was basically the

16   peak of that movement.  At that time, we're talking about

17   probably hundreds of militias spread all over the country,

18   groups that promoted anti-government ideology more generally.

19   I can go into specific if you're interested, but these are

20   organizations that believed that the government is basically

21   corrupt and basically was hijacked by some kind of cabal of

22   elites that are basically running the government, that they are

23   planning to merge the United States government with some kind

24   of an international government.

25        They had multiple various conspiracy theories focusing on

1    what they define as "new world order."  They also believed that

2    the federal group is an intrusive, aggressive entity that is

3    aiming to erode their constitutional rights, their civil

4    liberties, you know, whether it's through environmental

5    legislation, gun rights legislation, and so on and so forth.

6         So we see the emergence of an ideological movement that

7    believed that the federal government is the enemy of the

8    American people and that it's not really committed to the

9    values, the ethos of America as a nation.

10         And so that's something that we see emerge in the '90s.

11   And then in the late '90s, partly as a result of the

12   significant pushback by the government and by law enforcement,

13   after the Oklahoma City bombing, the movement in many ways

14   declined.  There is some other reasons.  For example, the fact

15   that they -- they -- many of those groups promoted the Y2K

16   conspiracy theories, and when they didn't materialize, that

17   also impacted the movement.  Also 9/11 occurred.

18         So, again, many people distanced themselves from the

19   movement.  And then we see in 2008 reemergence of the

20   anti-government movement.  There are several reasons for that.

21   First of all, the election of the first African American

22   president which unleashed an unprecedented rise in hate crimes

23   and in the proliferation of racist, xenophobic ideologies, and

24   conspiracy theories.

25         The second one was the economic recession, which also had

the significant impact on the proliferation of those groups as people becoming more frustrated, more angry towards the government, displeased with the government policies, and so on and so forth.

And finally also we have to remember that we see a growing -- how should I put it -- a growing -- a political polarization in the country, as well as the emergence of extremist political movements or at least movements on the far right of the political spectrum, non-violent ones, but nonetheless, on the far right of the political spectrum such as the Tea Party who provide direct or indirect legitimacy to some of those xenophobic, illiberal -- illiberal views.

It's not a coincidence that the two major anti-government organizations, the Three Percenters and the Oath Keepers, were actually founded in 2008, 2009.  And what we see basically since then, we see an expansion of the number of groups, expansion of the number of their members, and something which, again, also was -- coincide also with increasing their level of violence.  We definitely see a dramatic increase in the level of violence that they produce.  And also in their willingness to really challenge directly the federal government.  Many of those groups had chapters all over the country, and when you're talking, for example, about the Oath Keepers, we are talking about a movement that have chapters all over the country which allow it to mobilize its own members for different -- in

1   different cases where there is a direct confrontation with

2   federal government such as the Alibrandi, if you remember,

3   standoff and so on and so forth.

4        So -- and, of course, the -- the election of 2016 and

5   especially the election of Donald Trump provided a boost in the

6   arm to many of those groups that basically believed -- I'm not

7   getting right now if -- if -- if they were corrupt or not, but

8   they believed that their views, their sentiments, their

9   narratives, their perceptions are now being legitimized by the

10  government, are now accepted in wider political circle.  They

11  felt that their ideology is gaining more legitimacy, something

12  that empowered many of them to increase their activities, to

13  increase, in some cases, also their willingness to engage in

14  violence and so on and so forth.

15       And eventually 2019 and 2020 with the -- the -- with the

16  COVID-19 outbreak and the post-George-Floyd trauma, all those,

17  again, created a breeding gorund for the emergence of new

18  movement and new groups, including the Boogaloo movement.

19  **Q.**   All right.  Thank you.

20       So from the time that you finished writing your book,

21  which you said was late 2018, early 2019, to today, has the --

22  has the process you've described, the dynamic process within

23  far right and extremist groups in this country continued with

24  splintering and emerging and shifting around?

25  **A.**   Yes.  Definitely.

1    **Q.**   Does that include the Boogaloo?

2    **A.**   Well, the Boogaloo was never really a unified movement,

3    so, you know, they have both what we define as online hubs --

4    that means online platforms where they could share their views,

5    promote their ideas, encourage each other, you know,

6    proliferating different conspiracy theories, if you'd like,

7    sharing their animosity towards what they perceive as their

8    adversaries and so on and so forth.

9         There are also, you know, groups of Boogaloo who were

10   basically active on the ground, showed up to, you know, siege

11   on different capital buildings and demonstrations and so on and

12   so forth.  And they, of course -- for various reasons, they

13   attracted a lot of attention, you know, whether it's through

14   their tropical shirts, Hawaiian shirts, so on and so forth.

15   But there definitely was a significant concern that we see the

16   emergence of movement that is expanding very quickly, is

17   proliferating very quickly, and has significant strong presence

18   online.

19   **Q.**   You were shown a transcript of a book talk that you gave

20   in August of 2020.  From that point to today, did you study the

21   Boogaloo movement?

22   **A.**   Yes.  Definitely.

23   **Q.**   Can you describe for the Court what you did and how did

24   you did it?

25   **A.**   Yeah.  So, first of all, of course is basically trying to

1   read any -- any research that was conducted by my colleagues,

2   by my peers, as well as basically directing my research team

3   and me to start reviewing materials on the Boogaloo, going to

4   whether it's their online platform that is used by their

5   members and so on and so forth and really educating myself and

6   my team about -- about the movement once it was clear that this

7   is something that seems to be more permanent than other

8   associations.

9   **Q.**   And you were asked questions about whether you yourself

10  have personally interviewed members of the Boogaloo movement.

11  Let me just focus on that for a minute.

12      How many different groups do you include within the

13  classification of far-right anti-government extremism groups in

14  this country?

15  **A.**   So in my book, I present a fairly detailed typology.

16  We're talking about three major streams.  Each one of them have

17  multiple types of groups.  So, for example, within the racist

18  streams, we have the traditional white supremacy groups such as

19  the KKK and so on.  We have neo-Nazi organizations and

20  Skinheads.  If you're talking about the anti-government groups,

21  we are talking about the traditional militias, we're talking

22  about the new militias that I mentioned, the new

23  anti-government groups such as the Oath Keepers and the Three

24  Percenters.  We're talking about groups of actual law

25  enforcement who are basically associating and challenging

the -- the federal government.  And also, of course, groups
that started emerging initially online and then materializing
also offline, such as the Boogaloo.

**Q.**   In your field of academic research, is it an accepted and
usual practice to rely -- for scholars to rely on factual
research generated by other sources?

**A.**   Yes.  And I think it's an important point in terms of
conducting interviews.

I've conducted interviews in some -- in my previous book
about terrorism in Israel because this is where I had the
opportunity safely to communicate with former terrorists and
interviewing them about their radicalization, about their --
about their ideology, about their -- about their behaviors and
so on.

In this case, these are hard-to-reach populations.  In
many cases, directly interacting with them, it's something
which is considered unsafe.  For the same reason that I won't
send any of my students to far-right extremist convention, also
I don't feel comfortable in doing that.

When it is possible -- for example, my research about
extremist misogyny, I actually do conduct interviews, but as --
as a Jewish person with somewhat of an accent, I think me going
to some kind of far-right extremist events, whether it's white
power music festival or gun show or any one of those, I will
probably put myself in risk.

1    And I'll just say that interviews are fairly rare,

2  especially with active terrorists.  I can't think about --

3  there are some interviews, but usually these are with formers,

4  not with people that are actively members of those groups.

5  That's usually very difficult to do.  These are very

6  hard-to-reach populations.  And in many cases, we will never

7  get the approval of our own institutions.

8    As you know, every research that we conduct needs to be

9  approved by the ethical board of our institution, the IRB, and

10  in most cases, they will not approve that because that present

11  safe -- a risk to the researchers and his team.

12    So there's many limitations that prevent us, especially in

13  this area, in this field, from engaging in direct interviews.

