ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JONATHAN U. LEE (CABN 148792)
JOHN C. BOSTIC (CABN 264367)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-6748
    Email: jonathan.lee@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 20-CR-265 YGR |
| Plaintiff, | |
| v. | UNITED STATES' POST-HEARING BRIEF REGARDING MOTION TO EXCLUDE PROFFERED EXPERT TESTIMONY OF ARIE PERLIGER |
| ROBERT ALVIN JUSTUS, JR., | |
| Defendant. | |

Post-Hearing Brief
20-CR-265 YGR

## I. Introduction

The Court should deny the motion. First, Dr. Perliger is a leading expert in anti-government, far right extremism in the United States, which includes the Boogaloo movement. As Dr. Perliger's supplemental report, his curriculum vitae, and his testimony make clear, he has studied extremism for two decades, with domestic extremism as his focus for the past decade. Dr. Perliger collected nationwide data describing domestic extremism, and he developed a comprehensive database of over 9,000 incidents of domestic far right extremism. As a result, Dr. Perliger is able to identify, research, and classify newly emerging strains of extremism, such as the Boogaloo movement. Second, Dr. Perliger's testimony demonstrates that he uses the methodology of his academic discipline of political science to gather, review, and include incidents in the database. He explained that he and his team of researchers reviewed thousands of social media accounts to gather information documenting extremist groups, including the Boogaloo movement, and they also rely on news reports and records of court proceedings to cross-reference and quality control. This is reliable methodology in Dr. Perliger's academic discipline. The supplemental report and hearing testimony demonstrate that Dr. Perliger will apply his expertise to the facts of this case using the same reliable and accepted methods of political scientists. Third, Dr. Perliger's testimony will be helpful to the jury in understanding defendant's statements, all of which are admissible when offered by the government. The defendant made scores of statements in the months leading up to the attack, in which he articulated Boogaloo ideological principles of antipathy toward government generally and the federal government specifically. He did so by usage of Boogaloo vocabulary. Dr. Perliger's body of work enables him to explain to the jury that the Boogaloo adherents formed a kind of community or culture through their online communications using the coded words. From this testimony, as well as other evidence, the jury may conclude that the defendant intentionally aided and abetted his co-defendant in carrying out the attack. But the jury is not compelled to reach that conclusion simply because of Dr. Perliger's testimony. Fourth, Dr. Perliger confirmed that he will not offer opinion testimony concerning the defendant's state of mind in the shooting incident. Fifth, the defense's cross-examination tested, if at all, the weight of the testimony, not its admissibility. The jury should hear Dr. Perliger's admissible, helpful testimony.

## II. Procedural History

The United States made is Rule 16 expert witness disclosure on November 1, 2022. A signed report from Dr. Perliger was included. Gov't Hearing Ex. 1. The defendant filed a motion to exclude Dr. Perliger. Dkt. 189. The United States opposed the motion. Dkt. 190. Defendant filed a reply. Dkt. 191. The Court heard argument on May 12, 2023, and presided at an evidentiary hearing on June 26, 2023, at which Dr. Perliger testified in person. Dkt. 198, 205, 212. Before the evidentiary hearing, the United States filed Dr. Perliger's supplemental report on June 16, 2023. Dkt. 203.

## III. Argument

### A. Dr. Perliger is Highly Qualified

Dr. Perliger is a Professor at the School of Criminology and Criminal Justice at the University of Massachusetts Lowell. Hearing Transcript (Dkt. No. 212) at 5:6-7.[1] Dr. Perliger traced the development of this expertise, explaining that his master's thesis focused on political socializations in schools, and after completing his thesis, his focus shifted to political violence, political extremism, and terrorism. Tr. 72:2-7, 73:3-5. He testified that, initially, most of his studies focused on terrorism in the Israeli-Palestinian conflict. Tr. 73:7-12. By 2008, Dr. Perliger moved to the United States, accepting a position as visiting professor at SUNY-Stony Brook, where he continued to focus on political violence and extremism. Tr. 73:15-18. In 2010, the U.S. Military Academy at West Point recruited Dr. Perliger to manage its terrorism studies program. Tr. 73:22-24. Dr. Perliger hypothesized at that time there was a significant growing threat of far-right extremism and violence in the United States, and his early efforts at data collection confirmed it. Tr. 73:25-74:3, Tr. 74:4-7.

Dr. Perliger testified he was dissatisfied with the existing data because of definitional and reporting problems, and he described that government agencies were focused on foreign extremism with little attention paid to domestic extremist groups. Tr. 74:9-16. Starting in 2011, Dr. Perliger built a database of far-right extremism in the United States with his team at West Point. *Id*. He described his team at the outset as one student or research assistant, but since about 2016, his team has consisted of 2-4 doctoral students focusing on far-right extremism in the United States. Tr. 78:10-23.

---

[1] All subsequent references to this transcript are shown as "Tr."

