1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney

2

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division

4  JONATHAN U. LEE (CABN 148792)
   JOHN C. BOSTIC (CABN 264367)

5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495

7      Telephone: (415) 436-7200
       FAX: (415) 436-6748

8      Email:  jonathan.lee@usdoj.gov

9  Attorneys for United States of America

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13

14  UNITED STATES OF AMERICA,          )   CASE NO. CR 20-265 YGR
                                       )
15           Plaintiff,                )   UNITED STATES' SENTENCING
                                       )   MEMORANDUM REGARDING ROBERT JUSTUS
16      v.                             )
                                       )   Date:    March 15, 2024
17  STEVEN CARRILLO and ROBERT ALVIN   )   Time:    10:00 a.m.
    JUSTUS, JR.,                       )   Court:   Courtroom 1, 4th Floor, Oakland
18                                     )   Before:  Hon. Yvonne Gonzalez Rogers
             Defendants.               )
19  _____ )

20

21

22

23

24

25

26

27

28

**I.      Introduction**

As the Court is well aware from the trial record, this is a murder and attempted murder prosecution arising from a drive-by shooting of court security officers guarding an entrance to the federal courthouse in Oakland on May 29, 2020.  Defendants Robert Justus and Steven Carrillo, who carried out the attack, were two adherents of the extremist "Boogaloo" movement.  The defendants plotted to attack the courthouse as part of their anti-government ideology, and they hoped to spark a second civil war.  They chose to strike in the vicinity of a large protest at Frank Ogawa Plaza over the killing of George Floyd, in order to avoid apprehension and in the hopes of sparking additional unrest.  One Protective Security Officer (PSO), Pat Underwood, was killed and a second PSO suffered severe injuries.

At trial, the evidence showed that Justus spent hours with his co-defendant Carrillo on the night of May 29, driving a white van around downtown Oakland with an armed Carrillo concealed in the rear passenger compartment behind a black curtain.  On two occasions just before the attack, Justus exited the white van and walked around downtown Oakland and the federal courthouse, scouting targets and the surrounding area before returning to the van.  Moments after his second reconnaissance ended, Justus drove the van across the intersection, while Carrillo opened fire on Underwood and the second PSO, striking each multiple times in a matter of seconds.

In aiding and abetting Carrillo, Justus took a life and attempted to take another, then he disposed of his clothing and backpack, and deleted communications he had using his phone with Carrillo as well as his Facebook anti-government activity—evidence that might link him to the Oakland attack.  He returned to his life as normal, working as a locksmith and planning a July vacation.  He took no timely steps to report to law enforcement and prevent Carrillo from taking another life on the day he was arrested.  Nearly two weeks following the courthouse shooting, after learning he was likely under surveillance, Justus came to the FBI's San Francisco office and asked to speak to agents.  During the interview, he found it difficult to admit what was clearly shown on video footage – that he got out of the white van twice to walk around, scout the area and report back to Carrillo, among other issues with his statements.

The United States submits this memorandum in support of its recommendation that the Court

1  impose sentence of life imprisonment on Defendant Robert Justus.  The recommended sentence

2  punishes Justus for his criminal conduct, promotes respect for the rule of law, and provides deterrence.

3  **II.     Factual Background**

4        On the night of May 29, 2020, Carrillo and Justus carried out a premeditated attack at the federal

5  courthouse in Oakland, California.  While Justus drove, Carrillo opened fire on two PSOs with an

6  assault rifle from inside a van.  One PSO, Pat Underwood, died from his wounds.  The other PSO was

7  seriously wounded.

8        Eight days later, on June 6, 2020, Carrillo murdered a Santa Cruz County Sheriff's Deputy

9  during an encounter in Ben Lomond, California.  Following a firefight with law enforcement officers

10  and a subsequent carjacking, within minutes Carrillo was arrested in possession of the assault rifle that

11  he had used to murder in the May 29 shooting in Oakland.

12        During those eight days, Robert Justus returned to work as a locksmith, exchanged text message

13  banter with Carrillo, and planned for a vacation in July.  Only after he realized he was under surveillance

14  did Robert Justus decide to visit the FBI offices in San Francisco to provide a self-serving and false

15  account of his involvement in the courthouse shooting.  That same day, June 11, 2020, Justus was

16  arrested by the FBI.