14  So I would say that this is extremely rare practice in my area

15  of research.

16  **Q.**   In addition to those approvals that you've talked about,

17  is it your understanding that to the extent that an event has

18  happened, an individual has been identified as being in

19  Boogaloo and is being prosecuted for criminal offenses, that

20  you would also have to obtain the consent of any lawyer that

21  represents that person?  Is that your understanding?

22        **THE COURT:**  Or do you even have an understanding.

23  **BY MR. LEE:**

24  **Q.**   Do you have an understanding?

25  **A.**   We never tried to interview someone who was in the midst

1    of legal process.  That's something that we don't even think

2    it's fair to him.  We don't think it's ethical to do.  Yeah.

3    **Q.**   You mentioned that among your sources of information that

4    you've used to develop your expertise in far-right extremism --

5    includes social media posts by individuals; correct?

6    **A.**   That's correct.

7    **Q.**   Can you explain more about what -- what is the scope of

8    social media posting that you've reviewed and what has it told

9    you?

10   **A.**   So one of the things that -- when we're talking about

11   social media and extremist groups, social media allowed

12   extremist groups to dramatically enhance their visibility,

13   their impact, and their ability to reach out to new potential

14   recruits to mobilize support, to spread their ideas and their

15   views.  And that's bad.

16        On the other end, however, it makes them more transparent,

17   not just to law enforcement, but also to us by the -- because

18   we are able to really look into their discourse, analyze their

19   language, analyze their ideological discourse, their

20   operational discourse.  And by using different tools, also to

21   try to understand their emotional status, their cognitive

22   processes, and so on and so forth.

23        So by collecting social media posts from platform used by

24   extremist groups, we can gain very important insights about

25   various facets of those groups, their language, their

discourse, their ideologies but also about the members

themselves.

     We don't focus necessarily specific on any one individual.

This is something that we try not to do, also because of

privacy issues and so on, but we -- looking at in an aggregated

form -- so, for example, just today, one of my colleagues

actually presented one of our research that actually compares

six different types of far-right groups.  We collected hundreds

of online communications of those different far-right groups,

whether these are neo-Nazis, anti-government organization,

chauvinist far-right groups such as the Proud Boys and so on,

and we analyzed their discourse.

     We collected, again, hundreds of social media

communications of those groups, and we analyzed and we showed

that each of them defined their adversaries differently, each

of them used different ideological themes.  They also have

different -- they express different type of sentiments.  That

means that the emotional tone of their language is distinct.

So this is just one example.  And this is something which is

just, you know -- we just basically finished the first analysis

of this, and this is part of this project that was funded by

the National Institute of Justice.

**Q.**   So with respect to Boogaloo, have you reviewed online

writings by people who identify as --

**A.**   Not in that specific party, but I reviewed and my team

1  definitely reviewed when the Boogaloo became more prominent

2  group.

3  **Q.**   Okay.  So during what period of time were you reviewing

4  social media --

5  **A.**   I think it -- I think it probably -- from mid to late 2020

6  to 2021.

7  **Q.**   And can --

8  **A.**   Mid to late 2021, I think, most of the time.  2022

9  probably also a little bit.

10  **Q.**   Can you give us an estimate of the scope of social media

11  posts that you or your team reviewed?

12  **A.**   Yes.  There is plenty of websites and plenty of platforms.

13  Each one of those platforms have sometimes -- we're talking

14  about several thousands of members, if not more.  And of course

15  they engage, they communicate in those websites, they

16  correspond, they express their emotions, their views, and so

17  on.

18  **Q.**   They use the terminologies that you have identified in

19  your report?

20  **A.**   Yeah.  They use a lot of the terminology that we identify.

21  Again, we didn't analyze specifically Boogaloo because today it

22  is 2023.  For us it was less relevant.  We felt that it's less

23  relevant.

24       But, again, we -- we reviewed their website.  Again, we

25  didn't do any specific linguistic analysis at that time.

1   **Q.**   I am referring to your report.  You listed vocabulary that

2   you identified as Boogaloo.

3   **A.**   Yes.  That's based on our reviews then at that time of

4   their website, yes.

5   **Q.**   All right.

6       And you were asked questions about your supplemental

7   report, so let me follow up.

8       Is there anything in your supplemental report that is not

9   accurate, not an accurate statement about Boogaloo, as of May

10  2020?

11  **A.**   I don't believe so.

12          **MR. LEE:**  One moment, Your Honor.

13          **THE COURT:**  Okay.

14          **MR. LEE:**  Nothing else from us at this time,

15  Your Honor.

16          **THE COURT:**  Recross?

17                  **RECROSS-EXAMINATION**

18  **BY MR. NOVAK:**

19  **Q.**   Thank you.

20      Dr. Perliger, returning to your supplemental report and

21  you remember the footnote that we were addressing which was

22  Footnote 2 at the bottom of page 3, your citation to the

23  articles by Bülent, is it Kenes or Kens, and Kriner and Lewis?

24  **A.**   Yes.

25  **Q.**   You said in the last few years you have been reading all

1    of the other scholarly articles following leading scholars on

2    the Boogaloo.  My question is other than these two articles,

3    can you identify specifically other scholarly work that you

4    rely upon specifically?

5    **A.**   Yeah.  I -- I read -- I read tons of articles about

6    Boogaloo.  I can't come up with specific names.  I read tons of

7    articles, yeah.  Sorry.  Not something that comes to mind right

8    now specifically.

9    **Q.**   Okay.  Can we draw a distinction between media and

10   scholarly work?

11   **A.**   Yeah.  I'm talking about scholarly articles.  I read --

12   again, that's my job.  I read most of the time.

13   **Q.**   Who are the leading scholars whose work you've read other

14   than the people who wrote these two articles you cited?

15   **A.**   So I think -- I think the -- the people at the GW, the

16   people at the SPLC, all of them published quite a lot about the

17   Boogaloo movement.

18   **Q.**   So when you say GW, you are --

19   **A.**   George Washington Project on Extremism.

20   **Q.**   And the SPLC is the Southern Poverty Law --

21   **A.**   That's is correct.

22   **Q.**   You described how it wouldn't be, in your view, safe to

23   interview or for your colleagues or your graduate students to

24   interview true believers, if I can use that term.  And I

25   understand what you're saying.

1      But it would be safe to interview law enforcement people;

2  correct?

3  **A.**   That is correct.

4  **Q.**   Okay.  It would be safe to interview national security

5  professionals; right?

6  **A.**   That is correct.

7  **Q.**   Okay.  Are there specific people in the law enforcement

8  community or the national security community whose opinions

9  about the Boogaloo you have learned of and agree with?

10  **A.**   No.  I rely mostly on researchers, other researchers.

11  **Q.**   All right.  Now, you spent a few minutes just a very brief

12  time ago mentioning the platforms and the websites of the

13  Boogaloo that you spent a lot of time studying.  The specific

14  websites and platforms are not listed in your reports, so my

15  question is what are those platforms?  What are those websites?

16  **A.**   Mostly, if I remember correctly -- again, it was two years

17  ago when we reviewed them as a team.  I think mostly these are

18  Facebook pages and Instagram pages, I think, if I remember

19  correctly.  Most of them -- this is where the plat -- the pages

20  were.  These are the platforms.

21  **Q.**   So they're in Facebook?

22  **A.**   They were in Facebook.

23  **Q.**   They were in Facebook?

24  **A.**   Yes.

25  **Q.**   Okay.  And so my question is which Facebook groups are you

1    referring to?

2    **A.**    Yeah.  I'm talking about -- about the Facebook -- I don't

3    remember the specific names of the -- of the Facebook pages.

4    Again, this was two years ago, and I reviewed hundreds of

5    websites usually.

6    **Q.**    Did you do some sort of download or compilation or take

7    notes --

8    **A.**    Not at the time.

9    **Q.**    -- or a memo?