In 2013, Dr. Perliger published his first quantitative analysis of the state of far-right extremism in the United States.  He explained that there was "substantial backlash" to his report, and he received hundreds of threats as well as requests for him to be fired.  Tr. 75:3. Nevertheless, West Point supported and defended him, with the superintendent taking the position that the study of domestic threats was part of the academy's mission.  Tr. 75:24-76:5. In six years at West Point, Dr. Perliger advanced from assistant professor to a director to associate professor. Tr. 75:17-20.

During 2014-2016, Dr. Perliger explained, there was a "growing recognition" of the threat among colleagues and law enforcement.  Tr. 76:6-9.  Dr. Perliger began to receive requests from local FBI offices, local police, and ICE, for briefings.  Tr. 76:9-15.  He described that he received requests and made briefings on numerous occasions, including multiple briefings on far-right extremism to the Military Commander of North America.  Tr. 76:11-15.  Dr. Perliger attributed the requests for briefings to the data set he developed with his team, which he described as "reliable" data that identified the "important trends" including "new ones." Tr. 76:16-20.

In 2016, UMass recruited Dr. Perliger, making him a full professor and asking him to run their graduate program in security studies.  Tr. 77:5-7.  Dr. Perliger began to receive greater research funding from federal agencies to study extremism in police organizations and the military.  Tr. 77:10-78:8.  Dr. Perliger explained that he has many discussions with law enforcement about far-right extremism, including Boogaloo in 2020-21.  Tr. 15:4-13.  In general, Dr. Perliger conducts webinars, speaks at conferences, and meets with other academics to share and discuss findings.  Tr. 15:23-16:10.  He wrote an article in 2021 about the current wave of antigovernment organizations or militia movement, including a section focusing on Boogaloo.  Tr. 16:16-17:3; D's Exh. 28.

He explained that his book American Zealots did not mention Boogaloo by name because he finished the manuscript in late 2018 or early 2019, before Boogaloo became prominent.  Tr. 52:13-53:4. After the publication of his book, he studied the Boogaloo movement.  Tr. 57:29-33.  His study also included reading research about Boogaloo, reviewing other materials about Boogaloo, and reviewing writings in online platforms used by Boogaloo.  Tr. 57:25-58:8.

Post-Hearing Brief
20-CR-265 YGR

3

In addition to testimony, the Court received Dr. Perliger's November 2022 report and March 2023 curriculum vitae. Gov't Hearing Exhs. 1-2. These exhibits contain information confirming Dr. Perliger's writing, teaching, and research experience. For example, Dr. Perliger's CV lists over 50 peer reviewed articles or chapters he has authored or co-authored between 2003-2022, as well as a host of publications in his field for which he serves as editor or reviewer. *See* pp. 2-7, 14-15. Similarly, Dr. Perliger's November 2022 provided a summary overview of his research, writing, publishing, and grant work. Gov't Hearing Exh. 1 at pp. 1-2. His CV lists the DHS grant project to research far right extremism in law enforcement, the DOD grant project to research far right extremism in the military, and the DOJ grant to study domestic far-right extremism. Gov't Hearing Exh. 2 at pp. 8-9.

### B. Reliable Methodology

Dr. Perliger confirmed that in his field, it is an accepted and usual practice for scholars to rely on factual research generated by other sources. Tr. 59:4-7. It is an important aspect of how he conducts interviews. *Id*. Dr. Perliger explained that unlike his work in Israel, where he could conduct interviews with former terrorists safely, the Boogaloo adherents were a hard-to-reach population with whom he considered it unsafe to interact directly in many cases. Tr. 59:7-25. Reviewing their online writings, by contrast, protects against safety concerns. Tr. 71:2-11. Dr. Perliger also explained that interviews with active terrorists are rare because they are difficult to arrange and the institutions will not approve of such interviews. Tr. 60:1-7. He further explained that such interviews in most cases would not be approved by the ethical board, the IRB, overseeing his field of research because of safety risks to the researchers. Tr. 60:8-11. Dr. Perliger testified that direct interviews of such subjects are "extremely rare" in his field. Tr. 60:12-15. Finally, Dr. Perliger testified that interviewing someone involve in the legal process, as the defense suggested, is something "we never tried to do" and "we don't even think it's fair" to the subject, nor does he "think it's ethical to do." Tr. 60:16-61:2.

Dr. Perliger reviewed social media posts by far-right extremists, including Boogaloo. Tr. 61:3-63:1. He reviewed social media websites from mid-2020 to late 2021 and possibly into early 2022. Tr. 63:3-9. This was when Boogaloo was "more prominent". Tr. 63:1. Dr. Perliger testified that there were plenty of websites and platforms covering "several thousand members, if not more" and the

individuals express their views. Tr 63:12-17. In that review, he noted the terminology used by Boogaloo adherents that he has included in his work in this case. Tr. 63:18-64:4.