17        **A.     Events of the May 29, 2020, Homicide in Oakland, California**

18        On May 29, 2020, significant protests were under way in downtown Oakland in response to the

19  death of George Floyd.  Surveillance footage shows that, at the same time that these protests were

20  ongoing, a white Ford Econoline-style van was driving around the downtown Oakland area, with its

21  earliest sighting on footage occurring at around 8:30 p.m.  Footage shows that the van parked in the

22  downtown area around 8:45 p.m. and that the driver got out and walked around, before getting back into

23  the van and driving again.  At one point, video footage appears to show the driver jogging and, at

24  another point, he appears to be using his phone.

25        Video surveillance shows that the Ford van was driving around the area of the federal courthouse

26  from around 9:15 p.m. that evening.  Around 9:19 p.m., the van drove down Clay Street past the open

27  courtyard of 1301 Clay Street.  Three Federal Protective Service Officers were standing in the courtyard

28  at the time and observed the white van temporarily stop in front of the courthouse for a few seconds,

while the driver looked in the direction of the three officers before pulling away again.  Two of those officers saw the driver of the van and later worked with a sketch artist to produce sketches of the driver's face.  Both described the driver as a white male wearing a mask.

Based on surveillance images, the Ford van parked at 12th Street and Jefferson Street at 9:27 p.m.  Justus had positioned the van in the parking space on Jefferson across the street from the federal courthouse parking garage entrance, with a clear view of the guard post and any security personnel stationed there.  The van remained in the parking space until about 9:44 p.m. with its headlights off.  At 9:28 p.m., Justus exited from the driver's door of the van and walked around the area until around 9:38 p.m.  Surveillance footage shows that Justus walked down to Broadway, past the BART station entrance, and then back to the parked van, where he re-entered the van through the driver's door.

At approximately 9:43 p.m., the exterior lights of the Ford van turned on and the van moved forward toward the guard post at the intersection of 12th and Jefferson.  The passenger-side sliding door opened, and a second person in the passenger compartment of the van, Carrillo, opened fire on the guard post.  There were two Protective Security Officers on duty at the guard post at the moment of the shooting.  One of those PSOs, Pat Underwood, died of gunshot wounds.  The other sustained serious injuries that required surgery and have left him with a permanent disability.  At the time, both officers were working in an official capacity for Triple Canopy, Inc., which is contracted with the Federal Protective Service to provide security at the federal building and federal courthouse located at 1301 Clay Street.  One of their duties was to control access of vehicles driving into the courthouse's garage, which was the task that they were performing on the night of May 29.

After the homicide, officers of the Oakland Police Department and agents from the FBI responded to the scene and began their investigation.

**B.    Events of the June 6, 2020, Homicide in Ben Lomond, California**

At approximately 1:26 p.m. on June 6, 2020, in Ben Lomond, California, a witness located a white Ford van that appeared to be abandoned on property controlled by Big Basin Water Company on Jamison Creek Road.  The witness observed items in the van that appeared to be ammunition, firearms, and bomb-making equipment.  The witness also took note of the white van's Vehicle Identification Number (VIN).  The witness reported this information to law enforcement.  The VIN, when run by law

enforcement, came back as registered to Monika Leigh Carrillo (later determined to be Carrillo's deceased wife) at 120 Waldeberg Road in Ben Lomond, California. Law enforcement also learned that the license plate number assigned to the vehicle was 4P05520, but the abandoned van did not bear any license plates.

In response to the information provided by the witness at Jamison Creek Road regarding the 1992 van, deputies from the Santa Cruz County Sheriff's Office (SCSO) responded to 120 Waldeberg Road at approximately 2:00 p.m. on June 6, 2020. Deputies from the SCSO approached the property at 120 Waldeberg Road. Carrillo then opened fire on the deputies. Two members of law enforcement were shot, with one deputy subsequently dying from his injuries. An explosion also occurred on the property, further injuring one of the officers who had already been shot.