10   **A.**    Not at that time, no.

11   **Q.**    Since then?

12   **A.**    No.

13   **Q.**    As you sit here today, can you name the five most

14   prolific -- I shouldn't use the word "prolific."

15       Can you name leading members of the Boogaloo movement?

16   **A.**    No.

17   **Q.**    Can you name one?

18   **A.**    I don't -- I don't think that you can really talk about

19   leaders.  I think I mentioned some name that provide

20   inspiration in my reports, but because this is a decentralized

21   movement, it's not like you have Stewart Rhodes with the Oath

22   Keepers or similar -- similar leaders.  This is a decentralized

23   movement that really operate in its own online and offline

24   hubs.

25       I never really personally paid much attention to anyone

1    who argued that he's a leader or that he has too much influence

2    because that's not what we perceived, really.

3    **Q.**   So your understanding is there is no formal membership,

4    there is nothing to join or not join?

5    **A.**   That's true.  There is no membership cards.  You don't

6    need to pay a fee.  You don't need to enroll necessarily.

7    **Q.**   There is no indicia of membership because there is nothing

8    to be a member of; right?

9    **A.**   That is correct.

10   **Q.**   But there are indicia of agreeing in a certain ideology;

11   right?  Things that you say online; fair?

12   **A.**   I think it's systematic engagement with this kind of

13   ideological narrative, attendance of those online platforms,

14   right, and in some cases, also expressing support for those

15   narrative, encouraging those narratives.  I think, in my view,

16   that is what defines someone who is part of the movement.

17   **Q.**   But there are other ways that people -- people demonstrate

18   their identification with the movement; right?  For example,

19   the clothing they wear?

20   **A.**   That's offline, yes.  That's yes.

21   **Q.**   So in the real world, one way you would demonstrate

22   support for Boogaloo ideologies would be to wear a Hawaiian

23   shirt; right?

24   **A.**   Yes.  Or shorts with writing, slogans and so on.

25   **Q.**   Or an igloo?

1    **A.**    A picture of an igloo.

2    **Q.**    Yeah.  I don't mean a real one.  A picture of an igloo;

3    right?

4    **A.**    Yes.  Yes.

5         I want to clarify, because it's a decentralized movement,

6    because there is no -- there is no formal boundaries, right?

7    We said there is no real formal boundaries, you know, people

8    can transition in and out, can engage in with other groups, can

9    decide to go dormant forever, sometime personally reasons.

10        So it's important to remember that especially with this

11   kind of movement, which are becoming more and more prominent in

12   recent years because of the nature of the online sphere or the

13   online extremist landscape, the definition of a "member" is

14   even more challenging, right, so, for example, we're not using

15   the term "lone wolves" anymore because even people who operate

16   independently usually are being influenced from some kind of an

17   ideology that they were exposed to online, so we're talking

18   about lone actors, actually, not about lone wolves anymore

19   because they may not collaborate with others, but they are part

20   of some kind of an ideological online community.

21   **Q.**    Understood.

22        So what are the -- the -- when you look at people who show

23   up at events, political events, protests, marches, what are the

24   symbols of their embracing of the Boogaloo movement, other than

25   the Hawaiian shirts, other than images of igloos?  What are the

1   other indicia?  I'm not talking about what people say on

2   Facebook.

3   **A.**   Yeah.  Yeah.  No.

4   **Q.**   I'm talking about in public.

5   **A.**   I think, first of all, is they identify themself as a

6   group so they tend to congregate.  That's one thing.

7        Secondly, many of them tend to express their support for

8   Second Amendment or similarly protest what they see as the

9   erosion of the Second Amendment by showing up with -- with

10  firearms, for example, or military gear.

11  **Q.**   Showing up with firearms.  Okay.

12  **A.**   Sometimes.  Or military gear sometimes.  Using different

13  insignia or different clothing or different type of a -- words

14  on clothing that are associated with the Boogaloo movement.

15  And, of course, in their discussion during the event themselves

16  also, you see them, in many cases, using these kind of terms.

17  **Q.**   Like statements in a crowd.

18  **A.**   Yes.

19  **Q.**   Okay.  All right.

20       Your Honor, thank you.

21           **THE COURT:**  Any redirect?

22           **MR. LEE:**  Very briefly, Your Honor.

23  ///

24  ///

25                    **FURTHER REDIRECT EXAMINATION**

1    BY MR. LEE:

2    Q.   Dr. Perliger, you were asked questions just now about

3    whether it would be safe to interview law enforcement and/or

4    national security personnel or people.  When you have reviewed

5    social media posts from the Boogaloo movement, is that a

6    primary source -- do you consider that to be a primary source

7    of information from members of the movement itself?

8    A.   That is correct, yes.

9    Q.   Is it safe for you to review social media posts that are

10   from the source of -- the primary source of --

11   A.   Yes.

12        MR. LEE:  Thank you.  Nothing further.

13        THE COURT:  Anything on that?

14        MR. NOVAK:  No.  Thank you very much, Your Honor.

15        THE COURT:  Professor, I just want to ask a couple of

16   questions as I look at your curriculum vitae.

17        So going back -- and I know you've got these in

18   sections -- it looks like you started in 2003.  2007 was your

19   first posting.  Is that when you started?

20        THE WITNESS:  My first publications, yes.

21        THE COURT:  And at that time, you had your -- you had

22   just received your master's.

23        THE WITNESS:  I was part of a doctoral program, yes.

24        THE COURT:  Your master's was in what field?  I mean,

25   I see political science, right, but political science is very

1  broad.

2       **THE WITNESS:**  My master's thesis -- my master's was in

3  political science.  My master's thesis specifically was

4  focusing on political socializations in schools.  More

5  specifically, I was trying to test how much civic education

6  classes actually impact students' civic perception, democratic

7  attitudes, and so on.

8       **THE COURT:**  And the vitae that you have provided me,

9  is this -- is this complete or is this just focused on this

10  particular area?

11       **THE WITNESS:**  No.  It is complete.

12       **THE COURT:**  Okay.  So going back then to 2002, 2003

13  when you started in this field, do you have a copy in front of

14  you?  I'm looking at your writings.  It looks like -- and, of

15  course, these go backwards.

16     So page 7 at the top.

17       **THE WITNESS:**  Uh-huh.

18       **THE COURT:**  That's the -- these are the peer-reviewed

19  articles and chapters?

20       **THE WITNESS:**  Yes, Your Honor.

21       **THE COURT:**  Were there -- were there -- I know you've

22  got lots here, but were there -- would you say there were

23  phases in -- in your development of expertise?

24       **THE WITNESS:**  Yes.

25       **THE COURT:**  Could you give me an overview of how long

1    you've -- you know, going back to 2002, kind of the early

2    years, how did things change over time?

3           THE WITNESS:  So after completing my master's thesis,

4    I shifted to focus on political violence, political extremism,

5    terrorism.

6           THE COURT:  So that happened early on?

7           THE WITNESS:  Yes.  And initially, because I was

8    situated in Israel, most of my studies focusing on Palestinian

9    terrorism and Jewish Israeli terrorism.

10          My dissertation, my doctoral dissertation focused on the

11   democratic response to terrorism, which at that time was very

12   understudied.  It was 2005, '6, '7.  There was a lot to study.

13          And then I focused also again on political violence by

14   Jewish extremist religious groups, fundamentalist groups.

15          In 2008, I moved to the U.S.  I was a visiting professor

16   at the University of the -- the State University of New York at

17   Stony Brooks where I continued conducting research, focusing on

18   terrorism and political violence and extremism.

19          THE COURT:  So was there a shift there?

20          THE WITNESS:  Not really.  I continued doing the same

21   things.

22          And then in 2010, I was recruited by the United States

23   Military Academy at West Point.  They brought me because they

24   wanted me to manage their terrorism studies program.

25          And very early in that stage, I arrived to the conclusion

that there is -- at least I felt that there is a significant growing threat of far-right extremism, far-right violence in the U.S.