As for his data set, Dr. Perliger's team of researchers constructed the more than 9,000 entries. In some years, he explained, they consider hundreds of incidents, making it difficult for him to recall which researcher worked on each entry. Tr. 31:8-16. He explained, however, that the team of researchers and graduate students help in the coding process, but the data set is the end result of a process involving quality control, verification, and cross-checking. Tr. 22:9-19. This is a "group of researchers working together to improve, as much as possible, the database." Tr. 22:18-19. Dr. Perliger's dataset includes 21 incidents involving Boogaloo (all postdating 2019). Tr. 21:1-21.

In addition to the testimony, Dr. Perliger's supplemental report described the research methodology he used to become a subject matter expert in far-right extremism including Boogaloo: (1) comprehensive data collection and compilation of relevant datasets, (2) analysis of primary source materials produced by individuals and groups engaged in extremist violence, including online platforms used by Boogaloo adherents, (3) experimental bio-criminology, (4) surveys, and (5) working meetings with other professionals and scholars. Gov't Hearing Exh. 3 at pp. 2-3.

C. **Helpfulness to the Jury**

Dr. Perliger's specialized knowledge will assist the trier of fact at trial. The jury will consider evidence showing that the Boogaloo is a recently emerging anti-government ideological movement that used coded language in online communications to connect to each other, spread the ideology, and coordinate activities. Dr. Perliger identified a list of terms in his supplemental report. He explained in his testimony that he and his team identified those terms from reading thousands of online writings by members of the Boogaloo movement. Dr. Perliger also described a list of the defendant's statements that used the vocabulary or espoused the principles of Boogaloo. Dr. Perliger's research confirmed that Boogaloo was most active during 2020-2021, and this coupled with the decentralized nature of Boogaloo make Dr. Perliger's testimony even more helpful to the jury. This is admissible testimony that will assist the trier of fact in understanding the trial evidence.

Moreover, the defendant used these terms in hundreds of online writings. His use of the Boogaloo terminology developed over several months from 2019-2020, and that timeframe corresponds to the period involved in Dr. Perliger's research. Like other members of Boogaloo, the defendant identified himself as one who espoused the ideological principles of the movement. His writings also included his statements to others explaining that they could verify the beliefs of Boogaloo by visiting online discussions and he explained what those belief were. The defendant did all of this as he communicated with his co-defendant, and others, in the days and weeks leading up to the deadly attack on two federal officers at the Oakland courthouse. Dr. Perliger's testimony is relevant to the defendant's motive – animosity toward federal government employees and in particular federal law enforcement officers – to commit murder and attempted murder.

### D.  State of Mind issue

At the May 12 hearing, the Court explained that no expert witness at trial would be allowed to offer opinion testimony about the defendant's state of mind at the time of the May 29 shooting, consistent with the Federal Rules of Evidence and Ninth Circuit precedent. Dr. Perliger testified that he will abide by that rule and demonstrated that he can monitor questioning in real time to avoid answering a question seeking such evidence. Tr. 10:22-11:20 (responding to government counsel); 49:7-50:5 (responding to defense counsel).

### E.  Defense Questions Probed Weight, Not Admissibility

Prior testimony or presentations about Boogaloo are not a required predicate for this expert, but he in fact has lectured and written on the movement. Prior consultations with law enforcement or national security personnel are not required either, but Dr. Perliger has had those contacts about far right extremism in the United States, including with the U.S. military commander for North America. The defense questioning suggested that 21 Boogaloo incidents is an inadequate sample size, but this is simply incorrect. Two attacks on the World Trade Center were more than enough for experts to study, for example, to discern the organization and coordination of the groups involved. More importantly, as Dr. Perliger explained, his conclusions about Boogaloo stem from review of thousands of social media posts. Moreover, whether Boogaloo had a membership card, written constitution, or tangible markers

of membership found in other types of cases is not the relevant inquiry. Boogaloo grew as a movement through decentralized processes such as online communication between individuals or small groups. Its adherents connected and found common ground in their online communications. By reviewing the social media and online writings of Boogaloo adherents, Dr. Perliger was able to gather primary source materials created by individuals who spoke freely without fear of immediate sanction; by contrast, an interview in person with an active Boogaloo member in the midst of legal proceedings, such as either defendant in this case, would implicate that individual's exercise of free will and constitutional rights, and would be unethical in Dr. Perliger's discipline. This was a major focus of the defense, but the interview issue is one of weight of the testimony, if anything.

### IV.     Conclusion

Dr. Perliger is highly qualified and will provide reliable testimony based on his knowledge and research that will assist the jury at trial. Therefore, the United States respectfully requests that the Court deny the motion.

DATED: July 10, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/ Jonathan U. Lee
JONATHAN U. LEE
JOHN C. BOSTIC
Assistant United States Attorneys