At approximately 2:34 p.m., Carrillo used an assault rifle to carjack a white Toyota Camry from a victim who was driving nearby. The Toyota Camry was later located nearby on Alba Road in Santa Cruz County, and an SCSO deputy reported that he observed a person running away from the Camry. At approximately 3:00 p.m., an SCSO deputy advised dispatch that a man wearing a long-sleeved blue shirt was running toward Highway 9. This individual, Carrillo, attempted to carjack at least one additional car on Highway 9 in Ben Lomond by using an assault rifle. At 3:39 p.m., Carrillo was taken into custody. The gun Carrillo was carrying during his arrest was the same gun used in the Oakland homicide. Carrillo's cell phone was also seized.

In state court proceedings, Carrillo pled guilty to murder and other charges stemming from the June 6 incident and was sentenced in 2022 to life imprisonment without parole. Justus was not present for the events in Santa Cruz, and investigators did not find evidence of his knowledge of or involvement with Carrillo's planning or actions on June 6.

### C.    Evidence of Justus's Purposeful Involvement in May 29 Oakland Homicide

On June 9, 2020, state law enforcement obtained a state search warrant for records related to Carrillo's T-Mobile account. Following T-Mobile's production of those records pursuant to the search warrant, the state inspector shared those records with the FBI. Carrillo's T-Mobile phone records were analyzed by the FBI's Cellular Analysis Survey Team (CAST). The CAST analysis showed that on May 29, 2020 – the day of the Oakland murder – Carrillo's phone was powered on and was

communicating with cell towers starting at Travis Air Force Base from 5:00 p.m. to 5:37 p.m., when it left Travis Air Force Base.  The phone showed communication with towers along I-80 through Berkeley into San Leandro.  At 8:09 p.m., the phone either powered off or was placed into airplane mode, because it did not communicate with any towers from 8:09 p.m. until 10:08 p.m. (as earlier noted, the Oakland murder occurred at about 9:44 p.m.).  When Carrillo's phone began communicating with cell towers again, it was on I-580 near the Oakland Zoo around 10:08 p.m.

According to the CAST analysis, Carrillo's phone subsequently traveled southbound on I-880, then to northbound U.S. Highway 101.  It appeared to stop in a residential area of Millbrae, California. It stayed in Millbrae from about 11:14 p.m. to 6:22 a.m. the next day, May 30, when it made its way to Santa Cruz County.

CAST agents identified a specific T-Mobile number as the last number in contact with Carrillo's phone before it was turned off or placed in airplane mode on the night of the homicide. CAST agents used a commercially available database to identify a possible subscriber to that phone number, one possible subscriber was Justus.

Search warrants were obtained for Carrillo's and Justus's Facebook and Instagram accounts. Those search warrants revealed that Justus friend-requested Carrillo on May 28, 2020.  The records also show the following exchange between Carrillo and Justus on Facebook in a group called /K/alifornia Kommandos on May 28, 2020.  At approximately 7:20 a.m., Carrillo posted, "It's on our coast now, this needs to be nationwide.  It's a great opportunity to target the specialty soup bois. Keep that energy going."  This statement was followed by two fire emojis and a link to a YouTube video showing a large crowd violently attacking two California Highway Patrol vehicles.  At approximately 7:37 a.m., Justus responded, "Lets boogie."  Another user commented at approximately 6:44 p.m., "Starting tomorrow, Oakland be popping off. Maybe more."

According to the evidence heard at trial, "soup bois" is a term that followers of the Boogaloo movement use to refer to federal law enforcement agents; federal law enforcement agencies are sometimes referred colloquially to as "alphabet soup" agencies.  Justus's response "let's boogie" appears to be a statement of agreement and affirmation to engage in attacks on law enforcement personnel in accordance with Boogaloo ideology.  Accordingly, these messages show that, on May 28, 2020, the day

1   before the attack on the courthouse security officers, Carrillo, Justus, and others were discussing a plan

2   to travel to Oakland and attack federal law enforcement officers.

3       Other messages on Carrillo's social media also suggest that he was planning an attack on federal

4   officers and that he believed that Justus was an equal partner:

5     • On the afternoon of May 28, 2020, after Carrillo had connected with Justus on Facebook,

6        Carrillo posted to another Facebook group, stating, "Y'all ready to boog or just talk about

7        it?"  Under his original post, Carrillo wrote, "This is a great time to perpetuate the destruction

8        of the government."  That same day, another user responded, "Boog isn't necessarily a

9        national thing. That being said if you live in the area I'd prolly stay on alert and if you feel

10       obligated to go protect a shop or assist people in some way, Go do it!"  Carrillo responded,

11       "im trying to make it [Boog] national, perpetuate the hate towards the govs attack dogs."  In

12       a subsequent response, Carrillo continued, "I actually have been, I wont get into it. Im trying

13       to do even more shit as we speak. I finally found a dude thats willing to do badder shit to do

14       it with."  In the context of the other trial evidence, this last comment likely relates to Justus

15       and his plans with Carrillo.