I began by conducting initial data collection, which confirmed to me that there is dramatic increase since 2008 in hate crimes, in far-right extremism, in the number of groups that are active and so on.  So I decided to -- to delve into this area, to this field.

I was very dissatisfied with the data that existed at that time.  The FBI crime -- hate crime statistics is very problematic.  There is partial reporting.  There is a lot of -- of definitional problems.  I also was not satisfied with other existing database on terrorism, which were heavily covering foreign terrorism but not really domestic, so I decided to build my own database with my team of far-right extremism, violent far-right extremism in the U.S.

**THE COURT:**  This started while you were at West Point?

**THE WITNESS:**  That is correct.  2011.

**THE COURT:**  Okay.  And at that time, how big was your team?

**THE WITNESS:**  Oh, it was basically me and one more student or research assistant that helped me.  There were some cadets who also participated and were willing to help and so on.

And then in 2013 I published my first report, which is one

of the first, if not the first, really, quantitative analysis

of the state of far-right violent extremism in the U.S.  That

created substantial backlash in the sense that I received

hundreds of threats.  West Point received hundreds of requests

for me to be fired because they couldn't imagine why a faculty

at West Point focusing on domestic terrorism.  They thought

that this is something which is unacceptable.  I even had, I

think, assigned two FBI agent to my case just to be sure that

the threats did not materialize.  I received a lot of backlash.

There were a lot of donors who pulled back money because

they were very disappointed that we doing research about

domestic extremism.  They wanted us to continue focusing on

Islamic Jihad terrorism and so on.

Nonetheless, I continued to conduct research in this area,

in this field, and in 2016, I moved to UMass Lowell.  They

offered me to move there and to run their graduate program --

**THE COURT:**  Am I right, so as I'm looking at your

academic positions, over the course of those six years at West

Point, you went from assistant professor to a director to an

associate professor?

**THE WITNESS:**  That is correct, yes.

**THE COURT:**  So even though you were getting these

threats, West Point wasn't pulling back your funding?

**THE WITNESS:**  So, yes, that is correct.  So West Point

defended me.  We received, I think, multiple FOIA requests from

congressmen and so on.  But I think -- I think the
superintendent made it very clear that, you know, it's part of
our duty to study threats to American people, and if that
threat is domestic, it's definitely justifiable and important
to do.

And I think at that time also -- I think there was
gradually -- 2014, '15, '16 -- a growing recognition among
other colleagues and among law enforcement and so on about the
growing threat.  And this is when I started to get requests
from local FBI offices, from local police stations, from ICE
and so on to talk more and more about this.  I gave multiple
briefings to NORTHCOM commander, the military commander of --
of North America.  He was also -- so I gave many, many, many
briefings, two, three a week on far-right extremism because
there was a growing interest in it and so I briefed.

The reason they came to me, because we had the data.  We
had the reliable, strong data that even though there were,
again, thousand of cases, there is always typos, there is
always mistakes.  We were able to capture the trends, the
important trends, and also to identify the new ones.  That
means that we're able to show that -- so, for example, when I
gave a briefing to the NYPD intelligence, I was able to tell
them, for example, that Skinheads never attack law enforcement,
for example.  So if they are law enforcement being attacked by
far-right activists, these are probably not Skinheads.  So we

were able to provide a lot of nuance because we collected the
data.

So I gave, again, many, many briefings.  I won't even try
to account.  And then I'm -- I'm guessing that, you know, I --
as I gained more visibility, that led eventually UMass to
recruit me, and they offered me a promotion to a full professor
and also to run their graduate program in securities studies,
again, recognition of my increasing -- I'm guessing --
increasing prominence in my field, in my area.

One of the things that also shifted my research efforts
since I arrived to UMass was the fact that more and more
government agencies approached me to conduct research about
far-right extremism, so currently, for example, I do a funded
research for the Department of Homeland Security about
radicalization within police organization.

THE COURT:  Radicalization of what?

THE WITNESS:  Within police organizations.  Far-right
extremism within police organization.

THE COURT:  I see.  I see.

THE WITNESS:  I do similar funded research for the
Department of Defense about radicalization within the military,
far-right radicalization within the military.  And I have an
ongoing grant also with the Department of Justice which, in
many ways, the Department of Justice felt that this will be
beneficial for them to invest in helping us improve our data.

1    So the --

2              **THE COURT:**  The --

3              **THE WITNESS:**  Sorry, Your Honor.

4              **THE COURT:**  Finish your sentence.

5              **THE WITNESS:**  So the access to extra funding and

6    resources allowed me to expand my team, especially through

7    funding more doctoral students who express interest in this

8    area and to do more.

9              **THE COURT:**  How big is your team now?

10              **THE WITNESS:**  So I have usually around three, four,

11    full-time doctoral students who works on different research

12    project with me, focusing on various aspects of far-right

13    extremism.

14              **THE COURT:**  And you've had three to four Ph.D.

15    students for what period of time?

16              **THE WITNESS:**  So when I just arrived to UMass, I had

17    two who worked with me.  Now I have four.  One of them is

18    graduating.  She was -- so it's always a -- it's always

19    changing.  They're graduating.  But usually it's always between

20    two -- two and four.

21              **THE COURT:**  And it's about two to four since about

22    2016?

23              **THE WITNESS:**  Yes.  Yes, Your Honor.

24              **THE COURT:**  Okay.  All right.

25         Any follow-up questions with respect to my questions?

1   Mr. Lee?

2                **MR. LEE:**  No, Your Honor.

3                **THE COURT:**  Mr. Novak?

4        **MR. NOVAK:**  Yes.

5                **THE COURT:**  We didn't hear that, so if you'll repeat

6   or it won't be in the record.  Wherever you want.

7                **MR. NOVAK:**  Yes.  One narrow area of follow-up.

8                    **FURTHER RECROSS-EXAMINATION**

9   **BY MR. NOVAK:**

10  **Q.**   Dr. Perliger, you have a contract with the Department of

11  Defense to study anti-government extremism within the military?

12  **A.**   So it's not a contract.  So the way --

13  **Q.**   A grant?

14  **A.**   A federal grant.  So the university got the grant.  I'm --

15  I'm the -- I'm one of the co-PIs on that specific grant so I

16  work with other researchers focusing on studying manifestations

17  of far-right extremism within the military.

18  **Q.**   When you said "co-PI," "PI" means "principal

19  investigator"?

20  **A.**   Co-PI is co-principal investigator, right?  So I work with

21  the -- with two other colleagues and -- and other students.

22  That's the team that is studying this, yes.

23  **Q.**   Have you reviewed any materials related to Mr. Carrillo's

24  status as a member of the Armed Forces?

25  **A.**   So we created a sub-dataset of just cases of military

1    personnel or Veterans who were involved in that, and he -- his

2    case is there as well, for obvious reasons.  But not -- no.

3        We -- I also want to clarify, when we get grant, we don't

4    get data or documents or information.  It's exactly the

5    opposite because they don't have the data.  They approach us

6    because they trust us to collect the data for them in many

7    ways.

8    **Q.**   Has the Government in this case, meaning counsel or people

9    working with them, provided you with information about

10   Mr. Carrillo's military service?

11   **A.**   No.

12   **Q.**   Okay.  Or any reports of investigation of his extremism

13   that related -- that were from interviewing people in the Air

14   Force?

15   **A.**   No.

16   **Q.**   Okay.

17       And then I just have one last question.  You said that you

18   have a contract with the Department of Justice.

19   **A.**   It's a federal grant.

20   **Q.**   My mistake.  It's a federal grant to the University.

21   **A.**   Yes.

22   **Q.**   And so my last question is separate and apart from that

23   grant and separate and apart from your relationship with the

24   University, are you being compensated by the Department of

25   Justice to serve as an expert in this case?

1    **A.**    Yes, I am.

2    **Q.**    Okay.