16     • On May 29, 2020, at 7:57 a.m., Carrillo commented on Facebook, "If it kicks off? Its kicking

17        off now and if its not kicking off in your hood then start it. Show them the targets." At 8:02

18        a.m., Carrillo commented on Facebook, "Go to the riots and support our own cause.  Show

19        them the real targets.  Use their anger to fuel our fire.  Think outside the box.  We have mobs

20        of angry people to use to our advantage."

21     • Also on the morning of May 29, 2020, Carrillo posted a meme with the words, "You are

22        burning down all of the wrong buildings."  Behind each word is an image of an historic or

23        government building. Carrillo captioned the image, "SHOW THEM THE WAY."  A user

24        posted in the comment thread below the photo, "Steve C Rrillo they have the federal

25        protective service for those too. They wouldn't hesitate to shoot."  Carrillo responded to that

26        comment on the afternoon of May 29 as follows: "…at night dude. Or on a weekend, Take a

27        buddy."

28       Post-arrest statements by Justus provide context for the above evidence and further confirm that

Justus willingly and intentionally participated in the May 29, 2020, shooting.

Justus made self-serving statements to FBI agents on the day of his arrest, which are summarized below.  After his arrest however, he was housed at Santa Rita Jail, where he ended up making incriminating statements about the shooting to another inmate, who cooperated with the government and testified at trial.  According to that inmate, Justus admitted to being the driver during the May 29, 2020, shooting, and said that the original plan had been for both Carrillo and Justus to shoot at federal agents. Justus said that when Carrillo found out that he did not have experience with firearms, Carrillo gave Justus the driver role.  Justus also made statements to the effect that, leading up to the shooting, his job was to confirm that the intended victims were staying at the location where they had originally been spotted so that they would be there when Carrillo opened fire.  The inmate to whom Justus spoke remarked that, while Justus seemed to regret his actions and the consequences he was facing, he never showed any remorse regarding the harm and loss of life the shooting caused.

### D.    Justus's Social Media

A review of Justus's social media indicates that Justus was deeply involved in many Facebook groups, including groups dedicated to Boogaloo ideas and memes, groups discussing the building of homemade firearms, and groups in which non-custodial fathers commiserated about the unfairness of the judicial system and child support.

Below are some of the most relevant items identified from Justus's Facebook data:

- Justus commented in Feb 2020: "You guys ask why we have a bloodlust for police…"
- Justus commented on May 28, 2020: "Police are less likely to use force when you are willing to shoot back."
- Justus commented on May 28, 2020: "Start chucking molotovs."
- Justus interacted with a "Fuck the Police: Vengeance for George Floyd" flyer advertising protests in Oakland on May 29.  On May 29, Justus commented to another user, "I don't know.  Probably centered near this."
- Justus interacted with a meme depicting a police officer being shot in the face.  The meme said "Speak to Cops in a Language They Understand."
- Justus also commented on May 27, 2020, "Be a shame if someone caught all these cops in a

alley way like this."

**E.      Justus's June 11, 2020, Statement to the FBI**

Upon learning about the phone record connection between Carrillo and Justus, FBI agents began surveillance of Justus's residence in Millbrae.  They observed a man consistent in appearance with Justus's general physical description coming and going from the residence.

On the morning of June 11, 2020, surveillance agents observed Justus and his parents drive to the Federal Building located at 450 Golden Gate Avenue in San Francisco.  Justus and his parents approached the Federal Building's Visitor Entrance and informed courthouse security officers that they wanted to visit the FBI.  An FBI agent approached Justus and his parents, identified herself as an agent, and indicated that she had learned that they wanted to visit the FBI.  Justus's mother said that they wanted to provide the FBI with information about the white van in Oakland.  FBI agents observed Justus nodding in agreement with his mother's statement.  An FBI agent then walked with the family into the Federal Building.  Once the family was through security, FBI agents took Justus and his parents to an FBI conference room.  At approximately 11:00 a.m., Justus began a consensual interview with FBI agents, which was recorded.