3          Thank you, Your Honor.

4               **THE COURT:**  Anything on those questions?

5               **MR. LEE:**  No, Your Honor.  Thank you.

6               **THE COURT:**  Okay, sir.  Thank you very much.  You may

7    step down.

8          Any argument?

9               **MR. NOVAK:**  What I would like to propose, Your Honor,

10   if I may --

11              **THE COURT:**  The microphone, please.

12              **MR. NOVAK:**  What I would like to propose, if we may,

13   is to submit short post-hearing briefs of whatever length the

14   Court thinks is appropriate as soon as we get a transcript of

15   his testimony -- and we'll order that transcript today or

16   tomorrow, I guess -- because I think it's important to be able

17   to summarize with accuracy what he said.  So rather than

18   arguing today, I'm just asking for the opportunity to get and

19   review a transcript and then provide something in writing.

20              **THE COURT:**  All right.  So you want to submit on

21   written argument?

22              **MR. NOVAK:**  Yes.

23              **THE COURT:**  All right.  Hold on a moment.

24   (Conversation off the record between the Court and the court

25   reporter.)

 1              **THE COURT:**  So you'll have it this week.  I'll

 2      authorize it.

 3              **MR. NOVAK:**  Thank you.

 4              **THE COURT:**  So shorter is always better.  How much do

 5      you want?  Seven pages good?

 6              **MR. NOVAK:**  That's fine.

 7              **MR. LEE:**  That is the Court's motion in limine

 8      limitation, so that's fine, yes.

 9              **THE COURT:**  That's about all you need, generally

10      speaking.  If I need more, I can always ask.

11              **MR. LEE:**  Agreed.

12              **THE COURT:**  All right.  Seven pages.

13         You'll have it this week.  So I'm heading into trial on

14      July 5th, so just file it by noon on July 10th.  That should be

15      plenty of time.  That gives you about a week.

16         Okay.  There are other things you all wanted to talk

17      about?

18              **MR. NOVAK:**  Well, there's an issue or a set of issues

19      that we --

20              **MR. LEE:**  Your Honor -- I'm sorry, Mr. Novak.  Just

21      briefly, would it be all right to excuse Dr. Perliger?

22              **THE COURT:**  It is.

23              **MR. LEE:**  The discussion of these issues doesn't

24      involve him, I gather, correct?

25              **THE COURT:**  I am done.

1          **MR. LEE:**  Okay.

2          **THE COURT:**  He is excused.

3          **MR. LEE:**  Thank you, Your Honor.

4          **MR. NOVAK:**  Just to back up for a second, Your Honor,

5     before Ms. Moeel and I realized that there were documents on

6     the Government's exhibit list which we -- I shouldn't even call

7     it "documents"; materials, because a lot of it appears to be

8     digital -- that we have not received and that is addressed in

9     our status report.  We had agreed with Government counsel that

10    what we would do after today's hearing is we would sit and meet

11    and confer about potential in limine issues.  It just seemed to

12    us, and the Government agreed, that it made more sense to sit

13    and talk about potential in limine issues because sometimes in

14    limine issues arise out of, you know -- I don't want to call it

15    fear but just unknown as opposed to knowing what the parties'

16    intentions are.

17         And what we actually agreed is that the internal deadlines

18    that the Court had set for exchanging our in limines and our

19    oppositions we were going to ask the Court to modify just so we

20    would have more time to talk and then talk again about what in

21    limines are or are not necessary.

22         We didn't want to change the briefing schedule in terms of

23    when those pleadings would be filed with the Court, and I see

24    Mr. Bostic nodding so I assume I'm stating our agreement, but

25    we were just going to basically let the Court know that we

1  would like to spend a few days more than the exchange deadlines

2  that the Court set talking about in limines so that we don't

3  waste our time and the Court's time with unnecessary in

4  limines.

5      So that's kind of where we were until maybe late last week

6  when we realized that we don't have a lot of the materials that

7  seem to relate mostly to Mr. Carrillo, but not exclusively, and

8  those are detailed in that chart we gave the Court.

9      The Government may have an update on this, so I don't want

10  to go too far.  But I also think -- and I don't know if the

11  Court has had a chance to look at the exhibit lists and the

12  witness lists, and I don't mean this in any derogatory way, but

13  I think the Government's exhibit list includes almost

14  everything the Government thinks it's produced in terms of

15  discovery.  And when I say it thinks it's produced, because we

16  believe we don't have the things I've identified.  But I guess

17  what I'm saying -- maybe it's just for counsel to talk about,

18  but there's this huge unknown now based on the exhibit list of

19  what is or is not something that needs to be addressed through

20  in limines.  And so my -- I have a couple of examples.

21      Thousands and thousands of pages of Mr. Carrillo's social

22  media postings, thousands and thousands of pages of Mr. Justus'

23  social media postings, all of Mr. Justus' jail calls that the

24  Government apparently has collected -- which is fine, that's

25  their prerogative -- are listed as exhibits.  And so I feel

1   like the deadline is the deadline the Court set, but I feel

2   like we really need to drill down on which phone calls, which

3   social media posts -- Mr. Carrillo's phone and his laptop and

4   his -- and his hard drives -- like which pieces of it?

5       The Government has listed all of the surveillance video

6   collected in and around the shooting of Mr. Underwood from

7   dozens and dozens of establishments as exhibits.  And I --

8           **THE COURT:**  So what do you have to say?

9          **MR. BOSTIC:**  So, Your Honor, on the topic of the scope

10   of the exhibit list, I don't think the Government's approach is

11   unusual here.  We're three months in advance of trial.  This

12   was an in-depth investigation that collected information from a

13   lot of sources.

14       As explained in the pleading that comes before the

15   Government's exhibit list that we gave to the Defense and

16   lodged with the Court, the presence of an item on that exhibit

17   list doesn't necessarily indicate the Government's intention to

18   introduce it or to attempt to introduce it into evidence at

19   trial.  Many of those items are marked for identification.  And

20   this far in advance of trial, it seemed prudent to take a wide

21   approach to the things that we added to the exhibit list to

22   provide Defense with the maximum amount of notice, to minimize

23   the risk that we would need to add a significant amount of

24   material to the exhibit list as our trial preparations

25   continued.

 1          So I don't think this is unusual.  It's not unusual for a

 2   party to designate many items on its exhibit list and only

 3   introduce a fraction of those items at trial based on the needs

 4   of trial.  So the --

 5          **THE COURT:**  I don't think so either.  It could be --

 6   and I don't have the -- I don't have the exhibit list.  I have

 7   your -- your attachment to your status report.

 8          **MR. NOVAK:**  The exhibit lists were lodged with the

 9   Court by email to chambers.  They weren't filed, and they were

10   exchanged.

11          **MR. BOSTIC:**  Correct.

12          **MR. NOVAK:**  And just to maybe short circuit this --

13          **THE COURT:**  Let me get this.  You lodged it where?

14   Can somebody send that to me?

15          **MS. MOEEL:**  Your Honor, I could forward those to you.

16          **THE COURT:**  Where was it sent?  Where was it lodged?

17          **MR. BOSTIC:**  On June 12, Your Honor, both parties sent

18   individual emails to the Court's chambers email address.

19          **THE COURT:**  Somebody forward those ones to me, please.

20          **MS. MOEEL:**  I can do that, Your Honor.

21          **THE COURT:**  I'm talking to my staff.

22          **MS. MOEEL:**  Okay.

23          **MR. NOVAK:**  While we are waiting for that, may I say

24   something?

25          **THE COURT:**  You may.

1          **MR. NOVAK:**  I don't have a problem with an exhibit

2     list being over-inclusive and I completely understand what

3     Mr. Bostic is saying.  My concern is the Court has set a

4     deadline for in limines --

5          **THE COURT:**  But my point is that's always the way

6     trials work.  I try big cases where literally I've got a

7     courtroom full of exhibits, literally, and people still can

8     file motions in limine.  This is no different than is generally

9     the case in most trials unless it's a baby trial, which this is

10    not and which things are not.