Justus stated that he met Carrillo on Facebook, and the two arranged to meet on May 29 for Carrillo to give Justus a ride to protests that were taking place in Oakland.  Justus and Carrillo met at the San Leandro BART station, where Carrillo arrived in a white van.  Justus further stated that he later removed the license plate of the white van at Carrillo's direction.

According to Justus, when Justus originally got in the van, Carrillo offered him body armor and a firearm, but Justus declined to use them.  Justus stated that he briefly handled the firearm but then dropped it on the seat.  Justus stated that, at that point, Carrillo instructed Justus to drive the van; Justus said that he drove the van the entire time that he was with Carrillo.  Justus drove away from the San Leandro BART station at Carrillo's direction.  The two then drove around Oakland for a time, which Justus said was to look for parking.  In response to questions about why he left the van to walk around, Justus said that the reason he got out of the white van was to walk around and see what was going on.  When he was asked if he got out of the van more than once, Justus shook his head in the negative.  When asked a second time, Justus said he did not remember.  When asked a third time, Justus

1  responded, "did I?"

2      Justus said he did not want to participate in the murder, but that he felt that he had to participate

3  because he was trapped in the van with Carrillo.  An interviewing agent pointed out to Justus that he had

4  gotten out of the van and walked around alone before the murder took place, and he conceivably could

5  have left at any time.  Justus responded that he stayed with Carrillo because Justus was trying to think of

6  ways to talk Justus out of his plan.  Justus said Carrillo expressed an interest multiple times in shooting a

7  helicopter, police officers, and civilians, but that Justus talked him out of it.  They eventually parked

8  near the Guard Post.  As Justus drove the white van away from the Guard Post, Carrillo opened the

9  passenger-side sliding door and began shooting.  As they drove away, Carrillo said words to the effect of

10  "did you see how they fucking fell."  Justus described Carrillo being excited and thrilled after the

11  shooting.

12      After the murder, Justus drove himself and Carrillo to a nearby location and Justus put the

13  license plate back onto the van at the Carrillo's direction.  He and Carrillo then drove to Millbrae, and

14  Carrillo dropped off Justus.  Carrillo told Justus not to talk about what happened that night and not to

15  brag about what happened.

16      Justus said that, after Carrillo left, Justus destroyed evidence of his involvement in the murder.

17  Specifically, Justus stated that he got rid of the clothing that he wore, and he erased from his phone any

18  communication with Carrillo.  He also claimed to have disposed of the backpack that he was seen

19  carrying in some of the video surveillance.

20      After Justus provided the above information to the FBI, the FBI Mirandized him.  Shortly

21  thereafter, Justus invoked his right to an attorney and the interview concluded.  The FBI ultimately

22  arrested Justus that same day.

23  **III.    Procedural Background**

24      On June 15, 2020, the United States filed a criminal complaint charging Justus with aiding and

25  abetting the murder of a person assisting an officer or employee of the United States Government in

26  violation of 18 U.S.C. § 1114(1) and with aiding and abetting the attempted murder of a person assisting

27  an officer or employee of the United States Government in violation of 18 U.S.C. § 1114(3).  Dkt. No. 1.

28      On June 25, 2020, the Grand Jury returned an Indictment charging defendants Carrillo and Justus

with murder of a person assisting an officer or employee of the United States Government in violation of 18 U.S.C. §§ 1114(1), 1111, attempted murder of a person assisting an officer or employee of the United States Government in violation of 18 U.S.C. §§ 1114(3), 1111, and aiding and abetting in violation of 18 U.S.C. § 2(a).  Dkt. No. 12.

On January 31, 2022, the United States filed a Notice of Intent Not to Seek the Death Penalty as to Defendants Carrillo and Justus.  Dkt. No. 124.

## IV.    Discussion

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

### A.    Sentencing Guidelines

Defendant Justus's Total Offense Level is 43.  His Criminal History Category is I.  Therefore, the Guideline Sentencing Range applicable to Justus is life.