11         **MR. NOVAK:**  All I'm really saying -- and maybe I don't

12    know how to take the Court's comments -- is I don't want to

13    forfeit raising a concern about an exhibit when the Government

14    isn't quite sure even which pieces of which voluminous dataset

15    they're going to offer.  So if what the Court is saying is we

16    will deal with the admissibility of exhibits as we -- as we get

17    closer to trial, that's fine, but the Government has over 700

18    exhibits on its list.

19         **THE COURT:**  So when I tried my last antitrust case, I

20    admitted 900, so the fact that there are 700 doesn't phase me

21    much at all.

22         The question is -- and motions in limine are typically

23    overused.  They're overused.

24         **MR. NOVAK:**  I don't want to do that.  That's right.

25         **THE COURT:**  Right.  But my point is, is there

1    something that is so prejudicial that it shouldn't be admitted?

2    That's the point of an in limine.

3        And obviously people have to -- you know, the Government

4    and you, for that matter, the Defense -- before anything can be

5    admitted, the evidentiary basis has to be -- has -- has to

6    be -- has to be laid, right?  There needs to be a foundation.

7        If they have -- how many did you say?  How many videos?

8        **MR. NOVAK:**  Well, I actually think the best example

9    would be thousands of pages of Mr. Justus' social media posts.

10       **THE COURT:**  Okay.  Because I was going to say on

11   videos, if this is all -- and they include the van and

12   everything else, I don't think it's very smart to play 700

13   hours of video to a jury, but it would all be relevant.

14       **MR. NOVAK:**  Agreed.

15       **THE COURT:**  So they may have it, but I don't see what

16   a motion in limine would be brought on that because it's all

17   relevant.  It may not be a smart trial tactic to play it all.

18       With respect to all of the -- all of the social media

19   posts, I don't know what to tell you.  If they're relevant and

20   they're admissions, then they all come in.

21       Now, perhaps theoretically speaking -- I haven't seen any

22   of this.  Perhaps there was one that said, you know -- he said

23   on there, you know, "I want" -- "I want to kill the President

24   of the United States."  I haven't looked at all this stuff.

25   Perhaps I would get a motion on that because is that -- on a

1    403 balancing, should I admit that or not?  You could make that

2    judgment call now.  I don't know what stops you from doing

3    that, stops you from complying with my deadline.

4         So it's -- I don't -- I don't know that there's -- yeah.

5    I don't know why you can't comply other than the things that

6    you say you didn't get.  That would be different.  Obviously if

7    you haven't seen it, if it wasn't produced, then you can't

8    comply.

9         But just because it's -- just because there are a lot

10   doesn't necessarily mean that you can't figure out what to

11   bring a motion on.

12        **MR. NOVAK:**  I understand.

13        **THE COURT:**  So I'm -- you know, I'm happy to listen.

14   I just don't quite understand.

15        **MR. NOVAK:**  I guess what I would say is if the

16   Government hasn't decided yet which pieces of which exhibits

17   they're going to use because it's premature, then I think

18   there's a lot of wheel-spinning that's going to go on, and it

19   should actually be the other way around.  The Government should

20   say, These are the pieces of these exhibits we are going to

21   use, subject, of course, to reasonable adjustments later, but

22   to say all of Mr. Carrillo's social media posts are coming in,

23   you go figure out which pages you have a problem with, we're

24   talking about thousands and thousands and thousands of raw

25   materials, everything in Mr.--

1          **THE COURT:**  Well, Carrillo is a little bit different,

2    right, than Justus.

3          **MR. NOVAK:**  Yes.  They are very different rules of

4    evidence, agreed.

5       You know what?  We're going to sit and we're going to talk

6    as soon as the Court's done, and we'll see whether we can make

7    some -- some progress on this.

8          **THE COURT:**  And we can check in.  You know, again,

9    while -- you know, the Government is at a disadvantage because

10   you don't have to tell them much of anything.

11         **MR. NOVAK:**  Well, we gave them an exhibit list.

12         **THE COURT:**  Okay.

13         **MR. NOVAK:**  And a witness list.

14         **THE COURT:**  Okay.

15         **MR. NOVAK:**  The Court ordered simultaneous exchanges,

16   and we tried to be as specific as possible.

17         **THE COURT:**  Okay.  Well, let's look at these.  I can

18   also let you go and -- I'm here all day.  I can let you meet

19   and confer, and we can meet again later today.

20      So I see on here your exhibit list, you've got 50 -- about

21   50 exhibits.

22         **MR. NOVAK:**  We do.  And the exhibit numbers overlap,

23   which I think we don't need to worry about at this point.

24         **THE COURT:**  And so many of these things, right -- 302s

25   don't come in.  Generally speaking, expert reports don't come

1  in.

2  **MR. NOVAK:** Yes. Much of it, as Mr. Bostic said, is

3  marked for identification because a witness might need to

4  refresh their recollection or because there may be an

5  inconsistent statement. Not all of it, but much of it. That's

6  fair. Because they back up --

7  **THE COURT:** And yours -- 521 you say "All indices,

8  warrants, photographs, logs, reports concerning the location,

9  search, inventory, and processing of the white Ford," so I

10  assume -- I don't know how many is in 521.

11  **MR. NOVAK:** There are hundreds of photographs. So I

12  am acknowledging that it's a two-way street.

13  **THE COURT:** Right.

14  **MR. NOVAK:** Yes, I am.

15  **MR. BOSTIC:** So this just illustrates the point,

16  Your Honor, that exhibit lists don't work the way that counsel

17  is portraying them. They don't announce an intention by that

18  party to introduce into evidence everything on the list. The

19  purpose is to gather everything together, to catalog it and

20  identify it for identification so that it can be selected from

21  for evidence that gets admitted.

22  **THE COURT:** You probably both are going to have to do

23  a better job. So I just -- you know, having just come

24  through -- there are probably, you know -- "all item seized,

25  all photos," look, that does not comply with my standing order.

1    Either of you.

2        My order requires -- if you've got a hundred or let's say

3    you have -- let's say you have 26 because that's the alphabet.

4    You have 26 photos of a search of a residence.  No. 549, which

5    is photos, would have to be separately identified 549A, B, C,

6    D, all the way down.  Each photo needs to be identified.

7        Now, I'll make this easier for you all.  If you want to

8    identify the ones you think you're going to use, then I'll let

9    you do that, and then you can put the rest in a -- you know, in

10   a reserve.  So let's say you want to use 10.  Then you give me

11   549A, B, C, D, E, F, G up to the 10 you're going to use, and

12   then you can put the rest as a backup, but you do have to

13   identify.  Your failure to identify is -- violates my standing

14   order on how these things work.

15       Like, I see, you know, 100 302s.  Obviously none of those

16   things are going to come in.  I don't know that there needs to

17   be any more description because they're not going to come in,

18   but you may need them to refresh.  Police reports, none of that

19   stuff is coming in, but you may need them to refresh.

20       So perhaps what you all need to do is have another

21   column -- one of the things that I make lawyers do -- and I

22   will order for you to do it now -- is you need to identify with

23   an asterisk or some other indication those exhibits that you

24   believe you are going to introduce, that is, the primary ones.

25   Now, they're all on your list because when we have our -- when

1    we have our pretrial conference, you're not going to be able to

2    go off your list, and that's the problem with bulking things.

3    You cannot go off your list.  So at least with the Government,

4    what I have are Bates numbers.  I have no Bates ranges on

5    yours, Mr. Novak.

6        So, for instance, we're back to that 549, photos.  I don't

7    know what those are, and I can't enforce an order that says you

8    can't bring in something that wasn't previously identified if I

9    don't have something on this list that tells me what they are.

10            **MR. NOVAK:**  Understood.

11            **THE COURT:**  So you're both going to need to do more

12    work on these lists.

13            **MR. NOVAK:**  Understood.