### B.    Sentencing Recommendation

#### 1.    Victim impacts

The surviving PSO must cope with permanent residual physical injuries and the emotional toll of experiencing the attack itself and surviving it, while a co-worker did not.  The siblings and extended family members of the deceased PSO are devastated by his loss.  The government requests that the Court allow victims and members of the victims' families and loved ones to address the Court at the sentencing hearing, if they so desire, so that they can express to the Court the extreme anguish they have suffered because of the defendant's crimes.

#### 2.    Section 3553(a) factors

##### (i)    The nature and circumstances of the offense

Justus's offense conduct was an attack on social order by means of a murder intended to spark a civil war.  Justus planned this attack.  For months, he nurtured his animus toward the government in online forums and messages.  He discussed carrying out violent attacks on the government and told others that the correct form of violence was necessary when they tried to talk him down.  He talked about the impending "Boogaloo," an expected revolution that Justus said he wanted to kick off.  Justus

1    progressed along this path of violence against the government for months, until he met the person he

2    described as "legit" –Carrillo.  At the same time, Carrillo was telling others online that he had finally

3    met someone who was willing to do violence with him, a statement made close to the attack that appears

4    to be Carrillo's confirmation that Justus was his compatriot in arms.  The trial evidence showed that

5    Justus got out of the white van twice to walk around Oakland, scouting targets and checking on the

6    nearby crowd of protesters.  He and Carrillo planned an attack in which one of them drove (Justus) so

7    the other could open fire (Carrillo).  In sum, this was a planned, premeditated act of deadly violence

8    against the government, borne from the violent anti-government extremism shared by Justus and

9    Carrillo.  To accomplish this brazen act of ideologically-derived violence, Justus planned and carried out

10   a killing in a particular place and time, and he targeted the victims because of their work as law

11   enforcement.  Murder is by definition a horrible crime, but here, the offense conduct was not just coldly

12   calculated and deadly but also intended to have the broader impact of destabilizing society by tearing at

13   the social fabric of this country and its institutions.

14                          **(ii)      The defendant's history and characteristics**

15        Justus came from a stable home, and he was raised by two parents who taught him right from

16   wrong and provided for his needs.  He has minimal prior criminal history.  He had stable employment

17   and residential history.  In April 2020, San Leandro Police Officers pulled Justus over for riding his

18   motorcycle in violation of the stay and home orders.  Justus did not stop immediately but instead led the

19   officers on a brief, high speed chase.  He was arrested and his motorcycle was impounded.  Angered by

20   the loss of his motorcycle, Justus later complained to the department about the officers' conduct.  He

21   focused his ire at the initial officer.  When the FBI later seized Justus's phone, it found google searches

22   by Justus seeking to find the officer's home address.

23                          **(iii)     The need to reflect the seriousness of the offense**

24        Carrillo and Justus committed murder and attempted murder in a brazen, calculated attack on the

25   federal government, specifically on those who provide security to the judicial branch.  The two victims

26   were shot on federal property, because they were on federal property, in order to bring more violence

27   and destruction onto federal property – not only in Oakland but across the nation.  The defendants

28   specifically targeted the federal building and federal authorities, with the intent to kill federal law

enforcement officers, and they hoped that their actions would inspire others to kill federal employees. As followers of the Boogaloo movement, the defendants were not an isolated pair, but instead were part of an ideological movement based on anti-government and violent rhetoric.  They specifically targeted the federal officers while a large protest into the killing of George Floyd took place at Oakland City Hall, because the defendants believed that the ensuing chaos of officer-involved gun violence would provide cover for their escape in the white van they used to commit the crime.  The defendants had extensive discussions with like-minded people in online discussion groups, exchanging ideas and encouraging each other to act on their grievances.  It is difficult to imagine a more serious course of conduct implicating more important federal interests.