14            **MR. BOSTIC:**  Understood, Your Honor.

15            **THE COURT:**  I thought I had something from Mr. Thomson

16    that indicated that Mr. Carrillo was refusing to testify, so

17    the fact that he's still on the list -- they can have it there,

18    but I can't force him to testify because the only thing I can

19    do is incarcerate him for contempt of court, and he's already

20    incarcerated.

21            **MR. NOVAK:**  I don't know -- I don't think anybody

22    knows -- unless the Government knows more than just having put

23    him on the list and included all of his statements, which I'm

24    asserting we don't have on their exhibit list -- whether

25    Mr. Carrillo will testify or not.  I understand what

1   Mr. Thomson said, but we also listened to his interview with

2   the various people in the room.  Mr. Thomson represents that

3   Mr. Carrillo thought that they were all correctional officers

4   and not FBI agents.  I'm not really sure what the significance

5   of that is, but he basically talked to law enforcement

6   officers -- and I'll use that term generically to include what

7   he thought were corrections officers -- for an extensive period

8   of time about his state of mind, his beliefs, his interactions

9   with Mr. Rush, Mr. Ybarra, Mr. Miksch, Mr. Justus.

10          **THE COURT:**  Here is one thing that occurs to me as I

11  was thinking about what you raised, and that is I -- look, do

12  you have him under subpoena?  How are you -- what is the basis

13  upon which you are going to compel him to come to court?

14          **MR. BOSTIC:**  Well, Your Honor, as with the Defense's

15  witness list, the fact that we listed a witness does not mean

16  that we think that it's likely that he is going to testify.

17          **THE COURT:**  But Carrillo is different.  Carrillo is a

18  co-defendant.  He is in a category all by himself.

19          **MR. BOSTIC:**  Agreed.

20     And, Your Honor -- so to answer the Court's and Defense's

21  implicit question, we don't have any additional information,

22  other than Defense counsel's representation that Mr. Carrillo

23  is unwilling to testify.

24          **THE COURT:**  Are you going to issue some writ to get

25  him here?

1          **MR. BOSTIC:**  I don't think --

2          **THE COURT:**  He is not going to just show up.

3          **MR. BOSTIC:**  Understood, Your Honor.  I don't think

4    we've made that decision yet.  We're aware that he does not

5    want to testify as of the last time that we got an update on

6    that.  We're aware that the Court -- the only way to enforce

7    him -- or force him to testify would be to impose more custody,

8    and we're aware of the limitations on that.  So that's a

9    decision that we're going to think about as we get closer to

10   trial and possibly during trial.

11         **THE COURT:**  Well, that could be a problem.  I may not

12   give you that flexibility.

13         **MR. BOSTIC:**  Understood, Your Honor.

14         **THE COURT:**  How much time in advance of trial do you

15   need to know?  The problem is either that or we are going to

16   take a break during the trial so that they can prepare.  I

17   don't -- you know --

18         **MR. NOVAK:**  Are you asking me how much time I need --

19   how much time Ms. Moeel and I need to know in advance of trial

20   whether he is going to testify?

21         **THE COURT:**  Yes.

22         **MR. NOVAK:**  What we need today is a commitment that

23   the Government will give us materials that we are entitled to

24   if there's one-percent chance that he will testify.  We can't

25   wait until the Government makes that decision --

1          **THE COURT:**  I thought you had the materials, other

2     than what you -- what they said -- and I'm going to let you all

3     go figure that out.

4          **MR. NOVAK:**  Okay.

5          **THE COURT:**  I understood that they believe they've

6     given you everything.  You believe that there is documents

7     missing?

8          **MR. NOVAK:**  Right.  And that's always a very -- you

9     know, you sort of put yourself out there when you say the

10    Government hasn't given us something and the Government says,

11    Yes, we have, which is why we double checked.

12         I think what the Government did is it gave all those

13    materials to Mr.-- to Mr. Carrillo's team, but we can go sort

14    those things out.  We don't have to do that here.

15         But I guess what I'm saying is that if we haven't received

16    those materials and there's a one-percent chance that

17    Mr. Carrillo will testify, we need all those materials before

18    we can even address in limine issues.  I haven't even seen

19    them.

20         **THE COURT:**  I disagree with that.

21         **MR. NOVAK:**  Okay.

22         **THE COURT:**  That is, you can address in limine motions

23    with respect to what you have.

24         **MR. NOVAK:**  That's fair.  Okay.

25         **THE COURT:**  So --

1    **MR. NOVAK:**  Yes.  That's exactly what I mean.  I

2    cannot address --

3        **THE COURT:**  I was under the impression you were

4    saying, "I can't do anything without these other materials,"

5    which I don't agree with.

6        **MR. NOVAK:**  No.  I think that we just can't do

7    anything about those materials and their admissibility if we

8    don't have them.

9        **THE COURT:**  Absolutely.

10       **MR. NOVAK:**  Then I stated the obvious.

11       **THE COURT:**  If you don't have them.  But with respect

12   to everything else, you certainly can.

13     So it seems to me there's work to be done.  Figure this

14   out.  I don't even know the scope of what it is that is

15   allegedly missing.

16       **MR. BOSTIC:**  Your Honor, just for the record so it's

17   clear, since we spoke to the Defense, we have confirmed that

18   there are some materials that have not been produced to these

19   Defense lawyers.  Most of them do relate to Mr. Carrillo.

20     I have been through those materials, and I understand why

21   they were not produced in the past.  I'm prepared to address

22   the nature of those materials and why producing them in the

23   near future won't cause or doesn't need to cause a change to

24   the trial schedule.

25       **THE COURT:**  You tell me now.  You are going to have to

1    produce them and then I'll talk to you again.  I can talk to

2    you later today.

3          **MR. BOSTIC:**  It may make sense for the parties to talk

4    and then come back to the Court if that's what the Court likes.

5          Defense counsel also indicated they were planning to file

6    a motion to continue.  It might make sense to have this

7    conversation in the context of that motion since that's their

8    plan, but we are happy to proceed any way the Court prefers.

9          **THE COURT:**  Tell me generically what you didn't

10   produce.

11         **MR. BOSTIC:**  Sure.

12         So I think there are a few categories.  One category is

13   there are some miscellaneous attachments to FBI 302s that were

14   not produced to Justus' counsel.  I'm not sure why that it is.

15   It may have been technical errors in the production process.

16   We can produce those in the very near future.  They are things

17   that are of very ancillary importance, if any, to the case,

18   things like a CLEAR report for the victim who was the

19   registered owner of the stolen van, for example.  That was an

20   attachment to a 302 of her interview.

21         The audio of the interview of a law enforcement witness

22   whom the Government does not intend to call at trial where the

23   substance of that interview was captured in the 302 itself.

24         In those cases, the 302s reference the attachments, so any

25   reader of the 302 would have been on notice that those

1   attachments existed and hadn't been produced.

2       But I think that was an oversight on the Government's

3   part.  We can fix that.

4       Another category is jail records relating to Mr. Carrillo

5   relating to two incidents.  One is a disciplinary incident

6   where pruno or homemade wine was found in his cell -- that's

7   about an inch of text about that incident -- and some body cam

8   footage and records relating to a medical incident where he had

9   a fainting spell and bumped his head.

10      Those, I think, were not produced because they were

11  specific to Carrillo and because they have no apparent

12  materiality to this case.  I think we -- we are in a possession

13  to produce that if the Defense is saying they need those

14  materials, but they really shouldn't matter in terms of the

15  questions that are going to be in front of the jury.

16      Another category, jail calls and correspondence of

17  Mr. Carrillo while in custody.  We produced some of those

18  materials pursuant to the Court's Jencks deadline.  We now see

19  that there were some previous jail calls and video calls that

20  were not produced.  We'll fix that.  We'll get those over to

21  the Defense.  I've looked at them, and the ones that I've seen

22  have been kind of typical of the calls that you would expect a

23  person in custody to have with their loved ones.  I don't see

24  mentions of the case or anything that would be germane to the

25  issues at trial.  But we'll get those over to the Defense,

1    again, assuming -- just out of an abundance of caution in case

2    he ends up testifying.