### (iv)     The need to promote respect for the law

The May 29 attack targeted the rule of law and the institutions that uphold the rule of law.  It was intended to spark additional attacks that would undermine those institutions and destabilize society.  To do this, Justus and Carrillo specifically intended to kill federal officers at the federal courthouse.  They surveyed the area around the courthouse on the evening in question and settled on these two targets. Their location in the rear corner of the property and the proximity to freeway access were factors in this targeting.  By plotting to kill federal law enforcement and make a successful getaway, Justus showed a profound lack of respect for the rule of law.  He and Carrillo, acting together, took a life and changed another permanently as part of their plan to attack those who provide security to the judicial branch. Courthouses are where the community rightly expects the orderly administration of justice.  The community counts on the peaceful administration of justice, so that the courts can act independently, according to the settled expectations of the rule of law, vindicating the rights of everyone including the powerless and dispossessed.  The victims in this case provided for the security of all stakeholders in the court including the judges, their staff, the court's staff, and the other agencies with offices in the courthouse.  It is difficult to imagine offense conduct involving a more serious attack on (and therefore lack of respect for) the rule of law than Justus's conduct.

### (v)     The need for just punishment

This offense conduct required planning, coordination, and cooperation between Carrillo and Justus.  The white van was in motion, crossing the intersection of Jefferson and 12th, when the shooting

happened.  Without Justus, Carrillo could not have fired on the victims from a moving vehicle, striking both victims multiple times in mere seconds, and then immediately fled the scene.  As driven by Justus, the van was an instrumentality of the killing.  The trial evidence showed that Justus's steady hand behind the wheel was an important ingredient in the attack.  As the white van rolled across the intersection, with Justus steering its course, Carrillo was able to open fire and hit the intended targets with maximum efficiency.  The courthouse security video showed this in clear, stark terms.  Justus's hands held steady on the steering wheel as the fatal shots rang out just a few feet from him.  The direction of the moving van did not change – there was no braking, swerving, or other abrupt movement. This is because, as the jury concluded, Justus knew full well what was happening, and he intended it.

### (vi)   The need for general and specific deterrence

The need for both general and specific deterrence is strong.  A term of life imprisonment incapacitates Justus from future attempts of any acts of violence.  That incapacitation is of increased importance in cases like this one, where violent conduct is motivated by deeply held ideological beliefs rather than a short-lived flare of emotion or a desire for financial gain.  This sentence will also signal to any like-minded individuals that they will be severely punished for such conduct.  The extremism at the core of the offense conduct is on the rise.  Acts of violence justified in the minds of the perpetrators by their social or political views are a growing problem.  Many individuals with views like the defendants—individuals who might pose a serious danger to life and property across the country—are likely paying attention to what happens in this case.

### (vii)   The need for protection of the public

There is a strong public interest in the protection of vital public institutions and infrastructure. The courts are one such area of public interest.  This case demonstrates that online activity can progress in a relatively short time period into deadly violence in the physical world.  Justus spewed anti-government hate for several months and in so doing told others that he hoped to strike out against the government in a way that would spark others to do violence.  Justus has expressed no remorse for his offense, and it is likely that his prosecution has only fueled his animosity toward the government and law enforcement.

(viii)   **Avoiding unwarranted sentencing disparities**

As the parties discussed at his sentencing hearing, Carrillo was in state jurisdiction for the murder of the Santa Cruz deputy and related acts of deadly violence on June 6.  The evidence against him was overwhelming – he was caught minutes after killing the deputy, tackled with the murder weapon used in Oakland in his hands.  Carrillo is serving life in prison without parole.  The recommended sentence here will result in the same for Justus.  In light of their complementary roles in the Oakland courthouse attack, this sentencing outcome reflects their coordination and eliminates disparities.

(ix)   **The need to provide restitution to victims**

The government requests that the Court set a date for a hearing on restitution claims submitted by victims.  Pursuant to 18 U.S.C. § 3664(d)(5), the government informs the Court that the victim's losses are not ascertainable 10 days prior to sentencing, and requests that the Court set a date for the final determination of the claims within 90 days of the sentencing hearing, if the parties are unable to reach a stipulated resolution.

**V.   Conclusion**

The defendants acted together to carry out a calculated, coordinated attack on courthouse personnel.  Their stated desire and intention was to spark civil unrest.  They saw government personnel as legitimate targets for the impending revolution they hoped to start.  Defendant Justus embraced this objective, scouted the targets, and drove the white van during the shooting.  He and Carrillo did together what neither of them could do alone.  For all of the foregoing reasons, the United States recommends that the Court impose the term of life imprisonment.

DATED:  March 8, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/ *Jonathan U. Lee*

_____
JONATHAN U. LEE
JOHN C. BOSTIC
Assistant United States Attorneys