3        Another category is materials related to Mr. Carrillo's

4    wife's suicide.  Those were not produced, I would imagine,

5    because they are specific to Mr. Carrillo.  This incident

6    happened years before the charged shooting.  And I think

7    because of the sensitive nature and personal nature of those

8    materials, they were given to Mr. Carrillo's counsel only.

9        Those I would like a chance to talk to these Defense

10   lawyers about.  We are cautious to produce those given their

11   sensitive nature, but separate from that, I don't see how they

12   are discoverable in the case.  They don't mention or refer to

13   the issues in this trial.

14       Two more categories to discuss.  One is materials from

15   Mr. Carrillo's Gmail and Snapchat accounts.  The Defense was on

16   notice that search warrants had been executed for those

17   materials years ago.  In addition, extensive selections from

18   Mr. Carrillo's Gmail and Snapchat accounts were produced to

19   these Defense lawyers a long time ago.

20       My understanding is that a review was done for anything

21   that might be Rule 16 or Brady and that that's why selections

22   were produced out of those materials.  There are some that were

23   held back if -- if they presumably did not meet that standard.

24   And to those I would say the Defense is not entitled to them.

25       And then finally, there is a laptop and a hard drive that

1    were seized from Mr. Carrillo's property.  Those are identified

2    on this list.  Again, on those, the Defense has been on notice

3    regarding those.  Their seizure was documented in a July 27th,

4    2020, FBI 302 that was produced to Justus' counsel on

5    August 19th, 2020, so, again, that report specifically mentions

6    that those devices were seized, and the accompanying discovery

7    letter to the Defense makes the offer by the Government to make

8    available for the Defense's inspection any item of evidence

9    referred to in the enclosed reports and documents.

10       I understand that these lawyers have taken us up on that

11   offer as to other evidence, but we've never gotten a request to

12   review the contents of the hard drive or the computer.  The

13   hard drive, I'm aware, contains about 140 files.  I don't know

14   whether any of that is relevant to this case.  I haven't had a

15   chance to see it since the Defense raised these issues.  It may

16   be Mr. Carrillo's music collection, sitcom episodes, who knows.

17   We will look at that in the next couple of days and double

18   check that, and the same thing for the laptop, Your Honor.

19       These items are on the Government's exhibit list

20   consistent with our kind of approach of providing notice about

21   anything that might possibly be used, but looking at these

22   items, there's almost no chance that the Government would

23   introduce them in trial.  We would intend to remove most, if

24   not all, of them from our exhibit list in case that clarifies

25   things or simplifies issues going forward.

1          **THE COURT:**  Okay.  Any comment now, or do you want to

2     meet and confer first?

3          **MR. NOVAK:**  I think we should meet and confer rather

4     than using up more of the Court's time, except to say that I

5     understand that when things are available for inspection, that

6     puts us on notice.  When the Government puts Mr. Carrillo on

7     the witness list and then lists things as exhibits, I hear what

8     Mr. Bostic is saying now, but I think the Court can understand

9     our concern that with the exception of the laptop and the hard

10    drive, these are mostly statements by Mr. Carrillo that we

11    haven't received, and the Government is putting him on the

12    witness list.

13         So that's a concern, not only from an impeachment

14    standpoint because we don't know what Mr. Carrillo's testimony

15    is going to be, we don't know whether any of it is going to be

16    inconsistent with these various recorded statements.

17         And I also think that there is a materiality issue which I

18    tried to describe without being obtuse.  But I think we should

19    really, instead of -- just sort the principals, we should

20    just -- the four of us should sit down and begin to work

21    through things.  And that's sort of the whole point of why we

22    were going to meet and confer anyway.

23         **THE COURT:**  Do you want to meet again today or

24    tomorrow?

25         **MR. NOVAK:**  I would strongly prefer, if the Court

```
1    wants a report back from us, that we do it today because I have

2    an appearance tomorrow morning in the Central District of

3    California --

4              THE COURT:  Okay.

5              MR. NOVAK:  -- that I'm flying to.

6              MR. BOSTIC:  That's fine for the Government as well,

7    Your Honor.

8              THE COURT:  I'm here all day.  You let me know when

9    you're ready.

10         Now, do you want Mr. Justus to remain in lockup or do you

11   want --

12             MR. NOVAK:  To waive his appearance?

13             THE COURT:  -- to waive his appearance?

14        (Defense counsel and defendant confer off the record.)

15             MR. NOVAK:  Thank you, Your Honor.  Mr. Justus is

16   going to waive his appearance this afternoon, and I think what

17   we will probably do is -- we will figure it out.

18             THE COURT:  All right.  Well, I'm here.  So his

19   appearance is waived for this afternoon's hearing.  We will

20   stand in recess until you let me know you're ready.

21                  (Recess taken at 11:25 a.m.)

22                  (Proceedings resumed at 2:35 p.m.)

23             THE CLERK:  Your Honor, calling back the matter of CR

24   20-00265-YGR, United States vs. Robert Alvin Justus.

25         Parties, please state your appearances for the record.
```

1        **MR. BOSTIC:**  Good afternoon again, Your Honor.  John

2   Bostic and Jonathan Lee for the United States.

3        **MS. MOEEL:**  Good afternoon again, Your Honor.  Shaffy

4   Moeel and Richard Novak for Mr. Justus, whose appearance we've

5   waived for this latter afternoon's proceedings.

6        **THE COURT:**  All right.  So where do we stand?

7        **MR. BOSTIC:**  So, Your Honor, thank you for giving the

8   parties a chance to meet and confer.  We've had a discussion,

9   and I think we have a plan for going forward.

10        **THE COURT:**  Okay.

11        **MR. BOSTIC:**  For the items that the Defense identified

12   as missing from document productions, I think the parties have

13   an agreement in place to -- where the Government will produce

14   or allow inspection of 90 percent of those items in the coming

15   days, in the very near future.

16        For a couple remaining categories, specifically the

17   laptop, hard drive, the Gmail and Snapchat materials identified

18   on the Defense list, the Government is going to do a review to

19   determine whether there are any discoverable materials, that

20   is, Brady, Rule 26 or Jencks materials that need to be produced

21   in addition to what has already been produced, and we intend to

22   let the Defense know the result of that review in the first

23   half of next month, so by the middle of July.

24        My understanding from the Defense is that they will hold

25   off on making their request for a continuance or filing that

1  continuance motion pending those additional steps.

2       MS. MOEEL:  Yes.  That's right, Your Honor.

3       THE COURT:  Okay.  Anything else?

4       MS. MOEEL:  We've also agreed on internal dates for

5  exchange of in limine motions, and just for the Court's

6  information, we have agreed that we will exchange in limines,

7  which we discussed and gave each other a sense of what in

8  limines those would be, on July 10th and that we would check in

9  with each other regarding our oppositions and exchange

10 oppositions ahead of the 17th, but that we would be ready to

11 file our oppositions by the 17th, along with the motions.

12      THE COURT:  Okay.  Is that agreed?

13      MR. BOSTIC:  That's agreed, Your Honor, yes.

14      THE COURT:  All right.  Any other agreements that you

15 want me to be aware of so that I can enforce them?

16      MR. BOSTIC:  Nothing else from the Government.  Thank

17 you, Your Honor.

18      MS. MOEEL:  No, Your Honor.

19      THE COURT:  All right.  Great work.

20      MS. MOEEL:  Okay.  Great.  Thank you, Your Honor.

21      THE COURT:  Anything else?  No?

22      MR. BOSTIC:  No.  Thank you, Your Honor.

23      THE COURT:  We're adjourned.

24           (Proceedings adjourned at 2:38 p.m.)

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Thursday, June 29, 2023

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25